## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MAINE

_____

|  |  |
|---|---|
| **BRETT BABER,** ) | |
| **TERRY HAMM-MORRIS,** ) | |
| **MARY HARTT,** ) | **Case No. _____** |
| **and** ) | |
| **BRUCE POLIQUIN,** ) | **DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |
| **Plaintiffs,** ) | |
| **v.** ) | |
| **MATTHEW DUNLAP, Secretary of the State of Maine.** ) | |
| **Defendant.** ) | |

_____

## COMPLAINT

Plaintiffs Brett Baber, Terry Hamm-Morris, Mary Hartt, and Bruce Poliquin

(collectively "Plaintiffs"), by and through their attorneys, file this complaint against

Matthew Dunlap, the Secretary of the State of Maine ("Secretary"), seeking declaratory

and injunctive relief on an expedited basis.

## INTRODUCTION

1.      The right to vote "'is of the most fundamental significance under our

constitutional structure.'" *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994)

(quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). Indeed, "'[n]o right is more

precious in a free country than that of having a voice in the election of those who make

the laws under which, as good citizens, we must live.'" *Melanson v. Sec'y of State*, 861 A.2d 641, 645 (Me. 2004) (quoting *Burdick*, 504 U.S. at 441). Because the right to vote is "at the heart of our democratic process" and regarded as "preservative of all rights," *Opinion of the Justices*, 162 A.3d 188, 207, as revised (Me. 2017), "[a]llegations by voters that their right to vote has been unlawfully denied or impaired must be considered with the utmost care," *Roberts v. Wamser*, 883 F.2d 617, 624 (8th Cir. 1989).

2.      Against this backdrop, Plaintiffs bring this lawsuit to protect their right to vote – and to vote effectively – in federal elections. This right is being undermined by Maine's "Act to Establish Ranked-Choice Voting" ("RCV Act"), which has replaced the plurality-based, single-election system used in this state for nearly 140 years with an exotic, ranked choice voting system described as "costly," "confusing," and "depriv[ing] voters of genuinely informed choice."

3.      Based on current returns, the November 6, 2018 election for U.S. Representative for Maine's Second Congressional District will be the first general election where the Defendant will apply the RCV Act's procedures to determine the winner of the election. While courts (including this one) have reviewed the RCV Act on prior occasions – with the Maine Supreme Court ruling just last year that the law conflicted with the Maine Constitution – this case involves heretofore unraised First Amendment, Fourteenth Amendment, and Voting Rights Act-based challenges that have arisen out of the present election and need immediate resolution.

4.      The RCV Act also violates Art. I, § 2 of the United States Constitution, which sets a plurality vote as the qualification for election to the U.S. House of Representatives.

Instead of respecting this important constitutional principle, the RCV Act directly contravenes it by denying individuals who obtained the highest number of votes after the first round of balloting – in this case, Bruce Poliquin – from being declared the winner of the general election.

5.      Accordingly, to prevent the irreparable injury that would occur should the Defendant determine the winner of this election based on ranked choice voting (also known as "instant-runoff voting"), Plaintiffs seek a preliminary and permanent injunction, expedited declaratory judgment, and other relief that will invalidate the challenged law and vindicate Plaintiffs' constitutional right to have federal election returns counted in accordance with traditional – and constitutional – procedures.

## JURISDICTION AND VENUE

6.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, 52 U.S.C. § 10307(a) (the Voting Rights Act), and the First and Fourteenth Amendments to the Constitution of the United States of America.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 (declaratory judgments).  Venue is proper under 28 U.S.C. § 1391 because the Defendant resides in this district and the events giving rise to the claims occurred in this district.

## PARTIES

7.      Plaintiff Brett Baber is a resident of and duly registered voter in Maine's Second Congressional District.  Consistent with Maine's use of ranked choice voting in federal elections, the details of which are described more fully *infra*, in the November 6 general election Mr. Baber voted for Republican Bruce Poliquin as his first choice to serve as

Maine's Second District Congressional Representative.  Mr. Baber did not rank or otherwise vote for any of the other remaining choices on the ballot for that office.  Mr. Baber is also Chair of the Penobscot County Republican Committee.

8.      Plaintiff Terry Hamm-Morris, a veteran of the U.S. Navy, is a resident of and duly registered voter in Maine's Second Congressional District.  Consistent with Maine's use of ranked choice voting in federal elections, in the November 6 general election Ms. Hamm-Morris voted for Republican Bruce Poliquin as her first choice to serve as Maine's Second District Congressional Representative.  Ms. Hamm-Morris did not rank or otherwise vote for any of the other remaining choices on the ballot for that office.

9.      Plaintiff Mary Hartt is a resident of and duly registered voter in Maine's Second Congressional District.  Consistent with Maine's use of ranked choice voting in federal elections, in the November 6 general election Ms. Hartt voted for Republican Bruce Poliquin as her first choice to serve as Maine's Second District Congressional Representative.  Ms. Hartt did not rank or otherwise vote for any of the other remaining choices on the ballot for that office.

10.      Plaintiff Bruce Poliquin is the incumbent Member of Congress from Maine's Second Congressional District.  Mr. Poliquin is also a resident of and duly registered voter in Maine's Second Congressional District.  Consistent with Maine's use of ranked choice voting in federal elections, in the November 6 general election Bruce Poliquin voted for himself as his first choice to serve as Maine's Second District Congressional Representative.  Mr. Poliquin did not rank or otherwise vote for any of the other remaining choices on the ballot for that office.  Mr. Poliquin is participating in this

lawsuit in both his capacity as a voter and as a candidate whose election has been subject to unfair process.

11.     Defendant Matthew Dunlap is the Secretary of State for the State of Maine ("Secretary") and is sued in his official capacity.  The Secretary is required to "tabulate the election returns and submit the tabulation to the Governor" no later than 20 days after the election.  21-A M.R.S. § 722.  State law also requires the Secretary to tabulate the votes according to Maine's special ranked choice voting procedures.  *See id.*  The Secretary is required to keep his office in Augusta, Maine.  *See* 5 M.R.S. § 81; Me. Const. art. IX, § 16.

12.     Under the Secretary's direction, the Division of Elections in the Secretary's Office "supervises and administers all elections of federal, state and county offices and referenda, and in that capacity advises election officials from 500 municipalities, 600 candidates and the general public regarding election laws and procedures; prepares, proofreads and distributes 1,800 separate ballot types and other elections materials; tabulates official elections results; supervises recounts in contested races; and oversees the application of state laws pertaining to candidate and citizen initiative petitions." Dep't of the Sec'y of State, *Elections & Voting*, at https://www.maine.gov/sos/cec/elec/ (last visited Nov. 12, 2018).  The requested relief sought against the Secretary is also requested to extend to any officer, employee, or agent acting at the Secretary's direction, supervision, or control.

## FACTS

### The Adoption of Ranked Choice Voting in Maine

13.     In November 2016, a statute entitled "An Act to Establish Ranked-Choice Voting" was enacted via citizen initiative by a vote of 52.12% to 47.88%.  The RCV Act required the Secretary to implement ranked choice voting for elections of U.S. Senators, U.S. Representatives, Governor, State Senators, and State Representatives in Maine, as well as primaries for those offices, occurring on or after January 1, 2018.  *See* L.D. 1557 (127th Legis. 2016).

14.     The term "ranked choice voting" is defined in the RCV Act as "the method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected."  *Id.* 1557, § 2.

15.     Ranked choice voting under the RCV Act works as follows.  Voters are permitted to "rank" candidates for an office in order of preference.  That is, they can indicate on their ballots that a particular candidate is their first choice, another candidate is their second choice, yet another is their third choice, and so on.  If one candidate receives an outright majority of first choice votes in the first round of counting, he or she wins.  If no candidate receives a majority, the candidate with the fewest first choice votes is eliminated and voters who chose that candidate as their first choice have their ballots counted for their second choice.  This process repeats and last-place candidates are eliminated until one candidate receives a majority and wins.

16.     In practical terms, the RCV Act "[w]orks just like actual runoff elections without the cost and delay." *Me. Citizen's Guide to the Referendum Election, Tuesday, Nov. 8, 2016* at 52-53, at www.maine.gov/sos/cec/elec/upcoming/citizensguide2016.pdf (last accessed Nov. 12, 2018).

17.     As enacted via citizen initiative, the RCV Act mandated that elections of U.S. Senators, U.S. Representatives, Governor, State Senators, and State Representatives in Maine, as well as primaries for those offices, be determined by majority vote.

18.     Prior to adoption of the RCV Act, elections of U.S. Senators, U.S. Representatives, Governor, State Senators, and State Representatives in Maine, as well as primaries for those offices, were determined by simple plurality.  Under the simple plurality system, voters are only permitted to select one candidate for an office and the candidate that receives the most votes (whether or not they obtain an absolute majority) wins.

19.     In February 2017, the Maine Senate asked the Maine Supreme Judicial Court ("SJC") for an advisory opinion as to the constitutionality of ranked choice voting in general elections for state offices in light of the provisions in the Maine Constitution mandating that elections for State Representative, State Senator, and Governor be determined by "plurality."  Me. Const. art. IV, pt. 1, § 5; id. art IV, pt. 2, § 4; id. art. V, pt. 1, § 3.  The Justices answered the Senate's question.  *Opinion of the Justices*, 2017 ME 100, 162 A.3d 188.

20.     The SJC explained the distinction between the plurality system established by the Maine Constitution and the majority system established by the RCV Act.  Under the

plurality system, "an election is won by the candidate that first obtains 'a plurality of' all votes returned." That is, "[i]f, after one round of counting, a candidate obtained a plurality of the votes but not a majority, that candidate would be declared the winner." *Id.* at 211. Under the RCV Act, "that same candidate would not then be declared the winner. Instead, the candidate, though already having obtained a plurality of the votes, would be subject to additional rounds of counting in which second, third, and fourth choices are accounted for and the lowest vote-garnering candidates are successively eliminated. Once those additional rounds are completed, a different candidate may be declared the winner . . . because that candidate obtained a *majority* of the votes." In short, the "Act prevents the recognition of the winning candidate when the first plurality is identified." *Id.*

21.     Because ranked choice voting fundamentally changed the plurality system, the SJC opined that the RCV Act violated the Maine Constitution insofar as it applied to general elections for state office. The SJC reasoned as follows: while the Maine Constitution mandates that "a candidate [for State Representative, State Senator, or Governor] who receives a plurality of the votes would be declared the winner in that election," the RCV "Act, in contrast, would not declare the plurality candidate the winner of the election, but would require continued tabulation until a majority is achieved or all votes are exhausted." The SJC thus concluded that the RCV Act was "in direct conflict with the [Maine] Constitution." *Id.*

22.     In October 2017, after the Supreme Judicial Court issued *its Opinion of the Justices*, the Maine Legislature adopted L.D. 1646, "An Act to Implement Ranked-choice Voting in 2021" (hereafter, the "2021 Implementation Act"). The 2021 Implementation

Act delayed implementation of ranked choice voting for all relevant elections until
December 1, 2021, and it repealed ranked choice voting for all relevant elections as of
that date unless, prior to December 1, 2021, Maine voters ratified an amendment to the
Maine Constitution authorizing the Legislature to determine the method by which the
Governor and members of the State Senate and House of Representatives are elected.
Pub. Law 2017, ch. 316.  The 2021 Implementation Act was codified at 21-A M.R.S.
§§ 1(27-C), 1(35-A), 601, 695, 722-723, and 723-A.

23.     After the Legislature adopted the 2021 Implementation Act, proponents of ranked
choice voting gathered sufficient signatures to initiate a People's Veto of portions of the
2021 Implementation Act.  The Secretary certified the signatures for the People's Veto on
March 5, 2018.  On June 12, 2018, Maine voters sustained The People's Veto, and ranked
choice voting was reinstated for elections for U.S. Senator and U.S. Representative, as
well as primary elections for those offices and the offices of Governor, State Senator, and
State Representative.  This includes the November 6, 2018 election for U.S.
Representative from Maine's Second Congressional District.

24.     At the same time voters were approving ranked choice voting, they also used it to
determine the winners of the June 12 primary.  But the system had serious problems:
"many voters were confused by the new system," "perplexed at the polls," and left
"angry" by their experience.  Matt Vasilogambros, *Now That Maine Tried Ranked-
Choice Voting, Will Other States?*, Governing (June 26, 2018), at
http://www.governing.com/topics/politics/sl-ranked-choice-voting-states.html.  In Bangor
alone, "about 200 were spoiled because of voter error from confusion over ranked-choice

voting," a number the City Clerk said was "far more than she sees in a typical election." *Id.*

### Criticism of Ranked Choice Voting/Instant-Runoff Voting

25.     Ranked choice voting/instant-runoff voting has been met with bipartisan criticism across the country.  In Maine, former Democratic Secretary of State Bill Diamond condemned the process as "costly" and predicted that it's "going to be a huge mess." David Sharp, *Ranked Choice as Easy as 1, 2, 3?  Not So Fast, Critics Say*, Associated Press, Oct. 9, 2016.  Governor Paul LePage, a Republican, has decried ranked choice voting as a "one person, five votes" system that is "repugnant to the Constitution."  Mal Leary, *Opposed to Ranked-Choice Voting, LePage Says He Might Not Certify Primary Election Results*, Maine Public Radio (June 12, 2018), at

http://www.mainepublic.org/post/opposed-ranked-choice-voting-lepage-says-he-might-not-certify-primary-election-results#stream/0.

26.     In California, Democratic Governor Jerry Brown Jr. vetoed a bill that would have expanded ranked-choice voting beyond a limited number of municipalities.  *See* David Sharp, *Ranked Choice as Easy as 1, 2, 3?  Not So Fast, Critics Say*; Bob Egelko, *Brown Vetoes Bill to Broaden Ranked-Choice Voting in California*, San Francisco Chronicle, Sept. 30, 2016.  In his veto message, Governor Brown explained that "[i]n a time when we want to encourage voter participation, we need to keep voting simple.  Ranked choice voting is overly complicated and confusing. . . . I believe it deprives voters of genuinely informed choice."  David Sharp, *Ranked Choice as Easy as 1, 2, 3?  Not So Fast, Critics Say*.  California Senator Dianne Feinstein has also taken aim at ranked choice elections, saying "I think you [need to] outright win these things.  With ranked choice, you could be

No. 2 and win.  I don't think that makes sense in an office where any degree of strength is required."  Sam Levine, *Maine Is About to Try Out a New Way of Electing Politicians*, Huffington Post, June 7, 2018, at https://www.huffingtonpost.com/entry/maine-new-way-electing-politicians_us_5b16fe45e4b0734a99386f47.

27.     Academics, commentators, and other scholars have likewise criticized ranked choice voting and spoken out about its drawbacks.  For example, one Columbia University Professor observed that this type of voting can lead to "bizarre results" and has "serious problems related to the tabulation and reporting of . . . results."  Stephen Unger, *Instant Runoff Voting: Looks Good--But Look Again* (Mar. 26, 2007), at http://www1.cs.columbia.edu/~unger/articles/irv.html; *see also* Kathy Dopp, *Realities Mar Instant Runoff Voting: 18 Flaws and 4 Benefits* (updated Feb. 12, 2009), at http://electionmathematics.org/ucvAnalysis/US/RCV-IRV/InstantRunoffVotingFlaws.pdf (noting same).  Another commentator has cautioned that ranked choice voting is a "deceptive and potentially dangerous" system.  James Langan, *Instant Runoff Voting: A Cure That Is Likely Wore Than the Disease*, 46 Wm. & Mary L. Rev. 1569 (2005).

28.     And yet another has underscored the undemocratic nature of ranked choice voting: "voters cannot foresee the effect of their second- and third-choice votes" and are, in short, left to take "a costly shot in the dark."  Gordon Weil, *Ranked-Choice Voting: Costly, Complicated, Undemocratic*, Portland Press Herald (Sept. 30, 2016).

29.     Ranked choice voting/instant run-off voting also reduces the incentives that major parties have "to cater a bit to ideological minorities," as a number of third-party voters will list a major party candidate as their second choice and obtain their votes anyway,

thereby decreasing the incentives for Republican and Democrats to modify their platforms to entice independent voters in the first instance.  Jason Sorens, *The False Promise of Instant Runoff Voting*, CATO Unbound (Dec. 9, 2016), at https://www.cato-unbound.org/2016/12/09/jason-sorens/false-promise-instant-runoff-voting.

30.     Studies also have shown that as many as 27% of ballots in a particular race may be discarded before the final, decisive round of voting – a phenomenon known as exhaustion – because voters fail to rank all of the candidates, which means that ranked choice voting is not necessarily increasing voter participation.  Simon Waxman, *Ranked-Choice Voting Is Not the Solution*, Democracy: A Journal of Ideas (Nov. 3, 2016), at https://democracyjournal.org/arguments/ranked-choice-voting-is-not-the-solution/.  And still another scholar has highlighted how ranked choice voting can lead to higher overvotes – i.e., where voters make errors that invalidate their vote – than would otherwise exist in a typical "vote for one," plurality-style contest.  Corey Cook, *The Trouble with Ranked-Choice Voting*, San Francisco Bay Area Planning and Research Ass'n (Jan. 6, 2012), at https://www.spur.org/news/2012-01-06/trouble-ranked-choice-voting.

31.     Ranked choice voting also has "suppressed voter turnout, especially among those segments of the electorate that are already least likely to participate."  Testimony of Vignesh Ganapathy, Policy Director, ACLU of Kansas, Kan. Special Comm. on Elections (Oct. 27, 2017), at https://www.aclukansas.org/en/legislation/aclu-testimony-ranked-choice-voting.  In particular, scholarly analysis has revealed "a significant relationship between [ranked choice voting] and decreased turnout among black and white voters, younger voters and voters who lacked a high school education," Mary

Kenny, *Ranked-Choice Voting Linked to Lower Voter Turnout*, S.F. State News (Oct. 23, 2015), at https://news.sfsu.edu/news-story/ranked-choice-voting-linked-lower-voter-turnout, with "poor people, the elderly and people who aren't native English speakers particularly struggl[ing] with [the system]," Lance Williams, *Instant Runoff, Low-Income Voters Struggle with Ranked-Choice Voting*, Hawaii Free Press (Jan. 13, 2011), at http://www.hawaiifreepress.com/ArticlesMain/tabid/56/ID/3541/Instant-Runoff-Low-income-voters-struggle-with-ranked-choice-voting.aspx.  Ranked choice voting also can lead to increased levels of overvotes in low income areas.  *See id.*

### The November 6, 2018 and Future Elections

32.     On November 6, 2018, Maine held a general election that included a number of federal and states races on the ballot.  As part of this election, voters in Maine's Second Congressional District – including Plaintiffs – voted to select the individual who would represent them in the 116th Congress.  According to the U.S. Census Bureau, 652,628 individuals live in Maine's Second Congressional District, with 525,845 being of voting age.  *See* U.S. Census Bureau, *My Congressional District*, at https://www.census.gov/mycd/?st=23&cd=02 (utilizing 2017 American Community Survey Data).

33.     There were four candidates in the November 6 general election whose names appeared on the ballot to represent Maine's Second Congressional District.  They were: Republican Bruce Poliquin (the incumbent), Democrat Jared F. Golden, and Independents Tiffany L. Bond and William R.S. Hoar.  Dep't of the Sec'y of State, *2018 – Final Candidate List*, at https://www.maine.gov/sos/cec/elec/upcoming/2018-11FinalCandidateList.xlsx (last accessed Nov. 12, 2018).

34.     A complete version of the sample ballot, with instructions, is attached as

Exhibit A.  In relevant part, the portion of the ballot that the voter was asked to complete

was as follows:

| Rep. to Congress District 2 | 1st Choice | 2nd Choice | 3rd Choice | 4th Choice | 5th Choice |
|---|---|---|---|---|---|
| **Bond, Tiffany L.** Portland Independent | ○ | ○ | ○ | ○ | ○ |
| **Golden, Jared F.** Lewiston Democratic | ○ | ○ | ○ | ○ | ○ |
| **Hoar, William R.S.** Southwest Harbor Independent | ○ | ○ | ○ | ○ | ○ |
| **Poliquin, Bruce** Oakland Republican | ○ | ○ | ○ | ○ | ○ |
| **Write-in** | ○ | ○ | ○ | ○ | ○ |

Dep't of the Sec'y of State, *State of Maine Sample Ballot General Election, November 6,*

*2018*, at https://www.maine.gov/sos/cec/elec/upcoming/pdf/CD2.SampleBallot.pdf.

35.     The instructions provided to each voter on his or her ballot were as follows:

---

### **Instructions to Voters**

To vote, fill in the oval like this   ☐

To rank your candidate choices, fill in the oval:

- In the 1st column for your 1st choice candidate.

- In the 2nd column for your 2nd choice candidate, and so on.

Continue until you have ranked as many or as few candidates as you like.

Fill in no more than one oval for each candidate or column.

To rank a write-in candidate, write the person's name in the write-in space and fill in the oval for the ranking of your choice.

---

The instructions are vague and, for example, do not inform voters of the significance or consequences of ranking a candidate as one's first, second, third, or fourth choice. Moreover, the instructions fail to explain that voters may be effectively disenfranchised in later rounds of voting if they fail to rank all of the candidates.

36.     Tabulation of the results in other races on the same November 6 ballot (e.g., for the Office of Governor) were governed by the plurality test rather than using the ranked choice/instant-runoff voting rules that applied in the case of federal races.  The Secretary "called it a 'distinct possibility' that many people won't know about the different voting methods between the [federal and state] races," and observers documented the "confusion among voters" as to how the voting process would actually work.  Michael Shepherd, *Mainers Are Using 2 Voting Methods This Year.  It's Causing Confusion*, Bangor Daily News (Oct. 26, 2018).

37.     While the Secretary of State's Office has not published final results from the initial round of voting, unofficially it appears that the results (to this point) are as follows:

| Candidate | Votes | Percentage |
|---|---|---|
| Bruce Poliquin | 130,916 | 46.3% |
| Jared Golden | 128,915 | 45.6% |
| Tiffany Bond | 16,088 | 5.7% |
| William Hoar | 6,717 | 2.4% |

*Maine Election Results 2018*, https://bangordailynews.com/maine-elections/state/ (last accessed Nov. 12, 2018); *see also* Press Release, *Secretary Dunlap Confirms: Congressional District 2 Tabulation Will Go into Ranked-Choice Voting Rounds*, Dep't of the Sec'y of State (Nov. 7, 2018), available at https://www.maine.gov/sos/news/2018/rcvcongressdis2.html (providing vote totals through November 7, 2018).

38.     Personnel with the Secretary of State's Office have explained that, following a final tally of all votes from the first round of balloting, if no candidate receives 50% of the votes cast on the initial ballot, they will eliminate the candidates with the lowest vote totals and reallocate the votes based on their voters' second (and, in some cases, third) preferences.  *See, e.g.*, Kevin Miller and Steve Collins, *Nation's Eyes on Maine As Ranked Vote Tally Starts in 2nd District Race*, Portland Press Herald, (Nov. 9, 2018. Centralized ballot collection began last Thursday at the Elkins Building in Augusta.  *See* Press Release, *Secretary Dunlap Confirms: Congressional District 2 Tabulation Will Go into Ranked-Choice Voting Rounds*.  Tabulation of these ballots started on Friday,

continued through the Saturday and Monday of the Veterans Day holiday weekend, and will continue until the process is complete.  *See id.*

39.     Absent relief from this Court, Defendants will continue to conduct future elections in accordance with the same ranked choice procedures mandated by the RCV Act.

## CLAIMS FOR RELIEF

### Count I (Violation of Article I, Section 2 of the United States Constitution)

40.     Plaintiffs incorporate each of the paragraphs above by reference as if fully set forth herein.

41.     Article I, section 2, clause 1 of the United States Constitution provides that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States."

42.     This provision "has always been construed to mean that the candidate receiving the highest number of votes at the general election is elected, although his vote be only a plurality of all votes cast."  *Phillips v. Rockefeller*, 435 F.2d 976, 980 (2d Cir. 1970) (emphasis added).

43.     By declining to recognize Bruce Poliquin as the winner after the first round of balloting and certifying him as the Representative from Maine's Second Congressional District for the 116th Congress, the Secretary has and continues to violate Article I, section 2, clause 1 of the United States Constitution.

44.     Plaintiff Bruce Poliquin is entitled to injunctive relief to prevent this injury and, pursuant to 28 U.S.C. § 2201 and 2202, a declaration that he was "chosen . . . by the People" at the November 6, 2018 election as the Representative from Maine's Second Congressional District for the 116th Congress.

**Count II (Denial of an Effective Vote Under
the First Amendment, Due Process Clause, and 42 U.S.C. § 1983)**

45.     Plaintiffs incorporate each of the paragraphs above by reference as if fully set forth herein.

46.     The "foundation of our 'democratic process' is the right of all qualified voters to cast their votes effectively," *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729 (1st Cir. 1994), with such right ranking "'among our most precious freedoms,'" *Libertarian Party of Maine, Inc. v. Dunlap*, No. 2:16-CV-00002-JAW, 2016 WL 3039715, at *4 (D. Me. May 27, 2016) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).  Indeed, this Court has repeatedly recognized the foundational nature of this principle.  *See, e.g.*, *id.*; *Emrit v. Dunlap*, No. 1:17-CV-00402-GZS, 2018 WL 1321567, at *5 (D. Me. Mar. 14, 2018), appeal dismissed, No. 18-1221, 2018 WL 4381529 (1st Cir. June 12, 2018); *Stoddard v. Quinn*, 593 F. Supp. 300, 303 (D. Me. 1984); *Anderson v. Quinn*, 495 F. Supp. 730, 732 (D. Me. 1980).  As a matter of federal constitutional law, the right to cast an effective vote is a fundamental right protected by the First and Fourteenth Amendments to the United States Constitution.

47.     Here, Defendant's implementation of the RCV Act denies Plaintiffs the opportunity to cast their votes effectively.  At the time Plaintiffs cast their ballots in this election, and at the time they will cast their ballots in future elections, they do not know

the identities of the candidates who are on the ballot, nor the match-ups of candidates who will be on the ballot, after the first round of voting.

48.     The lack of access to such basic information about which candidates will be on the ballot and the match-up of candidates who will be on the ballot prevents Plaintiffs from choosing among candidates and casting their votes effectively, causing them irreparable injury under the First and Fourteenth Amendments to the U.S. Constitution. Since no other adequate remedy at law is available, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent this injury.

49.     The challenged law also establishes an actual controversy concerning the federal law rights and legal relations of Plaintiffs with the Defendant, thus entitling Plaintiffs to a declaratory judgment under 28 U.S.C. § 2201 and appropriate supplemental relief under section 2202.

**Count III (Violation of the Voting Rights Act)**

50.     Plaintiffs incorporate each of the paragraphs above by reference as if fully set forth herein.

51.     The Voting Rights Act prohibits any state official from "fail[ing] . . . to permit any person to vote who is entitled to vote . . . or is otherwise qualified to vote"). 52 U.S.C. § 10307(a).  "Vote" is defined as "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to . . . casting a ballot."  *Id.* § 10310(c)(1) (emphasis added).

52.     For example, the Voting Rights Act requires measures to assist voters in casting knowledgeable votes, such as through the provision of language-appropriate ballots.

53.     Here, Defendant's implementation of the RCV Act denies Plaintiffs the opportunity to cast their votes effectively in violation of the federal Voting Rights Act. At the time Plaintiffs cast their ballots in this election, and at the time they will cast their ballots in future elections, they do not know the identities of the candidates who are on the ballot, nor the match-ups of candidates who will be on the ballot, after the first round of voting.

54.     While most states use a single-ballot, plurality system to elect candidates for federal office, a minority of states – mostly in the South – have required candidates to win a run-off election if they do not exceed 50% of the votes cast on the initial ballot. *See, e.g.*, Nat'l Conference of State Legislatures, *Primary Runoffs*, at http://www.ncsl.org/research/elections-and-campaigns/primary-runoffs.aspx (last accessed Nov. 12, 2018).  Observers have noted that the "runoff system is a vestige of a time when white Democrats controlled Southern politics[] and manipulated election rules to make sure they stayed in power."  Reid Wilson, *Runoff Elections a Relic of the Democratic South*, Wash. Post, June 4, 2014.

55.     The lack of access to such basic information about which candidates will be on the ballot prevents Plaintiffs from casting their vote knowledgeably and effectively, causing them irreparable injury under the Voting Rights Act.  Since no other adequate remedy at law is available, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent this injury.

56.     The challenged law also establishes an actual controversy concerning the federal law rights and legal relations of Plaintiffs with the Defendant, thus entitling Plaintiffs to a declaratory judgment under 28 U.S.C. § 2201 and appropriate supplemental relief under section 2202.

**Count IV (Denial of Right to Vote for Candidate of Voter's Own Choice Under the First Amendment, Due Process Clause, and 42 U.S.C. § 1983)**

57.     Plaintiffs incorporate each of the paragraphs above by reference as if fully set forth herein.

58.     Implicit in the constitutional right to vote is a right to vote for a candidate of the voter's own choice.

59.     The right to vote for a candidate of the voter's own choice includes the right to vote strategically or tactically to advance a weaker candidate to a subsequent election or round of voting so that the voter's actual preferred candidate will have a better chance of ultimately winning.

60.     Here, Defendant's implementation of the RCV Act denies Plaintiffs from voting for a weaker candidate where it appears an election will not be decided on the initial round of ballot counting.  Specifically, if a voter were to vote for what the voter perceives as the weaker candidate as the voter's first-ranked choice, the voter does not have a chance to vote against that candidate in subsequent rounds of vote counting and to vote for the voter's actual preferred candidate.  Conversely, if a voter were to vote for what the voter perceives as the weaker candidate by ranking that candidate lower on the voter's

ballot, that would simply diminish the candidate from advancing in subsequent rounds of vote counting.

61.     The inability for voters to vote strategically or tactically under the RCV Act causes them irreparable injury under the First and Fourteenth Amendments to the U.S. Constitution.  Since no other adequate remedy at law is available, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent this injury.

62.      The challenged law also establishes an actual controversy concerning the federal law rights and legal relations of Plaintiffs with the Defendant, thus entitling Plaintiffs to a declaratory judgment under 28 U.S.C. § 2201 and appropriate supplemental relief under section 2202.

**Count V (General Denial of Due Process and Violation of 42 U.S.C. § 1983)**

63.     Plaintiffs incorporate each of the paragraphs above by reference as if fully set forth herein.

64.     Defendant's implementation of the RCV Act denies Plaintiffs' their right to due process of law guaranteed by the Fourteenth Amendment to the U.S. Constitution in that implementation of the RCV Act results in fundamental unfairness and arbitrariness in the vote-counting process.

65.     Among other infirmities, ranked choice voting/instant-runoff voting can arbitrarily distort majority will in elections and can cause a voter's vote for a particular candidate to reduce that candidate's electoral chance to win.  This phenomenon, unique to ranked choice voting/instant-runoff voting, constitutes fundamentally unfair treatment

of votes.  Expert Witness Statement of Jason Sorens at 7 (attached to accompanying
Motion for Preliminary Injunction).

66.     Defendant's implementation of the RCV Act thus irreparably injures Plaintiffs by
denying them their right to due process under the laws under the Fourteenth Amendment.
Since no other adequate remedy at law is available, Plaintiffs are entitled to preliminary
and permanent injunctive relief to prevent this injury.

67.     The challenged law also establishes an actual controversy concerning the federal
law rights and legal relations of Plaintiffs with the Defendant, thus entitling Plaintiffs to a
declaratory judgment under 28 U.S.C. § 2201 and appropriate supplemental relief under
section 2202.

### Count VI (Denial of Equal Protection and Violation of 42 U.S.C. § 1983)

68.     Plaintiffs incorporate each of the paragraphs above by reference as if fully set
forth herein.

69.     Defendant's implementation of the RCV Act denies Plaintiffs' right to equal
protection of the law guaranteed by the Fourteenth Amendment to the U.S. Constitution
in two fundamental ways.  *First*, Plaintiffs' votes are diluted by the multiple votes that
others are able to cast for different individuals running for the same office.  Here, for
example, while Plaintiffs voted for one candidate – i.e., Bruce Poliquin – ranked choice
voting permits other voters to change their votes several time and cast ballots for three
different candidates in the same election by listing William Hoar as their first choice,
Tiffany Bond as their second, and Jared Golden as their third.  *Second*, the RCA Act's
decision to discard exhausted ballots – i.e., those that fail to rank all of the candidates –

means that some voters will be deprived of the opportunity to participate in later rounds of voting in violation of their constitutional right to do so.

70.     In many cases, voters' ballots will be exhausted, and the voter effectively disenfranchised, because the voter is deprived of actual knowledge of the identities of the candidates who will be standing for election on a second or third match-up.

71.     Defendant's implementation of the RCV Act thus irreparably injures Plaintiffs by denying them their right to equal protection under the laws under the Fourteenth Amendment.  Since no other adequate remedy at law is available, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent this injury.

72.     The challenged law also establishes an actual controversy concerning the federal law rights and legal relations of Plaintiffs with the Defendant, thus entitling Plaintiffs to a declaratory judgment under 28 U.S.C. § 2201 and appropriate supplemental relief under section 2202.

**PRAYER FOR RELIEF**

Plaintiffs pray for the following relief:

      A.     A declaration that the RCV Act violates the U.S Constitution, the Voting Rights Act, and 42 U.S.C. § 1983;

      B.     A preliminary and permanent injunction: (1) prohibiting the Defendant, and all persons under his direction, supervision, or control, from taking any steps to enforce or apply the RCV Act to determine the winner of the

November 6 general election for U.S. Representative from Maine's

Second Congressional District or in connection with any other future

election for such office; (2) requiring the Defendant, and all persons

operating under his direction, supervision, or control, to determine the

winner of the November 6 general election for U.S. Representative from

Maine's Second Congressional District, and all future elections for such

office, based on the results of the first tabulation of ballots;

C.      An award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

D.      Any other relief, at law or in equity, to which Plaintiffs may be entitled.


Dated: November 13, 2018                    Respectfully submitted,

                                            /s/ *Lee E. Goodman*

                                            Lee E. Goodman (pro hac vice pending)
                                            Andrew G. Woodson (pro hac vice pending)
                                            Eric Wang (pro hac vice pending)
                                            WILEY REIN LLP
                                            1776 K Street, NW
                                            Washington, D.C. 20006
                                            Phone: (202) 719-7000
                                            Fax: (202) 719-7049
                                            lgoodman@wileyrein.com
                                            awoodson@wileyrein.com
                                            ewang@wileyrein.com

                                            /s/ *Joshua A. Tardy*
                                            Joshua A. Tardy, Esq.
                                            Joshua A. Randlett, Esq.
                                            RUDMAN WINCHELL
                                            84 Harlow Street; P.O. Box 1401
                                            Bangor, ME 04402-1401
                                            Phone: (207) 997-4501
                                            jtardy@rudmanwinchell.com
                                            jrandlett@rudmanwinchell.com

                                            Attorneys for Plaintiffs