## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MAINE

_____

|  |  |
|---|---|
| **BRETT BABER, et al.** | ) |
|  | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) **Case No. _____** |
|  | ) |
| **MATTHEW DUNLAP, Secretary of the** | ) |
| **State of Maine.** | ) **DECLARATORY AND** |
|  | ) **INJUNCTIVE RELIEF** |
|  | ) **SOUGHT** |
| **Defendant.** | ) |
| _____ | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs Brett Baber, Terry Hamm-Morris, Mary Hartt, and Bruce Poliquin, by and through counsel, hereby move this Court on an emergency basis, pursuant to Fed. R. Civ. P. 65, for the entry of a preliminary injunction: (1) preventing Defendant Secretary of the State of Maine Matthew Dunlap (the "Secretary"), and all persons under his direction, supervision, or control, from enforcing or applying Maine's Ranked Choice Voting Act (the "RCV Act") to determine the winner of the November 6, 2018 general election for U.S. Representative from Maine's Second Congressional District; and (2) requiring the Secretary, and all persons operating under his direction, supervision, or control, to determine the winner of the November 6, 2018 general election for U.S. Representative from Maine's Second Congressional District based on the results of the first tabulation of ballots.

1

Plaintiffs are challenging the RCV Act facially on the basis of federal constitutional and statutory claims that were not raised in the *Maine Republican Party v. Dunlap*, 324 F. Supp. 3d 202 (D. Me. 2018) case that this Court recently decided.  Specifically, Plaintiffs allege here that the RCV Act violates Art. I, § 2 of the United States Constitution, which sets a plurality vote as the qualification for election to the U.S. House of Representatives, by changing the substantive qualification to an absolute majority vote.

Plaintiffs also allege that the RCV Act denies them and other Maine voters of the right to vote effectively and to vote for candidates of their own choice in violation of the First and Fourteenth Amendments to the U.S. Constitution and the Voting Rights Act.  The RCV Act does so, first, by depriving Plaintiffs and other Maine voters of the knowledge of what the subsequent fields of candidates will be when they initially vote their candidate preferences.  Yet, if (as is the case here) the vote counting proceeds to subsequent virtual runoff elections, voters' initial candidate preferences will still be tallied, even if voters would not have voted the same way given the altered candidate matchups.  Second, the RCV Act deprives voters of their right to vote strategically or tactically by advancing weaker candidates into subsequent rounds of voting.

Additionally, Plaintiffs allege here that the RCV Act, in violation of the Fourteenth Amendment, deprives them and certain other Maine voters of the equal protection of the laws by giving more weight to the expressed candidate preferences of voters whose first-choice candidate receives the least number of votes in the initial vote count.

Plaintiffs are entitled to immediate injunctive relief because: (1) Maine may not alter the U.S. Constitution's substantive qualification to serve as a member of the U.S. House of Representatives; (2) the RCV Act violates the Voting Rights Act and the State has no compelling interest for burdening the constitutional right to vote by enforcing the RCV Act; (3) Plaintiffs

will face irreparable harm to their constitutional right to vote if the Secretary proceeds with additional rounds of vote counting in a virtual runoff election; (4) a preliminary injunction will impose no additional burden on the Secretary; and (5) the protection of Plaintiffs' constitutional right to vote is in the public interest.

## FACTUAL BACKGROUND

The election recently held on November 6, 2018, was the first general election in nearly 140 years in which Maine used so-called "ranked-choice voting" (also known as "instant-runoff voting") to elect candidates for federal office. *See* 21-A M.R.S. § 723-A; Me. Dept. of the Sec'y of State, Ranked choice voting in Maine: Frequently Asked Questions (*hereinafter*, "Ranked Choice Voting FAQs"), *at* www.maine.gov/sos/cec/elec/upcoming/pdf/RCVFAQs. 51618.pdf.  Maine's ranked-choice/instant-runoff voting law, known as the "Ranked Choice Voting Act" (*hereinafter*, "RCV Act"), was enacted by a voter referendum in 2016 (Question 5). Me. State Legislature, Ranked Choice Voting in Maine, *at* http://legislature.maine.gov/ lawlibrary/ranked choice-voting-in-maine/9509.  While this novel and complex scheme was used during the June 2018 primaries for both state and federal offices, it was used on the November general election ballot only to select candidates for federal office, as the method was determined to violate Maine's state constitution with respect to selecting state candidates. *See* Ranked Choice Voting FAQs; *Op. of the Justices of the Me. Supreme Judicial Ct.*, 162 A.3d 188 (2017).

The vast majority of American state and local jurisdictions do not use ranked-choice voting. *See* FairVote.org, Ranked Choice Voting in U.S. Elections, *at* https://www.fairvote.org/rcv_in_us_elections.  Ranked-choice voting schemes are complex and difficult for voters to understand.  Compl. ¶¶ 25-28; Expert Witness Statement of Jason Sorens (*hereinafter,* "Sorens Statement") (Exh. A) at 6-7.  In California, which has had some limited

3

experience with municipalities using this method of voting, the governor vetoed a bill to expand ranked-choice voting, calling it "overly complicated and confusing" and "depriv[ing] voters of genuinely informed choice."  Bob Egelko, *Brown Vetoes Bill to Broaden Ranked choice Voting in California*, SAN FRANCISCO CHRONICLE (Sept. 30, 2016); David Sharp, *Ranked Choice as Easy as 1, 2, 3?  Not So Fast, Critics Say*, ASSOC. PRESS (Oct. 9, 2016).  Because of this complexity, ranked-choice voting schemes result in more improperly marked ballots than in traditional "vote for one" systems, with disproportionate negative effects on minority, low-income, older, and less-educated voters.  Corey Cook, *The Trouble with Ranked choice Voting*, San Francisco Bay Area Planning and Research Ass'n (Jan. 6, 2012), https://www.spur.org/ news/2012-01-06/trouble-ranked choice-voting; David C. Kimball and Joseph Anthony, *Voter Participation with Ranked Choice Voting in the United States*, Univ. of Mo.-St. Louis (Oct. 2016) at 4, http://www.umsl.edu/~kimballd/KimballRCV.pdf; Sorens Statement at 6-7.

Indeed, during the June 2018 Maine primary, "many voters were confused by the new system," "perplexed at the polls," and left "angry" by their experience.  Matt Vasilogambros, *Now That Maine Tried Ranked-Choice Voting, Will Other States?*, GOVERNING (June 26, 2018), http://www.governing.com/topics/politics/sl-ranked-choice-voting-states.html.  In Bangor alone, "about 200 [ballots] were spoiled because of voter error from confusion over ranked-choice voting," a number the City Clerk said was "far more than she sees in a typical election."  *Id.* With respect to the November general election at issue in this challenge, Secretary Dunlap acknowledged "a 'distinct possibility' that many people [would not] know about the different voting methods between the races."  Michael Shepherd, *Mainers are using 2 voting methods this year. It's causing confusion,* BANGOR DAILY NEWS (Oct. 26, 2018).

As summarized by Dr. Jason Sorens, Plaintiffs' expert witness, ranked choice/instant-runoff voting "places greater cognitive demands on voters than does plurality voting . . . [and] undermines political equality by particularly privileging more sophisticated voters." Sorens Statement at 6.

Ranked-choice voting under the RCV Act works as follows:  Voters are permitted to "rank" candidates for an office in order of preference.  That is, they can indicate on their ballots that a particular candidate is their first choice, another candidate is their second choice, yet another is their third choice, and so on.  If one candidate receives an outright majority of first-choice votes in the first round of counting, he or she wins.  If no candidate receives a majority, the candidate with the fewest first-choice votes is eliminated and voters who chose that candidate as their first choice have their ballots counted for their second choice.  This process repeats, and last-place candidates are eliminated until one candidate receives a majority and wins.  *See* 21-A M.R.S. § 723-A; Me. Citizen's Guide to the Referendum Election, Tuesday, Nov. 8, 2016 (*hereinafter*, "2016 Referendum Guide") at 50, www.maine.gov/sos/cec/elec/upcoming/citizensguide2016.pdf.

Notwithstanding Maine officials' explanation of the RCV Act as providing for elimination of last-place candidates one-by-one through successive rounds of vote counting, *see* Ranked Choice Voting FAQs and 2016 Referendum Guide, the Act and implementing regulations also allow for "batch elimination," in which multiple candidates may be eliminated in a single round of runoff vote counting.  21-A M.R.S. § 723-A(4)(B); 29-250 C.M.R. ch. 535, § 4.2.A.

Plaintiff Bruce Poliquin is the incumbent U.S. Representative for Maine's Second Congressional District.  During the November 6, 2018 election, Rep. Poliquin received a

plurality of the votes in a four-way race.  Press Release, *Secretary Dunlap Confirms: Congressional District 2 Tabulation Will Go into Ranked-Choice Voting Rounds*, Dep't of the Sec'y of State (Nov. 7, 2018), https://www.maine.gov/sos/news/2018/rcvcongressdis2.html.  Art. I, § 2 of the U.S. Constitution sets plurality voting as the standard to be "chosen by the people" of Maine.  Thus, Rep. Poliquin has been "chosen by the people" of Maine.

However, because Rep. Poliquin did not receive a majority of the votes, under the RCV Act, the election is now poised to be decided by Maine's ranked-choice voting scheme in a virtual runoff election.  *Id.*  Plaintiffs Brett Baber, Terry Hamm-Morris, Mary Hartt, and Bruce Poliquin are voters in Maine's Second Congressional District who voted in the November 6, 2018 election.  All four Plaintiffs designated Bruce Poliquin as their first-choice selection for the U.S. House of Representatives in Maine's second Congressional district and did not rank or otherwise vote for any of the other candidates for that office.

## DISCUSSION

Plaintiffs have sued under the Civil Rights Act, 42 U.S.C. § 1983, for declaratory and injunctive relief against enforcement of Maine's RCV Act as violating Art. I, § 2 as well as the First and Fourteenth Amendments of the U.S. Constitution.  In addition, Plaintiffs have sued under the Voting Rights Act, 52 U.S.C. § 10307(a), for declaratory and injunctive relief against enforcement of the RCV Act as violating their right to vote effectively.  In considering a motion for preliminary injunction, the Court examines whether the moving party has established: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest."  *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015).  Here, all four factors favor preliminary injunctive relief.

## I.      Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed for two independent reasons.  *First*, Bruce Poliquin has

been "chosen . . . by the People" of Maine according to the provisions of Article I, § 2 of the

U.S. Constitution and therefore is entitled to be certified the winner of the election.  *Second*, the

Maine RCV Act imposes severe burdens on each citizen's right to vote.  In such circumstances,

where an election law imposes "severe burdens" on the constitutional right to vote, the law must

be "narrowly tailored to serve a compelling state interest."  *Clingman v. Beaver*, 544 U.S. 581,

586 (2005) (citation omitted).  A law that imposes "lesser burdens" must still be justified by

"important regulatory interests" and may not impose unreasonable, discriminatory restrictions.

*Id.* at 587.  In either situation, state election laws are subject to the following balancing test:

> A court considering a challenge to a state election law must weigh the character
> and magnitude of the asserted injury to the rights protected by the First and
> Fourteenth Amendments that the plaintiff seeks to vindicate against the precise
> interests put forward by the State as justifications for the burden imposed by its
> rule, taking into consideration the extent to which those interests make it
> necessary to burden the plaintiff's rights.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citation and internal quotation marks omitted).

The RCV Act does not pass this test.

### A)   Bruce Poliquin Was "Chosen . . . by the People" of Maine Under Article I, Section 2 of the United States Constitution.

Article I, section 2 of the U.S. Constitution provides that "[t]he House of Representatives

shall be composed of Members chosen every second Year by the People of the several

States . . . ."  This provision "has always been construed to mean that the candidate receiving the

highest number of votes at the general election is elected, although his vote be only a plurality of

all votes cast." *Phillips v. Rockefeller*, 435 F.2d 976, 980 (2d Cir. 1970).[1]

---

[1]        The year after the *Phillips* decision, a federal district court in Georgia declined to invalidate a state law
requiring that U.S. Senators and Representatives be elected by a majority vote and providing for a run-off election if

In *United States Term Limits v. Thornton*, 514 U.S. 779 (1995), the Supreme Court clarified that the Elections Clause of Article I, section 4 does <u>not</u> authorize states to alter the substantive provisions of Article I, section 2.  According to the Court, the Time, Place, and Manner provisions of the Elections Clause authorize the states only "to create procedural regulations, not to provide States with license to exclude classes of candidates from federal office."  *Id.* at 832-33.  The Court observed that the Elections Clause is but "a grant of authority to issue procedural regulations" and is not "a source of power to direct electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints."  *Id.* at 833.  Thus, a state has no authority to create substantive qualifications that contradict the provisions of Article I, section 2.

The RCV Act does precisely that.  It countermands the substantive plurality provisions of Article I, section 2.  Because a plurality of voters elected Bruce Poliquin, he has been "chosen . . . by the People" pursuant to Article I, section 2, and is entitled to be certified the winner of the election.

     B) <u>Maine's Ranked-Choice Voting Scheme Unconstitutionally Imposes a Severe Burden on the Right to Vote Effectively.</u>

The First and Fourteenth Amendments not only guarantee a right to vote, but they also guarantee "the right of all qualified voters to cast their votes *effectively*."  *Ayers-Schaffner v.*

---

no candidate received a majority of the votes cast in the general election.  *Bond v. Fortson*, 334 F. Supp. 1192, 1192 (N.D. Ga.), *aff'd*, 404 U.S. 930 (1971).  However, the district court distinguished the case from *Phillips* and granted summary judgment for the state on the grounds that the case "d[id] not present a justiciable case or controversy" as there was "no immediate, live controversy . . . requiring determination [of] the constitutionality of the statutes they attack."  334 F. Supp. 1193-94.  Although the Supreme Court summarily affirmed the district court's judgment, it did not decide the precise issue presented in *Phillips*.  *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.5 (1983) ("A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment."); *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 949 (1982) ("In summarily affirming the District Court . . . , we did not necessarily adopt the court's reasoning."); *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (summary affirmances without opinion have limited precedential effect).

*DiStefano*, 37 F.3d 726, 729 (1st Cir. 1994) (collecting authority) (emphasis added). Similarly, the Voting Rights Act, which prohibits any state official from "fail[ing] . . . to permit any person to vote who is entitled to vote . . . or is otherwise qualified to vote"), 52 U.S.C. § 10307(a), defines "vote" as "all action necessary to make a vote *effective* in any primary, special, or general election, including, but not limited to . . . casting a ballot," *id*. § 10310(c)(1) (emphasis added).

Voters cannot cast their votes effectively when they do not know what or whom they are voting for. *See Burger v. Judge*, 364 F. Supp. 504, 511 n.16 (D. Mont. 1973) ("the state may not mislead its voters to the extent that they do not know what they are voting for or against") (quoting *Kohler v. Tugwell*, 292 F. Supp. 978, 982 (E.D. La. 1968), *aff'd*, 393 U.S. 531 (1969)). In Voting Rights Act cases, courts also have held that "the right to an effective vote" encompasses being provided with "oral assistance" or "assistance in the language [a voter] can read or understand." *Puerto Rican Org. for Political Action et al. v. Kusper*, 490 F.2d 575, 580 (7th Cir. 1973); *see also U.S. v. Louisiana*, 265 F.Supp. 703, 708 (E.D. La. 1966), *aff'd*, 386 U.S. 270 (1967) (a state may not deny voting assistance to illiterates); *Hamer v. Ely*, 410 F.2d 152, 156 (5th Cir. 1969) (same).

Maine's ranked-choice voting scheme denies voters the ability to vote effectively when the vote tally proceeds to the runoff round, as voters who marked their ballots with their candidate rankings in the initial election did so based on the entire field of candidates presented to them at the time. However, when presented with an alternative and winnowed field of candidates, voters may not have the same preferences. *See* Sorens Statement at 4-6. For example, in a four-way race, Voter Doe may vote based on the following considerations:

| Candidate | Rank # | Rationale |
|---|---|---|
| A | 1 | Doe likes A's character, qualifications, and fitness for office; is indifferent to A's policies. |
| B | 2 | Doe likes Candidate B's policies; dislikes B's character, qualifications, and fitness for office. |
| C | 3 | Doe likes C's character, qualifications, and fitness for office; dislikes C's policies. |
| D | 4 | Doe dislikes D's character, qualifications, and fitness for office; dislikes D's policies |

However, if Doe were presented with a field that consists only of Candidates B, C, and D, she may wish to vote as follows:

| Candidate | Rank # | Rationale |
|---|---|---|
| C | 1 | Doe likes C's character, qualifications, and fitness for office; dislikes C's policies; and ultimately believes character, etc. is more important. |
| B | 2 | Doe likes Candidate B's policies; dislikes B's character, etc.; and ultimately believes character, etc. is more important. |
| D | 3 | Doe dislikes D's character, qualifications, and fitness for office; dislikes D's policies. |

Such "intransitive voter preferences" are not theoretical. In races (such as the one at issue here) involving a larger field of candidates, more than a quarter of voters may have such preferences. Sorens Statement at 5-6.

Using identical language in the official 2016 referenda citizens' guide, the two proponents of Question 5 touted how Maine's RCV Act would "[w]ork[] just like actual runoff elections without the cost and delay." 2016 Referendum Guide at 52-53. However, this is only half true. In an actual runoff election, Doe in the example above would know that Candidates B, C, and D are the candidates running in that race, and would be able to express her true preference by voting for Candidate C over B. But voters are not clairvoyant, nor are most voters pollsters or professional political prognosticators. Maine's RCV Act therefore induces Doe to vote for Candidate B over C in the runoff round of vote counting when Candidate A is eliminated from

10

the initial round, even though Doe would have voted differently had she been presented with the identities of the actual candidates in the runoff election and the matchup of candidates.[2]

Maine's RCV Act and implementing regulations exacerbate voters' lack of knowledge and uncertainty as to which candidates will be matched against each other in the subsequent virtual runoff elections because the Department of State may eliminate more than one candidate in a single round of vote counting.  *See* 21-A M.R.S.  § 723-A(4)(B); 29-250 C.M.R. ch. 535, § 4.2.A.  For example, in a six-way race between Candidates A, B, C, D, E, and F, a voter whose first-choice candidate is A could be deprived of expressing her true vote preference and casting an informed vote in subsequent rounds in any number of ways if A is eliminated in the initial vote count, as the remaining field of candidates could consist of B, C, D, E and F; or B, C, D, and E; B, C, and D; or any other permutation not involving A.

Moreover, the ballots Maine has implemented under the RCV Act fail to "instruct voters what to do if they are indifferent between candidates or if they have intransitive preferences, and most importantly, it tells them nothing about how their votes will be counted or a winner decided."  Sorens Statement at 7.

As the U.S. Court of Appeals for the Ninth Circuit critically observed of San Francisco's ranked-choice voting law, such systems do not "allow[] voters to *reconsider* their choices after seeing which candidates have a chance of winning.  In other words, voters must submit their preferences . . . even though they might have chosen differently with more specific information about other voters' selections, they are not provided an opportunity to revise their choices."

---

[2]      Maine voters also may vote for only their first-choice candidate and not rank the other candidates.  Me. Dept. of the Sec'y of State, Are you ready for ranked choice voting? (Oct. 2018), https://www.maine.gov/sos/cec/elec/upcoming/pdf/rcvfactsheet.pdf ("If you wish to rank some or all of the remaining candidates in order of your preference, you may do so, or you can choose to vote for only your first choice.").  However, this is not a meaningful choice.  As discussed in more detail below, this unconstitutionally dilutes the ballots of voters who only vote for their first-choice candidate because they will not have any say in subsequent rounds of vote counting.

*Dudum v. Arntz*, 640 F.3d 1098, 1105 (9th Cir. 2011) (emphasis in the original). However, the Ninth Circuit did not address the constitutionality of this burden that ranked-choice voting imposes on voters because the plaintiff did not raise the issue. *See id.* at 1106-7.

Relatedly, the inherently complex and confusing nature of Maine's ranked-choice voting scheme denies voters an effective vote. *See* Sorens Statement at 6-7. As discussed above in the factual background, voters were perplexed by the system when they cast their ballots during the June 2018 primaries, and election officials reported a higher than average number of spoiled ballots. This confusion was compounded in the general election because the same ballots that asked voters to vote for federal candidates using the ranked-choice system also asked voters to vote for state candidates using the traditional plurality system – a problem that Secretary Dunlap publicly acknowledged. Maine's confusing voting procedures denied voters an effective vote in the same way that misleading ballots and ballots printed in a language that voters cannot understand deny voters an effective vote.

In short, Maine's RCV Act interferes with the right of voters to vote effectively as guaranteed by the First and Fourteenth Amendments and Voting Rights Act.[3] *See Burger*, 364 F. Supp. at 511 n.16; *see also Smith v. Cherry*, 489 F.2d 1098, 1100, 1102 (7th Cir. 1973) (where a candidate conspired with political party officials to run as a "stand-in" candidate during a primary but had no intention of running in the general election, and then dropped out after the primary to make way for a candidate supported by the party officials, voters who voted for the

---

[3]      The Voting Rights Act preempts state voting laws to the extent the latter are in conflict with the former. *See*, *e.g.*, *Gonzalez v. Arizona*, 677 F.3d 383, 390 (9th Cir. 2012) (en banc) (holding that a federal election law preempts state law under the U.S. Constitution's elections clauses), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013); *Ex Parte Siebold*, 100 U.S. 371, 384 (1879) (a federal law, "so far as it extends and conflicts with the regulations of the State, necessarily supersedes them").

stand-in candidate believing they were voting for the party's nominee for the general election suffered an "impermissible" "abridgment of the[ir] right to vote").

    C)  <u>Maine's Ranked-Choice Voting Scheme Unconstitutionally Deprives Voters of the Right to Vote for a Candidate of Their Choice.</u>

Also implicit in the constitutional right to vote is "the right to vote for a candidate of the[] [voter's] own choice." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 435 (5th Cir. 2011) (quoting *Carter v. Dies*, 321 F. Supp. 1358, 1360 (N.D. Tex. 1970) (*aff'd sub nom. Bullock v. Carter*, 405 U.S. 134 (1972)); *Bolanowski v. Raich*, 330 F. Supp. 724, 729 (E.D. Mich. 1971) (same).

In other words, voters have a constitutional right to vote for candidates for whatever reason, even if it is to do so strategically or tactically to advance a weaker candidate to a subsequent election or round of voting so that their actual preferred candidate will have a better chance of ultimately winning.  A famous example of this is Democratic U.S. Senator Claire McCaskill's efforts to help Todd Akin win the 2012 Missouri Republican primary because she believed he would be a weaker opponent.  Claire McCaskill, *How I Helped Todd Akin Win – So I Could Beat Him Later*, Politico (Aug. 11, 2015).

Maine's ranked-choice voting scheme precludes voters from voting for a weaker candidate when it appears an election will not be decided on the initial round of ballot counting. Specifically, as illustrated in the example above involving Voter Doe, if Doe were to vote for Candidate A as her first-choice candidate believing he is the weaker candidate, Doe and other voters would not be able to subsequently vote against Candidate A and for their true preferred candidate.  On the other hand, if Doe were to rank Candidate A lower on her ballot, this would simply prevent Candidate A from advancing in subsequent rounds of ballot counting.  Either

way, Maine's ranked-choice voting scheme denies voters who wish to vote strategically or

tactically the right to vote for a candidate of their own choice.  *See* Sorens Statement at 4.

D)  Maine's Ranked-Choice Voting Scheme Unconstitutionally Treats Voters'
    Votes Unequally.

The Fourteenth Amendment's guarantee of equal protection of the laws means that a

"State may not, by [] arbitrary and disparate treatment, value one person's vote over that of

another."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (citing *Harper v. Virginia Bd. of Elections*,

383 U.S. 663, 665 (1966)).  "The idea that one group can be granted greater voting strength than

another is hostile to the one man, one vote basis of our representative government."  *Id.* at 107

(quoting *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969) (brackets omitted)).  "[T]he right of

suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as

effectively as by wholly prohibiting the free exercise of the franchise."  *Reynolds v. Sims*, 377

U.S. 533, 555 (1964).

If Maine's ranked-choice voting is "just like actual runoff elections without

the . . . delay," 2016 Referendum Guide at 52-53, the scheme gives more weight to voters who

rank as their number-one choice candidates who are eliminated in the first and subsequent rounds

of ballot counting.  Take, for example, the following scenario:

Voter Doe's Ballot:

| Candidate | Rank # | 1st Round Result | 2nd Round Result | 3rd Round Result |
|-----------|--------|------------------|------------------|------------------|
| A | 1 | A receives plurality; D receives least votes | Doe's ballot is not counted again | Doe's ballot is not counted again |
| B | 2 | | | |
| C | 3 | | | |
| D | 4 | | | |

14

Voter Smith's Ballot:

| Candidate | Rank # | 1st Round Result | 2nd Round Result | 3rd Round Result |
|-----------|--------|------------------|------------------|------------------|
| A | 4 | A receives plurality; D receives least votes | Smith's ballot is counted again, this time with a vote for C; A still leads, with B coming in second, and C coming in third | Smith's ballot is counted again, this time with a vote for B; B receives a majority of votes (when other voters' votes are also counted) and wins. |
| B | 3 | | | |
| C | 2 | | | |
| D | 1 | | | |

In this example, while Doe's initial vote for Candidate A is carried through the second and third rounds of ballot counting, Doe's ballot is not considered again. Meanwhile, Smith is allowed to express through her ballot her preferences for second- and third-choice candidates two more times, thus effectively giving her three votes versus Doe's one vote. By contrast, if separate runoff elections had been held, Doe would have been on equal footing with Smith, in that each of them would have been able to express their candidate preferences again in those subsequent elections.

In short, Maine's allowance for voters whose first-choice candidates receive the least votes to take additional "bites at the apple" gives more weight to those voters' ballots and dilutes the votes of others, such as voters who ranked Rep. Poliquin as their first-choice candidate, thereby depriving the latter of equal protection in violation of the Fourteenth Amendment.

E) Maine's Ranked-Choice Voting Scheme Is Not Narrowly Tailored To Serve a Compelling State Interest.

Election laws that limit the choice of candidates and information that voters are presented with on the ballot impose a "severe" burden on constitutional rights. *See*, *e.g.*, *Norman v. Reed*, 502 U.S. 279, 282, 288-89 (1992); *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 524 (7th Cir. 2017); *Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 581-82 (6th Cir. 2006). Likewise, election laws that impose unequal

burdens on voters of "an identifiable political group whose members share a particular viewpoint [or] associational preference" are "especially difficult for the State to justify." *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983).

As discussed above, Maine's RCV Act limits the information and choices that voters are presented with on the ballot because they are forced to vote (or their votes are tallied) in subsequent "runoff" elections (*i.e.*, rounds of vote counting) without their knowing the subsequent matchup of candidates.  The RCV Act also imposes unequal burdens on voters who associate with and vote for a candidate as their first choice who wins the plurality of votes on the first round, since their second- and third-choice candidate preferences are disregarded in subsequent rounds of vote counting, unlike the ballots of other voters whose first-choice candidates came in last in the initial round.

In light of these severe burdens Maine's ranked-choice voting scheme imposes on voting rights, the state must demonstrate this scheme is "narrowly tailored to serve a compelling state interest." *Clingman*, 544 U.S. at 586.  This Maine cannot do.  In the *Maine Republican Party* case, the state claimed two interests to support the RCV Act: "(1) conducting statewide elections in an orderly manner, and in preserving the integrity and reliability of the electoral process . . . ; and (2) establishing a uniform set of rules governing the process of casting and counting ballots at the primary election for all parties in order to assure consistency and uniformity of election administration by all officials involved."  324 F. Supp. 3d at 212.

In *Maine Republican Party*, this Court held that the RCV Act "places no heavy burden" on a political party's right to nominate candidates through primary elections, and therefore applied the more "forgiving standard" of evaluating whether the state advanced "important regulatory interests . . . to justify [its] reasonable, *nondiscriminatory* restrictions."  *Id.* (emphasis

added).  However, because the instant action points to severe burdens the RCV Act imposes on voters, the state's interest in "conducting statewide elections in an orderly manner, and in preserving the integrity and reliability of the electoral process" is insufficient to justify the RCV Act.  To wit, it is extremely unlikely the state can demonstrate that the prior system of voting, in which a plurality of votes determines winners, and which was used for almost 140 years and remains in effect for state-office races in the general election, is not a more narrowly tailored system of conducting orderly and reliable elections.  This is doubly so where, as noted above, the vast majority of other jurisdictions in the United States do not use ranked-choice voting.

The second interest the state advanced in *Maine Republican Party*, which specifically pertained to primary elections, also does not apply to this challenge, which alleges broader issues with Maine's RCV Act.

Moreover, even assuming *arguendo* the RCV Act does not impose a severe burden on voting rights as this action alleges, the Act still fails under the more "forgiving standard" of judicial review.  That standard requires that a state's voting laws be "*nondiscriminatory*."  *Id*. (emphasis added); *Clingman*, 544 U.S. at 586.  For the reasons discussed above, the RCV Act fails even the lower level of judicial review by systematically discriminating against voters whose first-choice candidate wins a plurality of votes in the initial round of vote counting.

Finally, no level of state interest authorizes Maine to alter the qualifications for office set forth in Art. I, § 2 of the U.S. Constitution.

F)  Maine's Ranked-Choice Voting Scheme Unconstitutionally Deprives Plaintiffs of Due Process.

For the reasons discussed above, Maine's RCV Act results in fundamental unfairness and arbitrariness in the vote-counting process, and therefore deprives Plaintiffs of their right to due process of law guaranteed by the Fourteenth Amendment to the U.S. Constitution.  Among other

infirmities, ranked-choice voting/instant-runoff voting can arbitrarily distort majority will in elections and can cause a voter's vote for a particular candidate to reduce that candidate's electoral chance to win.  This phenomenon, known as "non-monoticity," is unique to ranked-choice voting/instant-runoff voting and constitutes fundamentally unfair treatment of votes.  *See*, *e.g.*, Warren D. Smith, *(non)Monoticity and Instant Runoff Voting*, Ctr. for Range Voting, https://rangevoting.org/Monotone.html.[4]

## II.       A Preliminary Injunction Is Necessary to Prevent Irreparable Harm.

Plaintiffs will suffer irreparable injury if this Court permits the Secretary of State to proceed with a second round of counting based on ranked-choice voting.  It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury."  *Sindicato Puertorriqueno de Trabajadores y Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Thus, voters suffer irreparable injury when a state disregards their ballots or presents voters with a ballot in which validly selecting a certain choice will result in one's vote being ignored or diluted, or the votes of others being redistributed to a different candidate.  *See, e.g.*, *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) (if their ballots were disregarded, "plaintiff voters [would] suffer an injury that is neither remote nor speculative, but actual and imminent").

Here, Plaintiffs' votes will be diluted or disregarded, or other voters' votes will be redistributed to other candidates, if the state is permitted to proceed with tabulating their votes

---

[4]       This non-monoticity of Maine's RCV Act violates not only Plaintiffs' due process rights, but also their First Amendment rights.  *See Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806 (2011) (a law under which a person's support for a candidate results in advantages to an opposing candidate is unconstitutional); *see also Davis v. FEC*, 554 U.S. 724 (2008) (a law under which a person's support for his own candidacy results in advantages to an opposing candidate is unconstitutional).

pursuant to ranked-choice voting.  Because the ranked-choice voting scheme threatens to deprive Plaintiffs of constitutional rights, Plaintiffs will suffer irreparable harm.

### III.      The Balance of Equities Favors the Plaintiffs.

The balance of equities tilts strongly in favor of the Plaintiffs because "issuing an injunction will burden the defendant[] less than denying an injunction would burden the plaintiffs."  *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11 (1st Cir. 2008).

If the election proceeds to a second round of counting under the ranked-choice voting scheme, plaintiffs and thousands of other voters will have their validly cast votes diluted or ignored, or other voters' votes will be redistributed to other candidates, in determining the outcome of the election.  Moreover, all voters will be denied the opportunity to review the entire field of remaining candidates and to cast a vote for their preferred candidate in that field.  As demonstrated above, these outcomes represent serious, irreparable injuries to Plaintiffs' and voters' constitutional rights.

Conversely, no additional burden will be imposed on the government if an injunction is granted.  Defendant has already tabulated the first-ranked selections of all voters, and those votes will be counted to determine the winner of the congressional election.  Furthermore, even if the government can point to some additional administrative burden that would result from an injunction, the protection of First Amendment rights "cannot be considered a burden on the government."  *Freeman v. Morris*, No. 11-CV-00452-NT, 2011 WL 6139216, at *4 (D. Me. Dec. 9, 2011).

With respect to other voters, every voter who cast a properly marked ballot in the congressional race will have his or her vote counted for the voter's preferred candidate.  Thus, no one will be disenfranchised by the granting of an injunction.

## IV.     A Preliminary Injunction Is in the Public Interest.

Finally, the public interest in this case favors a preliminary injunction.  The right of qualified voters to cast ballots for their preferred candidates and to have their votes counted is a constitutional right and the very "foundation of our democratic process."  *Ayers-Schaffner*, 37 F.3d at 729 (1st Cir. 1994).  When the Constitution protects an activity, such as the right to vote, the public interest is also served by protecting that activity.  *See Freeman*, 2011 WL 6139216, at *4; *see also Magriz v. Union de Tronquistas de Puerto Rico*, Local 901, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) ("'[I]t is always in the public interest to prevent violation of a party's constitutional rights.'") (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)).

Here, Plaintiffs and thousands of other voters are at risk of having their votes diluted or disregarded, or having other voters' votes redistributed to other candidates, if Maine proceeds to additional runoff rounds of ballot counting under the ranked-choice voting scheme.  Because these voters' constitutional rights are threatened, "the public interest militates in favor of injunctive relief."  *Magriz*, 765 F. Supp. 2d at 157.

## CONCLUSION

For the above-stated reasons, Plaintiffs respectfully request that the Court enter a preliminary injunction: (1) preventing Maine's RCV Act from being used to determine the winner of the November 6, 2018 general election for U.S. Representative from Maine's Second Congressional District; and (2) requiring the Secretary, and all persons operating under his direction, supervision, or control, to determine the winner of the November 6, 2018 general election for U.S. Representative from Maine's Second Congressional District based on the simple plurality vote result of Maine's first certified vote result.

DATED: November 13, 2018

Respectfully submitted,

/s/ *Lee E. Goodman*

Lee E. Goodman (pro hac vice pending)
Andrew G. Woodson (pro hac vice pending)
Eric Wang (pro hac vice pending)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone: (202) 719-7000
Fax: (202) 719-7049
lgoodman@wileyrein.com
AWoodson@wileyrein.com
EWang@wileyrein.com

/s/ *Joshua A. Tardy*
Joshua A. Tardy, Esq.
Joshua A. Randlett, Esq.
RUDMAN WINCHELL
84 Harlow Street; P.O. Box 1401
Bangor, ME 04402-1401
Phone: (207) 997-4501
jtardy@rudmanwinchell.com
jrandlett@rudmanwinchell.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2018, I electronically filed the foregoing document entitled Plaintiffs' Motion for Preliminary Injunction and Incorporated Memorandum of Law via email to the U.S. District Court, Bangor, Maine (newcases.bangor@med.uscourts.gov), and sent a copy of the foregoing document to the State Attorney General's Office by email (phyllis.gardiner@maine.gov) and U.S. Mail at the following address:

> Phyllis Gardiner
> Office of the Maine Attorney General
> 6 State House Station
> Augusta, ME 04330

DATED: November 13, 2018

> /s/ *Joshua A. Randlett*
> Joshua A. Randlett, Esq.