UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| BRETT BABER, et al.<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW DUNLAP, Secretary of the State of Maine.<br><br>Defendant. | Case No. _____ |

## SWORN EXPERT REPORT OF JASON P. SORENS, Ph.D.

# Voter Disenfranchisement Under Maine's Ranked-Choice Voting System

Jason Sorens*

November 12, 2018

The following represents my expert report and professional opinions in a case challenging the application of the Maine Ranked-Choice Voting Act to the 2018 Second Congressional District of Maine general election. It is based upon a review of the Maine Ranked Choice Voting Act, rules and guidelines issued by the Maine Secretary of State, and professional studies in the field of voting behavior and election systems. I reserve the right to amend or supplement this report if additional information or data regarding the 2018 Maine election becomes available.

## 1 Biographical Introduction

I received my B.A. in economics and philosophy, with honors, from Washington and Lee University in 1998 and my Ph.D. in political science from Yale University in 2003. I have taught at Yale, the University at Buffalo-SUNY, and Dartmouth College. I have taught in the Government Department at Dartmouth College since 2013. Much of my research focuses on political parties, voting behavior, and elections, both in the United States and in other advanced industrial democracies. I have extensive experience working with both individual-level survey data and aggregate election data, and with estimating the effects of electoral systems on electoral outcomes. Within the narrow field of voting methods for single-winner elections, such as instant runoff voting, my experience consists of: presenting at conferences and public events, writing in non-peer-reviewed publications, and teaching. I have taught voting methods as part of comparative politics and American politics classes at Buffalo and Dartmouth since 2005. I am familiar with the most current mathematical and empirical findings in the field of voting methods.

*Lecturer, Department of Government, Dartmouth College, jason.p.sorens@dartmouth.edu. Nothing in this testimony is intended to represent the views of Dartmouth College or any other organization.

## 2 Methodology

This report points to problems with instant-runoff voting that are uncontroversial and well known to scholars in the field, in order to illuminate infirmities with Maine's ranked-choice voting system. In this report I compare Maine's instant-runoff voting method, called "ranked-choice voting" in statute and described in the next section, to alternative voting methods. *Plurality* is the most familiar method: voters vote for one and only one candidate, and the candidate with the most votes wins. *Majority runoff* requires voters also to vote for only one candidate, and the top two candidates from a first round go to a runoff election, in which the candidate with the most votes wins. *Condorcet-consistent methods*, of which there are several, allow voters to rank all candidates and select the winner as the candidate that defeats each other candidate by a head-to-head majority of votes, if such a candidate exists.

## 3 Maine's Instant Runoff Voting Method

Maine's IB 3 established "ranked-choice voting" for primary and general elections to U.S. Senate, U.S. House, Governor, State Senate, and State House in Maine. Due to an advisory opinion of the Supreme Court of Maine, the provisions applying ranked-choice voting to general elections for state office will not take effect unless the state constitution is amended to permit it. "Ranked-choice voting" is actually a misnomer here, as there are many ranked-choice methods. IB3 established what is known in the literature as *instant-runoff voting* (IRV).

Under Maine's version of IRV, voters are allowed to rank all candidates for an office, and a winner is determined by, first, electing any candidate with an absolute majority of first-place votes, and, if no such candidate exists, sequentially eliminating last-place and mathematically eliminated candidates and redistributing their votes to other candidates on the basis of voters' next-highest preferences, until one candidate has a majority, or until two candidates are remaining and one candidate has more votes than the other. If a voter does not rank all candidates, skips a rank, or "overvotes" for more than one candidate at the highest expressed rank (an "exhausted ballot"), then the ballot is no longer distributed once all the properly ranked candidates on that ballot have been eliminated. The statute also gives the Secretary of State the option to limit the number of permitted rankings in any election to six. These provisions differ from those governing Australian federal elections, where ballots that are not marked with a full preference ordering are considered spoilt and invalid.

## 4 Voter Disenfranchisement Under Maine's IRV System

This section considers ways in which IRV forbids voters from expressing the preferences they wish to express, advantages sophisticated over unsophisticated

3

voters, and may unpredictably punish voters for voting their true preferences. These problems are typically worse for IRV than plurality, majority runoff, or alternative ranked-choice methods. IRV denies voters the opportunity to choose the candidate they would prefer under the circumstances relevant to that choice.

## 4.1 Voters Lack Information to Determine How to Vote at Appropriate Stage of Candidate Elimination Under IRV

This section addresses two cases in which IRV forbids voters from expressing the preferences between candidates that they would like to express. In the first case, the sequence of candidate elimination affects the vote that voters would like to cast. However, since voters have to submit their ranking up-front, they do not have the opportunity to cast their preferred ballot. In the second case, voters may have intransitive preferences, and no ranked-choice voting system allows them to vote as they would wish.

### 4.1.1 Voters May Wish to Change Their Votes During Counting Process

Because IRV "instantly" eliminates candidates and redistributes votes based on voters' rankings, it prevents voters from expressing the preference between two candidates that they would otherwise wish to express at the relevant round of elimination. In other words, the way a voter wants to vote can easily depend on how that vote would affect the elimination process, but IRV prevents voters from having that information at the time that they vote.

As an example, consider an election with four candidates, labeled A through D, and nine voters, labeled 1 through 9. Suppose voters have the following preferences, where P indicates the strict preference relation, such that "APB" means "A is preferred to B" (Shepsle 2010).

- Voters 1, 2, 3: APCPBPD
- Voters 4, 5, 6: BPCPDPA
- Voters 7, 8: CPDPAPB
- Voter 9: DPBPCPA

If voters know nothing at all about how other voters are likely to vote, they will want to vote their true preferences. In that case, D is eliminated, then C, making A the winner (voters 1, 2, 3, 7, 8 for A, voters 4, 5, 6, 9 for B), despite the fact that C is the *Condorcet winner*, defeating every other candidate by a head-to-head majority. But suppose voters knew each other's preferences. Then it would be obvious to all that A would win under an instant-runoff election, even though a majority of voters would prefer either C or D to A. If voting had taken place sequentially, and D was eliminated first, then the anti-A voters

would have had a chance to coordinate. In particular, voters 4 through 9 might have well decided to vote C to keep A out. Take voters 4 and 5. Suppose voters 4 and 5 have a slight preference for B over C but really dislike A. Knowing that A would win an instant-runoff election would give these two voters an incentive to rank C first and B second. By doing so, they would change the *expressed* preferences in the instant-runoff election to the following:

- Voters 1, 2, 3: APCPBPD
- Voters 4, 5: CPBPDPA
- Voter 6: BPCPDPA
- Voters 7, 8: CPDPAPB
- Voter 9: DPBPCPA.

With this distribution of votes, B and D are jointly eliminated first, and C then wins a decisive 6–3 victory over A.

In this example, two voters can vote tactically to change the outcome to one preferred by a majority of voters (C defeats A). But they can only do this once they know something about the distribution of votes and which candidates are still in the running. IRV prevents them from having this information and acting on it. A temporally sequential runoff process does not suffer from this problem. Viewed from one angle, the problem is not a problem at all: if tactical voting is necessarily undesirable or wrong, then the fact that lack of information could frustrate some voters' tactical voting under IRV might even be seen as a benefit. But tactical voting and the formation of coalitions are the stuff of politics and can sometimes, as in this example, lead to more democratic (majority-preferred) outcomes. (Per the Gibbard-Satterthwaite Theorem, *all* voting methods can provide incentives to vote tactically (Gibbard 1973, Satterthwaite 1975).) Regardless of the reasons why voters want to vote as they do, the indisputable point is that IRV forbids voters from voting the way they would wish at the relevant stage of counting, while neither plurality nor a temporally sequential runoff nor alternative, Condorcet-consistent methods of ranked-choice voting would do so.

### 4.1.2 Intransitive Voter Preferences

Suppose a voter prefers candidate A to B, candidate B to C, and candidate C to A. This preference ordering is a cycle; social choice theorists call it *intransitive*. Ranked-choice voting methods force voters to rank candidates. In this way, it forbids voters with intransitive preferences from expressing those preferences. If this voter ranks A first, B second, and C third, this ballot could be used to indicate a vote for A over C in a runoff between those two candidates, but that counting is the opposite of what the voter intended.

How common are intransitive voter preferences? A study of the American National Election Survey over the years 1972 to 1984 showed that in three-candidate elections, up to five percent of voters displayed intransitive preferences,

5

while in five-candidate elections, 27 percent did (Radcliff 1993). Ranked-choice voting methods disenfranchise these voters.

## 4.2 IRV's Cognitive Demands on Voters May Distort Votes

Potentially exacerbating the problems just described, IRV places greater cognitive demands on voters than does plurality voting, approval voting (give one vote to as many candidates as one likes, the winner is the candidate with the plurality of votes), or majority runoff elections because it requires voters to express far more preferences than do other voting methods. This cognitive burden can lead to distortions in outcomes. Some examples follow.

- Voters may not realize whether their ballot will be counted if they do not rank all the candidates. Accordingly, they may falsify lower rankings in order to ensure their first-choice preference will be counted. (Under Maine's law they do not need to do this, but they may not realize this.)

- Voters may wish to express indifference relations within their rankings, but Maine's law forbids this. For instance, a voter may wish to rank A above B and C, to express indifference between B and C, and to rank B and C above D. Under Maine's law, any "overvote" causes the ballot to be invalidated at the point of the overvote.[1] Neely & Cook (2008, p. 544) find that overvoting is more common in IRV than other elections in San Francisco, and that precincts with more African-American residents had higher overvote rates. Subsequent research has confirmed abnormally high rates of overvote errors under IRV, particularly among African-American and Latino communities (Neely & McDaniel 2015).

- Voters may simply tire of the task of ranking candidates or fail to understand how the counting process works, and therefore avoid ranking candidates below their first preference even though they *do* have preferences among the other candidates. Burnett & Kogan (2015) find that the rate of "ballot exhaustion" (failing to rank all candidates) ranged between 9.6 to 27.1% of all ballots in the four instant-runoff elections they examined, which meant that the ultimate winner received less than a majority of votes (when all ballots are considered) in all four elections. In San Francisco, exhausted ballots are common in precincts with lower proportions of college-educated voters (Neely & Cook 2008, p. 544).

Of particular concern is the possibility that IRV undermines political equality by particularly privileging more sophisticated voters and exacerbating the problem described in the previous section. More sophisticated voters will be more likely to express a full ranking of candidates and better able to use their understanding of the sequential elimination process to vote tactically than will less sophisticated voters, who economize on information processing costs (Lau

---

[1] Department of the Secretary of State, "Chapter 535: Rules Governing the Administration of Elections Determined by Ranked-Choice Voting," Section 4.2.B(1).

& Redlawsk 2006). These problems exist also under other voting methods, but they appear to be especially acute under IRV. Relevantly, McDaniel (2016) finds that IRV decreased turnout in San Francisco and exacerbated turnout disparities related to age and education, while decreasing the effect of income on turnout.

Plaintiff's counsel has provided me with an image of the Maine Second Congressional District sample ballot, which I believe to be true and accurate (Figure 1). The ballot instructs voters not to overvote, but it does not instruct voters what to do if they are indifferent between candidates or if they have intransitive preferences, and most importantly, it tells them nothing about how their votes will be counted or a winner decided. As a result, sophisticated voters that understand the voting system from their other research have a significant advantage over unsophisticated voters in being able to vote tactically and get their preferred candidates elected.

### 4.3 Under IRV Voters Can Harm a Candidate by Voting for Him or Her

A final downside to IRV is that it can cause a candidate to be defeated because of his or her being ranked *higher* by a voter, or a candidate to become victorious because of his or her being ranked *lower*. IRV thus fails the criterion of *monotonicity* (Fishburn & Brams 1983). Consider the following simple case with three candidates and 17 voters.

- Voters 1-6: APBPC

- Voters 7-12: BPCPA

- Voter 13-17: CPAPB

C is eliminated in the first round of counting, making A the winner. Had voters 7 and 8 switched their ballots to APBPC, B would have been eliminated first and C would have won. By switching their first preference from B to A, voters 7 and 8 cause A to *lose*.

Ornstein & Norman (2014) point to the 2009 Burlington, Vermont mayoral election as an example of monotonicity failure under IRV. The Progressive candidate won despite the fact that a majority of voters preferred the Democratic candidate. Had enough Republicans switched to ranking the Progressive first, the Democrat would have won (an outcome most of them likely would have preferred). Ornstein and Norman also create simulated electorates in two ideological dimensions and run IRV elections with three candidates to see how often IRV leads to monotonicity failure. The simulated elections "exhibit monotonicity failure in anywhere from 0.7% to 51% of all cases, and between 15% and 51% of competitive elections" (p. 6). IRV's monotonicity failures occur primarily due to "Condorcet inefficiency" (p. 7), namely, the fact that IRV fails to elect the majority-preferred candidate in a large number of cases.

The frequency of monotonicity failure implies that IRV can often be an irrational method for aggregating votes. It is worth stressing that some other

Figure 1: Maine Sample Ballot

ranked-choice methods, such as Condorcet-consistent methods that always elected a majority-preferred candidate when one exists, do not suffer from monotonicity failure. These methods require no more cognitive effort from voters than IRV. A typical conclusion is offered by Negriu & Piatecki (2012, p. 63), who examine voter utility under various ranked-choice voting rules, including IRV: "As expected, the results show an overall dominance of Condorcet completion methods over the traditional and more widely used voting systems, regardless of the distributions of voter and candidate positions."

## 5 Conclusion

There are plausible policy rationales for ranked-choice voting, such as reducing the "spoiler" problem in plurality elections and giving candidates an incentive to reach out beyond their own electoral base. Still, voting methods scholars generally see Maine's adopted solution, instant-runoff voting, as clearly dominated by other ranked-choice voting methods that offer all the benefits of IRV but fewer of the costs.

Regardless of the policy merits or demerits of Maine's IRV system, two key problems persist. First, because of its sequential nature, IRV denies voters the opportunity to choose the candidate they would prefer under the circumstances relevant to that choice, including the knowledge that some candidates have been eliminated. This report has shown that voters would be willing to change the way they rank the candidates if they had some information about the likelihood of different candidates' elimination at various stages of the counting process. Moreover, IRV absolutely forbids voters with intransitive preference orderings from expressing those preferences. Those voters, who represent a nontrivial share of the electorate according to the available evidence, simply cannot vote their preferences under Maine's system. Relatedly, the high cognitive demands IRV places on voters means that less sophisticated voters will be more disenfranchised than others by IRV's requirement that they speculate about the counting process. Second, IRV can cause voters to harm the candidate they prefer by voting for that candidate, or benefit a candidate they disprefer by voting against that candidate. This perverse outcome is, notably, not possible under plurality, majority runoff, approval voting, or Condorcet-consistent ranked-choice methods, some of which could as satisfactorily achieve the legitimate outcomes that Maine has sought by adopting IRV.

## 6 Information Considered in Formulating the Report

Maine Ranked-Choice Voting Act.
Department of the Secretary of State, "Chapter 535: Rules Governing the Administration of Elections Determined by Ranked-Choice Voting."
Maine Second Congressional District sample ballot.

Burnett, Craig M. & Vladimir Kogan. 2015. "Ballot (and voter) 'exhaustion' under Instant Runoff Voting: An examination of four ranked-choice elections." *Electoral Studies* 37:41 – 49.

Fishburn, Peter C. & Steven J. Brams. 1983. "Paradoxes of Preferential Voting." *Mathematics Magazine* 56(4):207–214.

Gibbard, Allan. 1973. "Manipulation of Voting Schemes: A General Result." *Econometrica* 41(4):587–601.

Lau, Richard R. & David P. Redlawsk. 2006. *How Voters Decide: Information Processing During Election Campaigns.* New York: Cambridge University Press.

McDaniel, Jason A. 2016. "Writing the Rules to Rank the Candidates: Examining the Impact of Instant-Runoff Voting on Racial Group Turnout in San Francisco Mayoral Elections." *Journal of Urban Affairs* 38(3):387–408.

Neely, Francis & Corey Cook. 2008. "Whose Votes Count? Undervotes, Overvotes, and Ranking in San Francisco's Instant-Runoff Elections." *American Politics Research* 36(4):530–554.

Neely, Francis & Jason McDaniel. 2015. "Overvoting and the Equality of Voice under Instant-Runoff Voting in San Francisco." *California Journal of Politics & Policy* 7(4):1–27.

Negriu, Anghel & Cyrille Piatecki. 2012. "On the Performance of Voting Systems in Spatial Voting Simulations." *Journal of Economic Interaction and Coordination* 7(1):63–77.

Ornstein, Joseph T. & Robert Z. Norman. 2014. "Frequency of monotonicity failure under Instant Runoff Voting: estimates based on a spatial model of elections." *Public Choice* 161(1):1–9.

Radcliff, Benjamin. 1993. "The Structure of Voter Preferences." *Journal of Politics* 55(3):714–719.

Satterthwaite, M.A. 1975. "Strategy-proofness and Arrow's conditions: Existence and correspondence theorems for voting procedures and social welfare functions." *Journal of Economic Theory* 10(2):187–217.

Shepsle, Kenneth A. 2010. *Analyzing Politics.* 2 ed. New York: W.W. Norton.

# 7 Request for Expert Opinion

I was requested to analyze Maine's instant-runoff voting by plaintiff's counsel, Mr. Lee Goodman.

## 8 Compensation

I am being compensated for my work on this case at a rate of $150 per hour plus expenses.

## 9 Declaration

I declare under penalty of perjury that the foregoing is true and correct, and that if I am called as a witness, I will testify competently and consistently with the opinions stated above.

_____  11/12/18
Jason P. Sorens                  Date

11