## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| **BRETT BABER, et al.,** | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:18-CV-465-LEW |
| | ) | |
| **MATTHEW DUNLAP,** | ) | |
| | ) | |
| DEFENDANT | ) | |

## ORDER ON PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER

On November 6, 2018, the State of Maine conducted an election and presented voters with a ballot that asked them to rank their choices for who should be the people's representative for Maine's Second Congressional District. The congressional election was subject to Maine's Ranked-Choice Voting Act, 21 M.R.S. § 723-A. Defendant Secretary of State Matthew Dunlap is invested with the duty to "tabulate the election returns and submit the tabulation to the Governor" no later than 20 days following the election. 21-A M.R.S. § 722.

On November 13, after Defendant Dunlap announced that no contestant had received enough votes to achieve an outright majority victory in Second Congressional District election, and that the ballot counting process would continue as outlined in section 723-A, Plaintiffs, Representative Bruce Poliquin,

*et al.*,[1] filed this civil action.  In their complaint, Plaintiffs maintain that Maine's experiment in ranked-choice voting violates Article I, section 2 of the United States Constitution, and deprives Plaintiffs of rights secured to them under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, as applied to the State of Maine through incorporation in the Fourteenth Amendment, and the Voting Rights Act. (Complaint, *passim.*)  They request the Court declare that their rights have been violated, and they further request injunctive relief that, in effect, requires Defendant to certify Representative Poliquin to be the winner of the election.  (*Id.* at 24 – 25, *prayer for relief.*)

On November 14, 2018, the Court conducted a hearing on Plaintiffs' request for a temporary restraining order (TRO).  The Court heard argument from Plaintiffs, Defendant, and Intervenors Tiffany Bond, et al.[2]  Plaintiffs argue they are entitled to an order enjoining Defendant from finalizing the ballot count under Maine's ranked-choice scheme, such that no final tabulation of votes will occur until this Court is able to rule on Plaintiffs' motion for preliminary injunction or the merits of Plaintiffs' action.

For reasons that follow, Plaintiffs' request for TRO is denied.  The case will proceed in the normal course.

## I

This is not the first time a challenge has been raised concerning the

---

[1] Representative Poliquin is joined in this action by Plaintiffs Brett Baber, Terry Hamm-Morris, and May Hartt.

[2] Ms. Bond is a contestant in the election.

constitutionality of Maine's Ranked-Choice Voting Act ("RCV Act") when used for the selection of Maine's congressional representatives.  Due to the emergency nature of the pending motion, the following background statement is borrowed from this Court's prior order in the matter of *Maine Republican Party v. Dunlap*, No. 1:18-cv-179 (Levy, J., presiding).

> [Prior to passage of the RCV Act], Maine law required a single-choice voting system in primary and general elections, in which voters voted for a single candidate, and the candidate with the most votes (but not necessarily a majority of votes) won. *See Opinion of the Justices*, 162 A.3d 188, 197 (Me. 2017). That system is referred to by the parties as a "plurality" system.
>
> The RCV Act defines ranked-choice voting as "the method of casting and tabulating votes in which voters rank candidates in order of preference, tabulation proceeds in sequential rounds in which last-place candidates are defeated and the candidate with the most votes in the final round is elected."  21-A M.R.S.A. § 1(35-A)).  Under ranked-choice voting, the first round proceeds much in the same way it did under the plurality system: Each voter's first choice vote is counted, and if any candidate captures an outright majority of the first choice votes that candidate wins.  But, if no candidate captures a majority of the first choice votes, there is an instant run-off.  The candidate with the fewest first choice votes is eliminated [and potentially all candidates for whom it is "mathematically impossible to be elected" are also eliminated at the same time], and all of the ballots that listed him or her [or them] as the first choice candidate are counted for their second choice candidate.  The process repeats and eliminates more [non-viable] candidates until one candidate receives a majority [or plurality] of the votes [counted through the RCV process].  [21-A M.R.S. § 723-A(2).]
>
> ...

Following the adoption of the RCV Act by public referendum in 2016, there were legislative efforts to repeal or delay its implementation.[2]  The RCV Act's complex post-adoption legislative and judicial history is chronicled in two opinions of the Maine Supreme Judicial Court related to it: *Opinion of the Justices*, 162 A.3d 188 (Me. 2017) and *Maine Senate v. Secretary of State*, 183 A.3d 749 (Me. 2018). And, as the Court explained in *Maine Senate*: "The history of ranked-choice voting in Maine to date could provide the substance of an entire civics course on the creation of statutory law in the State of Maine." *Maine Senate*, 183 A.3d at 751.

In *Opinion of the Justices*, the Supreme Judicial Court determined that portions of the RCV Act violate several provisions of the Maine Constitution (Art. IV, pt. 1, § 5, Art. IV, pt. 2, § 4, and Art. V, pt. 1, § 3), which, the Court opined, [expressly] require plurality voting in general elections for Maine's State Senators and Representatives, and for Maine's Governor.  *See* 162 A.3d at 209-11.

*Maine Republican Party v. Dunlap*, 324 F. Supp. 3d 202, 204–06 (D. Me. 2018) (footnote omitted).

While Plaintiff Bruce Poliquin stands in a position unlike that of his co-Plaintiffs, each of the Plaintiffs is similar in that he or she indicated on the ballot that Bruce Poliquin is his or her first round choice in the RCV contest.  Each Plaintiff also opted not to rank any other candidate.  (Complaint ¶¶ 7 – 10.)

Upon the calculation of the first round votes, the results (unofficial) appear to be as follows:

| | | |
|---|---|---|
| Bruce Poliquin | 130,916 votes | (46.3%) |
| Jared Golden | 128,915 votes | (45.6%) |
| Tiffany Bond | 16,088 votes | (5.7%) |
| William Hoar | 6,717 votes | (2.4%) |

(Complaint ¶ 37.)

Given these results, application of the RCV system could result in a victory by either Representative Poliquin or Mr. Golden. That victory, if certified, could be based on either a majority or a plurality of the total votes casts. Neither Plaintiffs nor Defendant has suggested that the outcome of the RCV election is known at this time.

## II

"[Injunctive relief]is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012). To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction. *Monga v. Nat'l Endowment for Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018). Those factors are:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant]; (3) the balance of the relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)). As the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor. *Id.* at 18; *Monga*, 323 F. Supp. 3d at 82.

It is generally understood that "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits," meaning that the Court should not address the remaining factors if the movant makes a weak showing as to the

likelihood of success on the underlying claim(s). *Monga*, 323 F. Supp. 3d at 82 (citintg *New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). In some contexts, however, and perhaps particularly in the context of elections, other considerations may have equal sway when it comes to preliminary remedies. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam) ("As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."). In the final analysis, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009)).

### III

**A.    Likelihood of success on the merits**

*1.    U.S. Constitution, Article I*

Plaintiffs' primary argument is that Maine RCV system violates an unstated, but in their view implicit, constitutional requirement that all ballots be counted in a single round and that the candidate with the plurality of votes is the winner.

Article I, Section 2, Clause 1 of the Constitution provides, in pertinent part, as follows:  "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States ...."

Article I, Section 4, Clause 1, provides:  "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators.

Citing precedent of the Second Circuit Court of Appeals, Plaintiffs maintain that Article I, section 2 "has always been construed to mean that the candidate receiving the highest number of votes at the general election is elected, although his vote be only a plurality of all votes cast." *Phillips v. Rockefeller*, 435 F.2d 976, 980 (2d Cir. 1970). While it is true that it does not offend the Constitution if a state permits a candidate for federal office to win by a plurality – the actual holding of *Phillips v. Rockefeller* – it does not follow that Article I, section 2 mandates that all state elections be determined based on a plurality (in the absence of an outright majority).[3]

While I  appreciate that there are limits on the means by which States can conduct elections of representatives to Congress, *see, e.g.*, *U.S. Term Limits*, *Inc. v. Thornton*, 514 U.S. 779 (1995) (invalidating state-imposed term limits as violative of the Qualifications Clauses stated in Article I, § 3), Plaintiffs have not demonstrated that it is more likely than not they will succeed in demonstrating that the United States Constitution prohibits an election process that involves more than one round of ballot counting, or a process designed to ensure that everyone who votes has the opportunity to express their support and be counted with respect to the presumptive frontrunners in the election contest. In fact, it appears that both majority and plurality standards have historical antecedents in American politics.  In short, on the current showing, it appears equally

---

[3] In *Phillips*, the Second Circuit observed that it was significant to the analysis that "New York has permitted the candidate for United States Senate who receives the highest number of votes, even if that number be a mere plurality, to be duly elected," and that, consequently, certification of the candidate based on a plurality of votes "would be in accord with the mandate of the Seventeenth Amendment that Senators be 'elected by the people.'" *Phillips v. Rockefeller*, 435 F.2d 976, 980 (2d Cir. 1970).

plausible that Article I, section 2, when read in conjunction with Article I, section 4, affords the States sufficient leeway to experiment with the election process in the manner that is presently under consideration.

    2.    *Fourteenth Amendment*

The Fourteenth Amendment provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. Am. XIV, § 1.

Citing the Due Process Clause and *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729 (1st Cir. 1994) (collecting authority), Plaintiffs argue that Maine's RCV system will deprive them of the chance to cast their votes "effectively" in a fair election. They further maintain that the only suitable cure is for the Court to order that the vote count be halted and Defendant Representative Poliquin be declared the victor in light of his round-one plurality.

"If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). Assuming that all available state process has been exhausted in order to preserve this claim, *see Gonzalez-Cancel v. Partido Nuevo Progresista*, 696 F.3d 115, 120 (1st Cir. 2012), Plaintiffs' position is not without irony. For instance, if the Court were to sustain Plaintiffs' claim, and if the Court were to determine, as Plaintiffs request, that the appropriate remedy is to declare Representative

Poliquin the winner, there are many who would consider the cure to be worse than the alleged disease, at least insofar as the professed concern is with the right of voters to cast effective ballots in a fair election.  Intervenor Bond, for example, maintains that she would not have stood for the election if she had known prior to the election that the RCV system could be invalidated in this way, or that the result would be the one proposed by Plaintiffs.  Moreover, for this Court to change the rules of the election, after the votes have been cast, could well offend due process.  *See*, *e.g.*, *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 73 (2000) (per curiam) (granting certiorari to consider whether state court decision "changed the manner in which the State's electors [were] to be selected, in violation of the legislature's power to designate the manner for selection under Art. I, § 1, cl. 2, of the United States Constitution," and remanding with instruction for the state court to explain the basis for its decision).

In short, I am not persuaded on the current showing that the Due Process Clause will be upheld by an order that halts completion of the RCV tabulation process.[4]

Citing *Bush v. Gore*, 531 U.S. 98 (2000), Plaintiffs maintain that the RCV

---

[4] Plaintiffs also advance a number of academic challenges to instant run off models like the one set out in the RCV Act. (Sworn Expert Report of Jason Sorens, Ph.D., ECF No. 4.)  Chiefly, they content that instant run offs can give rise to a number of hypothetical scenarios in which voters are forced to make choices or predictions with imperfect information.  At oral argument, Plaintiffs expressed it as a vote made "in the dark."  With respect to the instant election, the Court is not persuaded that the electorate, with reasonable diligence, could not inform itself as to who among the candidates was likely to survive the first round of the RCV process.  The fact that there could be another election at which such concerns could be of paramount importance is not a sufficient basis, in the Court's view, to grant relief in the form of a TRO.  Moreover, assuming Professor Soren's report has a bearing on the merits of this case, the Court is not persuaded that his report supports the request for emergency injunctive relief.

process will deprive them of equal protection under the law.  They recite:

> The Fourteenth Amendment's guarantee of equal protection of the laws
> means that a "State may not, by [] arbitrary and disparate treatment,
> value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98,
> 104-05 (2000) (citing *Harper v. Virginia Bd. of Elections*, 383 U.S. 663,
> 665 (1966)). "The idea that one group can be granted greater voting
> strength than another is hostile to the one man, one vote basis of our
> representative government." *Id.* at 107 (quoting *Moore v. Ogilvie*, 394 U.S.
> 814, 819 (1969) (brackets omitted)).

(Motion for Preliminary Injunction at 14.)[5]

Plaintiffs argue they are deprived of equal protection if some voters are permitted to express a preference for more than one person.  However, it appears that Maine's RCV system is designed to enable every voter the opportunity to express a preference, and be counted, with respect to the candidates most likely to win the election.  Plaintiffs, it seems, have expressed their preference fully and equally on that matter.  They have not demonstrated disparate treatment, let alone a discriminatory intent.  The RCV Act, after all, is party-blind.

> A voter complaining about [a nondiscriminatory] law's effect on him has
> no valid equal-protection claim because, without proof of discriminatory
> intent, a generally applicable law with disparate impact is not
> unconstitutional.  *See, e.g., Washington v. Davis*, 426 U.S. 229, 248
> (1976).  The Fourteenth Amendment does not regard neutral laws as
> invidious ones, even when their burdens purportedly fall
> disproportionately on a protected class.  A fortiori it does not do so when,
> as here, the classes complaining of disparate impact are not even

---

[5] Plaintiffs incorporate these arguments in their Motion for Temporary Restraining Order. (Motion for Temporary Restraining Order at 3.)  They also have moved the Court to consolidate proceedings on their two motions.  (ECF No. 19.)

protected. [citation omitted]

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 207 (2008) (Scalia, J., concurring in judgment upholding photo identification requirement).

Once more there is a certain degree of irony because the remedy Plaintiffs seek could deprive more than 20,000 voters of what they understood to be a right to be counted with respect to the contest between Representative Poliquin and Mr. Golden.[6]  It is not clear, in my view, that such a result would avoid valuing one class of voters (those who voted for Poliquin or Golden as their first choice, without indicating a later preference) over another (those who relied on the RCV system to vote for Bond or Hoar, while also ranking either Poliquin or   Golden).

At oral argument, Plaintiffs emphasized that the First Amendment entitles them to express their support for their candidate.[7]  They feel that Maine is giving other voters disproportionate expression.  The Supreme Court's first amendment jurisprudence teaches that nondiscriminatory regulations that "burden" the right of individuals to vote must be weighed against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford*, 553 U.S. at 190 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434

---

[6] In this particular contest, Defendant has suggested it is likely there will be a "batch elimination," in which process both Ms. Bond's votes and Mr. Hoar's votes will be reviewed to determine whether they disclose a voter preference with regard to either Plaintiff Poliquin or Mr. Golden.  In other words, persons who voted for Ms. Bond will not be excluded from consideration in the Poliquin–Golden contest, which treatment would be unequal vis-à-vis those voters who ranked Mr. Hoar as their first choice.  Indeed, it does not appear possible for any candidate to win the RCV election without considering the ballots cast by Ms. Bond's supporters.  Thus, every voter will have received the opportunity to vote for Mr. Golden or Representative Poliquin.

[7] This first amendment challenge informs the fourteenth amendment analysis because the rights conferred by the First Amendment are incorporated into the substantive protections guaranteed to citizens under the Fourteenth Amendment.  *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 31 (1st Cir. 1993) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 276 – 77 (1964)).
*(continued next page)*

(1992)). That interest must be "sufficiently weighty to justify" whatever burden befalls Plaintiffs. *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288 – 89 (1992)). Here, there is no dispute that the RCV Act, the product of a citizens' initiative, was motivated by a desire to enable third-party and non-party candidates to participate in the political process, and to enable voters to express support for such candidates, without producing the spoiler effect. In this way, the RCV Act actually encourages First Amendment expression,[8] without discriminating against any given voter. Because there is no dispute as to the existence of a legitimate justification for the ranked-choice alternative,[9] and because the burden placed on Plaintiffs' right to vote is modest, if it exists at all, I am not persuaded that Plaintiffs have demonstrated a likelihood of success on the merits of their first amendment challenge.

### 3. *Voting Rights Act*

Assuming the Voting Rights Act, 52 U.S.C. §§ 10301 *et seq.*, has any application whatsoever in this case,[10] at this stage of the proceedings, for the

---

[8] Once more there is a certain degree of irony in Plaintiffs' position because the remedy Plaintiffs seek could deprive more than 20,000 voters of what they understood to be a right to be counted with respect to the contest between Representative Poliquin and Mr. Golden.

[9] In his report, Professor Soren acknowledges the existence of "plausible policy rationales for ranked-choice voting, such as reducing the 'spoiler' problem in plurality elections and giving candidates an incentive to reach out beyond their own electoral base." (Soren Report and 9.) While he maintains that Maine's RCV Act suffers from imperfections that give rise to certain concerns, he does not dispute that there are legitimate policy grounds for states to explore alternatives to the default plurality approach.

[10] The Voting Rights Act prohibits the abridgement of a citizen's right to vote "on account of race or color." 52 U.S.C. § 10301(a). "The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969). Although Plaintiffs maintain that "this case involves heretofore unraised ... Voting Rights Act-based challenges that have arisen out of the present election and need immediate resolution" (Complaint ¶ 3), they have not
*(continued next page)*

reasons already outlined, Plaintiffs have not demonstrated that the RCV Act, or Defendant's implementation of the RCV Act, are infected with discriminatory intent. *Abbott v. Perez*, 138 S. Ct. 2305, 2324, 201 L. Ed. 2d 714 (2018) ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State.").

### 4.   *Remedy*

Perhaps the weakest link in Plaintiffs' presentation concerns the issue of remedy.  Simply stated, Plaintiffs have not provided the Court with any reasoned argumentation, supported by citation to authority, on the specific topic of why the remedy they propose is the remedy they are entitled to.[11]  That shortcoming in their presentation, in my  view, precludes the extraordinary remedy of a TRO, even if they have demonstrated a likelihood of success on the merits of one or more constitutional challenge.  *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 28 n.5 (1st Cir. 2001) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("issues adverted to in a perfunctory manner, unaccompanied by some

---

explained why the Court would apply the Voting Rights Act under the circumstances alleged. However, assuming Plaintiffs have standing under the Voting Rights Act, what they have cited is 52 U.S.C. § 10307, which provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote."  (Complaint ¶ 51.)  The facts, as alleged, do not involve any effort by Defendant or anyone else invested with state-delegated authority to deny Plaintiffs their right to vote or refuse to tabulate their vote.

[11] The most Plaintiffs have indicated is that they "think," if the RCV Act is invalidated, that it would be appropriate to apply the "default" plurality standard to determine the winner of the election.  They have not, however, cited any authority for that proposition.  Moreover, the argument sounds more like a legal rule than a rule of equity.  In terms of an argument that could potentially sound in equity, Plaintiffs have argued that it is acceptable to disregard the ranked choices of Bond and Hoar voters because they acted in a strategic manner that, according to Plaintiffs, strayed out of the bounds sanctioned by the Constitution.  I am not persuasded that I can differentiate between Plaintiffs and other voters on "strategic" grounds.
*(continued next page)*

effort at developed argumentation, are deemed waived")).[12]

## B.    Potential for irreparable harm

Plaintiffs argue that they will experience irreparable harm if the RCV ballot counting process continues while this Court proceeds with the matter of Plaintiffs motion for preliminary injunction.  The contention, however, is that the injury is established because they have demonstrated a constitutional violation. (Motion for Preliminary Injunction at 18.)  For the reasons already outlined, I conclude that irreparable harm has not been demonstrated at this juncture.

## C.    Balance of Relevant Impositions

Plaintiffs argue that "[t]he balance of equities tilts strongly in favor of the Plaintiffs because 'issuing an injunction will burden the defendant[] less than denying an injunction would burden the plaintiffs.'"  (*Id.* at 19, quoting *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11 (1st Cir. 2008)).  In opposition, Defendant asserted orally that there is an appreciable administrative duty that needs to be addressed, without incurring unnecessary costs, as the deadline for final tabulation is November 26, 2018.  In Defendants' view, a TRO not only would disrupt the process in the absence of any showing of a

---

[12] The Court is also concerned with the doctrine of laches.  "'Doctrine of laches,' is based upon [the] maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity." *State of Kansas v. State of Colorado*, 514 U.S. 673, 687 (1995) (quoting Black's Law Dictionary 875 (6th ed. 1990)). Plaintiffs evidently appreciate that laches could be relevant to their action. Plaintiffs maintain that they would have lacked standing or did not have a live case or controversy prior to the first round of ranked choice ballot counting.  Plaintiffs have not briefed the contention, however, and the Court is not prepared at this time to assess Article III ripeness considerations, for purposes of assessing laches.  Ultimately, it may prove unnecessary to reach the issue, if Plaintiffs cannot demonstrate that their claims have merit.
*(continued next page)*

constitutional violation, but would also prevent the creation of a complete record for this Court to consider in the context of Plaintiff's motion for preliminary injunction and/or merits briefing.[13]

I am not persuaded that the balance tips in favor of Plaintiffs.  Indeed, assuming for the sake of argument that Plaintiffs' claims have merit, it appears that any potential remedy would require the application of equitable doctrines and principles.  Conceivably, the application of those doctrines and principles may be informed by the final tabulation of votes.

**D.    The Public's Interest**

Plaintiffs' argument as to this final factor is more of the same.  For the reasons set forth above, I am not persuaded that an order enjoining a final tabulation pending resolution of the motion for preliminary injunction would serve the public's interest.  Even if I concluded that Plaintiffs had demonstrated a likelihood of success, I would be inclined to deny the request for a restraining order because I am not persuaded that the public is not entitled to know the result of the election conducted pursuant to the RCV system, particularly where Plaintiffs have not developed their claim as to the appropriate remedy.

**CONCLUSION**

In denying Plaintiffs' motion for temporary restraining order, I do not discount the sincerity of their complaints regarding the RCV system.  The remedy in a democracy, when no constitutional infirmity appears likely, is to exercise

---

[13] On the morning of the hearing, Defendants filed the Declaration of Deputy Secretary of State Julie L. Flynn (ECF No. 24).  While the declaration is informative and helpful, the declaration is not necessary to overcome Plaintiffs' motion for temporary restraining order and, consequently, I have not summarized its content here.

the protected rights of speech and association granted by the First Amendment to persuade one's fellow citizens of the correctness of one's position and to petition the political branch to change the law.   As it stands, the citizens of Maine have rejected the policy arguments Plaintiffs advance against RCV.   Maine voters cast their ballots in reliance on the RCV system.   For the reasons indicated above, I am not persuaded that the United States Constitution compels the Court to interfere with this most sacred expression of democratic will by enjoining the ballot-counting process and declaring Representative Poliquin the victor.

Plaintiffs' motion for temporary restraining order is denied.

**SO ORDERED.**

**DATED THIS 15TH DAY OF NOVEMBER, 2018**

/S/LANCE E. WALKER
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**