1                    UNITED STATES DISTRICT COURT
                           DISTRICT OF MAINE
2

3
     BRETT BABER, et al.            )
4                                   )
                   Plaintiffs       )
5                                   )            CIVIL ACTION
          vs.                       )
6                                   )             Docket No.
     MATTHEW DUNLAP, Secretary      )           1:18-CV-465-LEW
7    of the State of Maine,         )
                                    )           MOTION FOR TEMPORARY
8                  Defendant.       )            RESTRAINING ORDER

9

10                      TRANSCRIPT OF PROCEEDINGS

11        Pursuant to notice, the above-entitled matter came on

12   for MOTION FOR TEMPORARY RESTRAINING ORDER before the

13   HONORABLE LANCE E. WALKER, District Judge, in the

14   United States District Court, Bangor, Maine, on the 14th

15   day of November, 2018, at 9:05 a.m.

16
     APPEARANCES:
17
     For the Plaintiffs:              Lee E. Goodman, Esquire
18                                    Joshua A. Randlett, Esquire
                                      Joshua A. Tardy, Esquire
19
     For the Defendant:               Phyllis Gardiner, Esquire
20
     For the Intervenor Defendant:    Peter J. Brann, Esquire
21                                    John M. Geise, Esquire
                                      David M. Kallin, Esquire
22                                    James T. Kilbreth, Esquire
                                      James G. Monteleone, Esquire
23
                        Melissa L. Merenberg, RPR
24                       Official Court Reporter

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer.

```
 1                    (Parties present with counsel in open court.)

 2            THE COURT:  Good morning, everyone.  The Court has

 3    convened this morning in the matter of Brett Baber v. Matthew

 4    Dunlap, and we're here specifically to talk about the

 5    plaintiffs' motion filed yesterday late afternoon for a

 6    temporary restraining order.  And before we do that, I'd like

 7    to, beginning with the plaintiffs, have counsel introduce

 8    themselves for the record, please.

 9            MR. GOODMAN:  Yes, Your Honor.  I'm Lee Goodman of

10    the law firm Wiley Rein in Washington, D.C.  I believe my

11    motion for pro hac vice has been submitted.

12            MR. RANDLETT:  Good morning, Your Honor.

13            THE COURT:  Good morning.

14            MR. RANDLETT:  I'm Josh Randlett with Rudman

15    Winchell.  I'm local counsel on behalf of each of the

16    plaintiffs.

17            THE COURT:  Good morning.

18            MR. TARDY:  Good morning, Your Honor.  I'm Joshua

19    Tardy, local counsel, as well.

20            THE COURT:  Good morning.

21            MS. GARDINER:  Good morning, Your Honor.  Phyllis

22    Gardiner, Assistant Attorney General here on behalf of the

23    Secretary of State.

24            THE COURT:  Good morning.

25            MR. KILBRETH:  Morning, Your Honor.  James Kilbreth
```

1   on behalf of Jared Golden.

2           MR. BRANN:  Peter Brann on behalf of Jared Golden.

3           THE COURT:  Good morning.

4           MR. KALLIN:  Your Honor, David Kallin on behalf of

5   Jared Golden.

6           MR. GEISE:  John Geise with the law firm of Perkins

7   Coie in Washington, D.C., on behalf of Jared Golden.

8           THE COURT:  Good morning.

9           MR. MONTELEONE:  Morning, Your Honor.  James

10  Monteleone on behalf of Tiffany Bond and voters, Kaylee

11  Michaud and Rachel Wollstadt.

12          THE COURT:  Good morning.

13      Counsel for plaintiff, you may proceed.

14          MR. GOODMAN:  Your Honor, can I take up one

15  procedural matter to start?

16          THE COURT:  Of course.

17          MR. GOODMAN:  These election disputes often occur in

18  a very expedited fashion after an election when problems

19  arise, and one of the dilemmas you will always face in these

20  is the timing of the action that the Secretary of State and

21  the State of Maine will feel as though they are under to

22  complete their work under the existing plan and the ability of

23  the plaintiffs to get vindication in the federal court system

24  of the constitutional violations that they perceive to see if

25  the Court agrees.

1          And we filed a motion for preliminary injunction Tuesday.

2     We requested that the State suspend the tabulation of those

3     ballots to just maintain the status quo to give the Court time

4     to resolve these issues reflectively.  The Secretary of State

5     has declined that in treaty, and so that's why we filed a

6     motion for temporary restraining order.

7          What I might suggest, Your Honor, is that there are -- we

8     filed a motion this morning to consolidate the hearing on the

9     preliminary injunction with the hearing on the TRO because

10    everyone is here, and everyone is represented.  Our motion for

11    temporary restraining order refers to the brief we filed for

12    preliminary injunction.  And that -- but I want to start with

13    the procedure in which we operate, Your Honor, because we sort

14    of -- from the plaintiffs' perspective, we have four options,

15    the Court can grant the preliminary injunction, the Court can

16    deny the preliminary injunction, the Court can enter a

17    temporary restraining order until it has time to rule on the

18    preliminary injunction, or we could have a stipulation with

19    the State that they will not proceed to tabulate and determine

20    a winner until the federal court has resolved the issue.  But

21    we want to maintain the status quo in the most efficient way

22    possible, and it may make sense for judicial economy to

23    consolidate this hearing today with -- between the TRO and the

24    preliminary injunction since everyone is represented, we are

25    not here ex parte asking for a temporary restraining order.

1          THE COURT:  I'm disinclined to do that right now.  I

2    am going to hear from the defendants on that motion.  I

3    understand that motion was filed at approximately 4:30 this

4    morning.

5          MR. GOODMAN:  Yes.

6          THE COURT:  And the opposition came in not too long

7    ago, so while I have not fastidiously gone over every line of

8    the motion in the opposition, I at least want to hear from the

9    defendants.  It strikes me that to the extent there are

10   factual issues in dispute, that that discussion could have and

11   should maybe take place between the plaintiffs and the

12   defendants regarding whether or not the parties all agree that

13   the Court can accept, for example, I am not sure if this is --

14   would be the case here, that the Court could take it as true

15   for the purposes of ruling on the motion for temporary

16   restraining order, the facts alleged in the verified complaint

17   and the competing affidavits, but I am going reserve ruling on

18   that motion.

19         MR. GOODMAN:  Thank you, Your Honor.

20      Then I will proceed to the argument on temporary

21   restraining order at this time.  I would ask the Court to

22   perhaps consider if you later rule that we could consolidate

23   the preliminary injunction, that you would also accept this

24   argument on preliminary injunction, as well.

25         THE COURT:  Of course.

1          MR. GOODMAN:  Okay.  Your Honor, I think I would

2     start by calling Professor or Dr. Jason Sorens to the stand.

3     We have proffered him as an expert, and I will try to qualify

4     him and then we will ask him some questions.

5          THE COURT:  Dr. Sorens.

6          MS. GARDINER:  Your Honor, I would object.  The

7     Secretary of State -- we had no notice, we barely had time to

8     review Mr. Sorens' affidavit.  We did not think this was going

9     to be an evidentiary hearing.  I assumed we would be making

10    arguments based on the papers, including affidavits.

11         THE COURT:  Counsel.

12         MR. GOODMAN:  Your Honor, the First Circuit

13    indicates that this Court has wide discretion on an expedited

14    hearing like this in an exigent circumstance like this to

15    conduct this proceeding as this Court sees fit to inform

16    itself.

17       Now, Your Honor, we do have a sworn expert report before

18    the Court, and I can argue from that report.  I just wouldn't

19    want to face an objection later that it's hearsay to the

20    extent I want to base any of my legal arguments on Dr. Sorens'

21    expert opinions.

22         THE COURT:  Any objection to having counsel argue

23    from the report that's already before the Court in support of

24    its motion for preliminary injunction and motion for temporary

25    restraining order?

1          MS. GARDINER:  Your Honor, I thought that

2     plaintiffs' counsel just indicated that he was going to be

3     arguing the temporary restraining order motion, which is all I

4     understood was going to be argued today, and I don't really

5     see that this -- I think the only issue with the temporary

6     restraining order is, is there sufficient grounds to stop the

7     counting process where it is?  I don't think Mr. Sorens'

8     expert testimony has any bearing on that particular issue.

9          MR. GOODMAN:  One of the prongs, Your Honor, for

10    this Court to grant the temporary restraining order is the

11    likelihood of the success on the merits.  I have to get into

12    the merits of our constitutional violations, and the professor

13    provides us factual predicates for making certain conclusions.

14       But I am -- Your Honor, it's really the Court's

15    discretion.  I can argue from the report.

16          THE COURT:  Why don't we do that.

17          MR. GOODMAN:  Okay.

18          THE COURT:  Thank you.

19          MR. GOODMAN:  Your Honor, I represent several voters

20    of the Second Congressional District as citizens of Maine,

21    they voted in the election.  I also represent a somewhat

22    differently situated Congressman Bruce Poliquin, who is not

23    only a voter and has the same rights to assert as voters, but

24    also we contend is the winner of the election held on November

25    the 6th under Article I, section 2.  And so he presents unique

1    standing and arguments, as well.

2        So let me move to the -- under the temporary restraining

3    order, prong one, the merits.  Your Honor, the State Supreme

4    Court has already given advice to the State Senate that the

5    ranked-choice voting system or scheme violated the Maine

6    Constitution, which required a plurality of votes to be

7    elected to office, to State Office.  And the State has already

8    declined to implement this law with respect to State Office

9    because it violated the plurality requirement.  So in the

10   federal system, we believe we have a parallel or corollary

11   argument, and that is that Article I, section 2 sets forth

12   qualifications to serve as a member of Congress, and clause 2

13   of Article I, section 2 provides that a member of Congress

14   shall be a person chosen by the people of the district.  Now,

15   that chosen by the people must have some substantive meaning.

16   It should have one meaning, not multiple meanings.  And the

17   U.S. Court of Appeals for the Second Circuit has ruled that

18   for hundreds of years, chosen by the people under Article I,

19   section 2 has meant elected by plurality of the voters.

20   Now --

21        THE COURT:  Did they come to that conclusion in

22   Phillips because that has been the historical practice of

23   states as they elect their federal officials, or did they come

24   to that conclusion independently because that is clear and

25   evident from the history and the evolution of that part of the

1   Constitution?

2           MR. GOODMAN:  The way I read that decision, Your

3   Honor, is that the Second Circuit looked at history to inform

4   what chosen by the people historically meant to the framers

5   and its substantive meaning that carried through to the 1970s

6   in the Rockefeller decision.  Now, if it means plurality, if

7   it historically meant plurality, and if it meant plurality in

8   1970 in the Rockefeller decision, it must mean plurality.  And

9   that means that states cannot under time, place, and manner

10  provisions of Article I, section 2, clause 4 and under the

11  Term Limits v. Thornton decision, they do not have authority

12  to alter substantive provisions and qualifications for office,

13  and that means that --

14          THE COURT:  Is that really what the statute does?

15  It seems to me that this argument largely turns on answering

16  that particular question, that if we can begin with and agree

17  that Article I, section 2 does not say plurality, you're using

18  the Second Circuit case --

19          MR. GOODMAN:  Yes, sir.

20          THE COURT:  -- as support for the proposition that

21  that's what it's traditionally been understood to mean, but it

22  doesn't say that.  Then the question to me at least turns on

23  whether or not under Article I, section 4, this ranked-choice

24  voting law in Maine, is a procedural mechanism, which is

25  sanctioned by the existence of the election clause or whether

1   it's a substantive change to the qualifications provision in

2   Section -- Article I, section 2.  Why should we characterize

3   it as a substantive change and not merely a procedural matter

4   that's reserved to the states to figure out for themselves?

5           MR. GOODMAN:  Yes, Your Honor.  The Term Limits case

6   delineated what time, place, and manner authority extends to

7   it.  It made very clear that time, place, and manner in

8   Article I, section 2, it's actually clause 4, extends to

9   where you're -- the type of machinery you're going to use,

10  where you're going to have people vote, what times the polls

11  will be open.  It goes to the administration of the election.

12      When you decide that someone is qualified to be and is

13  chosen by the people by plurality vote or majority vote or

14  super majority vote, perhaps the State would want to say, we

15  want to be darn sure that our people really want somebody,

16  we're going to set a two-thirds vote majority to be chosen by

17  the people under Article I, now you're talking about

18  substantive qualifications for office.  Nothing is more

19  substantive than the -- than the number of people you need to

20  vote for you to be qualified to serve.  That is not the --

21  that is a very different kind of restriction than what time

22  and where your precinct is and whether it's in the school or

23  the church and the hours of operation, and whether you're

24  going to vote on a paper ballot or whether you're going to

25  vote on a direct record electronic touch screen vote, those

1  are time, place, and manner provisions.  And I think those

2  distinctions between substantive provisions of what it takes

3  to be elected to serve and what -- how the State conducts the

4  election are very two different kettle of fish, very two

5  different in kind things.

6           THE COURT:  Are you aware of any other states that

7  have majority rules in their election laws, whether they be

8  so-called instant-runoff states or in more traditional runoff

9  states, and if so, have there been any challenges in the

10 federal courts to provide this Court with some guidance?

11          MR. GOODMAN:  Your Honor, I understand that

12 Louisiana has one ballot that narrows the rankings to two and

13 then goes to the majority vote between those two, but in that

14 state, when you have multiple candidates on the ballot, they

15 actually consider that their primary, which distills the

16 elections to two and so the -- the -- when you get to two,

17 that ends up being the general election, but then you have the

18 actual runoff.  Georgia requires an actual runoff to get to a

19 majority.

20     The only case I have found, which we have cited in our

21 pleadings, Your Honor, it's in the footnote, is a Northern

22 District of Georgia decision that challenged the majority vote

23 requirement, and the Court determined it did -- that it --

24 that there was no actual case in controversy because it was

25 brought before an election, and it was hypothetical, so there

1    was no case or controversy --

2                    THE COURT:  So not very helpful to me.

3                    MR. GOODMAN:  I know.

4                    THE COURT:  Right.  Okay.

5                    MR. GOODMAN:  And the Supreme Court summarily

6    affirmed that decision, but when the Supreme Court summarily

7    affirms a lower Court decision, it's only on the judgment that

8    is the result and on that reasoning that it was necessary to

9    reach a result.  Well, since the reasoning was actually it was

10   no case in controversy, that's all you can read into the

11   Supreme Court's affirmance of that decision.  However, the

12   Court in the -- the district court in the Northern District of

13   Georgia took a different position than the Second Circuit and

14   in dicta.  In passing it, it said that the Constitution does

15   not set a majority or plurality.  That was a 1971 District

16   Court case.  We have noted that in our pleading for the

17   Court's benefit.

18       So, Your Honor, as far as our research shows in the very

19   short time we have had to present this case to you, we do not

20   have a Supreme Court, or other circuit court ruling, that

21   decides this conflict between Article I, section 2 chosen by

22   the people and the Article I, section 2, clause 4 for time,

23   place, and manner restrictions we believe is an open question

24   and we believe it is a case of first impression for this Court

25   to rule on that conflict.

1        And in the Rockefeller decision because New York had not

2   enacted a law that required majority, the Court did not have

3   to reach that conflict.  So the Second Circuit's decision

4   won't answer that conflict question for us here.

5        So, Your Honor, if we are right, and if the -- if we are

6   right that the -- in relying on the Second Circuit decision

7   that chosen by the people historically has meant and does mean

8   a plurality, it's our contention that the State can't alter or

9   change that.  It's also our contention that it can't mean

10  multiple things.  It has to mean one thing and -- because the

11  Constitution has to have a fixed meaning that we can all rely

12  upon.

13       And it's our contention to this Court that it means a

14  plurality and, therefore, that because in the first vote count

15  of the State of Maine, Bruce Poliquin received a plurality

16  majority of the votes, that he has been chosen by the people

17  of Maine and is entitled to be certified as the winner of the

18  Second Congressional District.

19            THE COURT:  Let me ask you a question about that

20  because that's a curious request for relief it seems to me,

21  and maybe you can enlighten me.  So the request for relief is

22  to have this Court order Mr. Dunlap to certify that

23  Congressman Poliquin is the winner of the election; is that

24  right?

25            MR. GOODMAN:  Two-fold, Your Honor.  First, enjoin

1   the State from certifying a different winner because that

2   would be contrary to Article I, section 2, and moreover, at

3   least declare Mr. Poliquin's right to be -- determined to be

4   the winner, at least declare that right under Article I,

5   section 2, and, yes, then, Your Honor, go further and order --

6   order the State of Maine to certify Mr. Poliquin as the winner

7   under Article I, section 2 of the Constitution.

8           THE COURT:  So how does it follow if your lead

9   argument anyway is to have the Court declare the ranked-choice

10  voting law unconstitutional that it follows naturally that the

11  relief should be to order Secretary of State Dunlap to not

12  certify anyone other than Mr. Poliquin?  How is that the

13  natural relief if this Court concludes that when all of the

14  Mainers who went to the polls to vote for the race in the

15  Second Congressional District did so under the impression both

16  because it's been part of our daily public discourse for a

17  fairly long time and because it was evident on the ballot that

18  they were casting their votes in a ranked-choice system, even

19  though, as you probably know, federal courts are highly

20  reluctant to order special elections, why would it be that the

21  relief would naturally result in simply declaring Mr. Poliquin

22  the winner, and thereby, it seems to me, at least run the risk

23  of having ignored tens of thousands of votes by voters who

24  cast their ballots for one of the other candidates whose names

25  were not Golden or Poliquin?

1          MR. GOODMAN:  I see that as two questions in one.
2   And the first is, why would the natural result be that Bruce
3   Poliquin won the election?  It's because the election was held
4   and if the ranked-choice voting or instant-runoff voting
5   scheme is unconstitutional as we've alleged, then the State --
6   the ranked-choice voting was enacted as an overlay on an
7   existing election system.  And if you -- if you rule that the
8   ranked-choice voting system is unconstitutional, then you
9   revert to the law as it has been for probably 200 years in the
10  state of Maine, which is that the -- that the plurality winner
11  has won the election.
12         He did -- he was the top vote-getter in the first count
13  of ballots in a field of four.  And so if -- if we are correct
14  that the law violates the Constitution, then the ranked-choice
15  voting scheme cannot be implemented as an overlay on the
16  election that was had and the winner, who should be determined
17  to be the winner under the plurality vote system that exists
18  underneath the ranked-choice voting.  The ranked-choice vote
19  was an overlay on that.  So it's the logical result of saying
20  that the ranked-choice voting violates the Constitution and,
21  therefore, you cannot implement its second vote tabulation,
22  its second vote determination, its second vote determination,
23  or certify anybody other than the plurality winner under the
24  exigent or preexisting voting scheme.
25         The second issue you asked me, Your Honor, was how is it

1  fair to the voters who voted in the system?  Well, Your Honor,

2  let me jump ahead a bit from our first argument on Article I,

3  section 2 to some of the flaws in the system because the

4  voters -- one of our claims here, Your Honor, is an equal

5  protection challenge.  And to say that those voters who voted

6  for Hoar or Bond have the right now to have -- have the right

7  even in an unconstitutional system -- if we are right that

8  under due process, First Amendment, and equal protection, that

9  they nonetheless have the right to have their second choices

10  voted (sic), well, that is part in parcel of our equal

11  protection claim.  The right that they are asserting is the

12  right to have disproportionate influence in the outcome of an

13  election that other static single voters who voted for Golden

14  and Poliquin cast.

15       Your Honor, the -- the vote for a candidate, the Courts

16  have ruled, is an expression of a First Amendment right.  It's

17  an exercise of First Amendment rights.  It's an expression of

18  support when you cast a vote on a state ballot.  And at the

19  heart of our equal protection challenge is that to count

20  second and third choices by voters who voted for Bond or Hoar,

21  gives them more speech rights on one ballot than everybody

22  else gets.  A vote is supposed to be a static expression of

23  support for one candidate over one or two others.  It is not

24  supposed to be an officially sanctioned state mechanism to

25  give -- to limit one citizen to express support only for

1   Poliquin or only for Golden and to give another citizen the

2   right to express support for Bond and then Hoar.  Oh, and if

3   those two happen not to win, now I get a third bite at the

4   apple to express my support now for Poliquin or Golden.  So

5   the harm -- the prejudice that is claimed by some of the

6   defendants because they participated in what we contend was an

7   unconstitutional election, to now claim prejudice, that is

8   part in parcel what we claim as part of the unconstitutional

9   aspect of the system, brings us right back to our

10  constitutional challenge.

11      So the prejudice, at heart in the issue of prejudice that

12  you asked me about, is the equal protection problem embedded

13  in this system.  The prejudice they claim is the right to have

14  disproportionate speech and expression over other voters who

15  only got to cast their vote once for one candidate.

16      Moving to the due process claim, Your Honor, the effect

17  of ranked-choice voting is to -- is to conduct a virtual

18  runoff election collapsed in the initial election.  Now, if I

19  gave every voter on their first ballot -- if I gave every

20  voter a ballot and said, here are five candidate names.  I am

21  not going to tell you which two are in contention in this

22  race.  You have to guess at which two are actually going to be

23  standing in the ultimate election, and you have to guess which

24  one you like among the two match up.  I think we would all say

25  that that denies people an effective right to vote under the

1   Due Process Clause.  It's no different than when you force

2   people to make that choice in an instant-runoff election on

3   one ballot because our expert report shows that a -- and

4   studies show that in about 20 -- as much as 27 percent of the

5   time a voter may choose candidate A or over B.  A candidate

6   may choose, if he knows the contest is between B and C, he may

7   choose B over C, but if you make that match up between

8   candidate A and C, in somewhere between 5 to 27 percent of the

9   time, according to our expert, the studies show that voter may

10  prefer C over A.  I can put that in real terms.  You might

11  prefer Trump over Bush.  You might prefer Bush over Rubio, but

12  if the match up if Trump versus Rubio, you recalculate your

13  criteria for selection and to have an effective choice in that

14  election, you have to know the match up is now Trump versus

15  Rubio and you would choose Rubio because these are

16  idiosyncratic elections.  Voters have a right to know who's

17  actually standing.

18      So we contend that forcing that runoff election on the

19  very first ballot forces people to vote in the dark and that

20  denies them an effective right to vote under the Due Process

21  Clause because it is a fundamental right under the Fourteenth

22  Amendment.  And that is -- that is such a severe restriction

23  on voter choice.  I understand that ranked-choice voting is

24  presented as somehow aggrandizing voter choice, giving people

25  more choices, but it actually restricts choice in a very

1    profound way.  It denies them critical knowledge of knowing

2    who the actual candidates are who are going to be in that

3    runoff and who their choice is in the relative merits of

4    the -- with the match up itself.  And so because we think that

5    is a very severe restriction on the right to vote -- and by

6    the way, we aren't the only ones to raise this argument.  The

7    Ninth Circuit upheld ranked-choice voting in a San Francisco

8    race in a case we cited.  The Ninth Circuit raised this issue

9    sua sponte and said this system denies people the right to

10   know who they're voting for at the moment they vote and to

11   recalibrate their votes based on the actual match up.  But the

12   Ninth Circuit says the plaintiffs hadn't raised that issue, so

13   it wouldn't reach it.  So we aren't the first ones to raise

14   this.  That was an almost gratuitous sua sponte observation by

15   the Ninth Circuit.  We think it presents a severe restriction

16   and, therefore, we are entitled to strict scrutiny, and the

17   State must establish a compelling governmental interest to

18   justify this restriction on the ballot.

19        Now, if the Court does not accept my argument under

20   Article I, section 2, the qualifications issue, the Court can

21   still look at what would be a less tailored means.  And that

22   means if the State wanted to, it could preserve that choice

23   for voters.  It could -- by having an actual runoff, only if

24   the Court rejects my argument under Article I, section 2.  So

25   there is a more narrowly tailored means if you want to give

1    voters a second choice to get to an absolute majority where

2    they have actual knowledge at the moment they cast their

3    ballot.  There is a mechanism to do that if it doesn't violate

4    Article I, section 2.

5         Now, as presented in our papers and in our expert report,

6    that fundamental choice program is compounded by other

7    problems inherent in the ranked-choice voting system.  It

8    inherently restricts strategic voting.  It suffers from

9    something our expert calls non-monotonicity, which means that

10   just because you vote for your preferred candidate, you can

11   actually harm that candidate's chances at winning.  That's a

12   very arbitrary treatment of a vote and expression of support

13   for someone.

14        This system is confusing for voters and it has

15   inherent -- well, it has had negative effects on lower income

16   and minority voters, according to our expert report.  That's

17   compounded by the vague instructions that the -- that the

18   Secretary of State has given on the ballot itself.  And some

19   of the instructions that the -- that the Secretary of State

20   provided on the ballot actually contradict guidance posted on

21   the Secretary of State's website leading up to this election,

22   so -- and there were anecdotal reports in the local newspaper

23   about disenfranchised voters and people who didn't understand

24   this ballot in the first -- when you compound all of those

25   individually and cumulatively, we argue it presents a very

1   profound and severe restriction on the right to vote and

2   cannot be defended by a compelling governmental interest.

3        Just very briefly, Your Honor, on the Voting Rights Act.

4   It's very similar to the due process argument for the vote.

5   The Voting Rights Act requires each voter in America to be

6   given a fair and effective right to vote.  We don't believe

7   this does so.  For example, if I gave a Spanish speaking voter

8   an English only ballot, I would violate the Voting Rights Act

9   because it would not inform them of who they're voting and how

10  to vote effectively.

11       If I gave a voter with disabilities a ballot that they

12  couldn't manipulate or couldn't see or hear, you have to

13  provide those options.  This ballot keeps the voter in the

14  dark in the -- in an analogous way.

15       Also, Your Honor, because it has negative effects, I can

16  tell you I have come from Virginia where we used to be subject

17  to Section 5 Preclearance for every voting chain.  I used to

18  have to submit those.

19       If I submitted this system given the professional

20  research showing its disproportionate effect on minority poor

21  voters, I don't know that I would have gotten this, pretty

22  clear in the old days under Section 5.  So -- but that's

23  really more or less the same argument as our effective vote

24  argument under the Due Process Clause.

25       I know you addressed it briefly before, Your Honor, just

1   briefly on equal protection.  It is our assertion, Your Honor,
2   that by virtue of choosing a loser in this election, one voter
3   gets extra speech rights to keep expressing him or herself
4   more additional times over and above the static voter who
5   voted for Golden or Poliquin and is held to one expression of
6   support all the way through.  And under a technical read of
7   the statute, the technical way that the Secretary of State --
8   the presumptive way that the Secretary of State approaches the
9   redistribution of votes is to start with the loser, so if you
10  have a five-way race and there's a loser, you first take the
11  votes of the losing candidate, you single out those voters,
12  and you redistribute their votes to see if you get the
13  majority.  That means the voters for the losing candidate even
14  get more speech rights than the loser voters who voted for
15  three and four.  And so I think that fundamentally presents an
16  equal protection problem.  Some voters get to express
17  themselves more and more than others.  A vote should be one
18  static expression of support.  And you can do that again, Your
19  Honor, if there is no Article I, section 2 problem, you can
20  accomplish that through an actual runoff election.
21       So, Your Honor, moving to the other factors for both the
22  temporary restraining order and/or preliminary injunction.
23  The -- any time the voters of Maine are subjected to the
24  constitutional violation restrictions, severe impingement on
25  their right of franchise, the denial of a duly-elected

1  candidate who was chosen by the people under the Constitution,

2  that -- if this law is unconstitutional as we say, that is

3  irreparable harm.  The denial of constitutional rights in an

4  election is irreparable harm.

5      We also contend, Your Honor, that if the Secretary of

6  State perpetuates this system by continuing to count by

7  tabulating those votes on this recount, this re -- this

8  virtual runoff election, and sending those vote tallies to the

9  Governor and if the Governor is to certify, the perpetuation

10 is continuing harm if this system is unconstitutional.

11     On the balance of equities, the plaintiffs and the

12 defendants both share an interest in constitutional

13 compliance.  Our equities should be the same there, Your

14 Honor, pending a decision by this Court on whether the law is

15 unconstitutional.

16     And so all we are asking is to maintain the status quo

17 until the Court can render a thoughtful decision on the

18 preliminary injunction ruling.  And there is no irreparable

19 harm that we see to the Secretary of State in waiting for this

20 Court to tell the State of Maine and the people of Maine

21 whether this is a constitutional system.  And the public

22 interest likewise, Your Honor, is --

23         THE COURT:  Why are we waiting until some -- a week

24 after the election to raise this issue?

25         MR. GOODMAN:  Yes, sir, Your Honor.

1    THE COURT:  It seems to me that it's been lurking

2    in the background for an awfully long time, and I was a bit

3    surprised to hear from plaintiffs, of course, only yesterday

4    regarding the resolution of this issue as Mr. Dunlap is this

5    morning, one assumes, continuing his duties under the law and

6    continuing to count the votes of pace.  Why now?

7    MR. GOODMAN:  Your Honor, first, I came prepared to

8    address the issue of laches.

9    THE COURT:  I figured you may have.

10   MR. GOODMAN:  Yes, sir.  Let's start with the

11   plaintiff Bruce Poliquin.  Had Mr. Poliquin tried to bring

12   this action under Article I, section 2, let's start there, had

13   he -- had he tried to bring this action before the election,

14   it would have been completely hypothetical to challenge that

15   he was the duly chosen person under Article I, section 2.

16   That is, by the way, the Northern District of Georgia case

17   that we distinguished from -- that was what happened there.

18   And they said, you don't have an actual election yet.  You

19   don't have a plurality winner to present to us, and,

20   therefore, your claim hasn't ripened.

21     So Mr. Poliquin had no right claim under Article I,

22   section 2 until the moment the State announced the election

23   results that he was the plurality winner.  Before that moment,

24   and that would have been late last week, any Article I,

25   section 2 -- by the way, that didn't happen on election day.

1   We didn't get that count from the Secretary of State until

2   later in the week.  So he is here very quickly -- so it was a

3   too soon, too late problem for Bruce Poliquin to raise his

4   Article I, section 2 claim.  It is ripe now because the harm

5   is ripened because he now is the person chosen by the people

6   of Maine under Article I, section 2.

7              THE COURT:  Has Mr. Poliquin lost the election yet?

8              MR. GOODMAN:  Excuse me?

9              THE COURT:  Has Mr. Poliquin lost the election yet

10  under ranked-choice voting?

11             MR. GOODMAN:  He has not.

12             THE COURT:  Okay.

13             MR. GOODMAN:  We -- we believe he is the winner

14  today under Article --

15             THE COURT:  Yes.

16             MR. GOODMAN:  But we believe that the -- in

17  perpetuating the ranked-choice voting plan to get to a

18  different count and to give certain -- to have violated

19  constitutional rights in that ranked-choice -- in other words,

20  is the implementation of that program that we're challenging

21  as unconstitutional, we believe that the laying over of that

22  unconstitutional process to the election that we had and the

23  plurality win that we had, violates his right to be determined

24  to be the winner, for the Secretary of State to send his name

25  to the Governor and to be certified the winner.

1          THE COURT:  So the only point in time -- your

2     argument is, the only point in time that Mr. Poliquin and the

3     other plaintiffs could have brought this action was after the

4     election when it became apparent that the ranked-choice voting

5     process was going to be implemented, notwithstanding the fact

6     that this is a facial constitutional challenge; is that right?

7          MR. GOODMAN:  Both as applied and facial, Your

8     Honor.

9          THE COURT:  Okay.

10          MR. GOODMAN:  It is as applied now because Bruce

11     Poliquin -- he could have perhaps brought a facial challenge

12     before the election.  However, we believe it would not have

13     been ripe and it may have been an advisory opinion.  Now that

14     he has been elected or chosen by the people by plurality

15     election, it is as applied.  The State is now applying this

16     law to him to deny him his rightful certification as the

17     winner of the election.

18     Your Honor, under -- the voters here, looking at their

19     claims as well to the unconstitutional system, they brought

20     their action promptly once the RCV procedures were triggered.

21     They didn't know they would be triggered beforehand.  So once

22     they were triggered, they're here within a week of the

23     election to try to vindicate the constitutionality and

24     preservation of their voting power relative to voters who got

25     unequal protection and disproportionate power in the election.

1      Moreover, Your Honor, looking at the haste or the
2  punctuality of these plaintiffs, this is a brand-new law
3  enacted this year, Your Honor.  It has been implemented more
4  or less on the fly by the Secretary of State.  September 20th
5  was the earliest possible date the Secretary of State appears
6  to have posted sample ballots on the website.  It was on
7  September 21 that Maine needed to make ballots available for
8  Uocava, for overseas citizens.  It was on October 30 that
9  there was a deadline for local clerks to post a sample ballot
10  in a conspicuous public place.  And it wasn't until November
11  the 2nd, about two weeks ago, Your Honor, that the Secretary
12  of State issued a final adoption of the ranked-choice voting
13  rules that would apply to this election.  That was on November
14  the 2nd, Your Honor.  They have been working through expedited
15  rule making year.  So this was also, Your Honor, the first
16  time these voters experienced a general election pursuant to
17  the system.  And they didn't know what to expect going in, but
18  I can tell you this, they know now, and they know because
19  it -- this election did trigger the ranked-choice voting
20  procedures that we claim are unconstitutional.
21      Now, my plaintiffs, Your Honor, are not professional
22  civil rights testers or litigators.  They are voters who have
23  found themselves now impinged after the election because
24  ranked-choice voting was triggered and they brought their
25  claims promptly when they -- when they now realize when the

1  actual unconstitutional effects and harms materialize and

2  affected their franchise.

3      There is also, you know, Your Honor, we talked about this

4  briefly, with the other prong of laches is -- so on point one,

5  Your Honor, we would say there wasn't a delay, certainly not

6  for Bruce Poliquin, and I argue not for the voters, as well.

7  Secondly, it was not an undue delay for all the reasons I just

8  stated.

9      And finally, Your Honor, the third prong of laches is

10 whether or not there is undue prejudice.  And here, Your

11 Honor, all voters will be placed in the same position in a

12 constitutional system.  That is that their first vote will be

13 counted on the same basis as everyone else to the extent we

14 have -- to retrace our grounds, to the extent that the

15 defendants, any of the defendants, argue that their voters

16 voted in a system expecting their vote for Hoar or Bond to be

17 re-credited down the line to two or three other choices, we

18 argue that's part in parcel to the equal protection problem.

19 So we don't -- we do not recognize that as prejudice.  We

20 recognize that as perpetuation of the equal protection problem

21 that is present here.

22      THE COURT:  So that's essentially your -- your

23 analysis is that -- I was trying to follow your answer to my

24 question a few minutes ago regarding the impact.  You talk a

25 lot in your brief about the dynamism of the voting process,

1    meaning you laid out a hypothetical in your brief and for us

2    this morning, and it strikes me interesting that the relief

3    you seek doesn't take into account precisely that dynamic

4    interaction the voter has based on a given set of rules, in

5    this case ranked-choice voting, when the voters went to the

6    ballot box.  And so it strikes me as unusual that you would on

7    the one hand claim that this statute is unconstitutional for a

8    variety of reasons, not the least of which it creates a severe

9    burden on casting a meaningful vote and yet the relief

10   ultimately you seek, if I declare the statute

11   unconstitutional, is to deprive the voters who voted for the

12   two independent candidates their votes.  In other words, they

13   may well have gone into the polling place not faced with a

14   traditional plurality voting system in their mind and that

15   allowed them to cast their first vote, their first choice for

16   Mr. Hoar or Ms. Bond, assuming that if those candidates

17   weren't in the runoff that their second and third place votes

18   perhaps would be cast.

19        My question is, wouldn't they -- even under your own

20   argument that you go on in some length in your brief, wouldn't

21   they have perhaps made a different choice?  And now we're

22   telling them that they are essentially casualties of an

23   unconstitutional system.  That's not the plaintiffs' fault.

24   That's the State's fault.

25             MR. GOODMAN:  Your Honor, we're talking about

1    different sets of voters.  Some voters indeed may have voted

2    strategically, other voters did not.  And there is an in the

3    alternative dimension of asserting the arguments under the Due

4    Process Clause and the Equal Protection Clause.  And the

5    problems inherent in this problem run both ways depending on

6    which constitutional claim there is, but only in the context

7    now of post-election relief from a specific election.  The

8    equal protection problem is inherent and only now is it raised

9    as a prejudice to some voters.  Many other voters, Your Honor,

10   however, were disenfranchised perhaps by voting for one

11   candidate and then no other candidate or not being -- most

12   voters, Your Honor, weren't allowed to make the knowledgeable

13   choice at the beginning of the ballot.  To say that some

14   voters utilized the system in place in order to cast a

15   strategic vote and use the disproportionate, that is the

16   unconstitutional dimension of this, I just don't recognize as

17   prejudice to begin with.

18        And finally, Your Honor, as one who's litigated many

19   post-election disputes, constitutional rights come up after

20   the election oftentimes and affect how a vote was cast or how

21   it's going to be counted after an election.  In recounts, it's

22   pretty standard to start arguing the constitutional rights of

23   whether the late arriving overseas ballots should be counted

24   or not, whether or not the absentee ballots -- this is going

25   on in Florida right now.  They're deciding the constitutional

1    rights of ballots after the election, even though people voted

2    certain choices before the election under an exigent set of

3    rules.  An example of that is the Bush v. Gore decision where

4    there was a 7 to 2 decision that Florida had violated the due

5    process rights through arbitrary counting of ballots after the

6    election.  There, Your Honor, you had a set of rules going

7    into the election, people cast their ballots pursuant to those

8    rules, and then after the election the constitutionality of

9    how those ballots would be counted was decided.  Some -- some

10   voters, the constitutional decision and resolution might have

11   benefited their ballot, and in some cases, their ballots

12   perhaps didn't get counted under certain standards.

13       My point is, we believe that we're here as quickly as we

14   can when we had a right, and the fact that -- that Maine tried

15   to afford certain voters disproportionate power in this

16   election and that they utilized the unconstitutional power is

17   not prejudice under the laches analysis.

18       And I recognize, Your Honor, that under our due process

19   claim, we claim that a voter has a right to engage in

20   strategic voting, but only, Your Honor, in a constitutional

21   process where he knows who his choices actually are.  So that

22   some took advantage of an unconstitutional dimension under our

23   equal protection, I admit that there is some conflict, but

24   those could also be viewed in the alternative, due process and

25   the equal protection aspects of this, but we're really arguing

1   this under a rubric of prejudice to the voter.  I don't think

2   that you get to claim an unconstitutional right to express

3   disproportionate power in the election as prejudice to you

4   after the election.

5       Finally, Your Honor, under the undue prejudice prong, the

6   Courts have recognized that the federal courts have been

7   flagging authority to protect constitutional rights.  That

8   certainly weighs against the prejudice.  Some voters get the

9   mass of voters who were subject to an unconstitutional system.

10  And we believe that the Secretary of State could stop at least

11  some aspects of what the Secretary of State's currently doing

12  to perpetuate this system, at least do not tabulate the final

13  count, do not certify a final count, or send it to the

14  Governor, or have the Governor certify the winner until the

15  federal court system can resolve these issues.  So we don't

16  think that there is ultimate prejudice if we can get expedited

17  resolution of the rights in federal court.  We are just asking

18  to maintain the status quo, Your Honor.

19      So I will close, Your Honor, that's why we are -- we are

20  looking for a declaration of rights and then some logical

21  order that flows from that.  And I will end where we started,

22  Your Honor, the Court could grant our preliminary injunction,

23  the Court could deny our preliminary injunction.  The Court

24  could enter a temporary restraining order to give this Court

25  time to reach a more reflective opinion on the preliminary

1   injunction ruling, or the State could offer a stipulation that
2   it will not tabulate, determine a winner or certify a winner
3   until the federal court has resolved our plaintiffs and all
4   citizens of Maine's constitutional rights.
5           THE COURT:  Thank you, counsel.
6           MR. GOODMAN:  Thank you, Your Honor.
7           MS. GARDINER:  Good morning, Your Honor.
8           THE COURT:  Good morning.
9           MS. GARDINER:  I would like to start and focus on
10  the TRO motion because I think that's the principal reason
11  that we are here today.  The plaintiffs have waited until this
12  very last minute, beyond the last minute, to file an emergency
13  motion to stop a ranked-choice voting counting process that
14  began last Thursday with the gathering of ballots and memory
15  devices at the central counting location in Augusta.  They're
16  looking to -- the TRO -- I guess I want to start with the
17  balance of harms here and come back to the likely success on
18  the merits in a moment.
19      The balance of harms tip against the plaintiffs in a
20  number of ways in this matter.  First of all, I think they
21  have some misunderstandings about the process and what is --
22  what are the next steps.  The Secretary of State's office is
23  engaged right now in the process of scanning hand-count
24  ballots into a high speed tabulator machine to upload what's
25  called a digital cast vote record, which is what enables the

1    computer to run the ranked-choice voting process as outlined

2    in the rules, the same process that was undertaken in the

3    Second Congressional District Democratic Primary in June for

4    which the rules were extremely similar to what they are today.

5        We have filed this morning, and I have advised counsel I

6    attempted to bring paper copies with me this morning, but we

7    filed a short while before the hearing, an affidavit from

8    Deputy Secretary of State Flynn with some exhibits that lay

9    out the process and show what the result would look like if

10   it's allowed to continue.

11       There are a lot of quality control steps that are

12   involved in the process.  Once the ballots are run through the

13   tabulator and uploaded, the report has to be generated and

14   compared to the return of votes cast submitted by the

15   municipal officials within three business days of the

16   election, which would have been by Friday, to try to verify a

17   quality control step and try to verify all the ballots are in.

18   The actual RCV counting process, once everything is uploaded

19   and checked and verified to make sure that indeed all the

20   ballots are in, the process takes minutes with the computer

21   program.

22       There are 69 towns' ballots left -- were 69 towns'

23   ballots left to be uploaded into the system as of the end of

24   the business day yesterday.  They anticipate getting through

25   that process today absent a court order stopping it.  And the

1   important thing is that all that -- results at the end of

2   that, is that then produces, if the process is allowed to go

3   to completion, which it will likely be finished today, there

4   will be a printout that will give the first choice results,

5   which lead to the -- lay out the record to support -- to lay

6   out the record for their plurality argument, the plaintiffs'

7   plurality argument, and it will show the ranked-choice voting

8   result after round two when the third and perhaps fourth place

9   candidates are probably eliminated and the second choices on

10  those ballots redistributed.  So it's going to preserve a

11  record of the full counting process.

12       The official results of the election are due to be

13  submitted to the Governor on November 26th when the tabulation

14  is due under Title 21-A, section 722.  That's the official

15  tabulation of all of the election results from the general

16  election on November 6th.  And there's another step on

17  December 14th, the State has to submit a Certificate of

18  Election to the Clerk of the House at the U.S. House of

19  Representatives reporting -- certifying who the members --

20  members elect to Congress are.  So as we know, Congress can

21  decide whom they wish to seat.

22       So there is nothing magical that happens at the end of

23  the ranked-choice voting process that's going on today, except

24  that it will generate a report and --

25            THE COURT:  And that's important for me to know

1   because?

2           MS. GARDINER:  I'm sorry?

3           THE COURT:  Why is that important for me to know?

4           MS. GARDINER:  Because there is no -- even under the

5   plaintiffs' theories, there is no harm to allowing that

6   process to go through because there's -- all we have to do is

7   get a recorded result that is accurate and the legal arguments

8   can continue from there because there's no consequence.

9           THE COURT:  So that observation is all by way of

10  suggesting to the Court that there is no irreparable harm for

11  purposes of a TRO, that we have time, we meaning me, I have

12  time to consider the motion for preliminary injunction and

13  have everybody back for a hearing on that motion.  Is that

14  your point?

15          MS. GARDINER:  Indeed, Your Honor.

16          THE COURT:  Okay.

17          MS. GARDINER:  Yes.  And my other point is that if

18  the Court were to issue a TRO today to stop this process in

19  the middle, there is harm to the process because you would be

20  interrupting the steps that have to follow in a pretty

21  carefully prescribed sequence.  The staff is there.  The

22  equipment is there.  The vendor, who has to be paid by the

23  day, is there to assist with the ranked-choice voting count.

24  All of that is in place today.  And to interrupt that and have

25  it have to be disbanded is both going to jeopardize the

1    integrity of the process, with respect to at least those last

2    69 towns, and cost additional moneys to the State and in

3    addition, as Ms. Flynn's affidavit lays out, the State also

4    has to begin conducting some recounts of legislative races.

5    The deadline for requesting recounts is 5:00 p.m. today, and

6    those recounts have to begin.  This has to occur in the very

7    same space where the ranked-choice voting count is going on

8    and that space is about as large a room as between the podium

9    I am standing at and the bench, Your Honor.  It is -- so those

10   are a lot of practical problems, but they're real problems

11   that affect the integrity of the process.

12        The plaintiffs -- I saw no reference to as an applied

13   challenge in their papers.  I see only reference to a facial

14   challenge.  I failed to see what their justification is for

15   not bringing a facial challenge on their Article I, section 2

16   claim before the election happened.

17             THE COURT:  No case in controversy, I take it?

18             MS. GARDINER:  But I don't understand that, Your

19   Honor, because the ranked choice -- it was -- as soon as the

20   June primary was concluded and the results of that tabulation

21   done on the 2nd of July, we knew who the four candidates would

22   be in this congressional district race.  We knew that it would

23   be done according to the ranked-choice voting process.

24             THE COURT:  Did we know that?

25             MS. GARDINER:  We didn't know whether one of those

1    four might get more than 50 percent of the first choice votes,

2    but as their facial challenge, which again they have set forth

3    in their papers as a facial challenge.

4           THE COURT:  Yes, that's why I asked.

5           MS. GARDINER:  Yeah.  So -- because they're trying

6    to argue that the -- that process -- for the State to change

7    from a plurality system to a ranked-choice system, violates

8    the U.S. Constitution.  First of all, that has zero legal

9    support.  The one case that they -- there's two aspects,

10   obviously -- I mean, two -- two points that are most

11   important.  The phrase, by the people, does not, as Your Honor

12   pointed out, mean it has to be a plurality.  And the case that

13   they cited, Phillips v. Rockefeller case, only says it doesn't

14   have to be read to require a majority.  That is not support

15   for claiming that it does require a plurality.

16          THE COURT:  Yeah.  Rockefeller said it doesn't --

17   that language doesn't require a majority.  There is no

18   constitutional support for the notion that it requires a

19   majority.

20          MS. GARDINER:  Correct.  So you can't rely on that

21   case to suggest that it does require a plurality.  Moreover,

22   there are several states --

23          THE COURT:  Well, it has to mean something.

24          MS. GARDINER:  It means --

25          THE COURT:  Does it mean anything, Article I,

1  section 2?

2          MS. GARDINER:  By the people as opposed to the

3  legislatures, for example, which is used to elect the

4  senators.  By the people -- this is a process -- the

5  ranked-choice voting process is an election by the people.  It

6  is just an election using a different method of casting and

7  counting the ballots.  It is still an election by the people.

8          THE COURT:  Let's focus on plaintiffs' lead argument

9  and stay there for just a moment.

10          MS. GARDINER:  Okay.

11          THE COURT:  Does Article I, section 2 mean anything?

12          MS. GARDINER:  Well, it does.  It does mean --

13          THE COURT:  Does it give any directive to the states

14  as to how a candidate for federal office and specifically the

15  House of Representatives is is to be elected either by plurality

16  or a majority, or is it simply silent?  And is your argument

17  because it is silent on the point and it ineluctably is silent

18  on the point --

19          MS. GARDINER:  Right.

20          THE COURT:  -- your argument is, then you go to

21  Article I, section 2, clause 4, the elections clause, which

22  vests with the states the authority to control and regulate

23  the time, place, and manner.  You heard --

24          MS. GARDINER:  Exactly.

25          THE COURT:  You heard your counterpart's argument on

1    that point, which says only that that relates to ministerial,

2    administrative matters and not substantive matters and that

3    the RCV is a substantive matter, what do you say about that?

4         MS. GARDINER:  RCV is clearly an administrative

5    matter.  It's not insignificant, but it is a method of

6    administering an election.  It is a method of counting

7    ballots.  I don't know what could be more administrative.  If

8    there are other more minor administrative points that would

9    have --

10        THE COURT:  If you are going to have the election or

11   when you're going to have the election.

12        MS. GARDINER:  Exactly.  Those would be even more

13   sort of technical requirements, but this is an administrative

14   process.  And we have states that have -- that do require a

15   majority vote and then a separate runoff election, such as the

16   state of Georgia, which you were discussing earlier, but the

17   plaintiffs did not mention that there's a District Court case

18   from the Northern District of Georgia from 1993, which was

19   affirmed by the Appeals Court, Public Citizen, Inc. v. Zell

20   Miller in which a citizen group and voters had challenged --

21   they voted for the candidate who received the plurality, but

22   lost the runoff based on the Georgia majority vote statute,

23   and they challenged the validity of that statute under the

24   qualifications clause that Your Honor mentioned.  And the

25   Court held that a majority vote requirement did not

1   unconstitutionally add a qualification of the Office of United

2   States Senator.  It's 813 F. Supp. 821 Northern District of

3   Georgia.

4        So it -- and there are other states that require majority

5   runoffs, many of them in the south, I believe Louisiana,

6   Mississippi, and I know that --

7             THE COURT:  Isn't Mississippi engaged right now in a

8   runoff as we sit here?

9             MS. GARDINER:  I don't know, Your Honor.  I have not

10  checked the status of what's going on in those states in this

11  election cycle, but it's not infrequent that those states have

12  majority runoff.

13       So, again, there is just -- so there's just no support in

14  the law for saying that a method of counting ballots is

15  somehow creating a qualification to serve in Congress.  It's

16  not akin to a term limit because once you reach your term

17  limits you, as a candidate, you as a person, cannot be a

18  candidate again for that office.  Ranked-choice voting doesn't

19  affect your ability to be a candidate.  It doesn't affect your

20  access to the ballot.  It gives you the same opportunity as

21  every other candidate who qualifies for the ballot and goes

22  through the nominating process and gets enough signatures and

23  meets the age requirements set forth in the Constitution, etc.

24             THE COURT:  What about the term limits case that was

25  decided by the Supreme Court?  That case was interesting for a

1   variety of reasons, not the least of which is that part of the

2   discussion pertained to this idea that the power to modify

3   elections or to modify qualifications for elected office are

4   within the exclusive province of the federal government and

5   because at the time of the creation of the new federal

6   Government, the states, of course, never had that power, that

7   isn't the power that the states could have reserved to them

8   under sort of a Tenth Amendment argument or understanding.

9        What's also interesting about that case, and I would like

10   to hear your thoughts on it, is that that case pretty clearly

11   said that Article I, section 2 rather than being some sort of

12   vacuous set of words that don't really say anything regarding

13   this particular issue that we are wrestling with today and,

14   therefore, we should just let the states do whatever they

15   want, that -- the Supreme Court said the opposite.  Now it was

16   in a different context because the term limits case, as you

17   know, had to do with a categorical preclusion of certain

18   candidates from office.  It's sort of a different -- I

19   understand that.  But it seems to me that ultimately the

20   reasoning in that case sort of cuts against your argument that

21   we should read Article I, section 2 as saying not much of

22   anything to answer our question and, therefore, we should look

23   to Article I, section 2, clause 4, the elections clause, to

24   just simply let the states do what they want with respect to

25   that particular issue.  The Supreme Court didn't, at least in

1    the context of that case, agree with that position.  It

2    basically said that it is Article I, section 2, the exclusive

3    province of the United States Constitution and that the states

4    certainly can't engage in modifying qualifications if, as they

5    held, Congress can't even do that absent an amendment to the

6    Constitution.

7         So how does that -- how do I reconcile that part of that

8    case with your argument today on that particular point?

9              MS. GARDINER:  Well, I am not fully refreshed on the

10   details of that case, Your Honor, having had less than

11   24 hours to consider their Article I, section --

12             THE COURT:  You and me both.

13             MS. GARDINER:  However, I don't think that -- I just

14   don't think that there is any reasonable way to construe the

15   ranked-choice voting law as an attempt by the State to set a

16   qualification.  I think it's very far removed from something

17   that could be considered a qualification.  So it's not just a

18   difference in context.  It's completely different in kind from

19   what --

20             THE COURT:  I think that's really -- I think that's

21   going to be an important point for the Court to resolve.  Why

22   do you say that?  Can you say more about that?  Why do you say

23   that?  What makes it different?

24             MS. GARDINER:  Because all this is -- all the

25   ranked-choice voting is is a series of instant-runoff

1    elections held on the same day, so the voters have the

2    ability, if they so choose to, as Your Honor alluded to, to

3    decide to vote for a candidate whom they may think is unlikely

4    to survive round one, but that's the candidate they really

5    want.  And then they rank another candidate as the person they

6    would next want to vote for who would be perhaps making it to

7    the second round.  Obviously, nobody knows for sure until the

8    first choice votes are counted, but --

9              THE COURT:  So should I --

10             MS. GARDINER:  -- it's a series of runoff elections.

11   It doesn't have anything to do with limiting the ability of

12   those candidates to be candidates on the ballot.  It just --

13   instead of having the voters come to the polls on one day and

14   vote -- pick one candidate among four and then go home and

15   wait for the results on that and have, you know, it knocked

16   down to the two -- the two high vote-getters and have to come

17   back on a second day to choose between those two, it just

18   compresses that to one election day.

19        There are lots of policy arguments, pro and con, and as I

20   listen to the plaintiffs' argument this morning and read their

21   expert's report, those are all policy arguments as to whether

22   any ranked choice is a good way to capture the voters' choice

23   for their representative or not the best way, but they are not

24   of constitutional import, and they -- again, this clearly --

25   it's a method of counting, just like Georgia has a totally

1  separate runoff where the voters come back a second day to

2  vote -- to choose between the two highest vote-getters.

3          THE COURT:  Should I conclude that the

4  qualifications clause is whatever the State of Maine says it

5  is?

6          MS. GARDINER:  No, that's not my argument.  I am

7  saying on the -- if you look at the qualifications clause and

8  what qualifications mean, I mean, the -- it's -- you look at

9  ranked-choice voting and what it is, they're not the same

10 thing.  I just don't understand how it can -- it doesn't go to

11 the candidate themselves and whether they are able to be a

12 candidate or able to be elected to Congress.  Whether they're

13 able to be elected in a ranked-choice voting depends entirely

14 on how many people vote for them.

15         THE COURT:  No, and I understand ultimately it's an

16 appropriate time, place, and manner adjustment to voting in

17 Maine.  But I guess my primary question is, we just agreed

18 that the qualifications clause doesn't say anything directly

19 to answer our question about whether a plurality vote is

20 required or majority vote is required.  It ought to mean

21 something.  I'm trying to nail down, is your argument -- that

22 provision simply allows the State to tell us what that means.

23 It might mean plurality in Maine.  It may mean the majority in

24 Mississippi.  Is that how we should reconcile those provisions

25 in Article I?

1          MS. GARDINER:  As between plurality and majority,

2     yes, Your Honor.

3          THE COURT:  Okay.

4          MS. GARDINER:  I think so.  Indeed, our -- our

5     preliminary research, again in less than 24 hours, is that

6     Maine in the 19th century used to elect our congressmen by

7     majority.  We haven't had time to trace the whole history, but

8     it hasn't always been plurality even within the state of

9     Maine, and I don't think it's probably always been plurality

10    in the entire country either for our entire country's history.

11         There is a -- and this switches a bit.  We have been

12    talking about the merits on those points, and I guess I want

13    to pick up also on their equal protection claim, which has

14    been addressed by Courts and rejected.  The brief that was

15    filed on behalf of Jared Golden last evening, page 9 cites

16    three cases where equal protection claims have been addressed.

17    I think the equal protection claims, which hold no weight here

18    that I can see, are based on the misconception, again, about

19    how ranked-choice voting works.

20         Nobody gets extra -- no voters get extra weight or extra

21    opportunities to vote in a ranked-choice voting.

22         THE COURT:  How about Mr. Hoar's voters who chose

23    him in their first position?  And the way the system works is

24    now we are going to retabulate his second -- his voters'

25    second choices.

1          MS. GARDINER:  Right.

2          THE COURT:  Right?  But we're not going to tabulate

3    Ms. Bond's second choices, at least not yet.

4          MS. GARDINER:  Well, we might because under the

5    ranked-choice voting law if -- if there are two candidates for

6    whom it would be mathematically impossible for them to prevail

7    in round two, they can both be eliminated in round one.  So it

8    is possible that when it gets to the point of running that

9    ranked-choice voting utility, the ballots for both Ms. Bond

10   and Mr. Hoar would be -- their second choices would be

11   allocated to remaining candidates.

12         THE COURT:  And it's at least equally possible that

13   after tabulating this first round, which only includes only

14   Mr. Hoar's second place -- his voters' second place choices,

15   that that could end the election?

16         MS. GARDINER:  If it was limited to him, it could, I

17   guess.  I haven't looked at the math to see.  And we don't

18   have the final -- we don't have the official results in any

19   areas, but until the ranked-choice voting utility is run, we

20   won't even have final number on the first round.

21         THE COURT:  I guess I'm simply trying to summarize

22   plaintiffs' --

23         MS. GARDINER:  Okay.

24         THE COURT:  -- argument on this point, which is, and

25   allow you to respond to it, which is that under a set of

1    circumstances that don't seem particularly farfetched --

2                    MS. GARDINER:  Okay.

3                    THE COURT:  -- that the person who received the

4    least number of votes, we start with that candidate first.

5                    MS. GARDINER:  Yeah.

6                    THE COURT:  And count that candidate's voters'

7    second choices.

8                    MS. GARDINER:  Right.

9                    THE COURT:  That may end the election and we never

10   get to -- in this instance, we may not get to Candidate Bond.

11                   MS. GARDINER:  Well --

12                   THE COURT:  I think that's where the argument --

13                   MS. GARDINER:  -- perhaps not, but every voter had

14   an opportunity to decide how they wanted their vote counted.

15   Their vote is -- if -- their vote for Ms. Bond is still a vote

16   for Ms. Bond.  In other words, every -- and the votes for the

17   plaintiffs who voted for Mr. Poliquin and they only voted for

18   Mr. Poliquin, their vote for Poliquin will be counted in each

19   round.  It doesn't cease to be counted after round one.  It

20   gets counted in every round.  It's just that the candidates

21   who are eliminated -- and I think it's actually much more

22   likely that both Ms. Bond and Mr. Hoar will be eliminated at

23   the end of the first round, not just one at a time, and their

24   second choice is distributed, their voters are getting to vote

25   in that runoff election, in effect, as are the voters who

1    chose Mr. Golden or Mr. Poliquin.  Every ballot gets counted

2    in every round.  It's just your first choice -- if your top

3    choice is still a continuing candidate and makes it into the

4    next round, it gets counted.  It gets counted in the second

5    round, too.  So there's simply no -- nobody gets more bites at

6    the apple.  That's just a misconception.

7         And I think the cases -- the Stephenson case involving

8    Ann Arbor, Michigan System of -- they don't call it

9    ranked-choice voting, but the description of the system is

10   almost identical to ranked-choice voting, I found to be one of

11   the most helpful in terms of explaining accurately how and why

12   the system does not favor any group of voters over another.

13   It just simply doesn't create classifications among voters.

14        And I don't see -- there's no restriction at all, let

15   alone a severe restriction, on voters' rights to vote for the

16   candidate of their choice.  They can vote as strategically as

17   they want.  They can pick one or they can pick four or they

18   can pick everything between one and four and rank them as

19   they -- as they see fit.

20        Again, there's -- there's -- I see no harm to the voter

21   in this system at all.  There are some benefits to voters, but

22   there's no harm and certainly nothing I could see rising to

23   the level of a severe harm that would warrant the more

24   heightened scrutiny and the more profound interest of the

25   Government.

1      So I think, again, we could give the Court a more -- much

2   more thorough response to merits arguments in the context of

3   the PI motion.  I think the most critical issue I want to

4   leave the -- make sure the Court is -- fully appreciates today

5   is that to stop the process right now could only affect the

6   integrity of the process and increase costs and cause delays

7   in our aspects of the election, machinery such as recounts,

8   and would not do anything to protect status quo in terms of

9   the plaintiffs' ability to make their arguments and get the

10   relief that they want ultimately because the end result would

11   be a clear record of what each phase of the counting process

12   produced and that preserves it for all the legal arguments and

13   all the possible relief that they want to seek.

14          THE COURT:  Thank you.

15          MS. GARDINER:  Thank you very much, Your Honor.

16          MR. BRANN:  May it please the Court.  Peter Brann on

17   behalf of the defendant, Jared Golden.

18      The critical issue here today should be the motion for a

19   temporary restraining order.  We filed a very brief opposition

20   to the suggestion that we ought to consolidate that.  I think

21   the argument today in part shows why we really shouldn't be

22   trying to decide the entire case this minute before the State

23   even has an opportunity to file a legal brief before we have

24   an opportunity to, you know, submit some significant papers in

25   regard.  And indeed a couple of things that I am going to talk

1  about are things that are going to appear in the brief because

2  we, you know, have seen it, and it's a very fast moving train.

3     So let me go first to the likelihood of success on the

4  merits.  In our view, there actually is no likelihood of

5  success on the merits and on any of the number of the issues

6  that the plaintiffs have raised today.

7     Let's go first to Article I, section 2.  Now, that -- the

8  qualifications clause, and that has never been used by any

9  Court to invalidate a method of selecting candidates.  The

10 Thornton case does not apply at all in this case because that

11 was where they were trying to -- a state was trying to

12 override what the Constitution expressly said with regard to

13 who could be a member of Congress, that is what -- term

14 limits.  They're saying this many years, you can't serve

15 anymore.

16    The reality was the Constitution expressly says you have

17 to be of this age, you have live in the state, etc., end of

18 story.  The State does not have the ability to change what is

19 in the Constitution, that's what the Thornton case stands for.

20    The other case -- the other case cited, this Phillips v.

21 Rockefeller case, is actually not even helpful to them.  That

22 was a case in which they say, as the Court's question alluded

23 to, the historical practice in a lot of places is to use

24 plurality vote.  It didn't say that is the only way you can do

25 it.  It's just describing what was the historical practice.

1   And indeed later in the same page cited by the plaintiffs in

2   their case, it says it is permitted.  That would suggest not

3   that it is mandated or it is required.  So that there is no

4   suggestion in this theory, and as I said, there are -- no

5   Court has ever done that.

6        The theory behind this argument would not just apply to

7   ranked-choice voting, which is as the plaintiffs' counsel this

8   morning referred to, instant runoff, it would apply to real

9   runoffs.  And as we know, I mean there is, as the Court

10  alluded to, there is going to be a runoff in Mississippi.

11  That would be illegal under -- unconstitutional under the

12  theory that's being espoused today because there is no

13  difference under their analysis of how they -- how they have

14  mischaracterized or misread <u>Phillips v. Rockefeller</u>.  That's

15  why there is no case that does it.  What the -- that clause

16  does is it answers the question of when you have to have these

17  elections, every two years for Congress, and who can be a

18  congressman.  It asks the when and who question.  If you want

19  to know the answers to how you can conduct the election, you

20  go to a different clause, the different clause is Article 4 --

21  Article 4, section 4, clause 1, the time, manner, and place

22  provision.  We cite just the tip of the iceberg on the case

23  law that has to do with that clause in which the Supreme Court

24  has said time and again, this is incredibly broad authority

25  that the State has in order to decide how they want to conduct

1    congressional elections.  And indeed, it's the -- you know, we

2    cite -- there are a number of these cases, a couple of them

3    that came out of Arizona, so they're very recent cases in

4    which the Supreme Court made that clear.  What does it

5    include?  Well, you go to the Supreme Court cases themselves.

6    That Smiley v. Holm case that we cite in our papers that we

7    filed, you know, just before 11 o'clock last night, says it

8    includes counting the votes.  That would appear to include

9    ranked-choice voting.

10         In the Roudebush v. Hartke case, also from the Supreme

11   Court, it says it includes recounts.  That would appear -- at

12   least bring within the rubric what we're talking about here.

13         The State has had -- had very, very broad authority.

14   They're looking at the wrong provision of the U.S.

15   Constitution.  The provision that the Supreme Court looks to

16   in looking at how you conduct an election is found in the --

17   this provision, which really isn't talked about at all.  And

18   so -- so their constitutional argument implodes and leaves

19   them with no likelihood on their primary argument as it's

20   described today.

21         With regard to their constitutional claims, they mention

22   in their papers this Dudum case and they cited, well, this is

23   sort of helpful.  The Dudum case actually rejected the

24   constitutional claim that they actually are asserting in this

25   case.  And indeed we cite to four different cases, the only

1    four cases that we are aware of that have to do with the

2    constitutional claims that are being asserted in this case

3    and -- including the Dudum case.  Every single one of them

4    rejected it.

5         Ms. Gardiner mentioned the Stephenson case, which I

6    actually like a lot.  That's unreported.  And if the Court

7    would like a copy, we could submit it in short order.  It's

8    the oldest one, but it's actually -- in many ways, I think

9    it's actually the easiest to follow.  It explains why there is

10   no problem here.  It's not -- it's a misunderstanding of how

11   the process works.  It's not that any voter gets another

12   chance, they get more votes or anything else.  You go to round

13   -- the second round of the tabulation, all the Poliquin votes

14   are counted again, all the Golden votes are counted again, and

15   then you figure out what is the second choice of those who

16   have been excluded.  If it turns out, although it doesn't

17   appear likely in this case, that it's just the fourth person

18   who is eliminated, then Ms. Bond's votes are counted yet

19   again.  She gets -- you know, each person -- you get the same

20   right every single time.

21        Every voter has the same right to pick one person, pick

22   four people, or some number in between, and so every single

23   voter has a right every single time within all the

24   tabulations.  And so -- and it is no different than a runoff

25   election.  The difference is you don't have to, as

1  Ms. Gardiner has alluded to, you don't have to come back

2  another day.  You don't have to worry about the drop off in

3  participation.

4      And so once the process is understood, a process that

5  Maine voters have approved twice, a process that has been

6  upheld at least as applied to congressional elections three

7  times, you do not have a situation in which there is an equal

8  protection problem at all.

9      With regard to the due process claim, plaintiffs don't

10 really cite to any cases that have to do with substantive due

11 process issues.  And indeed the ones we cite say there is no

12 due process issue, instead rely on this expert, and this is an

13 example of why it is that, oh, well, we are going to spring

14 this affidavit on you or -- and then we will see whether or

15 not that applies.

16     The affidavit comes from a political scientist or

17 somebody who is looking at this -- a theory of criticism, a

18 policy of criticism of ranked-choice voting.  It's not -- you

19 know, it's not -- it's obviously not our job to question the

20 policy at this stage.  It's whether or not it's

21 constitutional.  And indeed it's based on a theory from a

22 Nobel prize winning economist by the name Kenneth Arrow, who

23 came up with Arrow's Theorem, which has five criteria for

24 evaluating the propriety of a voting system.  His conclusion,

25 none of them are perfect.  You have -- because none of them

1   you can say satisfy all five criteria.  And so you can

2   criticize it, that's why you can have these vigorous debates

3   in the public, vigorous debates in the Legislature.  Is this a

4   good idea or is this a bad idea?  Because all of them have

5   some aspect that means it's not perfect.  But the Due Process

6   Clause does not require perfection.  It requires that --

7   simply that you are within the range of what is appropriate.

8   And so therefore -- and it's not surprising, therefore, there

9   is no case that the plaintiffs have unearthed that suggests

10  that there is a due process violation with regard to

11  ranked-choice voting.

12      The -- so everyone has the same right to make their

13  ability and political scientists and politicians and others

14  can argue whether or not they think that this is a good idea

15  or not, but that's obviously not the issue for this Court.

16      With regard to the constitutional claims, I would point

17  out that the strict scrutiny has never been used with regard

18  to evaluating the ranked-choice voting.  That would only occur

19  if they can provide and prove a severe burden, which they

20  can't do.  All the others say it's a flexible standard.

21      With regard to the other complaints that we heard about

22  this morning, I don't read those are actually even mentioned

23  in the preliminary injunction.  They're talking about the

24  procedures and how -- whether it's a good idea or how --

25  whether they're doing a good job or not in the count.  The

1  reality there is that doesn't amount to a due process

2  violation either because there is first an adequate state

3  remedy.  That's the whole process.  You get a recount at the

4  end of this thing.  You can challenge the result.  You can

5  complain to the Secretary of State about how they're doing the

6  job.  And beyond that, to show a due process violation in this

7  context, you have to show intentional wrongdoing.  Now, I

8  don't think there is even an allegation to that effect.

9      With regard to the Voting Rights Act, never been used as

10  far as we can tell in the, you know, 24 hours we have had to

11  look at it, to challenge a method of selecting candidates,

12  certainly for Congress.  The reference to -- I'm not sure we

13  could get this through Preclearance Section 5, news alert,

14  doesn't apply to the State of Maine.  There is no suggestion

15  that the Voting Rights Act has any applicability in this case

16  at all.  And it's no different than their due process claim,

17  which is already not valid.

18      So if they have no chance -- no likelihood of success on

19  the merits, that's the end.  There is no right to a temporary

20  restraining order.  But beyond that, we look at the other

21  factors and Mr. Kilbreth, who is working with us, who -- he

22  and I are working together, will have a couple other points

23  based on his experience, but I just want to touch on those

24  briefly.

25      With regard to the harm, and the real -- the irreparable

1  injury to the plaintiffs, and Judge Woodcock said a number of

2  years ago in the Dobson v. Dunlap case, he says, there is no

3  constitutional right to procrastinate.  And that applies here.

4      This is -- if you go to the preliminary injunction

5  motion, page 2, ECF 3, I believe it is, plaintiffs are

6  challenging the RCV Act facially on the basis of federally

7  unconstitutional statutory claims.  It's a facial challenge.

8  As of -- certainly as of June, the voters had said, yeah, we

9  want it, so we know it's going to happen.

10     The federal court down in Portland said, it's

11 constitutional.  The state court said it's constitutional.  It

12 is going to happen.  At that point, certainly Mr. Poliquin

13 knows, is that I am going to be participating in an election

14 with ranked-choice voting, and indeed he already participated

15 in the primary, although it didn't make any difference because

16 he didn't have an opponent.  But he knew then and the

17 plaintiffs knew that that's what was on the horizon.  And so

18 they could say -- well, someone might have said it wasn't

19 right.  Well, they could file the case and find out.  But as

20 the Court alluded to, it makes a difference if you bring in

21 the facial challenge.  And it's not a hypothetical at that

22 point, that we know they're going to use it.  And certainly if

23 anyone picked up the newspaper between June and, you know,

24 this past week, they would know the race is probably kind of

25 close.  There's a good chance there's going to be the use of

1    ranked-choice voting.  It didn't come as a surprise that it

2    happened, you know, and so that to sit and wait is something

3    that this Court has done time and again said, you cannot sit

4    on your rights.  You cannot just sit by and wait and then

5    create that and call, well, I have an emergency.

6        You know, we cite a number of cases in our papers that we

7    filed last night.  There was one from the First Circuit,

8    Respect Maine PAC case, the League of Women Voters v. The

9    Secretary of State, this Dobson case versus the Secretary of

10   State, all of them from this jurisdiction that say, you -- you

11   know, equity ministers to the vigil.  You know, it's not a

12   situation where you're allowed to wait and say, I would like

13   to buy a lottery ticket the day after the winning numbers are

14   announced.  It's too little too late.

15       And furthermore, there is -- with respect to the TRO,

16   there is no proof of injury whatsoever.  The TRO is -- make

17   the Secretary of State stop counting.  That's -- how is that

18   injuring the plaintiffs?  It's not, I am going to lose the

19   election.  That hasn't happened.  We don't have a final

20   result.  We don't even know yet who is ahead after the first

21   round.  It's -- so what is the harm in doing the tabulation

22   and following up on the timetable that Ms. Gardiner told us

23   about this morning, which is in the next few weeks -- we

24   actually briefed these issues.  We could actually say things

25   and put in what is actually the law in this area, which shows

1   the cupboard is bare with regard to their legal arguments.

2   And so that there is no need to resolve this today.  And

3   indeed what would be nice is if we -- if the Secretary of

4   State can do its job and finish its process, we will then have

5   a complete and fulsome record, open and transparent that tells

6   us, this was -- this is what the numbers were at the end of

7   the first tabulation.  This is what the numbers are after the

8   second tabulation.  And then we can see -- let's apply those

9   legal arguments and see if there is something there that would

10  suggest that we are going to overturn the rule of the voters

11  who said they want to use ranked-choice voting.  And the

12  Supreme Court or the Constitution says, you can pick the time,

13  manner, and place with regard to the manner in which you want

14  to conduct the elections.

15      Lastly, with -- and Ms. Gardiner talked about the harm to

16  the State.  I would like to talk about a slightly different

17  harm and then -- and then the public interest briefly and then

18  turn to Mr. Kilbreth for a moment.  Is with regard -- we put

19  in affidavits, which we were able to obtain in very short

20  order, that demonstrate that there are real live voters who

21  relied on the instructions and the ballot, as your questions

22  to plaintiffs' counsel suggested, in order to decide how they

23  were going to participate in this election.  Those 25,000

24  people are just a casualty of the ambition of the plaintiffs.

25  They are the real live voters who made the decision.  Now,

1    some of them made -- their second choice may have been for

2    Mr. Poliquin.  Their second choice could have been for

3    Mr. Hoar or Ms. Bond's support, so whatever, but they made a

4    choice.  They participated in the election with the

5    instruction as to how to conduct it and with an expectation.

6    These are the rules of the game and that they would be

7    disenfranchised if they are lost, if not allowed to do it.

8         Lastly, with regard to the public interest.  The Supreme

9    Court in June of 2018 unanimously concluded in a case coming

10   up having to do with gerrymandering claims in Maryland that

11   the plaintiffs once again there had waited too long before

12   they brought their case.  They let a bunch of elections go and

13   then came in and said, oh, my God.  This is terrible.  We need

14   to stop this.

15        And the Supreme Court fell unanimously, per curiam

16   decision, said that the reason the public interest didn't

17   support going ahead with this is it would create chaos and

18   upset the expectations to overturn or to disrupt an election

19   that was just about to happen.  Well, it's even worse if you

20   have a circumstance here where you have -- approximately

21   280,000 people voted based on the rules of the road and then

22   the plaintiffs come in and says, you know what, we don't think

23   we like the handwriting on the wall.  We want to change the

24   rules, but not all of them.  We just want to want to change

25   some of them so that we will then be declared the winner as

1    though those 25,000 people who voted first for one of the

2    candidates, who is not going to be one of the top two

3    finishers, tough luck.

4         And the Supreme Court, in the gerrymandering case, said

5    that the Court should take into consideration even if they had

6    shown a likelihood of success on the merit, the public chaos

7    and disruption that would occur, and that would be a reason to

8    say, no, we are not going to do it.

9         I think Mr. Kilbreth has covered some things he didn't

10   trust me to say, so.

11             THE COURT:  Thank you.  Thank you, Mr. Brann.

12             MR. KILBRETH:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. KILBRETH:  I will be very brief.  As Mr. Brann

15   said, we had 24 hours to work on this.  He alluded to a

16   Supreme Court case.  One of the things that, in the fullness

17   of time with a little -- a week or so to develop our argument,

18   there is a whole line of cases about when it's appropriate for

19   a federal court to intervene in a state election.  As he

20   alluded to, I think the -- that line of cases is very clear

21   that basically it's not appropriate.

22        The second thing I would say is there is another line of

23   cases in which, again I don't think we had time to put in that

24   memo, that talks about after-the-fact changes to election

25   rules.  And those cases go to the proposition that when people

1    participate in an election, candidates and voters and the

2    rules are clear and the campaign is conducted that way and

3    people vote that way, you cannot after they have voted change

4    the rules.  And we will provide the Court with those when we

5    have a schedule.

6          And the final thing I would say, Your Honor, Mississippi

7    came up, Mississippi, as has been discussed, has a runoff

8    election, which would not be allowed under the plaintiffs'

9    theory.  Interestingly, military personnel in Mississippi use

10   ranked-choice voting because it is the only way their vote can

11   be counted in that runoff.

12         Thank you, Your Honor.

13             THE COURT:  Thank you.

14             MR. MONTELEONE:  Morning, Your Honor.

15             THE COURT:  Morning.

16             MR. MONTELEONE:  On behalf of Ms. Bond and voters

17   who supported her in the first round.  I'd like to initially

18   focus the Court's attention on the laches issue.  It's my

19   intention to not be duplicative of many things that you have

20   heard from my colleagues already.

21         Ms. Bond, and voters who supported her, relied on the

22   expectation that the ranked-choice voting laws in Maine were

23   going to be implemented.  Had they had any reason to doubt

24   that after months of seeing that the laws were put on the

25   books that there was an open window of time where the

1    challenge could have been brought, had they had any reason to

2    doubt that they wouldn't be implemented, they would have

3    engaged in a different course of conduct.  Specifically,

4    Ms. Bond would not have been a candidate in the race.  She had

5    no intention of being a spoiler and entered the race

6    exclusively because the system that Maine established as its

7    method of election ensured that there was no spoiler.

8         Similarly, candidates who decided -- essentially the five

9    percent of voters who decided to support Ms. Bond, entered

10   their votes with the expectation that there is no spoiler, and

11   there would be subsequent opportunities should Ms. Bond be

12   unsuccessful.

13        To try and interpret the -- what that first round count

14   means after the fact, distorts the reality that that's not an

15   accurate -- the initial plurality that's been established in

16   the first round is not an accurate representation of what the

17   vote count would have otherwise been established if voters

18   went to the polls knowing that they were participating in a

19   traditional plurality election.  Because they relied on a

20   different standard, we're now changing -- changing the rules

21   of them.

22             THE COURT:  Just so we simplify this, so what you

23   really are arguing is that as well-informed as most voters are

24   simply by virtue of having near them a computer, telephone,

25   newspaper, or television, that voters who voted for Ms. Bond

1    and Mr. Hoar under the ranked-choice voters system, had they

2    known they were voting under a plurality system, they may have

3    concluded even though Mr. Golden and Mr. Poliquin may not have

4    been their first choices, they may have voted for one or the

5    other of them anyway so as to not create a spoiler situation?

6              MR. MONTELEONE:  Correct, Your Honor.

7              THE COURT:  Meaning the outcome of the election

8    under a plurality system, which is what's advocated by the

9    plaintiffs as a constitutional mandate would -- may have

10   resulted in an election result in favor of Mr. Golden.

11             MR. MONTELEONE:  Correct, Your Honor.  And in

12   addition to that, that voter perspective, is the simple

13   reality that Ms. Bond would not have been a candidate in the

14   election and the five percent of votes that she received would

15   have been redistributed in that initial round to begin with.

16   Considering the razor-thin margin between Mr. Poliquin and

17   Mr. Golden in that initial round, it's impossible for the

18   Court to look in hindsight and try and imagine how that would

19   be redistributed.  Unfortunately, that means the only result

20   that can satisfy the equities of voters who reasonably relied

21   on the system would be to engage in a special election which

22   throws the balance of harms and the impact of the public

23   dramatically.

24        That said, Mr. Poliquin had ample opportunity to bring

25   this issue before the Court.  The Maine Republican Party

1    demonstrated that it had standing in a case in controversy to

2    raise the question of the applicability of ranked-choice

3    voting before the election took place.  After the primary

4    election day, ranked-choice voting was the law in Maine, and

5    there was standing to raise the -- to raise this

6    constitutional interpretation issue then.  It took no action

7    whatsoever and then wait until the last minute, so -- after

8    the last minute to say, well, let's rewind.  Let's do it a

9    different way.  Their claims should be barred for that reason.

10          Just looking at the merits of the arguments, the --

11          THE COURT:  Let me interrupt just for a moment.  I

12    will let you get back to your point.  If the Court concludes

13    that the statute is unconstitutional, and this is really the

14    point I was trying to make about an hour or so ago, if the

15    Court declares that the statute is unconstitutional, I thought

16    it interesting that the remedy sought by the plaintiffs is

17    simply to declare a priority that Mr. Poliquin should be

18    declared the winner of the election because he received

19    plurality of the votes.  The federal case law on the point of

20    whether federal courts ought to be willy-nilly ordering

21    special elections is pretty clear, and it's disfavored in the

22    extreme.

23          My question for you is, what is -- you made a claim that

24    if the Court were to order something like a special election,

25    that that would be unduly prejudicial.  It would not capture

1    the same situation as was presented to the voters in the

2    Second Congressional District on election day, why is that?

3              MR. MONTELEONE:  The primary concern of prejudice is

4    trying to interpret that first round with a -- with a

5    hindsight view of what voters may have intended.  We know that

6    voters intended for multiple rounds to be counted.  Now,

7    should a special election be required?  That's -- that is

8    prejudicial, although for different reasons.  The prejudicial

9    nature of a special election is that running outside of

10   traditional course of the elections procedure, the ability to

11   engage voters, the ability to participate in the process, even

12   the ability for candidates, such as Ms. Bond, who may not

13   otherwise -- may now prefer to not be a participant in a

14   special election where we are selecting a winner by plurality.

15   There likely is insufficient time to communicate with those

16   supporters about that intent, about that intent to stay out of

17   the spoiler role.

18        This is -- it's a bell that can't be unrung.  And it's in

19   the public's interest that the -- the result of the election

20   follow through with their reliance upon the procedures that

21   were going to be engaged in.

22        Now, that said, the people's reliance on the

23   ranked-choice voting procedures were reasonable because those

24   procedures are absolutely in line with the Constitution.

25   Addressing the challenge to the Article I, section 2 language,

 1    I think it's very important for the Court to consider the
 2    context of the framers' intent at the point in time when this
 3    language was created.  Article I was created in a time where
 4    essentially the balance in power in Washington was a competing
 5    pull between central power and state power.  And in reading
 6    Article I, you can see very clearly how there is a very
 7    thoughtful division between rights and responsibilities that
 8    are given to the central power and rights and responsibilities
 9    that are given to the state power.  A perfect example of that
10    is in the clause in section 2 demonstrating that states will
11    have the right to choose -- essentially two, choose the
12    representative and have the right to choose the qualification
13    necessary for those -- those people that are casting votes.
14        On the other hand, the federal Government established its
15    authority to demonstrate the qualifications to be a candidate
16    for office.  The term limits case that was discussed earlier
17    addressed an aspect that was within Congress's control for the
18    qualifications for office.  By contrast, the language
19    regarding a selection by the people is ex -- is an area that's
20    dedicated to the state's control.
21        Now, the Court in Phillips was thoughtful of this balance
22    between section 2 and section 4 that addresses the State's
23    rights to select the manner of election.  And in following the
24    analysis in Phillips, it's clear that the Court recognized
25    that majority is not required -- a requirement that plurality

1   is possible, but rather than just concluding that plurality is

2   therefore a means by the people, it looked to the laws of New

3   York.

4       New York was the state that had the opportunity to choose

5   its manner of election.  And the Phillips Court recognized

6   that New York permitted election by plurality.  Because those

7   things were in harmony with one another, a candidate elected

8   by plurality and state that shows its manner of election would

9   be by plurality, affirmatively chose that its manner of

10  election would be plurality.  The Court saw those things as

11  being in harmony and in line with section 2 requiring a

12  selection by the people.

13      Here, Maine has determined that a selection by the people

14  is a process using the ranked-choice voting procedure.  That's

15  the manner of election that Maine has chosen.

16      The federal court in the Maine Republican Party echoed

17  that this is a -- that is a procedure that's within that right

18  to engage in the time, place, and manner of election.  Because

19  it's, therefore, consistent when we interpret what that

20  language selected by the people means as to the State of

21  Maine, that means ranked-choice voting.  It does not mean

22  plurality voting.

23      Addressing the due process vote regarding an effective

24  vote, it suggested that a voter loses its due process interest

25  if they don't have the opportunity to know who the match up of

1    their candidate is.  That argument sends a challenge because

2    inherently in any plurality election, you can have three or

3    four or more candidates running simultaneously.  A voter who

4    is making a selection of a pool of four candidates in a

5    traditional plurality election, is inherently making a guess.

6    That voter has to say, who do I think might be standing at the

7    end of the day?  I think candidate B might be standing.

8         Now, the argument presented by plaintiffs is that you're

9    denying -- rights would be denied if the voter had anything

10   less than to choose than is it voter B versus voter D or voter

11   -- or excuse me -- candidate D versus candidate B or candidate

12   B versus candidate C.

13        In light of how plurality elections are traditionally

14   conducted, it's clear that -- that guessing that they are --

15   that the plaintiffs described is not really a threat to rights

16   whatsoever.

17        Regarding the voting rights claim, the plaintiffs allege

18   that the act is confusing.  However, given the assertions of

19   plaintiffs demonstrating that they were able to recognize

20   Bruce Poliquin as their preferred candidate and cast a vote

21   for him, those plaintiffs lack standing here today to say that

22   it should be reversed because it was confusing.  Clearly, it

23   was not confusing to these voters.  And plaintiffs are

24   effectively asking the Court to identify unknown voters not

25   before the Court today, to conclude that some might have found

1    it confusing.

2        Now, regarding the equal rights issue, it's important to

3    emphasize that there is no -- there's no protected class here,

4    and there's no demonstrated damages and that the voters that

5    express their vote for Bruce Poliquin are -- their vote is

6    still counting today.  As we stand today, Bruce Poliquin is

7    still actively engaged in the race.  Their vote has not been

8    -- has not been cast aside.  There aren't -- we are not even

9    in a position today where we have two separate groups.

10       However, the relief requested by Mr. Poliquin would

11   effectively create a second group in the candidates who

12   supported or, excuse me, the voters who supported people such

13   as Candidate Bond, assuming a secondary round would take

14   place.

15       Addressing the point of irreparable harm.  There is no --

16   there's no basis -- although there is a reason to say that a

17   threat to constitutional rights is an irreparable harm.  Here,

18   the votes are cast.  We have a detailed record of everything

19   on the page.  There's no emergent basis for us to rush this

20   analysis of somewhat complicated constitutional issues knowing

21   that the voting procedure can continue, and it can simply be

22   tallied and reviewed in different ways.  There is nothing here

23   that can't be undone.  There is no irreparable harm that gives

24   rise to this emergency.

25       That said, similarly on the balance of harms issue, as

1  the First Circuit noted in the Respect Maine PAC v. McKee

2  case, that when -- essentially for a party to sit on its

3  rights, to fail to bring a challenge to an election within a

4  sufficient time for it to be addressed, tilts the balance of

5  harm.  The Court said that -- that it won't recognize an

6  emergency of the plaintiffs own creation, which is effectively

7  what we have here.

8      The failure to address this issue months ago when it was

9  known and actionable has created the so-called emergency that

10 we have today.  In effect, it's not an emergency at all.  And

11 that should -- that tilts the balance of harms to recognize

12 that it's more likely to harm the candidates than the voters

13 who cast votes and rely on a reasonable system.

14     In summary, Your Honor, I would ask that the Court

15 recognize that there is not an emergent basis, that casting

16 aside the reliance of voters and candidates in expectation of

17 a reasonable and lawful ranked-choice voting system would

18 cause severe prejudice to their positions.  We respectfully

19 ask that the motion for emergency relief be denied.

20         THE COURT:  Thank you.

21     Counsel.

22         MR. GOODMAN:  Your Honor, I think the issues are

23 joined.  I will be brief.  I appreciate your time, Your Honor.

24     On Article I, section 2, I think I understand the

25 position of the State and of the defendant Candidate Golden

1    that Article I, section 2 has no meaning at all.  It's

2    whatever a state wants to -- wants to determine, and that

3    means a state could determine it takes a super majority to be

4    chosen by the people.  It could take a simple majority.  It

5    could take plurality.

6        The issue is joined.  The Second Circuit said that

7    provision has a meaning.  And the Second Circuit says the

8    provision has always been construed to mean that the candidate

9    receiving the highest number of votes at the general election

10   is elected.  Now -- although the vote being only by a

11   plurality of votes cast.

12       Now, if that provision of the Constitution means

13   something the meaning should be fixed.  And we -- we -- it is

14   our contention that that meaning is fixed.  And it means

15   plurality, it always has meant plurality and that the State

16   cannot alter or amend or change that meaning.  So that issue

17   is joined.

18           THE COURT:  Let me ask you a question.  The

19   Rockefeller case -- didn't the Rockefeller case also go on to

20   make the observation that Article I, section 4 of the

21   Constitution provides that the manner of holding elections for

22   senators and representatives shall be prescribed in each state

23   by the Legislature thereof.  The Court goes on to say, the New

24   York election law does not specify whether in the case of

25   elections to these offices a majority or plurality is

1    required.  However, in interpreting the words of the election

2    law the senators shall be elected by the people, New York has

3    adopted a practice of permitting a plurality candidate to be

4    duly elected.

5         MR. GOODMAN:  So the issue wasn't joined there.  Had

6    New York adopted a majority rule, the Court would have had or

7    may have had to address this conflict between what Article I,

8    section 2 means and what New York -- we now have that

9    conflict, Your Honor.  Now, Your Honor, we now have that

10   conflict and so we are asking this Court to resolve that

11   conflict.

12       Your Honor, that takes me down now to the due process

13   claim because if the Court disagrees with our position on what

14   Article I, section 2 means and that the meaning is fixed and

15   the State cannot alter it, then the Court has to address the

16   due process problem inherent here.  And none of the cases that

17   the defendants have cited have grappled with, except the Ninth

18   Circuit flagged this issue, what happens about the voter

19   choice and the scenario or the example I gave the Court

20   earlier, what if I gave you your first ballot and said I'm not

21   telling you who the ultimate candidates are, you just have to

22   guess, when we know that voter choice turns on knowing who the

23   candidate is I am voting for and what that match up is.  It's

24   the A versus B, B versus C, but I will choose A over -- C over

25   A.  It is that problem that is inherent in this, and none of

1    the case law dealt with that issue.

2         Counsel for Candidate Golden mentioned that

3    non-monotonicity or some of these problems can inure in

4    various voting systems.  Our expert opines that

5    non-monotonicity, which is a problem with voting for a

6    candidate and hurting that candidate's chances, which is an

7    anti-democratic effect, is unique to instant-runoff voting.

8         The -- so if majority is permitted under Article I,

9    section 2, then that forces the question on due process, and I

10   think it is significant.  The characterizations you heard

11   about what ranked-choice voting is today from the State of

12   Maine.  The State of Maine told the Court that what this

13   system is is a series of runoff elections.  It is not one

14   election where one candidate gets to express multiple

15   preferences.  It is a series of runoff elections.  And the

16   State of Maine made that argument here today in defense of why

17   the Poliquin voter is essentially casting a vote in three

18   different elections, and, therefore, is being treated equally

19   as the candidate for Bond or Hoar, who gets three different

20   votes.  But that was the explicit representation.  Well, Your

21   Honor, if it is the equivalent of three or two different

22   elections, well, then you are indeed forcing each voter of

23   Maine at the point they cast the single ballot they're offered

24   in those multiple elections to guess at the ultimate election

25   and who those candidates will be and who the match up will be

1  and they are denied knowledge and an informed choice based on

2  the ballot system that Maine has forced them into.

3      So I believe the issue is joined on whether that system

4  violates the Due Process Clause by denying voters a meaningful

5  and effective vote, and I do not see that issue determined by

6  other Courts, including the Ninth Circuit or the Minnesota

7  case -- the Minnesota Supreme Court.

8      Now, none of the cases cited by my opposing counsel

9  really grapples with the equal protection problem.  By the

10  way, Your Honor, somewhat the alternative argument is due

11  process and equal protection turns somewhat on how to

12  conceptualize ranked-choice voting and the series of elections

13  where the due process problem is particularly acute, whereas

14  if you consider one election, which the State has just said it

15  is not, and you're allowing voters to express different

16  preferences in that one election.

17      Well, in none of the cases that I read cited by the

18  defendants grapples with the issue of the First Amendment

19  problem, conceiving the vote as an expression of support for

20  one candidate, and then granting in a state-sanctioned

21  structure or construct, certain voters a static choice of one

22  and giving other voters the right to change their expression

23  of support based on how the first election has turned out, how

24  the first ballot count has turned out and to amplify their

25  voice by expressing multiple opinions on one ballot in one

1    election.

2        It is only when, the cases that I am familiar with that

3    the defendants have cited, treat the equal protection argument

4    as a vote rather than as an expression of the support, but the

5    case law is clear that a vote is an expression of support.

6    It's an exercise of a First Amendment right and you're giving

7    some people more right to speak and express more opinions in

8    the election on one day than you are others.

9        Both of those problems go away, Your Honor, if you have

10   an actual runoff election to choose a majority winner.  And

11   that's only if Article I, section 2 doesn't apply.

12       And then, Your Honor, the State was unclear today.  They

13   admitted, as the Court questioned, under the stated rules, the

14   State may take the lowest voter and give those voters,

15   theoretically the Hoar voters, more expressions of support for

16   more candidates than even they would give the Bond voters.

17   Now, the State may choose to do both, but the system allows

18   facially to do both.

19       Finally, Your Honor, on the issue of prejudice, it's just

20   our position that claiming as the -- as Candidate Bond's

21   counsel has, that the voters who voted for Bond strategically

22   to exercise what we contend is an unconstitutional right to

23   have extra voices over our voters as prejudice is a little bit

24   like, you know, the orphan throwing himself on the mercy of

25   the Court because he killed his parents.  You can't claim the

1   exercise of an unconstitutional right as your prejudice if we

2   are right on that issue, Your Honor.

3       On the remedy, Your Honor, Your Honor, I don't think you

4   have to order a special election to clear this up.  I think

5   you can take the extant law, you can -- you can parse the law

6   and say, well, the ranked-choice voting aspect is the

7   unconstitutional aspect, otherwise the election was held

8   constitutionally and the plurality winner wins.

9       As for the emergency relief, Your Honor, it is unclear to

10  me at which point -- first, our first argument is perpetuation

11  of ranked-choice voting, the tabulation -- well, excuse me,

12  the running of the ballots.  There is that aspect of it.

13  That's the one ongoing right now.  Then there will be a

14  tabulation, which I take is really the pressing of a button.

15  The machine that takes the ballots is a computer.  It is

16  counting them.  And the data is in that machine.  And so the

17  tabulation is really hitting the button.  It's the programming

18  of the algorithm and then the hitting of a button.

19      At that point, Your Honor, I think the harm is very

20  clear.  You have now calculated a ranked-choice voting vote

21  that we claim is unconstitutional.  It is conceivable, Your

22  Honor, that the Court could fashion a remedy that grants us a

23  restraining order that merely reaches that point and says,

24  before you tabulate, before the Secretary of State comes to a

25  resulting tabulation and sends that for certification, that --

1    that should be enjoined until we resolve whether that

2    tabulation is even constitutional.  But certainly there

3    shouldn't be a certification of a winner until --

4            THE COURT:  So nobody has really hit upon this

5    point, and I'm surprised, so why is that your argument, that

6    the State argues that we have time, not a lot of time, but we

7    have time?  And there are several steps before a winner is

8    going to be certified, yet it's not simply finishing up

9    counting the votes today and tabulating votes tomorrow, if

10   that's what, in fact, what happens.  So what is it -- why is

11   that the magical point in terms of preventing an irreparable

12   harm if the Court were to give you some injunctive relief up

13   until that point at which Mr. Dunlap presses the button?

14           MR. GOODMAN:  Your Honor --

15           THE COURT:  What it is that might happen after that

16   point that would serve to be an exemplar of irreparable harm?

17           MR. GOODMAN:  Your Honor, our first argument is that

18   it is the implication of ranked-choice voting that is

19   unconstitutional for all the reasons that we have -- and,

20   therefore, implementation of it right now is a constitutional

21   violation because the State is now administering the election

22   in an unconstitutional manner.

23           THE COURT:  I understand.

24           MR. GOODMAN:  And that includes running the ballots.

25   Now, every point at every juncture after that, the harm

1  becomes more material and more material.  So let's assume that
2  the Court is not impressed that the running of the ballots
3  presents -- that the -- our broader view that is the
4  implication that is the irreparable harm, they are running the
5  extra count and the ballot to get to an extra -- an additional
6  tabulation that we believe would harm Bruce Poliquin because
7  that tabulation will reflect something -- is a nullity, and
8  the creation of that nullity, the unconstitutional tabulation
9  harms Bruce Poliquin because right now he is entitled to the
10  plurality vote count that he has.  He is entitled to a
11  determination by the Secretary of State of that vote count,
12  that is the only constitutional vote count that the State of
13  Maine should be issuing if we are correct on our
14  constitutional claims.
15      Now, if the Court is looking for where further can I go
16  to give myself more time without maintaining the status quo in
17  the meantime, the status quo that we have today, well, you
18  could allow the State of Maine conceivably to run without
19  tabulating, hold off on the tabulation, hold off on a
20  determination of vote count under the unconstitutional system,
21  hold off on sending a tabulation to the Governor.  But then at
22  some point, Your Honor, even if we have the running of the
23  ballots and then we have the tabulation that is they hit the
24  button and they print the results, I don't know when the
25  Governor is going to certify, and then here, Your Honor, if we

1   don't have a resolution at that point, Your Honor, I am going

2   to be here asking for a restraining order against the Governor

3   of Maine.  And I prefer not to ask the Court to enjoin the

4   Governor of Maine to sign an official document, and so we can

5   take care of that issue here and now by getting agreement.

6        I also don't know, Your Honor, we are also shooting in

7   the dark, I don't know when the Secretary of State is going to

8   do all these steps.  I believe that they are -- they plan on

9   producing what we contend is an unconstitutional tabulation by

10  November 26th, but they may do that before that date.  They

11  may do it as early as Friday of this week.  And so that's why

12  we're here, Your Honor.

13            THE COURT:  And is the irreparable harm to

14  Mr. Poliquin at that point that we may learn after the

15  algorithms are applied and the button has been pressed, that

16  under the ranked-choice system, Mr. Golden is the presumptive

17  winner of the election?  Is that the nature of the irreparable

18  harm?  I'd like to be clear.

19            MR. GOODMAN:  I don't consider the outcome, I

20  consider the process that is producing it, that the voters are

21  being subjected to to be the unconstitutional harm.

22        Now, now also, Your Honor, the failure to go ahead and

23  certify the vote total under Article I, section 2, is quite

24  real.  You know, if he is the alleged winner, why subject his

25  vote total to additional counts?  And other than an academic

1    study, Your Honor, but this is not an academic study.  This is

2    the State of Maine determining the winner of the election

3    through vote running, vote tabulation, re-tabulation,

4    algorithms.  This is the unconstitutional apparatus being

5    applied to the vote that elected Bruce Poliquin to Congress.

6            THE COURT:  All right.  And because that point

7    relates to the following question, it seems to me -- I want to

8    give you an opportunity to respond to the laches argument

9    that was made serially, and the reason I want you to respond

10   to that, because I think it relates to this line of

11   questioning we have just engaged in, meaning it seems to me

12   that the argument could be made that being late, according to

13   the defendants, to the courthouse, has created a collision

14   course for the type of irreparable harm that you're raising,

15   meaning we don't want to get to a point where we are back here

16   asking for injunctive relief after the votes have been

17   tabulated.  And we may learn that there is a different outcome

18   than there presently stands.  So I wanted -- because I think

19   those two things are related and because the concept of laches

20   was repeated by your colleagues on the other side, I wanted to

21   give you an opportunity to touch on that.

22           MR. GOODMAN:  Yes, Your Honor.  First off, on the

23   characterization of our complaint, as applied or facial, it is

24   both.  Our complaint does not characterize it as applied or as

25   facial.  And it is my understanding from years of litigating

1    that in a constitutional challenge, you're not required to

2    plead as applied.

3        If you read in context our claims, many of the provisions

4    of our complaint are clearly as applied.  And I have explained

5    to the Court why Bruce Poliquin's is as applied.  He won

6    the -- he won the plurality vote, and now that's not being

7    recognized by the State of Maine as the outcome of the

8    election.  We didn't know that -- that didn't ripen and so

9    that is -- that's because the law is being applied to him in

10   that way.

11           THE COURT:  Didn't he have standing to bring the

12   case, though, months ago?

13           MR. GOODMAN:  My argument would be no, if you

14   look at -- if you look at the Georgia case and other cases, it

15   was a too-soon versus too-late problem for him.  At that

16   point, he didn't even know if ranked-choice voting would be

17   invoked.  It was theoretic.  It was -- it would have been a

18   possibility, a hypothetical.  What if I run for office?  What

19   if there is no super majority or absolute majority on the

20   first ballot?  What if --

21           THE COURT:  Was there doubt after the primary that

22   he was running for office?

23           MR. GOODMAN:  I still think it would not have been a

24   ripe claim, and certainly that would have been a facial attack

25   perhaps.  He now has an as applied challenge to it.  It is

84

1    being applied to him.  His as applied definitely did not

2    ripen.

3              THE COURT:  How would your arguments have differed

4    in any material respect?

5              MR. GOODMAN:  It would have been -- it would have

6    been a facial attack by someone who would be hypothetically

7    claiming that his right to a -- to be elected by plurality was

8    being infringed.  And he faced every risk that that would be

9    deemed a hypothetical with regard to him and certainly if he

10   brought the claim.  And so -- but now his as applied challenge

11   only ripens when he is actually impacted by the law.

12        And we have gone through the issues of the voters, Your

13   Honor, waiting.  Well, the State didn't issue its rules -- and

14   you heard from the Attorney General today, they still haven't

15   decided how they're going to implement.  They still haven't

16   decided if they're just going to count Hoar voters second or

17   if they might count Hoar and Bond voters second and third

18   choices in this election.  They still haven't determined all

19   of this.

20        The -- the impact of this on the voter plaintiffs here,

21   the impact only materialized when the system was triggered by

22   a non majority vote in that first election.  Up until

23   November 2nd, we didn't even know the rules that they would

24   apply.  Those regulations weren't issued until November

25   the 2nd.

1          So the Courts have ruled that determining what is an
2    inexcusable delay, even if there is a delay, and we claim at
3    least as respect to the as applied aspect of this that I went
4    through an election now, the ranked-choice voting system is
5    being applied to me, and my vote and it now is actually, not
6    theoretically, but it is actually diluting my vote now,
7    that -- those arguments only ripen when ranked-choice voting
8    actually was triggered in the vote-counting process and -- but
9    the inexcusable aspect of delay under the Laches Doctrine
10   looks -- it's a facts and circumstances test.  And I won't
11   repeat all of them, but, Your Honor, this is the first general
12   election where this was ever implemented.  People couldn't
13   predict the impact on their vote until they saw it actually
14   happen.

15         And we have discussed the prejudice issue, the main
16   prejudice that we have heard.  I don't think administrative
17   prejudice for the Secretary of State overcomes a profound
18   constitutional violation, especially where the contention is
19   that it is the implementation of those administrative duties
20   that is part in parcel the constitutional claim.

21         But further, Your Honor, the prejudicial claim that
22   people voted strategically, actually, Your Honor, we are going
23   to leave people -- we are going to leave people in the same
24   position, their first vote, in a multi-candidate field, will
25   count.  And we think that's the only constitutional result,

1    and the only constitutional way to try to win over the field

2    would be to hold a second runoff, as some states do, if under

3    Article I, section 2 that's even permissible.

4         So the State has chosen -- the State here put us in this

5    bind.  And the prejudice is as a result of an unconstitutional

6    system that the State has -- is now implementing, not the

7    lawsuit to vindicate the rights of all voters who were

8    subjected to the absence of the right to make a knowledgeable

9    decision at the moment -- I mean, there is prejudice either

10   way here, Your Honor, perhaps, but the prejudice they contend

11   is the prejudice to exercise extra influence on the decision

12   of the election that gives some people more rights than

13   others, more speech to express their support than others, and

14   we don't think that as a matter of law can constitute the type

15   of prejudice for laches.

16              THE COURT:  Thank you.

17        At least under Article I, section 2, wouldn't your

18   argument apply equally to states who have -- you keep talking

19   about a traditional runoff as if that may cure the

20   constitutional infirmity as you see it, the ranked-choice

21   voting scheme, but I'm confused because wouldn't your Article

22   I, section 2 argument undermine the constitutional validity of

23   those states like Mississippi who now is going through a

24   majority runoff?

25              MR. GOODMAN:  Yes, Your Honor.  I have tried to be

1    clear I am arguing in the alternative.  I am saying if the
2    Court rules that Article I, section 2 doesn't provide meaning,
3    doesn't mean plurality, then you're forced, now we have to
4    grapple with the due process and equal protection problems
5    inherent in ranked-choice voting.  By comparison to the states
6    that have -- if Article I, section 2 does -- does allow a
7    state to have a majority vote, well, then those states are
8    doing it lawfully and constitutionally because they're having
9    an actual runoff election where the voters can turn out again,
10   know who they're voting for, be provided a ballot that says,
11   well, this vote is now between A and C.  You didn't have to
12   guess as between A, B, C, and D.

13        Now -- so if the State of Maine is allowed under Article
14   I, section 2 to require majority, well, then the State has to
15   do it in a constitutional manner and cannot do it in a way
16   that tells voters, guess at who that subsequent runoff
17   election will be between.  And that's what the Attorney
18   General argued today is that it is a subsequent runoff
19   election, it is a series runoff election, and they have forced
20   every voter to guess at who the candidates are in those
21   subsequent elections at the time they cast one ballot.

22            THE COURT:  Did this particular constitutional
23   infirmity simply escape the notice of talented election law
24   lawyers around the country near places like Mississippi who
25   conduct runoff elections?

1          MR. GOODMAN:  Your Honor, it's an open question,

2     that's all I can say.  It is an open question we have

3     presented for this Court to resolve for us.

4          THE COURT:  And you presented it well.  I appreciate

5     it.  Thank you.

6          MR. GOODMAN:  Thank you, Your Honor.

7          THE COURT:  Counsel, I appreciate you coming to

8     visit us in Bangor on short notice.  I appreciate the

9     arguments of counsel.

10     I will, of course, take the matter under advisement, but

11     will endeavor with haste in deliberation both to come to the

12     right conclusion as soon as I can.  I am not making any

13     assurances about the time frame, but I am hopeful to have an

14     order to you tomorrow.

15     We are in recess.

16          (The hearing was concluded at 11:24 a.m.)

17                        *  *  *  *  *

18                        CERTIFICATION

19     I certify that the foregoing is a correct transcript from

20     the record of proceedings in the above-entitled matter.

21

22

23     /s/ Melissa L. Merenberg                11/17/2018
       Melissa L. Merenberg, RPR               Date
24     Official Court Reporter

25