UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| BRETT BABER, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-00465 (LEW) |
| | ) |
| MATTHEW DUNLAP, Secretary of the State of Maine, | ) |
| | ) |
| and | ) |
| | ) |
| PAUL LePAGE, Governor of the State of Maine, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SWORN EXPERT REPORT OF JAMES G. GIMPEL, Ph.D.

**Report of Professor James G. Gimpel on Maine's Ranked Choice Voting and the 2018 General Election**

November 26, 2018

I am a Professor of Political Science in the Department of Government at the University of Maryland, College Park, where I have been employed on the faculty for 27 years. I received a Ph.D. in political science at the University of Chicago in 1990. My areas of specialization include voting behavior, political geography, geographic information systems (GIS), state politics, population mobility and immigration. Publications include papers in well-regarded peer reviewed political science journals (*AJPS, APSR, JoP, QJPS*), journals in other social science fields, as well as several books relating to the same topics.  I regularly teach courses that include instruction on alternative voting systems, election reform, political redistricting, political behavior and elections.   I am familiar with the published research at the intersection of electoral institutions and political behavior.    I have consulted and provided testimony in previous court cases relating to election reform and redistricting.    A curriculum vitae is attached as an exhibit to this report and I attest to its truth and accuracy.   Since complete data for studying the November 2018 election returns has only recently been made available, analysis of precinct level socioeconomic and demographic characteristics on the Second District vote is ongoing.   I reserve the right to amend and supplement this report as analysis is completed and additional data become available.

**Summary**

This report identifies inherent limitations that Maine's "ranked choice" or instant runoff voting system imposes upon voters and voter choices which are well recognized by experts.    Key deficits to be addressed include the fact that state election law may be inconsistent with instant runoff voting;  this system forces voters to make blind guesses about the ultimate match-up in the final round of vote

counting rather than permitting a well-considered choice between two final contenders;  instant runoff

elections privilege knowledgeable, highly informed voters, at the expense of less studied voters; there is

the frequent possibility that a candidate might obtain more first place votes, but still lose the election to

a candidate who received more second or third place votes – a problem called *monotonicity failure*;  the

problem of exhausted preferences in which voters whose preferred candidates are limited to one or two

candidates who fall behind in the vote count do not have their ballots counted in multiple rounds of

instant runoff counting, violating the one-person-one-vote principle.  Taken together, the deficits of

instant runoff voting introduce greater inequalities among voters, and burdens on voter effectiveness,

than exist in the traditional plurality system, the standard runoff system, and other voting systems.

**Maine's Ranked Choice Voting Law**

Maine adopted ranked choice voting in the form of instant runoff elections in a 2016

referendum that passed on by a narrow 52% to 48% margin.  Implementation was delayed by the state

legislature, but in a referendum vote Maine voters approved a measure to move forward with the new

method on June 12, 2018, in which 53.2% of voters cast 'Yes' votes.  A yes vote was one in favor of

repealing the state legislature's act to delay implementation.   In that special referendum, a total of

281,521 ballots were cast, although 3,330 voters left the vote on the question blank.   As of closing date

for the November 2018 election, Maine reports 1,028,602 active registered voters[1], down slightly from

the number reported in November 2017: 1,036,264.   A simple estimate suggests that turnout in the

June special election stood at about 27.4 percent.

Under the original law, offices for U.S. Senator, U.S. House, Governor, State Senate and State

House were intended to be subject to instant-runoff vote tabulation whenever one candidate does not

win more than half of the total votes.  If a candidate has greater than half of the votes among the lawful

---

[1] The state also reported 4,102 inactive voters in September 28, 2018.  Data are reported here:
https://www.maine.gov/sos/cec/elec/data/index.html, accessed 11/25/2018.

ballots, then that candidate wins the election outright.  If not, then the instant-runoff count is triggered.  The first step is to eliminate the candidate with the least first-choice votes.  The ballots from the eliminated candidate are counted such that each voter's second preference is allocated to the remaining candidates and treated as a first-choice vote.  If there are only two continuing candidates at this point, the candidate with the most votes is declared the winner of the election.   Alternatively, if there are more than two continuing candidates but one candidate has garnered half the total votes cast, the counting stops and a winner is declared.    If there are more than two continuing candidates and again there is no candidate who has achieved a simple 50%+1 majority, then the process is repeated for the next candidate until a candidate has more than half the total votes among the remaining ballots.

The portion of the Maine ballot with the three candidates for the U.S. Senate seat and the four candidates plus a write-in option for the state's Second U.S. House District is shown in Figure 1, below.  The correct way to fill out the ballot is to read down and mark preferences in order moving to the right.  Voters are allowed, however, to fill in only a first place preference and not fill out additional choices.  Voters are not allowed to fill out multiple first (or second, or subsequent) choices, an error referred to as "overvoting."   Voters have considerable leeway to not fill in a ranked choice beyond a first or perhaps a first and second preference, essentially leaving the subsequent choices blank.   Records from the November 2018 general election for Maine's Second Congressional District reveal a very large share of blanks.  Commonly voters rank only a first choice, or sometimes a first and a second, but no third, fourth or fifth.   These ballot completion patterns evidence confusion and miscalculation on the part of voters.   Instructions offered to voters on the ballot itself were ambiguous, failing to clarify why it might be advantageous to rank candidates beyond a first, or a first and second choice.



**Figure 1.  Maine Sample Ballot for the 2018 General Election in the Second Congressional District**

If a voter skips two or more ranks, leaving ovals blank, then that voter is excluded in an instant-

runoff count once all the properly ranked candidates on that ballot have been eliminated.  Ballot

"exhaustion" occurs when a ballot can no longer be counted in subsequent rounds of tallying because a

voter has ranked only candidates that have been eliminated, or perhaps failed to rank emerging front-

running candidates.   As trailing candidates' votes are tabulated, they can be "batch" eliminated;

meaning two or more can be eliminated at the same time, if it is mathematically impossible for them to

win.  Under the Maine instant runoff law, the Secretary of State is allowed the option to limit the

number of permitted rankings in any election to six.   Notably, these provisions for counting ballots that

have incomplete rankings are distinct from those implemented in other jurisdictions where ballots that

fail to mark a full ordering of preferences are considered invalid and thrown out.   Under Maine's law,

the most common cause of ballot spoilage is overvoting, or marking more than one candidate as a first

(or second, or subsequent) preference.  Undervoting does not invalidate a ballot, but skipping a first and

second choice and filling in a third (or subsequent) choice will result in the vote being recorded as blank.

Figures from the Secretary of State's Office indicate that about 5,582 (1.9%) voters in the

Second District failed to mark any candidate for Congress at any rank, basically leaving all ovals blank.[2]

Only a handful marked third, fourth and fifth preferences without marking a first or second, thereby

invalidating their ballots.   Nearly half, about 134,500 (46.4%), marked an oval to express a first

preference, not moving beyond that first column on the ballot.  In a very distant second place were the

27,366 (9.5%) who marked a first and second preference, but no subsequent preferences.

Just 9,249 (3.2%) voters ranked a candidate at all five positions, though in many cases it was the

same candidate at all five:  5,233 for Bruce Poliquin across all five; 2,080 for Jared Golden; 186 for

Tiffany Bond and 93 for William Hoar.   Of the group who ranked a candidate in all five positions, 82

---

[2] The figures in this paragraph and appearing elsewhere about the November 2018 general election results are drawn from data files originating at the Maine Department of the Secretary of State, Bureau of Elections, at the following URL:  https://www.maine.gov/sos/cec/elec/results/results18.html#Nov6, accessed November 26, 2018.

percent placed the same candidate across all five.   One can interpret these completion patterns in various ways, but certainly the very small percentage filling in the ballot at all five ranks suggests no small amount of misunderstanding about the way the system is supposed to work.   That so many chose not to rank alternative candidates, but expressed a preference for the same candidate across all ranks also evidences some combination of misunderstanding and/or disregard for the theory motivating the instant runoff.    In a prescient editorial written for the Portland *Press-Herald* in September 2016, local columnist Gordon Weil anticipated that many voters in a traditional partisan election would not cast second place votes.[3]   He was certainly proved right two years later.

**State Constitutional and Legal Tradition**

The Supreme Judicial Court of Maine indicated in a 2017 opinion that implementing instant runoff voting for state level offices would violate the Maine Constitution, which requires a simple plurality rule.[4]   Plurality voting is the familiar and regular practice of voting for only one candidate per office with the candidate receiving the most votes winning the election, even if the leading candidate's vote total is less than a majority.   The Maine Supreme Judicial Court did not indicate that the instant runoff system would pose a state constitutional conflict if implemented for primary elections or for general elections for federal office.

Maine is not the only state where an instant runoff system is considered to run contrary to state election law and the state constitution.  Most state constitutions mandate that the winner for state executive branch offices is the candidate who receives the most votes even if they don't receive a majority (Langan 2005, 1576).   Also worth remembering is that candidates who win with pluralities are ordinarily considered legitimately elected, even for the office of President of the United States (Nielson

---

[3] Gordon Weil. 2016. "Ranked-choice voting: Costly, complicated, undemocratic."  Portland Press-Herald, September 30, 2016, URL:  https://www.pressherald.com/2016/09/30/maine-voices-ranked-choice-voting-costly-complicated-undemocratic/, accessed November 27, 2018.
[4] 2017 ME 100, 162 A.3d 188.

2017, 543).   In several recent presidential elections, the victor received only a plurality of the popular vote:  Richard M. Nixon in 1968; Bill Clinton in 1992 and 1996.  Because of the Electoral College system, George W. Bush won the presidency with less than a majority of the popular vote in 2000, as did Donald Trump in 2016.   Winning without a clear-cut majority is not so uncommon in American political life.

**Preferences May Differ Depending on Changing Match-Ups**

A defect that is addressed in many research papers on instant runoff voting is the possibility that a voter's preference may change as the field of candidates is winnowed in the counting process.   These kinds of preference changes occur during standard, temporally sequenced, runoff elections in which two leading candidates contend for the majority in a second election after the others have been eliminated in the general election.   Voters often prefer a different ordering of candidates when considering four choices (in the instant runoff situation) than when considering just two (in the standard runoff).   The way voters decide will depend critically upon the actual candidates still in contention.   But in the instant runoff situation voters do not have the information about the final match-up at the time that they vote. They have to guess at what will happen to their second, third and subsequently ranked candidates. They are left in the dark and can only guess about what might happen in the multiple rounds of counting.

A summary of the ballot level preference orderings from the November 2018 Second District Congressional election shows that when we include the option to leave ovals blank, and include the write-in choices, there are over 1,500 candidate combinations (see Table 1 for the top 25 most common).   Certainly some combinations are more common than others, with half of all Second District voters expressing customary simple and sincere preferences limiting their choice to a single candidate. But we do see the remaining voters offering up a long list of alternative rank orderings suggesting the

| | Table 1. Twenty-Five Most Common Preference Orderings in the November 2018 Maine Second District Congressional Election | | | | | | |
|---|---|---|---|---|---|---|---|
| **Row** | **First** | **Second** | **Third** | **Fourth** | **Fifth** | **Total Ballots** | **% of Total** |
| 1 | R | U | U | U | U | 81,267 | 28.03 |
| 2 | D | U | U | U | U | 47,396 | 16.35 |
| 3 | D | B | H | R | U | 18,710 | 6.45 |
| 4 | D | B | H | U | U | 16,725 | 5.77 |
| 5 | D | B | U | U | U | 9,906 | 3.42 |
| 6 | R | H | B | D | U | 9,174 | 3.16 |
| 7 | R | B | H | D | U | 6,634 | 2.29 |
| 8 | D | H | B | R | U | 6,578 | 2.27 |
| 9 | U | U | U | U | U | 5,582 | 1.93 |
| 10 | D | H | B | U | U | 5,503 | 1.90 |
| 11 | R | R | R | R | R | 5,239 | 1.81 |
| 12 | B | U | U | U | U | 3,957 | 1.36 |
| 13 | R | D | B | H | U | 3,276 | 1.13 |
| 14 | D | B | H | U | R | 3,248 | 1.12 |
| 15 | D | H | U | U | U | 2,984 | 1.03 |
| 16 | D | R | U | U | U | 2,683 | 0.93 |
| 17 | R | D | U | U | U | 2,664 | 0.92 |
| 18 | D | R | B | H | U | 2,628 | 0.91 |
| 19 | R | H | U | U | U | 2,571 | 0.89 |
| 20 | R | B | U | U | U | 2,492 | 0.86 |
| 21 | R | H | B | U | U | 2,458 | 0.85 |
| 22 | R | D | H | B | U | 2,088 | 0.72 |
| 23 | D | D | D | D | D | 2,083 | 0.72 |
| 24 | B | H | D | R | U | 1,992 | 0.69 |
| 25 | H | U | U | U | U | 1,939 | 0.67 |
| | | | | | **Sum** | **249,777** | **86.14** |

| U=blank | O=Write-in |
|---|---|
| R=Poliquin | B=Bond |
| D=Golden | H=Hoar |

Note: Only the most frequent 25 orderings are presented. These common combinations captured 249,777 ballots, or 86.14% of all ballots cast. An additional 1,528 combinations were expressed by Maine Second District voters but are not included in this table. Source: Maine Secretary of State, Election Returns for November 6, 2018, URL: https://www.maine.gov/sos/cec/elec/results/results18.html#Nov6, accessed November 26, 2018.

mix of guesswork and annoyance that went into the task.  In addition to the common combinations reported in Table 1, over 2,000 voters showed ballot completion patterns that placed the two third party candidates as first, second or third, in varying orders, often not bothering to fill out ovals for fourth and fifth place.   These voters anticipated that Tiffany Bond or William Hoar would proceed to a runoff count instead of Jared Golden and Bruce Poliquin.  Those voters' participation was limited once it became clear in the initial counting that their higher ranked preferences were not widely shared.

        The superiority of the standard runoff election is seen in that it offers voters a chance to vote again after fully considering the relative merits of the final two candidates.   A campaign in the interim between the general and runoff election often sheds new light on the candidates, clarifies preferences and can certainly change them.   This has to do with comparison processes.   Even without a campaign to introduce new information, preferences between two options may still change when they are situated in a context among four choices rather than when they remain the only two.   The relative attractiveness of x compared to y regularly depends on the presence or absence of additional options (Tversky and Simonson 1993).   Some non-trivial share of voters will evaluate the choice of a Republican and a Democrat differently when they are in the presence of third party and independent candidates than they will when they are squaring off only against each other, even if information about the candidates does not change in the interim.

        Finally, the ranking system excludes the expression of some preference orderings.   For example, voters might prefer Jared Golden over William Hoar, William Hoar over Tiffany Bond, but Tiffany Bond over Jared Golden.  This is a cyclical ordering, and it is "intransitive" meaning it results in a preference loop.  Because ranked choice voting forces voters to rank candidates, it restricts voters with intransitive preferences from expressing them (Sorens 2018)   If the voter is forced by law to rank Golden first, Hoar second, and Bond third, this ballot could be understood to be a vote for Golden over Bond in a runoff

between the two, but that accounting is exactly the opposite of what the voter wanted.    Intransitive preference orderings are not out of the ordinary, either.    One study showed that in three-candidate elections, up to five percent of voters displayed such preferences, while in five-candidate elections 27 percent did (Radcliff 1993). The instant runoff does not permit the voicing of such preferences (Sorens 2018).

**The Burden of Voter Knowledge**

Ranking candidates beyond a first preference is a task requiring considerable political knowledge and sophistication (Burnett and Kogan 2014).  The great advantage of a two-party system with plurality voting is that participation and choice are straightforward and not burdensome.    The main barrier to participation is arguably the act of registration, not the act of voting itself.    While everyone is in favor of improved civic education and a more informed electorate, there are also limits on how much time one can reasonably expect citizens to invest in acquiring political information, often about very obscure candidates who are nearly invisible but have nevertheless met the minimum ballot access requirements. Recent survey research has shown that voters do not understand ranked choice voting because of its complex rules (Nielson 2017).  Though we do yet not have representative surveys of the Maine electorate on this question, one can infer from the large number of Second District ballots where only a first preference was ranked that many voters simply did not know enough about the other candidates to confidently order them.   An alternative possibility is that these voters held their first preference so strongly that they did not desire to express a second choice or subsequent preferences.  Astonishingly, several dozen voters failed to rank a first preference, leaving the oval in the first column blank, but did rank second and/or subsequent preferences, surely indicating confusion and lack of understanding.

A related problem is that the voters who prefer lower profile candidates who do not rank second, third or subsequent preferences will not be counted in subsequent rounds of ranked choice

voting because their ballots are quickly exhausted.  Burnett and Kogan (2015) found that failure to rank all of the candidates was very high, ranging between 10 and 27 percent of all ballots in four instant-runoff elections from California and Washington State. Table 1 shows that among the top 25 most common combinations, there are several that rank only a first, or a first and second choice, but no subsequent preferences.   As for first preference support for lesser known candidates, about 4,000 voters ranked Tiffany Bond first, but left all other ovals blank (see Table 1, row 12).  About 1,900 voters ranked William Hoar first, but left all other ovals blank (see Table 1, row 25).   Then there were the considerable share who ranked one of the third party candidates first, filled out ovals to rank other minor party/independent candidates (Hoar, Bond, write-in), but did not rank either of the two major party candidates (Poliquin, Golden), leaving blanks in the third, or third, fourth and fifth place ovals. These voters were apparently counting on one of the third-party candidates making it to the runoff round.  Of course they wound up quickly eliminated from the runoff count when they turned out to have misestimated their preferred candidate's chances.

Voters whose first preference turns out to be one of the leading candidates, and knowledgeable enough to rank all candidates, or confident enough to make a guess at how to rank them, will have their ballot counted repeatedly until a candidate obtains a simple majority.   Unlike the voters whose first preference winds up lagging behind, these voters will be full participants in the instant runoff system. The tendency to exclude voters from runoff counts when their first preference is not widely shared points to uneven voting power biased in favor of the knowledge and sophistication of voters who favor frontrunners and rank all of the candidates.

Social science research on instant runoff voting also confirms that voters who are less knowledgeable are more likely to make overvote errors or mark ballots in a way that will disqualify them (Neely and Cook 2008; Neely and McDaniel 2015, 4).  These are among the same voters who fail to rank

more than one or, at most, two candidates, limiting the voice of people who are less educated in shaping the outcome.   Racial and ethnic minority voters, and elderly voters, are among those found to be vulnerable to errors in voting under ranked choice systems even in settings where the level of voter information is generally high (McDaniel 2015).  We have not had the time to fully analyze the data from Maine's instant runoff election but we would not expect the results in Maine to differ appreciably from what other researchers have found among electorates that are better educated than Maine's.

Finally, one of the short-cuts voters use to help them vote is their party identification.   With party identification, voters need not be fully informed to cast an informed vote.   This is because party affiliation unifies voters and candidates on a platform of substantially shared interests and values.  The great utility of party identification as a voting cue is reduced in the instant runoff system.  Many independent and third party candidates are unknown, and have not actively campaigned.  Discovering essential information about where they stand on issues, what values they adhere to, or even what towns and neighborhoods they hail from is almost impossible for an ordinary citizen with the usual supply of time and resources.   No wonder that surveys have shown that ranked choice voting is less popular than alternative systems when voters are given alternatives (Nielson 2017, 555).  Because of its complexity, instant runoff voting exacerbates inequalities in the electorate, introducing greater unevenness in the voters' say in who wins and loses.   Voting systems should not require a high level of information investment and expertise for proper participation.   The widespread plurality system is already quite demanding and numerous studies have shown that less educated and interested voters fail to register and vote even with a high level of familiarity and ease.   There is no evidence that these inequalities in participation diminish when instant runoff voting is introduced, and most evidence points in the opposite direction.

**The Non-Monotonicity of Instant Runoff Voting**

Perhaps the most glaring problem with instant runoff voting is that the candidate with the most first choice votes may not win the election.   This is not a merely theoretical and abstract possibility. The term for this is "monotonicity failure" – when getting more first place votes can cause a candidate to lose, while getting fewer first place votes can cause a candidate to win (Miller 2012).   Election systems that lack this defect, such as plurality voting, are said to be monotonic.   The outcome of elections held under monotonic election systems is reliable because the procedures for determining the winner are transparent and uncomplicated.   An election winner is determined quickly, usually on Election Day.   Proponents of instant runoff voting have suggested that an actual result wherein the candidate with the most first place votes loses is unlikely, but research and practice has shown that it is alarmingly common (Ornstein and Norman 2014; Miller 2012; Smith 1973; Doron and Kronick 1977; Brams and Fishburn 1983).

In a 2009 election for mayor in Burlington, Vermont, conducted under instant runoff voting, the Republican candidate received 39% of first preference votes; the Democrat received 27% and a left-leaning Progressive candidate received 34% (Ornstein and Norman 2014; Miller 2012).   The Democratic candidate was eliminated, and those ballots were then distributed to the two leaders on the basis of their second choice preferences:  37% for the Republican, and 63% for the Progressive, with those votes constituting 10% and 17% respectively of the city's electorate (Miller 2012, 2).   In the instant runoff final vote count the Republican received 39%+10%=49%, falling just short of the majority.  The Progressive candidate received 34%+17%=51% and won.   Miller goes on to show that in a hypothetical subsequent election, the same Progressive candidate in the lead with 47% could lose because third place Republicans (at 26%) have allocated their second place votes to the Democratic candidate (at 27%). Again, the candidate with the most first place votes winds up losing by the same strange rules that

allowed them to win before.   Upon recognizing how the instant runoff system elected the wrong candidate, Burlington voters repealed it in 2010.   In Oakland, California, in 2010, a candidate won the city's mayoralty by focusing her attention on becoming the second choice of several minor candidates and the clearest alternative to the leaders.  She wound up winning on the basis of second and third preference votes and went on to proclaim this as a preferred strategy in future elections.

These real world examples show that instant runoff voting does not fix the spoiler problem, as proponents often allege, and does not prevent the election of candidates who are not preferred by voters.  To be sure, the problem is more threatening when elections are close, but Maine has had a history of close multi-candidate general elections.   Instant runoff voting fails to produce a reliable result in these cases.  This is because minor changes in the order of disqualification of candidates and the transfer of votes to other candidates can swing the election toward different outcomes.   Election systems need to produce monotonic, *reliable*, results.   When they do not, voters may begin to lose trust in them.

**Conclusions**

The benefits of instant runoff voting have been vastly exaggerated and its problems are becoming increasingly evident as more elections occur under its implementation.   Chief among the problems is that in the absence of sufficient information, many voters vote for fewer candidates than permissible, or for only one candidate.   The system privileges voters who are highly sophisticated and understand how outcomes may be manipulated through alternative ranking strategies.   In turn, candidates also learn quickly how to game instant runoff systems to their advantage whereas plurality rule elections are less guileful in this respect.   Perhaps worst of all is the unreliability of outcomes or monotonicity failure that accompanies instant runoff voting.   This system allows the candidate that wins the most first place votes to lose due to the ordering of second, third and subsequent place

rankings.   In cases where this has occurred, voters have decided to cast it off as overly complex and

confusing.   Elections always expect something by way of voter knowledge, and they should.   But there

are reasonable limits to how much we can expect of citizens with their varying levels of interest in and

experience with the subject matter of politics.

### Sources

Black, Eric. 2013.  "Why DFL is (somewhat secretly) Divided Over Ranked-Choice Voting."  *MinnPost,* December 19, URL: https://www.minnpost.com/effective-democracy/2013/12/why-dfl-somewhat-secretly-divided-over-ranked-choice-voting/, accessed November 26, 2018.

Brams, Steven J. and Peter Fishburn 1983.  "Some Logical Defects of the Single Transferable Vote."  In Arend Lijphart and Bernard Grofman, eds.  *Choosing an Electoral System*.  New York, NY: Praeger 147-151.

Burnett, Craig M. and Vladimir Kogan.  2015.  "Ballot (and Voter) 'Exhaustion' Under Instant Runoff Voting:  An Examination of Four Ranked-Choice Elections."  *Electoral Studies* 37: 41-49.

Cook, Corey.  2011.  "Ranked Choice Voting."  *The Urbanist*  No. 508, December 1, URL: https://www.spur.org/publications/urbanist-article/2011-12-01/ranked-choice-voting, accessed November 26, 2018.

Doron, Gideon and Richard Kronick.  1977.  "Single Transferable Vote:  An Example of a Perverse Social Choice Function."  *American Journal of Political Science* 21: 303-311.

Fishburn, Peter C. and Steven J. Brams.  1983. "Paradoxes of Preferential Voting."  *Mathematics Magazine*  56: 4: 207-214.

Langan, James P.  2005.  "Instant Runoff Voting:  A Cure that is Likely Worse than the Disease."  46 *William and Mary Law Review* 1569-1595.

Neely, Francis and Corey Cook.  2008. "Whose Votes Count?  Undervotes, Overvotes and Ranking in San Francisco's Instant-Runoff Elections."  *American Politics Research* 36: 4: 530-554.

McDaniel, Jason. 2015.  "Writing the Rules to Rank the Candidates:  Examining the Impact of Instant-Runoff Voting on Racial Group Turnout in San Francisco Mayoral Elections."  *Journal of Urban Affairs* 38: 3:  387-408.

McDaniel, Jason.  2018. "Does More Choice Lead to Reduced Racially Polarized Voting? Assessing the Impact of Ranked-Choice Voting in Mayoral Elections."  *California Journal of Politics and Policy* 10: 2, URL: https://escholarship.org/uc/item/2gm5854x, accessed November 25, 2018.

Miller, Nicholas R. 2012. "Monotonicity Failure in IRV Elections with Three Candidates."  Paper prepared for presentation at the Second World Congress of the Public Choice Societies, Hyatt Regency Miami Hotel, Miami, FL. March 8-11.

Nielson, Lindsay.  2017.  "Ranked Choice Voting and Attitudes Toward Democracy in the United States:  Results from a Survey Experiment."  *Politics and Policy* 45: 4:  535-570.

Neely, Francis and Jason McDaniel.  2015.  "Overvoting and the Equality of Voice under Instant-Runoff Voting in San Francisco." *California Journal of Politics and Policy* 7: 4, URL:  https://escholarship.org/uc/item/8tm3s6hz, accessed November 25, 2018.

Office of the Maine Secretary of State.  2018.  "Maine Citizen's Guide to the Special Referendum Election, Tuesday, June 12."  Augusta, Maine:  Office of the Secretary of State.

Ornstein, Joseph T. and Robert Z. Norman.  2014. "Frequency of Monotonicity Failure under Instant Runoff Voting: Estimates Based on a Spatial Model of Elections."  *Public Choice* 161: 1-9.

Radcliff, Benjamin.  1993.  "The Structure of Voter Preferences.*" Journal of Politics* 55: 3:  714-719.

San Francisco *Chronicle* Editorial Board. 2018.  "Editorial:  How Ranked-Choice Voting Works – and Doesn't."  May 29, URL: https://www.sfchronicle.com/opinion/editorials/article/Editorial-How-ranked-choice-voting-works-and-12951745.php, accessed November 25, 2018.

Sorens, Jason. 2016. "The False Promise of Instant Runoff Voting."  *Cato Unbound,* December 9, URL: https://www.cato-unbound.org/2016/12/09/jason-sorens/false-promise-instant-runoff-voting, accessed November 26, 2018.

Sorens, Jason. 2018. "Voter Disenfranchisement under Maine's Ranked-Choice Voting System."  Hanover, NH: Dartmouth College, Department of Government, unpublished ms.

The Supreme Judicial Court of Maine.  2017.  "Opinion of the Justices of the Supreme Judicial Court to Questions Propounded by the Maine Senate."  February 2, URL: http://www.courts.maine.gov/opinions_orders/supreme/lawcourt/2017/17me100.pdf, accessed November 26, 2018.

Smith, John H.   1973.  "Aggregation of Preferences with Variable Electorate."  *Econometrica* 34: 1027-1041.

Tversky, Amos and Itamar Simonson.  1993. "Context-Dependent Preferences."  *Management Science* 39: 10: 1179-1189.

**Request for Expert Opinion**

I was requested to write this report on Maine's instant runoff voting by plaintiff's counsel, Mr. Lee Goodman.

**Compensation**

I am being compensated for my work on this case at a rate of $300 per hour plus expenses.

**Declaration**

I declare under penalty of perjury that the foregoing is true and correct, and that if I am called as a witness, I will testify competently and consistently with the opinions stated above.


James G. Gimpel


11/27/2018

Date

# Exhibit A

Fall 2018
**James G. Gimpel**
Department of Government and Politics
University of Maryland
College Park, MD  20742
(301)-405-7929 (office)
jgimpel AT umd.edu


**Personal:**

Current residence:  Columbia, Maryland


**Current Position:**

University of Maryland - College Park.

Full Professor, August 2001-present.
Editor, *American Politics Research*, 2003-2011 (eight years)

Associate Professor with tenure, August 1997-August 2001.
Assistant Professor, January 1992-August 1997.

**Education:**

University of Chicago.  Ph.D. Political Science, 1990.
University of Toronto.  M.A. Political Science, 1985.
Drake University.  B.A. with honors.  Political Science, 1984.

**Books:**

► Dante Chinni and James G. Gimpel.  2010.  *Our Patchwork Nation:  The Twelve Community Types that Make Up Our Nation* (New York, NY:  Gotham, a Penguin imprint).

► James G. Gimpel, J. Celeste Lay and Jason E. Schuknecht.  2003.  *Cultivating Democracy: Civic Environments and Political Socialization in America* (Washington, DC:  Brookings Institution Press) .

► James G. Gimpel and Jason E. Schuknecht.  2003.  *Patchwork Nation:  Sectionalism and Political Change in American Politics* (Ann Arbor, MI:  University of Michigan Press).

► James G. Gimpel.  1999.  *Separate Destinations:  Migration, Immigration and the Politics of Places* (Ann Arbor, MI:  University of Michigan Press).

► James G. Gimpel and James R. Edwards, Jr.  1999.  *The Congressional Politics of Immigration Reform* (Needham Heights, MA:  Allyn and Bacon).

► James G. Gimpel. 1996.  *National Elections and the Autonomy of American State Party Systems* (Pittsburgh, PA:  University of Pittsburgh Press).

► James G. Gimpel.  1996.  *Fulfilling the Contract:  The First 100 Days* (Needham Heights, MA:  Allyn and Bacon). Published in hardcover under the title:  *Legislating the Revolution:  The Contract with America in its First 100 Days.*

**Articles in Peer Reviewed Journals:**

1  Caroline Carlson and James G. Gimpel. 2019.  "Political Implications of Residential Mobility and Stasis on the Partisan Balance of Locales." *Political Geography*.   Accepted and Forthcoming.

2  Wendy K. Cho, James G. Gimpel and Iris Hui. 2019. "Migration as an Opportunity to Register Changing Party Loyalty in the U.S." *Population, Space and Place*.   Accepted and Forthcoming.

3  James G. Gimpel and James H. Glenn.  2019.  "Racial Proximity and Campaign Contributing*." Electoral Studies*. Accepted and Forthcoming.

4  James G. Gimpel and Iris Hui.  2018.  "Political Fit as a Component of Neighborhood Preference and Satisfaction." *City and Community*. 17: 3: 883-905.

5  James G. Gimpel and Iris Hui.  2017.  "Inadvertent and Intentional Partisan Residential Sorting."  *Annals of Regional Science* 58: 3: 441-468.

6  James G. Gimpel and Iris Hui.  2015.  "Seeking Compatible Neighbors:  Partisan Composition, Neighborhood Selection and Residential Sorting." *Political Geography* 48: 4: 130-142.

7  James G. Gimpel, Frances E. Lee and Michael Parrott.  2014.  "Business Interests and the Party Coalitions: Industry Sector Contributions to U.S. Congressional Campaigns." *American Politics Research* 42: 6: 1034-1076.

8  Wendy K. Cho, James G. Gimpel and Iris Hui.  2013.  "Voter Migration and the Geographic Sorting of the American Electorate." *Annals of the Association of American Geographers* 103: 4: 856-870.

9  James G. Gimpel, Frances E. Lee and Rebecca U. Thorpe. 2012.  "The Distributive Politics of the Federal Stimulus:  The Geography of the ARRA of 2009."*Political Science Quarterly* 127: 4: 567-596.

10  Daron R. Shaw, Alan Gerber, James G. Gimpel and Donald P. Green.  2012.  "Do Robotic Calls from Credible Sources Influence Voter Turnout or Vote Choice? Evidence from a Randomized Field Experiment." *Journal of Political Marketing* 11: 4: 241-249.

11  Wendy K. Cho, James G. Gimpel and Daron R. Shaw.  2012.  "The Tea Party Movement and the Geography of Collective Action." *Quarterly Journal of Political Science* 7: 2:  105-133.

12  Wendy K. Cho and James G. Gimpel.  2012.  "GIS and the Spatial Dimensions of American Politics."  *Annual Review of Political Science* 15: 443-460.

13  Daron R. Shaw and James G. Gimpel.  2012.  "What if We Randomized the Governor's Schedule?  Evidence on Campaign Appearance Effects from a Texas Experiment."  *Political Communication* 29: 2: 137-159.

14  Scott L. Althaus, Brittany J. Bramlett and James G. Gimpel.  2012.  "When War Hits Home:  The Geography of Military Losses and Support for War in Time and Space." *Journal of Conflict Resolution* 56: 3:  382-412.

15  Andrew Reeves and James. G. Gimpel 2012.  "Ecologies of Unease:  Geographic Context and National Economic Evaluations." with Andrew Reeves.   *Political Behavior* 34: 3: 392-420.

16  Alan Gerber, James G. Gimpel, Donald P. Green and Daron R. Shaw.  2012.  "How Large and Long-lasting Are the Persuasive Effects of Televised Campaign Ads? Results from a Randomized Field Experiment." *American Political Science Review* 105: 1: 135-150.

17  Brittany H. Bramlett, James G. Gimpel and Frances E. Lee.  2011."The Political Ecology of Opinion in Big-Donor Neighborhoods." *Political Behavior*  33: 4: 565-600.

18  Wendy K. Cho and James G. Gimpel. 2010.  "Rough Terrain:  Spatial Variation in Contributions of Time and Money to an Election Campaign."  *American Journal of Political Science*  54: 1: 74-89.

19  Scott L. Althaus, Anne M. Cizmar and James G. Gimpel.  2009.  "Media Supply, Audience Demand and the Geography of News Consumption in the United States." *Political Communication*  26: 3: 249-277.

**Articles in Peer Reviewed Journals (cont'd.):**

20  James G. Gimpel and J. Celeste Lay.  2008.  "Political Socialization and Reactions to Immigration-Related Diversity in Rural America." *Rural Sociology*  73: 2:180-204.

21  James G. Gimpel, Frances E. Lee and Shanna Pearson-Merkowitz.  2008.  "The Check is in the Mail: Interdistrict Funding Flows in Congressional Elections." *American Journal of Political Science*  52: 2: 373-394

22  James G. Gimpel, Kimberly Karnes, John McTague and Shanna Pearson-Merkowitz.  2008.  "Distance-Decay in the Political Geography of Friends-and-Neighbors Voting." *Political Geography* 27: 2: 231-252.

23  James G. Gimpel, Karen M. Kaufmann and Shanna Pearson-Merkowitz.  2007.  "The Battleground vs. the Blackout States: Behavioral Implications of Modern Presidential Campaigns." *Journal of Politics* 69: 3: 786-797.

24  Wendy K. Cho and James G. Gimpel.  2007.  "Prospecting for (Campaign) Gold." *American Journal of Political Science* 51: 2: 255-268.

25  Wendy K. Cho, James G. Gimpel and Tony Wu.  2007.  "Spatial Surges in Arab American Voter Registration." *Political Geography* 26: 3: 330-351.

26  James G. Gimpel, Joshua J. Dyck and Daron R. Shaw.  2007.  "Election Year Stimuli and the Timing of Voter Registration." *Party Politics* 13: 3: 347-370.

27  Wendy K. Cho, James G. Gimpel and Tony Wu.  2006.  "Clarifying the Role of Socioeconomic Status in Political Participation: Policy Threat and Arab American Mobilization." *Journal of Politics* 68: 4: 977-991.

28  James G. Gimpel, Frances E. Lee and Joshua Kaminski.  2006.  "The Political Geography of Campaign Contributions in American Politics." *Journal of Politics* 68: 3: 626-639.

29  Wendy K. Cho, James G. Gimpel and Joshua J. Dyck.  2006.  "Residential Concentration, Political Socialization and Voter Turnout." *Journal of Politics* 68: 1: 156-167.

30  James G. Gimpel, Joshua J. Dyck and Daron R. Shaw.  2006.  "Location, Knowledge and Time Pressures in the Spatial Structure of Convenience Voting." *Electoral Studies* 25: 1: 35-58.

31  James G. Gimpel and Joshua J. Duck.  2005.  "Distance, Turnout and the Convenience of Voting." *Social Science Quarterly* 86: 3: 531-548.

32  James G. Gimpel, Joshua J. Dyck and Daron R. Shaw.  2004.  "Registrants, Voters and Turnout Variability Across Neighborhoods." *Political Behavior* 26:4: 343-375.

33  Wendy K. Cho and James G. Gimpel.  2004.  "The Persistence of White Ethnicity in New England Politics," *Political Geography* 23: 8: 821-832.

34  James G. Gimpel, Irwin L. Morris and David R. Armstrong.  2004.  "Turnout and the Local Age Distribution: Examining Political Participation Across Space and Time." *Political Geography*  23:1: 71-95

35  James G. Gimpel and Jason E. Schuknecht.  2003.  "Political Participation and the Accessibility of the Ballot Box." *Political Geography* 22: 4: 471-488.

36  Karen M. Kaufmann, James G. Gimpel and Adam Hoffmann.  2003.  "A Promise Fulfilled?  Open Primaries and Representation." *Journal of Politics* 65: 2: 457-476.

4

**Articles in Peer Reviewed Journals (cont'd.):**

37    James G. Gimpel and Jason E. Schuknecht.  2002.  "Reconsidering Regionalism in American State Politics."  *State Politics and Policy Quarterly*  2: 4: 325-352.

38    James G. Gimpel and Jason E. Schuknecht 2002.  "Political and Demographic Foundations for Sectionalism in State Politics: the Connecticut Case." *American Politics Research* 30: 2: 193-213.

39    James G. Gimpel and Jason E. Schuknecht 2001.  "Interstate Migration and Electoral Politics," *Journal of Politics* 62:1: 207-231.

40    Peter F. Burns and James G. Gimpel.  2000.  "Prejudice, Economic Insecurity, and Immigration Policy," *Political Science Quarterly* 115: 2 (2000) 201-225

41    James G. Gimpel.  "Contemplating Congruence in State Party Systems," 1999.  American Politics Quarterly 27: 1 (1999) 133-140.

42    James G. Gimpel and Robin M. Wolpert. 1998.  "Self-Interest, Symbolic Politics and Attitudes Toward Gun Control," *Political Behavior* 20:3: 241-262.

43    James G. Gimpel.  1998.  "Packing Heat at the Polls:  Gun Ownership as a Politically Salient Trait in State and National Elections," *Social Science Quarterly* 79:3: 634-648.

44    James G. Gimpel and Robin M. Wolpert.  1997.  "Information, Recall and Accountability:  The Electorate's Response to the Clarence Thomas Nomination," *Legislative Studies Quarterly* 22:4: 515-525.

45    Kathryn M. Doherty and James G. Gimpel.  1997.  "Candidate Character vs. the Economy in the 1992 Election," *Political Behavior* 19:3:  213-222.

46    James G. Gimpel and Diane Hollern Harvey.  1997.  "Forecasts and Preferences in the 1992 Presidential Election," *Political Behavior* 19:2:  157-175.

47    James G. Gimpel and Robin M. Wolpert.  1996.  "Opinion-Holding and Public Attitudes Toward Controversial Supreme Court Nominees." *Political Research Quarterly* 49: 1: 163-176.

48    James G. Gimpel and Robin M. Wolpert.  1995.  "Rationalizing Support and Opposition to Supreme Court Nominations:  The Role of Credentials." *Polity* 28: 1: 67-82.

49    James G. Gimpel and Lewis S. Ringle.  1995.  "Understanding Court Nominee Evaluation and Approval: Mass Opinion in the Bork and Thomas Cases."  *Political Behavior* 17: 1: 135-153.

50    Paul S. Herrnson and James G. Gimpel.  1995.  "District Conditions and Primary Divisiveness in Congressional Elections." *Political Research Quarterly* 48: 1: 117-134.

51    James G. Gimpel.  1993.  "Reform-Resistant and Reform-Adopting Machines:  The Electoral Foundations of Urban Politics 1910-1930," *Political Research Quarterly* 46: 2: 371-382.

**Chapters in Edited Books:**

1    James G. Gimpel. 2018.  "Sampling for Studying Context:  Traditional Surveys and New Directions."  in R. Michael Alvarez and Lonna Atkeson, eds.  *Oxford Handbook of Polling and Polling Methods*.  (New York, NY:  Oxford University Press).

2    James G. Gimpel.  2013.  "State Politics and Political Culture."  in Joshua J. Dyck and Richard G. Niemi, eds. *Guide to State Politics and Policy*.  (Washington, DC:  CQ Press)

5

**Chapters in Edited Books (cont'd):**

3    James G. Gimpel and Shanna Pearson-Merkowitz.  2009.  "Political Socialization and Religion." in Corwin Smidt, ed. *Oxford Handbook of Religion and Politics* (New York:  Oxford University Press).

4    James G. Gimpel and Shanna Pearson-Merkowitz.  2009.  "Policies for Civic Engagement Beyond the Schoolyard." in Peter Levine and James Youniss, eds.  *Engaging Young People in Civic Life*.  (Nashville, TN: Vanderbilt University Press).

5    James G. Gimpel and Kimberly A. Karnes.  2007.  "The Rural-Urban Gap in American Electoral Politics."  in Laura Olson and John C. Green, eds.  Beyond Red State, Blue State:  Voting Gaps in American Politics (Upper Saddle River, NJ:  Prentice Hall).

6    James G. Gimpel and Frances E. Lee.  2006.  "The Geography of Electioneering:  Campaigning for Votes and Campaigning for Money." in John Samples and Michael McDonald, eds. *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC:  Brookings Institution Press).

7    James G. Gimpel and J. Celeste Lay.  2005.  "Political Environments and the Acquisition of Partisanship."  in Alan Zuckerman, ed.  *The Social Logic of Politics* (Philadelphia, PA: Temple University Press).

8    James G. Gimpel and Joshua J. Dyck.  2004.  "The Politics of Election Reform in Maryland." in Daniel Palazzolo and James W. Ceasar, eds.  *Election Reform:  Politics and Policy* (Lanham, MD:  Lexington Books).

9    James G. Gimpel and Robin M. Wolpert.  1998.  "The Structure of Public Support for Gun Control: The 1988 Battle Over Question 3 in Maryland," in John Bruce and Clyde Wilcox (eds.) *The Changing Politics of Gun Control* (Lanham, MD: Rowman & Littlefield).

10   James G. Gimpel.  1998.  "Equilibrium Cycles in Grassroots Mobilization and Access,"  in  Paul S. Herrnson, Ronald Shaiko and Clyde Wilcox (eds.) *The Interest Group Connection* (Chatham, NJ:  Chatham House).

11   James G. Gimpel.  1994.  "The Rise and Demise of a Lead PAC," in Robert Biersack, Paul S. Herrnson and Clyde Wilcox (eds.) *Risky Business: PAC Decisionmaking and Strategy in 1992.*  (Armonk, NY:  M.E. Sharpe). 56-62.

12   James G. Gimpel.  1993.  "Congress and the Coordination of Public Assistance," in Edward T. Jennings and Neal Zank (eds.) *Welfare System Reform*. (Westport, CT:  Greenwood Press).  33-42.

**Grants and Awards:**

► Hoover Institution, National Fellowship 2012-2013.

► Knight Foundation Grant, 2007-2011, $60,000 (by contract via D. Chinni).

► CIRCLE via The Pew Charitable Trusts, 2004-2005, $35,000.

► CIRCLE via The Pew Charitable Trusts, 2002-2003, $33,000.

► Ahmanson Community Trust Foundation, 2001-2003, $100,000.

► William T. Grant Foundation Research Grant, 2001-2003, $102,000.

► John M. Olin Foundation Policy Studies Grant, 1998, $30,000.

► Visiting Fellow, Congress Assessment Project, Washington, DC, 1995, $7,000.

► Summer Research Award, Graduate Research Board, University of Maryland, 1995, $4,500.

► University of Chicago Graduate Fellowship, 1986-1990.

**Magazine Articles, Opinion Editorials, Book Reviews:**

◦ James G. Gimpel.  2015.  "Where are the Working Class Republicans and Is There Something the Matter with Them?"  *Extensions*: A Journal of the Carl Albert Congressional Research and Studies Center (Winter): 6-11.

◦ Dante Chinni and James G. Gimpel.  2011.  "The 12 States of America." *The Atlantic Monthly*.  307: 3 (April): 70-81.

◦ Wendy K. Cho and James G. Gimpel.  2009.  " Presidential Voting and the Local Variability of Economic Hardship." *The Forum*.  7: 1:  1-24.

◦ Wendy K. Cho and James G. Gimpel.  2008.  "A Political Powerhouse in Search of a Home."  with Wendy K. Cho.  *Asian American Policy Review*.  17: 155-161.

◦ James G. Gimpel.  2007.  "Etats-Unis Election Présidentielle:  Le Dessous des Cartes,"  *Alternatives Internationionales*. December. 10-14.

◦ Wendy K. Cho and James G. Gimpel.  "Pay Attention to Asian American Voters." *Politico*.  May 28, 2007 Opinion-Editorial posted on-line at http://www.politico.com/news/stories/0507/4213.html

◦ James G. Gimpel and Kimberly A. Karnes. 2006.  "The Rural Side of the Urban-Rural Gap." *P.S.:  Political Science & Politics* 39: 3: 467-472.

◦ James G. Gimpel  "The Federalism Flip-Flop:  Democrats Now Argue for States' Rights."  Opinion Editorial in the *Boston Globe*.  Sunday, December 19, 2004, Political Play.

◦ Wendy K. Cho and James G. Gimpel.  2004.  "Getting out the Asian-Pacific American Vote." *Campaigns & Elections*.  (July): 44-45.

◦ James G. Gimpel.  2003.  "Computer Technology and Getting Out the Vote: New Targeting Tools." *Campaigns & Elections* (August): 39-40.

◦ James G. Gimpel. 2003.  Review of Donald Green, Bradley Palmquist and Eric Schickler. *Partisan Hearts and Minds:  Political Parties and the Social Identities of Voters*. In APSR's *Perspectives on Politics.* (September):606-607.

◦ James G. Gimpel and Jason E. Schuknecht.  2001.  "Setting Different Courses: Along the Potomac, A Political and Philosophical Divide," Opinion Editorial in *The Washington Post*.   Sunday, January 21, Outlook Section.

◦ James G. Gimpel and Jason E. Schuknecht. 2000.  "We Shall Finally Overcome, By Exposure," Opinion Editorial in *The Baltimore Sun* Wednesday, September 6. p. 17A.

◦ James G. Gimpel.  2000.  Review of George Borjas' *Heaven's Door: Immigration Policy and the American Economy*. In *Political Science Quarterly* 115: 1: (Spring): 145-146.

◦ James G. Gimpel.  1998.  "Maryland's Topsy-Turvy Politics: A Step Up for a Party Coming Back to Life," Opinion Editorial in *The Washington Post*.  Sunday, October 17.  Outlook Section.

◦ James G. Gimpel. 1997-98.  Review of John Bader's *Taking the Initiative*. In *Political Science Quarterly* 112:4: 692-693.

◦ James G. Gimpel.  1996.  Review of Philip Klinkner's *The Losing Parties*.  In *Journal of Politics* 58: 245-246.

◦ James G. Gimpel.  1992.   Review of Ralph Goldman's *The National Party Chairmen and Committees*.  In *American Political Science Review* 86:  237-238.

◦ James G. Gimpel.  1991.  Review of Mark Bisnow's *In the Shadow of the Dome*. In *American Political Science Review* 85: 630-631.

**Magazine Articles, Opinion Editorials, Book Reviews (cont'd):**

◦   James G. Gimpel.  1991.  "Congressional Oversight of Welfare and Work."  *Public Welfare* 49: 8-11.

**Research in Progress or Under Review:**

◦   James G. Gimpel.   2018.  "Voicing Grievances to the Consumer Financial Protection Bureau."  Submitted for review.

◦   James G. Gimpel.  2018.  "Redistricting and the Geographic Redistribution of Political Influence."  Submitted for review.

**Conference Participation (recent):**

◦   James G. Gimpel, Nathan Lovin, Bryant Moy and Andrew Reeves.  2018.  "The Emergent Urban-Rural Gulf in American Political Behavior." Paper presented at the Annual Meeting of the Midwest Political Science Association, April 7-9, Chicago, IL.

◦   James G. Gimpel and Nathan Lovin. 2016.  "The Variable Development of Partisanship within the South, 1940-1966."   Paper presented at the annual meeting of the American Political Science Association, September 1-4, Philadelphia, PA.

◦   Kristina Miler, Charles R. Hunt and James G. Gimpel.  2016.  "Recruiting the Best Candidate for the Job: Candidate Dyads and Congressional Election Outcomes." Paper presented at the annual meeting of the Midwest Political Science Association, April 8-10, Chicago, IL.

◦   James G. Gimpel and James Glenn.  2016.  "Racial Context as a Stimulus to Campaign Contributing."  Paper presented at the annual meeting of the Midwest Political Science Association, April 8-10, Chicago, IL.

◦   Caroline Carlson, Wendy K. Cho and James G. Gimpel.  2014.  "Political Implications of Residential Mobility and Stasis on the Partisan Balance of Locales."  Paper presented at the annual meeting of the American Political Science Association, August 28-September 1, Washington, DC.

◦   James G. Gimpel and Iris Hui.  2013.  "Political Evaluations of Neighborhoods and their Desirability: Experimental Evidence."  Paper presented at the annual meeting of the American Political Science Association, August 30-September 1. Chicago, IL.

◦   James G. Gimpel, Frances E. Lee and Michael Parrott.  2012.  "Business Interests and the Party Coalitions: Industry Sector Contributions to U.S. Congressional Campaigns," Paper presented at the annual meeting of the Midwest Political Science Association, April 12-15. Chicago, IL.

◦   Brittany Bramlett and James G. Gimpel.  2011.  "Local Age Distributions and Ideological Extremism in American Politics," Paper presented at the annual meeting of the American Political Science Association, September 1-4. Seattle, WA.

◦   Wendy K. Cho, James G. Gimpel and Daron R. Shaw.  2011.  "The Geography of Tea:  Strategic Activism or Expressive Protest?" Paper presented at the annual meeting of the Midwest Political Science Association, March 30-April 3.  Chicago, IL.

◦   James G. Gimpel, Frances E. Lee and Rebecca U. Thorpe. 2010.  "The Distributive Politics of the Federal Stimulus:  The Geography of the ARRA of 2009," Paper presented at the annual meeting of the American Political Science Association, September 1-4. Washington, DC.

◦   James G. Gimpel and Iris Hui.  2010.  "Migration Decisions and Destinations: Evidence for Political Sorting and Mixing," Paper presented at the annual meeting of the Midwest Political Science Association, April 22-22, 2010. Chicago, IL.

8

**Ph.D. Dissertation:**

◦   Field:  American Government.  Subfield:  Political Behavior

◦   Title: "Competition Without Cohesion:  Studies in the Electoral Differentiation of State
      and National Party Systems."

      Committee:  Mark Hansen, Henry E. Brady, Gary Orfield, and J. David Greenstone (deceased)

**Teaching:**

◦   Courses:  Campaigns and Elections; American Voting Behavior; Immigrants and Immigration Policy;
      State Politics; U.S. Congress; Public Opinion; Statistics; Linear Models; GIS for Social Science
      Research;  Intermediate GIS for Social Science Research; Spatial Statistics.

◦   Awards:  University Excellence in Mentorship and Teaching Award, 1999.
      Panhellenic Association Outstanding Teacher Award, 1994.

**Ph.D. Students and Placements**

Michael Parrott, member (APSA Congressional Fellow, 2016)
Stephen Yoder, chair  (Government Accountability Office,  2014)
Heather Creek, chair (Pew Research Center, 2013)
Daniel Biggers, member  (Yale Post-Doc 2012; moved to tt UC-Riverside, 2014)
Brittany Bramlett, chair (tt Albright College, 2012, moved to non tt Georgia 2014)
Rebecca Thorpe, member (tt University of Washington, 2010 tenured)
Kimberly Karnes, chair (tt Old Dominion, 2010)
Shanna Pearson-Merkowitz, member (tt University of Rhode Island, 2009, tenured)
Laurence O'Rourke, chair (ICF Research 2008)
Joshua Dyck, chair (tt University of Buffalo, 2006 tenured, moved to UM, Lowell, tenured)
Laura Hussey, chair (tt University of Maryland, Baltimore County, 2006 tenured)
Richard Longoria, chair (tt Cameron University, 2006, moved to Texas A&M Brownsville 2014)
Adam Hoffman, member (tt Salisbury University, 2005, tenured)
Regina Gray, member (Department of Housing and Urban Development, 2005)
J. Celeste Lay, chair (tt Tulane University, 2004, tenured)
Atiya Stokes, member (tt Florida State University, 2004, moved to Bucknell, tenured)
Thomas Ellington, member (tt Wesleyan College, 2004, tenured)
Timothy Meinke, member (tt Lynchburg College, 2002, tenured)
Jason Schuknecht, chair (Westat research consulting, 2001)
Constance Hill, member (Birmingham Southern College, 2000)
Peter Francia, member (tt East Carolina University, 2000, tenured)
Peter Burns, member (tt Loyola University, New Orleans 1999, tenured)
David Cantor, member (Lake, Snell, Perry research consulting, 1999)
Richard Conley, member (tt University of Florida, 1998, tenured)
Susan Baer, member (tt San Diego State, 1998)
*and six others prior to 1998.*

9

**Advanced Training:**

- Statistical Horizons Workshop on Big Data and Data Mining. University of Pennsylvania Wharton Business School, Philadelphia, PA, April 2013.
- Summer Workshop on Frontiers of Spatial Regression Analysis.  Spatial Analysis Laboratory, University of Illinois, Urbana-Champaign, June 2007.
- Summer Workshop on Point Pattern Analysis, Department of Geography, University of California, Santa Barbara, June 2004.
- Summer Workshop on Distance and Accessibility, Department of Geography, Ohio State University, July 2002.
- Summer Statistics Program, ICPSR, University of Michigan, Ann Arbor, Michigan, June 1994.

**Service to the Discipline:**

- Journal Editor, *American Politics Research*, 2003-2011.  During this time, submissions doubled from ~110  per year to over 220 per year; journal submission and operations moved on-line;  journal content expanded by 30%;  and review times dropped to a mean of 45 total days (sd=17 days).
- Elections and Voting Section Committee to Name Emerging Scholar in American Politics, 2003 and 2007.
- Chair, APSA William Anderson Award Committee to Name the Best Ph.D. Dissertation in State and Local Politics, Federalism and Intergovernmental Relations, 2010.
- Manuscript Reviewer**:**  *American Political Science Review; American Journal of Political Science; Journal of  Politics; Political Geography; Political Research Quarterly; Public Opinion Quarterly; Political Psychology; American Politics Research; Political Behavior; Urban Affairs Quarterly; Social Forces*; Cambridge University Press, Brookings Institution Press, Johns Hopkins University Press; St. Martin's Press; HarperCollins Publishing;  Pearson-Longman Publishing; Greenwood Press; University of Pittsburgh Press; SUNY Press; University of Michigan Press
- *PRQ* Outstanding Reviewer Award, 2009-2010

**Departmental Committee Service:**

- 2003-2010 Promotion and Tenure Committees (Karen Kaufmann, Frances E. Lee (twice), Geoffrey Layman, Linda Faye Williams and Irwin Morris)
- 2001-2009 Faculty Supervisor, Maryland State Government Internship Program.
- 2003-2004, 2001-2002; 1998-1999 Faculty Search Committees
- Service includes:  Executive Committee; Undergraduate Studies Committee; Graduate Studies Committee;  Salary  Committee;  Conley-Dillon  Award  Committee;  Promotion  &  Tenure Working Group.

10

**University and College Service:**

2015-2017 Advisor to UMD BSOS Dean on College Fundraising and Development
2015-2017 Advisor to UMD Office of Government Relations
2015-2017 Advisor to UMD Office of Institutional Research, Planning and Assessment
2014-2016 Advisor to University Relations Office of Prospect Management and Research
2011-2012 Dean's Committee on GIS and Spatial Analysis in the Social Sciences
2007-2008 Joint Asian American Studies/Public Policy Faculty Search Committee.
2005-2007 Department Representative on UM Faculty Senate
2004-2006 Department Representative on College Promotion and Tenure Committee.
2000-2005  Chair, Behavioral and Social Sciences Curriculum Committee
1999-2001 Behavioral and Social Sciences Academic Council
1997-2000 Faculty Senate Campus Parking Advisory Committee

**Research Consulting and Government Work Experience (selected):**

° *Head Start XXI Resource Center, Hammond, Indiana.*   GIS and Statistical Consultant to this Head Start Program Serving 1,200 clients in Lake and Porter Counties. October 2003-March 2004.

° *Naugatuck Valley Economic Development Commission*. Adviser to this Connecticut economic development agency drafting an EDA report on the local economic impact of defense downsizing and industrial restructuring in the Northeast.  January 1998-May 1998.

° *U.S. Department of Housing and Urban Development*. Office of Policy Development and Research. Policy analyst working in the economics division under Assistant Secretary for Policy Development and Research, John Weicher.  June 1991-January 1992.

**Official Expert Testimony:**

° *League of Women Voters v. Commonwealth of Pennsylvania;* December 2017.

° *Agre et al. v. Wolf et al.;* December 2017.

° *Common Cause v. Rucho*; and *League of Women Voters v. Rucho*; consolidated cases; April 2017.

° *Juan Juaregui vs. City of Palmdale, California*; May 2013.

° U.S. House of Representatives, Government Reform Subcommittee on Federalism and the Census, Testimony on Immigration-Induced Reapportionment, December 6, 2005.

° U.S. House of Representatives, Small Business Committee, Testimony on Population Mobility and the Rural Economy, May 20, 1997.

° Maryland Commission to Revise the Election Code, Testimony on Third-Party Voting and Registration, November 1996.

**Invited Talks and Speaking Engagements (recent):**

° Invited Guest, Parkdale High School, Riverdale Park, Maryland; AP Government Lecture on Campaigns and Elections.   November 30, 2017.

° Invited Panelist, American Enterprise Institute, Washington, DC.  "Opinion Diversity in the Academy." May 11, 2017.

° Presentation at Washington University, St. Louis.  Department of Political Science.  "Incidental and Intentional Partisan Residential Sorting."   December 1, 2016.

**Invited Talks and Speaking Engagements (recent):**

- Presentation at The Maret School, Washington, DC.  "Our Patchwork Nation and the 2016 Election." November 9, 2016.

- Presentation at Bowdoin College, Brunswick, ME.  "Big Data and the Political Campaign."  February 16, 2016.

- Presentation at American University, National Capital Area Political Science Association Workshop. "Business Interests and the Party Coalitions: Industry Sector Contributions to U.S. Congressional Campaigns."  January 7, 2013.

- Conference Participant at Hoover Institution, Legal Immigration Policy Roundtable.   Stanford University.  Palo Alto, California.  October 4-5, 2012.

- Presentation at the University of Maryland Libraries, Speaking of Books Series.  "Our Patchwork Nation." College Park, Maryland.  October 19, 2011.

- Presentation at University of Iowa, Department of Political Science.  "Voter Migration and the Geographic Sorting of the American Electorate."  Iowa City, IA.  September 30, 2011.

- Keynote Address delivered to the Annual Great Plains Political Science Association Convention. "Economic and Political Socialization:  Lessons from Rural America for the Rest of the Nation." Brookings, SD.  September 24, 2011.

- Presentation at Stanford University, Hoover Institution.  "The Geography of Tea:  Strategic Activism or Expressive Protest?"  May 19, 2011.

- Presentation at the University of California, Los Angeles, Department of Geography.  "New Directions in the Geographic Analysis of Contemporary U.S. Politics."  April 22, 2011.

- Presentation at the University of Maryland, School of Public Policy.  Tuesday Forum. "Economic and Political Socialization across *Our Patchwork Nation*." November 30, 2010.

- Presentation at University of Kentucky, Department of Political Science. "Voter Migration and the Geographic Sorting of the American Electorate."  Lexington, KY.  December 3, 2010.

- Presentation at Georgetown University, American Politics Workshop.  "The Distributive Politics of the Federal Stimulus."   Washington, DC.  September 24, 2010.

- Presentation at Christopher Newport University, Conference on Civic Education and the Future of American Citizenship.  "Political Socialization Inside and Outside the Classroom." Newport News, VA.  February 4, 2010.

- Presentation at the Brookings Institution.  "Remarks on Joint Brookings/Kenan Center Immigration Roundtable Proposals and Recommendations." Washington, DC. October 6, 2009.

- Presentation at the University at Buffalo, Department of Political Science Seminar Series.   "Regional Migration Flows and Partisan Sorting of the American Electorate."  Buffalo, NY.  April 17, 2009.

- Presentation at the University of Wisconsin, Madison, American Politics Workshop.   "Rough Terrain: Spatial Variation in Political Participation."  Madison, WI.  March 23, 2009.

- Presentation at the University of Texas, Austin, Department of Government.   "Immigration and Diversity Attitudes in Rural America."  Austin, TX.  February 26-27, 2009.

12

**Invited Talks and Speaking Engagements (recent):**

Presentation at the University of Paris 8, St. Denis.   "Political Socialization and Diversity Attitudes."
- Conference on Immigration and Spatial Concentration in Three Countries.  Paris, France.  January 15-16, 2009.