UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| **BRETT BABER**, *et al.* | )<br>)<br>) |
| **Plaintiffs,** | )<br>) |
| v. | ) Case No. 1:18-cv-465<br>) |
| **MATTHEW DUNLAP, Secretary of the State of Maine,** *et al.*, | )<br>)<br>) |
| **Defendants.** | )<br>)<br>) |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Lee E. Goodman
Andrew G. Woodson
Eric Wang
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone: (202) 719-7000
Fax: (202) 719-7049


Joshua A. Tardy, Esq.
Joshua A. Randlett, Esq.
RUDMAN WINCHELL
84 Harlow Street; P.O. Box 1401
Bangor, ME 04402-1401
Phone: (207) 997-4501
jrandlett@rudmanwinchell.com

*Attorneys for Plaintiffs*

The Secretary of State, proceeding under Maine's Ranked Choice Voting Act (the "RCV Act"), redistributed 23,427 votes originally cast for Tiffany Bond and William Hoar, of which 15,174 were transferred to either Bruce Poliquin or Jared Golden.  In an outcome-determinative act, the Secretary discarded the remaining 8,253 votes cast by Maine voters in the election. Sec'y Opp'n Ex. F-2 (Doc. 44-3).  Without nullifying those votes, *no candidate* would have received a majority of the votes cast in this election.  Like Poliquin in the first round, Golden after the RCV tabulation had earned only a plurality: 142,440 out of the 289,624 total votes cast (49.18%).  After manipulating the denominator to exclude 8,253 votes, the Secretary instead declared that Golden had received a majority: 142,440 votes out of 281,371 (50.62%).  It is thus clear that Defendants believe a candidate may be "chosen by the People" of Maine by earning a mere plurality of the total votes cast in a race.  U.S. Const. art. I, § 2; *see also id.*  It necessarily follows that Bruce Poliquin, who earned a plurality on the first round, should have been declared the winner of this election.  The RCV manipulations that produced this *faux* majority violated the Equal Protection, Due Process, and the Voting Rights Act, and Plaintiff's injuries are no longer "theoretical" but real and material.  They were forced to participate in an election that denied all voters a ballot informing them of the actual candidates in a runoff election and the right to assess the relative merits of those two candidates, while the RCV system disenfranchised more than 8,000 voters who tried to vote in the runoff election but guessed at the wrong candidates.

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

   **A.  The RCV Act Violates Article I of the U.S. Constitution in Two Ways.**

Article I, § 2 – and specifically, the clause that representatives are "chosen . . . by the People" – is enforceable and must be "construed in its historical context." *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964). The Framers drafted the Constitution against the backdrop of "Anglo-American tradition [that

1

favors] 'first-past-the-post' electoral systems."[1] When the Framers intended to deviate from the default standard, they did so explicitly.[2] The "Framers understood [Article I] as a grant of authority to issue procedural regulations, and not . . . to dictate electoral outcomes,"[3] with the "language, 'chosen ... by the people,' [creating] a protection against interference with the privileges of suffrage."[4] Thus, the Second Circuit logically concluded that Art. I, § 2 "has always been construed to mean that the candidate receiving the highest number of votes at the general election is elected, although his vote be only a plurality of all votes cast." *Phillips v. Rockefeller*, 435 F.2d 976, 980 (2d Cir. 1970).

Defendants advocate an electoral system that did not exist until 100 years after the Constitution's adoption and remained relatively unknown in the U.S.[5] While Defendants cite the State's Article I, § 4 authority to regulate the time, place, and manner of elections, polling locations and hours are fundamentally different in kind than the substantive vote required to be "chosen by the People."[6] While the Secretary (at 7) claims "wide discretion" to experiment with electoral systems such decisions must comply with Art. I, § 2.[7] Additionally, as the Secretary (at 15) explained, the RCV Act was intended to "produce[] a winning candidate *with majority support of all the voters who participated*" (emphasis added). The Act's vote-manipulation to facilitate a *faux* majority (as discussed above) is precisely the type of dictated outcome the Constitution forbids under Art. I.

**B. RCV Violates the First and Fourteenth Amendments and Voting Rights Act.**

1. <u>The RCV Act Denies Voters an Effective Vote</u>.  The Secretary (at 12-13) concedes voters'

---

[1] George Steven Swan, *Prof. Lani Guinier and Proportional Representation: A Speculative Rationale for State Bicameralism*, 15 Hamline J. Pub. L. & Pol'y 55, 63 (1994); *see also Daggett v. Webster*, 81 F. Supp. 2d 128, 138 n.22 (D. Me. 2000) ("first past the post elections" are a basic "feature[] of our political system"), *aff'd sub nom. Daggett v. Comm'n on Governmental Ethics & Election Practices*, 205 F.3d 445 (1st Cir. 2000).
[2] *See, e.g.*, U.S. Const., art. II, § 3 ("[t]he Person having the greatest Number of Votes shall be the President, *if such Number be a Majority of the whole Number of Electors appointed*") (emphasis added).
[3] *U.S. Term Limits v. Thornton*, 514 U.S. 779, 833-34 (1995).
[4] *Republican Party v. Tashjian*, 770 F.2d 265, 272–73 (2d Cir. 1985), *aff'd*, 479 U.S. 208 (1986).
[5] *See, e.g.*, Maine League of Women Voters, *Concurrence Study: Instant Runoff Voting* at 4, 6-7, https://bit.ly/2Srfzk0.
[6] Golden (at 7) contends Art. I, § 4 leaves "counting of votes" to the States (citing *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *see also* Sec'y Opp'n at 8.  But the mechanical process of "counting the votes" is distinct from the "method of determining the outcome of an election (*e.g.*, by requiring a majority vote for election . . . )." *See* 28 C.F.R. § 51.13 (defining separate categories for purposes of the Voting Rights Act).
[7] *See U.S. v. Classic*, 313 U.S. 299, 311, 314-15 (1941).

constitutional right to "vote effectively" and does not deny that RCV creates "uncertainty on election day as to which candidates will continue" to an "instant runoff." Nonetheless, the Secretary, relying on the Court's TRO Order, posits that voters, "with reasonable diligence," could determine which candidate is "*likely* to survive the first round" of RCV (emphasis added). To say that voters may determine which candidates are "*likely*" to remain on the ballot in runoff rounds is to concede that RCV forces voters to guess at the candidates for whom they are voting.

Forcing voters to "guess" at what is on the ballot violates their due process rights. *See, e.g.*, *Jones v. Bates*, 127 F.3d 839, 859 (9th Cir. 1997), *rev'd on other grounds*, 131 F.3d 843, 846 (9th Cir. 1997) (en banc); *Burton v. Ga.*, 953 F.2d 1266, 1269 (11th Cir. 1992) ("substantive due process requires . . . that the voter not be deceived about what [is on the ballot]"); *Sprague v. Cortes*, 223 F. Supp. 3d 248, 288 (M.D. Pa. 2016) (quoting *Burton*). Maine's RCV Act and regulations exacerbate this uncertainty by allowing more than one candidate to be eliminated in a single round of ballot tabulation, thereby increasing the chances that voters will guess wrong.

The injuries here are not speculative. The actual votes cast on actual ballots in this election, compiled and posted on the Secretary's own website, evidence that almost one-third of voters guessed wrong. Gimpel Aff. (Doc. 37) at 9. The ballots reflect actual voter intent to support certain candidates in a separate runoff election at the time of the initial election, as counsel for the Secretary stated at the TRO hearing. Consistent with this logic and the Secretary's published guidance,[8] voters who voted for a candidate only in the first column intended to vote for that candidate in the initial and runoff elections. Voters who voted for candidates in the second and third columns were either guessing that candidate would be in a runoff or expressing hypothetical runoff preferences. Crediting those guesses and preferences as "votes," as Maine has counted them in this election, actual voter behavior indicates

---

[8] *See* Me. Sec'y of State, *Marking Your Ranked-Choice Ballot*, https://bit.ly/2Q6avEN; Sample Ballot, General Election, Nov. 6, 2018, Compl. Ex. A (Doc. 1-1).

3

a decisive number of voters guessed or preferred wrong and consequently were disenfranchised.

More than 8,000 voters voted for Bond and/or Hoar across their ballots, causing their ballots to be "exhausted" and completely discarded. *See* Supp. to Gimpel Aff. Ex. A (Doc. 51). These voters "anticipated that [] Bond or [] Hoar would proceed to a runoff count instead of [] Golden and [] Poliquin." Gimpel Aff. (Doc. 37) at 10. More than 600 voters voted for Bond or Hoar in the initial and runoff elections, and therefore were thrown out of the election, but voted for Poliquin or Golden in the fourth or fifth columns, miscalculating a subsequent runoff that never happened. *See* Supp. to Gimpel Aff. Ex. A. All of these voters were completely discarded and disenfranchised from the runoff election, even though they cast votes in the runoff.[9] Defendants have articulated no basis or evidence to justify RCV's categorical disenfranchisement of voters in this manner.

Nor have Defendants justified denying *all* voters the right to switch their votes based on actual knowledge, as opposed to a "likely guess," that Poliquin and Golden would be the runoff candidates. Ironically, the Secretary (at 15) correctly acknowledges that voters may have "nuanced preferences among multiple candidates." Analysis of voter data shows that in a given four-way race, fifteen percent of voters have such intransitive candidate preferences. Benjamin Radcliff, The Structure of Voter Preferences, 55 Journal of Politics No. 3, 715-716 (1993); *see also* Gimpel Aff. at 10-11; Sorens Aff. (Doc. 4) at 5-6. However, the actual ballots cast in this election belie the Secretary's claim that RCV protected thousands of voters' right to express such "nuanced preferences."

In short, the assumptions inherent in RCV that Defendants articulate go beyond the "mere speculation" they accuse Plaintiffs of.[10] Defendants' assumptions are demonstrably untrue and

---

[9] The Secretary recognizes that federal election law, which preempts state law, requires "uniform and non-discriminatory standards that define what constitutes a vote." Sec'y Opp'n at 8 (citing the Help America Vote Act, 52 U.S.C. § 21081(6)). The Secretary is thereby foreclosed from counting some voters' instant runoff choices as "votes" while discarding others.
[10] Of the more than 8,000 voters discussed above who guessed wrong and were disenfranchised in the runoff by voting for Bond and/or Hoar across their ballot or as their first- and second-choice candidates, it stands to reason that many would have voted for Poliquin or Golden had they known those would be the actual runoff choices. Here, where the RCV margin was a difference of 3,509 votes, and a shift in 1,755 votes would change the outcome, *see* Sec'y Opp'n Ex. F-2, RCV's disregard of these voters in the runoff round is significant and not hypothetical.

impermissibly disenfranchise voters or, at the very least, deny them an effective vote.[11]

Defendants also do not deny that the Voting Rights Act ("VRA"), like the First and Fourteenth Amendments, guarantees a right to vote effectively. They merely dispute whether its provisions apply beyond "discriminatory intent," racial discrimination, or "protected class." Sec'y Opp'n at 17; Golden Opp'n at 12; Bond Opp'n at 9-12. The plain language of the VRA provisions Plaintiffs cite, 52 U.S.C. §§ 10307(a), 10310(c)(1), does not state such limits. Bond (at 11) cites a Second Circuit holding that section 10307(a), protecting the rights of voters "otherwise qualified to vote," only addressed racial discrimination. The Second Circuit so limited this VRA provision for fear of involving "Federal courts [in] correct[ing] election deficiencies of any sort." *See Powell v. Power*, 436 F.2d 84, 87 (2d Cir. 1970). However, this ruling is outdated because the Supreme Court subsequently ruled that federal courts should intervene to adjudicate deficient election laws like the one here. *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983).

2. <u>RCV Fails Strict Scrutiny and "Important Regulatory Interests" Standards</u>. Defendants all agree that: (1) election laws that severely burden voting rights must be "narrowly tailored to serve a compelling state interest" ("strict scrutiny"), Sec'y Opp'n (at 11); *see also* Golden Opp'n (at 10), Bond Opp'n (at 12-13); and (2) less burdensome election laws still must further an "important regulatory interest" and be "nondiscriminatory," Sec'y Opp'n (at 11); Golden Opp'n (at 10), Bond Opp'n (at 11).[12] Defendants merely dispute and understate the severity of RCV's burdens on voter choice, knowledge, and effectiveness. For the reasons above, RCV's interference with the right to vote

---

[11] The Campaign Legal Center's *amicus* brief (at 5-6) goes even further and contends these fatal flaws in the RCV Act pose "*zero*" burden because "[v]oters are not *required* to rank candidates." (emphasis in the original). But voters also are not required to vote generally. Under *amicus*' logic, if a ballot designated two unknown candidates simply as "X" and "Y," this would pose "*zero*" burden to voters and would be constitutionally permissible.

[12] To the extent Bond's Opposition (at 13) suggests the First Circuit, in *Libertarian Party v. Gardner*, 843 F.3d 20 (1st Cir. 2016), dispensed with the Supreme Court's requirement in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) that election laws still must be "nondiscriminatory" under the most "deferential rational basis review," this is incorrect. The First Circuit repeatedly cited *Anderson* and incorporated by reference the Supreme Court's parameters for reviewing election laws under this deferential standard. *See Libertarian Party*, 843 F.3d at 31-32.

5

effectively is severe enough to trigger strict scrutiny. *See* Mot. for P.I. at 15 (collecting authority).[13]

Regardless, the RCV Act fails both judicial review standards, as none of Defendants' claimed state interests justifies RCV. Notably, the State never raised five of the six justifications now posited for RCV in prior litigation. *Maine Republican Party v. Dunlap*, 324 F.Supp.3d 202, 212 (D. Me. 2018). *Post hoc* justifications cannot support severe or discriminatory burdens on the franchise. *See Libertarian Party,* 843 F.3d at 31. Even accepting the belatedly articulated interests as genuine, they do not justify the severe burdens on the franchise imposed by RCV generally and in the 2018 election.

*First*, Defendants cite no authority recognizing a legitimate state interest, much less a compelling one, in facilitating the ability of "voters to express [their] preferences" for "spoiler" candidates without having any effect on the election. *See* Sec'y Opp'n at 15. This nonsensical justification begs the question: *What is even the point?* Presumably, many who vote for "spoiler" candidates wish for their vote to have the spoiler effect. If RCV merely nullifies the effect of those votes, this purported state interest actually harms voter choice and nullifies voter expression. Even if protecting against spoiler candidates were recognized as a legitimate state interest for the first time in this case, however, the RCV Act is not narrowly tailored because this interest can be served just as well by holding actual runoff elections, which do not burden the exercise of an effective vote by forcing voters to vote on unknown candidate matchups.

*Second*, the argument that RCV "encourage[s] greater [voter] participation" contradicts actual experience. *See* Sec'y Opp'n at 15. At a high level, the "considerable political knowledge and sophistication" required to understand RCV is just as likely to deter as it is to increase voter participation. Gimpel Aff. (Doc. 37) at 11; Sorens Aff. (Doc. 4) at 6; *see also* Craig M. Burnett & Vladimir Kogan, *Ballot (and voter) 'exhaustion' under Instant Runoff Voting*, 37 Electoral Studies 41

---

[13] Golden (at 10) contends "no court has ever applied strict scrutiny to evaluate any of the alleged burdens imposed by an RCV system." However, to Plaintiffs' knowledge, prior challenges have not argued that RCV deprives voters of an effective vote by forcing them to vote on runoff rounds in which the candidates and matchups are unknown.

(2015). In fact, compared to the 2014 midterm, RCV decreased 2018 participation by disenfranchising thousands of voters in the runoff election. In 2014, 295,009 ballots were cast in Maine's Second Congressional District (283,473 ballots cast for candidates and 11,536 over/undervoted). U.S. House of Reps., Statistics of the Nov. 4, 2014 Election at 19, https://bit.ly/2DSMB8B. In 2018, 296,077 ballots were cast (289,624 ballots cast for candidates in the first round and 6,453 over/undervoted). Sec'y Opp'n Ex. F-2. The marginal increase of 1,068 voters who turned out – hardly an endorsement for RCV – was wholly erased in the second round of tabulation when the RCV system disenfranchised an additional 8,253 voters. That is, the exhausted ballots, overvoted ballots, and undervoted ballots ballooned to 14,706 (6,453 in round one plus additional 8,253 in round two) in the runoff election, leaving only 281,371 votes for the round two candidates, *see id.* – a whopping 13,638-vote decrease from 2014. RCV caused this sizeable decrease in participation by disenfranchising more than 8,000 voters who guessed wrong or miscalculated their runoff votes. RCV's burdens on voters actually *reduced* voter participation in the 2018 runoff election.

*Third*, the argument that RCV "produces a winning candidate with majority support of all the voters who participated" in the election is disingenuous and flatly contradicted by simple math. *See* Sec'y Opp'n at 15; *see also* Bond Opp'n at 16; *but see* Golden Opp'n at 11 (RCV results in "strong *plurality* support") (emphasis added). Because RCV is so inherently confusing, and in this election demonstrably forced voters to miscalculate runoff candidates, 8,253 ballots were discarded from this election between round one and round two. Sec'y Opp'n Ex. F-2. As a result, RCV only produced the barest of majorities based on the fewer remaining valid ballots. *See* Sec'y Opp'n Ex. F-2 (Doc. 44-3). Moreover, based on the total number of ballots cast, Golden – the purported RCV "majority" winner – received only 49.18 percent of the votes (142,440 / 289,624). *See id.* Because the "majority support" rationale is implausible (or outright mathematically wrong), and RCV essentially manipulates election results from one plurality winner to another, it fails the "important regulatory interests" review

7

standard. "Majority support" also is not a "compelling" state interest given that the vast majority of American jurisdictions reject such a voting requirement. *See* Mot. for P.I. at 3. Moreover, the more narrowly tailored way to achieve this goal is, again, to hold actual runoff elections which eliminate the Due Process and Equal Protection problems.

*Fourth*, as to the argument that RCV "avoid[s] the inconvenience and cost . . . of holding a separate run-off election," Sec'y Opp'n at 15; *see also* Golden Opp'n at 11, "an interest in the 'preservation of the state's limited resources'" cannot justify the abridgement of fundamental rights or unconstitutional discrimination. *Plyler v. Doe*, 457 U.S. 202, 227 (1982); *see also Heller v. Dist. of Columbia*, 801 F.3d 264, 287 (D.C. Cir. 2015). RCV unconstitutionally burdens the right to vote and discriminates against certain voters and candidates, and therefore cannot be justified on the basis of cost savings. This is especially so when the purported "savings" are based on an alternative that serves a less-than-compelling state interest, and the RCV scheme achieves a majority winner only by discarding ballots, disenfranchising voters, and manipulating election results.

*Fifth*, RCV does not "more accurately [] reflect voter sentiment." *See* Golden Opp'n at 11. Again, RCV prevents voters from casting informed votes in runoffs and does not permit many voters with intransitive preferences to switch their votes based on the actual candidate matchups that emerge through the runoff process. *Dudum v. Arntz*, 640 F.3d 1098, 1105-06 (9th Cir. 2011). As the data from this election show, a substantial percentage of voters also guessed wrong at which candidates would continue to the runoff round. Moreover, the RCV system suffers from monotonicity failure and can actually produce results that countermand voter sentiment. Gimpel Aff. at 14-15; Sorens Aff. at 7-9. Given all this, it simply cannot be said that RCV "more accurately [] reflect[s] voter sentiment," and this rationale thus fails both levels of judicial review. Monotonicity failure is a problem unique to RCV voting, and all of its infirmities can be cured by holding actual runoff elections.

*Lastly*, the argument that RCV results in "orderly" elections and "preserve[s] the integrity and

8

reliability of the electoral process" also fails either judicial review paradigm. *See* Bond Opp'n at 16. It cannot be seriously argued that the plurality-wins system, which Maine used previously for almost 140 years and for state-office races in this very same election, and which the vast majority of other U.S. jurisdictions use, is somehow more chaotic or less "reliable." To the contrary, RCV's inherently confusing nature, the severe burden it imposes on effective and knowledgeable voting, and the actual disenfranchisement experienced in this election demonstrate it is *less* orderly and reliable. And to the extent RCV is only capable of producing "majority" winners by manipulating the election results and disenfranchising voters in the runoff round, this also severely undermines its "integrity."

### C. The RCV Act Violates Plaintiffs' and Voters' Rights to Equal Protection.

The Secretary (at 16) concedes that RCV permits some voters to have multiple "different [candidate] choices counted," while others have only one choice counted. Nonetheless, Defendants argue the equal protection claims are unlikely to succeed by characterizing RCV's violations at too high a level of generality. The basic "concept of equal protection . . . requir[es] the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). The Equal Protection Clause is violated whenever voters are treated unequally absent a "compelling state interest." *See*, *e.g.*, *Hill v. Stone*, 421 U.S. 289, 295 (1975); *Dunn v. Blumstein*, 405 U.S. 330, 337 (1972); *Cipriano v. City of Houma*, 395 U.S. 701, 704 (1969); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969). Election laws that violate Equal Protection are not limited to those that discriminate against a "protected class." *See id.*; *see also Bush v. Gore*, 531 U.S. 98, 103 (2000); *Bd. of Estimate of City of New York v. Morris*, 489 U.S. 688, 690 (1989); *Reynolds*, 377 U.S. at 568; *Baker v. Carr*, 369 U.S. 186, 237 (1962); *cf.* TRO Order at 10.

The Secretary defends RCV by saying that no voter has "more votes" than another. This glosses over what happens in each runoff round. Some voters (who guess the runoff candidates correctly) are able to shift their votes to different runoff candidates, and their ballots are counted for

9

multiple candidates rather than one candidate. Other voters are locked in to voting only for their first-choice candidate, with no ability to shift electoral support to other candidates in subsequent rounds. The ability to shift one's vote, on one ballot, from candidate to candidate affords one voter a greater degree and different kind of electoral power than voters who are foreclosed from shifting their votes.

This inherently unequal treatment of ballots and electoral power violates the core equal protection threshold requirement of "uniform treatment" of all voters, *Reynolds,* 377 U.S. at 565, where, as discussed above, there is no compelling state interest to justify the differential treatment. The inability of voters who had their first-choice candidate locked in "to controvert the presumption" that they still wish to vote for that candidate in subsequent runoff rounds "imposes an invidious discrimination in violation of the Fourteenth Amendment." *Carrington v. Rash*, 380 U.S. 89, 96 (1965).  Furthermore, considering the Secretary's acknowledgement (at 15) that voters are "express[ing] . . . preferences among multiple candidates," RCV also violates Equal Protection by treating voters' expressive activity differently absent "an appropriate governmental interest suitably furthered by the differential treatment."  *Police Dept. v. Mosley*, 408 U.S. 92, 94-95 (1972).  Again, the power to shift votes among candidates could be afforded all voters equally in an actual runoff election.

RCV's unequal treatment of voters is not limited to "voters [who] do not choose to vote in the runoff round" (*i.e.*, rank any candidates after their first choice).  *See* Golden Opp'n at 10.  A voter for a more viable first choice is locked in for that candidate, even if the voter expressed a different choice in the runoff, while others who voted for less-viable first-choice candidates receive do-overs.

Election laws need not have an "invidious intent" to violate the Equal Protection Clause.  *Cf.* Golden Opp'n at 11.  Treating voters differently based on any "capricious or irrelevant factor. . . *causes* an invidious discrimination" in violation of the Equal Protection Clause. *Harper v. Va. State Bd. of Elections*, 338 U.S. 663, 668 (1966) (emphasis added), including divining voter intent after an election using different standards. *Bush*, 531 U.S. 98.  Even if election laws were required to have a

discriminatory intent, *see* TRO Order at 10,[14] the RCV Act intends to (and in this election in fact did) treat certain voters' ballots differently. The RCV scheme could not function otherwise. The Secretary has conceded the RCV Act is intended to protect those voters who initially vote for longshot candidates over those voters who initially vote for more viable candidates, while protecting major-party candidates against "spoiler" candidates. This is *prima facie* intentional discrimination between voters who vote for major versus longshot candidates.

## II. THE OTHER CRITERIA SUPPORT A PRELIMINARY INJUNCTION.
### A. Plaintiffs will suffer irreparable harm absent preliminary relief, and the balance of equities and public interest favor a preliminary injunction.

Because Plaintiffs have only a narrow window in which they can vindicate their federal constitutional rights, they will suffer irreparable harm if Defendants determine and certify the election results based on the RCV Act. In the absence of preliminary relief, Defendants will certify a winner based on RCV tabulation, and that person will presumably be sworn into the U.S. House of Representatives less than five weeks from today, and Plaintiffs will be permanently deprived of the ability to have the federal judiciary determine the constitutionality of the state's treatment of their votes in the 2018 election. The loss of constitutional rights "unquestionably" constitutes irreparable harm. *Sindicato Puertorriqueno de Trabajadores y Fortuno*, 699 F.3d 1, 10-11 (1st Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

With respect to the balance of equities, Defendants assert that they will experience "substantial injury" if the Court temporarily enjoins Maine officials from determining or certifying the winner of the election until the Court can resolve Plaintiffs constitutional claims. Golden Opp'n at 16. But none of their claimed injuries would result from a limited injunction that merely preserves the status quo while the Court adjudicates the parties' constitutional claims. In the meantime, Golden will suffer no

---

[14] The TRO Order indirectly cites *Washington v. Davis*, 426 U.S. 229 (1976), which was not an election law case. *Davis* noted an election law could violate equal protection if it "was *either* motivated by racial considerations *or in fact* drew the districts on racial lines." *Id. at* 240 (quoting *Wright v. Rockefeller*, 376 U.S. 52, 67 (1964)) (emphasis added). Even if the RCV Act lacks a discriminatory intent, it *in fact* discriminates between voters.

11

injury as he proceeds with "apparent winner" activities, including recently attending orientation for new U.S. House members in Washington, DC.[15] The Secretary, for his part, has already certified the RCV tabulation, and a recount of that tabulation is ongoing. If the Court determines the RCV Act is constitutional, the Governor will certify a winner based on the recount tabulation. In that event, Defendants will experience no injury other than a temporary delay in the determination and certification of a winner of the election. If the Court instead determines the RCV Act violates the Constitution, a proper remedy can be tailored to the violation. *See, e.g.*, *Bush v. Gore*, 531 U.S. at 103 (fashioning a remedy to ballot counting and determination of election winner). Defendants and all citizens of Maine will then be afforded the benefit of a determination and certification that complies with the U.S. Constitution, which surely Defendants desire as much as Plaintiffs do. In short, a temporary delay poses no harm to the Defendants, but without such relief Plaintiffs' constitutional rights will be irretrievably forfeit. The balance of equities therefore favors Plaintiffs.

Finally, a preliminary injunction will serve the public's interest in protecting all citizens' constitutional right to vote and to elect their U.S. Representative through a constitutional process. *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 729 (1st Cir. 1994); *Magriz v. Union de Tronquistas de Puerto Rico*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011). Conversely, the public has no interest in preserving the results of an election infected by the disenfranchisement of thousands of voters and both facial and as-applied violations of the U.S. Constitution. Finally, regardless of the Court's conclusion with respect to the RCV Act, the public's interest is served by temporarily enjoining the determination and certification of a winner based on RCV to allow the parties to fully present their constitutional arguments to the court. A declaration of legal rights will benefit all parties and the public.

### B. Laches Does Not Bar Plaintiffs' Claims.

Defendants assert Plaintiffs' federal constitutional claims are barred because Plaintiffs were

---

[15] *See* Michael Shepherd, *What You Need to Know About the Looming Recount in Maine's 2nd District,* Bangor Daily News, Nov. 27, 2018, https://goo.gl/oqVNRR.

12

"obligated" to bring them earlier. Golden Opp'n at 14; *see also* Bond Opp'n at 4; Sec'y Opp'n at 18. But as Defendants acknowledge, ripeness requires that a case "not be premature or speculative." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). Indeed, "a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *City of Fall River, Mass. v. F.E.R.C.*, 507 F.3d 1, 6 (1st Cir. 2007) (citations omitted). Here, Plaintiffs' injuries did not accrue—and the Court thus found them to remain only a "hypothetical"—until the Secretary of State applied the RCV Act to tabulate the results of the election.[16] Thus, not only were Plaintiffs not "obligated" to bring their claims earlier, they in fact could not have done so.

Plaintiffs are challenging unconstitutional aspects of the Maine system that actually materialized and violated the personal Due Process rights of Plaintiffs (and all Maine voters) in this election. These violations include the actual disenfranchisement of thousands of voters by being forced to guess, and cast runoff votes, on Nov. 6 without knowing the runoff would be between Poliquin and Golden. The actual ballot imprints of all voters confirm that thousands of voters were in fact disenfranchised, by guessing wrong or by casting meaningless "preferences" not counted in the final tabulation. *See* Gimpel Aff. (Doc. 37) at 10, 12. Not only were these individuals' votes not counted for their lower-ranked candidate choices, their runoff votes were actually discarded from the denominator of the election – a nullification which decided the outcome. *See* Sec'y Opp'n Ex. F-2 (Doc. 44-3).

As a candidate in this election, Plaintiff Poliquin is also uniquely situated. Poliquin seeks a judicial declaration that determining the winner of this election based on the second, "instant runoff" count would violate the U.S. Constitution. Clearly, Poliquin could not have claimed to be the winner

---

[16] Even after the election was completed, in the absence of a final vote tabulation the Court observed that Plaintiffs presented only "hypothetical scenarios" in which voters are forced to guess the candidates in the "instant runoff" election. TRO Order at 9. The Court thus suggested that Plaintiffs claims were premature, observing that "the application of [equitable] doctrines and principles may be informed by the final tabulation of votes." *Id.* at 15. Other courts similarly have determined that "[a] case is ripe if any remaining questions are purely legal ones" but not "if further factual development is required." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987).

of the election before ballots were cast. Thus, his claim did not ripen until he achieved a plurality in a completed race and could assert a legal right to be declared the winner pursuant to the first tabulation. *See, e.g., Labor Relations Div. of Constr. Indus. of Massachusetts, Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (declaratory action ripens when a substantial controversy "of sufficient immediacy and reality" exists "between parties having adverse legal interests"). Poliquin's claim is not abstractly related to RCV's application to future elections or to hypothetical vote tabulations; it is based on the actual votes cast and tabulated in this election, which evidence widespread voter disenfranchisement.

As for the Equal Protection claims, had Poliquin supporters challenged the RCV Act based on a prediction that some Bond and Hoar voters would shift their votes to Golden in a hypothetical runoff, their claim similarly would have been conjectural. Now, we know that voters actually made multiple choices in this election, and, by guessing correctly, exercised disparate electoral power to change the outcome of the election. Thus, Plaintiffs' Equal Protection claims are no longer hypothetical but real, materialized, and ripe. *See, e.g.*, *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (ripeness distinguishes injuries that "may never occur" from those "appropriate for judicial review").

Defendants also assert that laches applies because some voters will be prejudiced by their reliance on RCV when they cast their ballots. Bond Opp'n at 19; Golden Opp'n at 15. But there is no right to rely on a voting mechanism that systematically violates federal constitutional rights. While courts sometimes recognize an interest in "protecting reasonable reliance on prior law even when" the law is determined to be unconstitutional, such an interest is given no weight "if the expectations sought to be protected were themselves unreasonable or illegitimate." *Heckler v. Mathews*, 465 U.S. 728, 746 (1984); *see also, e.g., Bush v. Gore,* 531 U.S. at 110 (enjoining recount tabulations despite voters' reliance on procedures in place before election). Furthermore, the Court may easily resolve any reliance concerns by ordering a new or runoff election to be held, in which all voters will have the opportunity to cast an effective vote for their candidate of choice. *See Griffin v. Burns*, 570 F.2d 1065,

14

1080 (1st Cir. 1978).

Finally, laches does not bar Plaintiffs' facial challenge to the RCV Act. *First*, "[e]ven a facial challenge to a statute is constitutionally unripe" until Plaintiffs can establish "[an] imminent injury." *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017). *Second*, to establish a laches defense Defendants must make a "clear showing" that any delay in challenging the law was "unreasonable." *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 187 (D. Me. 2008). This election was the first-ever general election for federal office held in the United States under an "instant runoff" system. Associated Press, *Nov. 6 General Election in Maine*, Nov. 5, 2018, https://goo.gl/fj7oRD. The election was conducted under ballot instructions that contradicted other guidance by the Secretary, *see supra* note 8, and tabulated pursuant to regulations adopted on Nov. 2, 2018, Me. Sec'y of State, *Rules Governing the Administration of Elections Determined by Ranked-Choice Voting*, https://goo.gl/zRm8as. Plaintiffs could not divine in advance the actual manner in which the new and untested RCV system would interfere with their exercise of the franchise. Based on these and other facts and circumstances, any delay was not unreasonable. *See, e.g.*, *Stoddard v. Quinn*, 593 F. Supp. 300, 309 (D. Me. 1984).

## **CONCLUSION**

At the merits stage, the Court may tailor a remedy to address the unconstitutional aspects of this election: a declaration of legal rights; an injunction against determining a winner based on the RCV count; an injunction requiring the state to determine a winner based on the voters' first-choice votes; or an order to conduct a new election. The Court need not determine now what remedy is appropriate. At this juncture, a preliminary injunction will preserve the *status quo* while the parties present their constitutional arguments. The merits can be decided on expedited cross-motions for summary judgment within one month. This case implicates profound federal constitutional rights in the context of a federal election imbued with serious federal interests. This matter properly should be decided by a federal court interpreting the Constitution.

DATED: December 2, 2018

        Respectfully submitted,

        /s/ *Lee E. Goodman*

        Lee E. Goodman (admitted *pro hac vice*)
        Andrew G. Woodson (admitted *pro hac vice*)
        Eric Wang (admitted *pro hac vice*)
        WILEY REIN LLP
        1776 K Street, NW
        Washington, D.C. 20006
        Phone: (202) 719-7000
        Fax: (202) 719-7049
        lgoodman@wileyrein.com
        awoodson@wileyrein.com
        ewang@wileyrein.com

        /s/ *Joshua A. Tardy*

        Joshua A. Tardy, Esq.
        Joshua A. Randlett, Esq.
        RUDMAN WINCHELL
        84 Harlow Street; P.O. Box 1401
        Bangor, ME 04402-1401
        Phone: (207) 997-4501
        jrandlett@rudmanwinchell.com

        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on December 2, 2018, I electronically filed the foregoing Plaintiffs' Reply to Defendants' Oppositions to Plaintiffs' Motion for a Preliminary Injunction with the Clerk of Court using the CM/ECF system, which will send notification to the following:

PHYLLIS GARDINER
Phyllis.gardiner@maine.gov

THOMAS A. KNOWLTON
Thomas.a.knowlton@maine.gov

PETER J. BRANN
pbrann@brannlaw.com

DAVID M. KALLIN
dkallin@dwmlaw.com

ELISABETH C. FROST
efrost@perkinscoie.com

JAMES T. KILBRETH
jkilbreth@dwmlaw.com

JOHN M. GEISE
jgeise@perkinscoie.com

MARC E. ELIAS
melias@perkinscoie.com

MICHAEL E. CAREY
mcarey@brannlaw.com

JAMES G. MONTELEONE
jmonteleone@bernsteinshur.com

PAUL J. BRUNETTI
pbrunetti@mb-law.com


                                            /s/ *Joshua A. Randlett*
                                            Joshua A. Randlett, Esq.