```
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF MAINE

 3    BRETT BABER, et al.,          )
                                    )
 4                  Plaintiffs      )         CIVIL ACTION
                                    )
 5          vs.                     )    Docket No. 1:18-cv-465-LEW
                                    )
 6    MATTHEW DUNLAP and            )          MOTION FOR
      PAUL LePAGE,                  )     PRELIMINARY INJUNCTION
 7                                  )
                    Defendants.     )
 8                                  )

 9                     TRANSCRIPT OF PROCEEDINGS

10         Pursuant to notice, the above-entitled matter came on

11    for MOTION FOR PRELIMINARY INJUNCTION before the HONORABLE

12    LANCE E. WALKER, in the United States District Court, Bangor,

13    Maine, on the 5th day of December, 2018, at 10:08 a.m.

14    APPEARANCES:

15    For the Plaintiffs:          Lee E. Goodman, Esquire
                                   Joshua A. Randlett, Esquire
16                                 Joshua A. Tardy, Esquire

17    For Defendant Dunlap:        Phyllis Gardiner, Esquire
                                   Thomas A. Knowlton, Esquire
18
      For Intervenor Golden:       Peter J. Brann, Esquire
19                                 Michael E. Carey, Esquire
                                   John M. Geise, Esquire
20                                 Eamonn R.C. Hart, Esquire
                                   David M. Kallin, Esquire
21                                 James T. Kilbreth, Esquire

22    For Intervenors Bond,        James G. Monteleone, Esquire
      Wollstadt, and Michaud:
23
                          Julie G. Edgecomb, RMR, CRR
24                          Official Court Reporter

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer.
```

INDEX OF PROCEEDINGS

                                                        Page:

Objection by Ms. Gardiner to Relevance of Testimony:       8

Testimony:  (see below)

Tender of Dr. Gimpel as an Expert Witness:                17

Motion by Mr. Kilbreth to Strike Testimony:               74

Argument by Mr. Goodman:                             74, 101

Argument by Ms. Gardiner:                                 79

Argument by Mr. Brann:                                    90

Argument by Mr. Monteleone:                               95


                    INDEX OF WITNESSES
                                                        Page:

JAMES GIMPEL   (called by Mr. Goodman)

Direct Examination by Mr. Goodman                         10
Cross-Examination by Mr. Kilbreth                         47
Redirect Examination by Mr. Goodman                       67


                    INDEX OF EXHIBITS
Plaintiffs'
Exhibit No.    Description              Offered    Admitted

    1     Curriculum Vitae of James Gimpel    17        17
    2     State of Maine Sample Ballot        25        26
    3     Compilation of Data by James Gimpel 37        37

1          (Counsel present in open court.)

2               THE COURT:  Good morning, everyone.  Have a seat,

3     please.

4          Okay.  We're here in the case of Baber versus Dunlap,

5     Case No. 18-cv-465.

6          Before we begin this morning, I'd like to have counsel

7     note their appearance for the record, starting with

8     Mr. Goodman.  Good morning.

9               MR. GOODMAN:  Good morning, Your Honor.  Lee

10    Goodman, of Wiley Rein, for the plaintiffs.

11              MR. RANDLETT:  Good morning, Your Honor.  Josh

12    Randlett, Rudman Winchell, on behalf of the plaintiffs.

13              MR. TARDY:  Good morning.  Josh Tardy on behalf of

14    the plaintiffs.

15              THE COURT:  Good morning.

16              MS. GARDINER:  Good morning, Your Honor.  Phyllis

17    Gardiner from the Attorney General's Office, with my colleague

18    Tom Knowlton, also from the Attorney General's Office, on

19    behalf of Secretary of State Matt Dunlap.

20              THE COURT:  Good morning.

21              MR. KNOWLTON:  Good morning.

22              MR. KILBRETH:  James Kilbreth on behalf of Jared

23    Golden.

24              THE COURT:  Good morning.

25              MR. BRANN:  Peter Brann on behalf of Jared Golden.

1          MR. GEISE:  John Geise on behalf of Jared Golden.

2          MR. MONTELEONE:  Good morning, Your Honor.  James

3  Monteleone, from Bernstein Shur, on behalf of Tiffany Bond,

4  Kaylee Michaud, and Rachel Wollstadt.

5          THE COURT:  Good morning.  Is that everyone?  Okay.

6          MR. BRANN:  Your Honor, with me is Michael Carey and

7  Eamonn Hart of my office, who are also here on behalf of Jared

8  Golden.

9          THE COURT:  Welcome, good morning.

10          MR. KILBRETH:  And, also, Your Honor, David Kallin

11  is also here.

12          THE COURT:  All right.  I think we've accommodated

13  everyone for introductions.  We should probably get to the

14  evidence sooner or later.

15      Before we do that, Mr. Goodman, is there anything from

16  your perspective that needs to be brought to the attention of

17  the court?

18          MR. GOODMAN:  Yes, Your Honor.

19          THE COURT:  Yes, sir.

20          MR. GOODMAN:  The defense counsel suggested just

21  before the hearing that we consolidate the plaintiffs' request

22  for preliminary injunction with a request for permanent

23  injunction.

24          THE COURT:  Hm-hmm.

25          MR. GOODMAN:  Plaintiffs' counsel has agreed to that

1  if the court is amenable to consolidating those -- those two

2  procedures and reliefs.

3      Now, we still do have a -- we have, of course,

4  alternative relief, including just a declaratory judgment --

5          THE COURT:  Right.

6          MR. GOODMAN:  -- but I think the court would have to

7  cross that bridge in order to get to an injunction.

8          THE COURT:  Right.

9          MR. GOODMAN:  But I wanted to bring that agreement

10  between counsel to present that to the court, to your

11  attention before we began.

12          THE COURT:  Is that the position of all defendants?

13          MS. GARDINER:  It's the position of the Secretary of

14  State, Your Honor, and just with the understanding that the

15  declarations of Deputy Secretary Flynn that have been

16  submitted to the court and those exhibits would be considered

17  part of the evidentiary record of the consolidated hearing.

18          THE COURT:  No objection to that, Mr. Goodman?

19          MR. GOODMAN:  No objection, Your Honor.

20          THE COURT:  Okay.

21          MR. BRANN:  Golden consents, as well.

22          MR. MONTELEONE:  As does Ms. Bond.

23          THE COURT:  So that request is granted.  Thank you.

24          MR. GOODMAN:  Thank you, Your Honor.

25          THE COURT:  Anything else we need to take up?

1          MR. GOODMAN:  Nothing preliminary.  Just ready --
2    prepared to get to the merits.
3          THE COURT:  You may call your first witness.
4          MR. GOODMAN:  Your Honor, before I call my first
5    witness, just -- just an update.
6          THE COURT:  Yes.
7          MR. GOODMAN:  We filed an amended complaint, Your
8    Honor, that updated factual circumstances.  The Secretary of
9    State certified a vote tabulation to the Governor's Office on
10   November 26th.
11         THE COURT:  Hm-hmm.
12         MR. GOODMAN:  That vote tabulation showed that
13   Congressman Poliquin won the first count and that Mr. Golden
14   won the -- the RCV, or the retabulated count.  That count is
15   not finalized now because the -- a recount has been requested
16   by the apparent loser of the RCV count, Mr. Poliquin, without
17   waiving his right to -- to, nonetheless, raise the
18   constitutional challenges he has to the count itself.
19         THE COURT:  Right.
20         MR. GOODMAN:  And we are -- we have been informed
21   from public pronouncements by the Secretary of State that that
22   recount could take approximately four weeks, and it's our
23   understanding that the Governor will certify a winner based on
24   the recount tabulation, not the original November 26th
25   certification.

1          THE COURT:  Hm-hmm.

2          MR. GOODMAN:  And in the meantime, you know,

3    Mr. Golden is attending orientation activities in Washington,

4    D.C., as the apparent winner of the election.

5          Our amended complaint, Your Honor, updated those factual

6    circumstances, added the Governor as a defendant in his

7    official capacity, given his role of certifying the winner

8    based on the eventual recount tabulation.  It -- our amended

9    complaint reflected -- reflects new evidence about the

10   election that we've now all learned about as a result of the

11   first tabulation.  The amended complaint responds to issues

12   that the court raised at the prior hearing and in the TRO

13   ruling, and we have added an alternative relief, which is the

14   call of a new election, which the court pressed us on.

15         So there are, effectively, four -- four potential or

16   alternative requests for relief:  One is the declaratory

17   judgment.  In some cases, courts reach declaratory judgment

18   and never issue an injunction.  They remand to the state to

19   act in accordance with the constitutionality or the

20   constitutional ruling.

21         Moving forward into injunctive relief, there are really

22   two:  One is to enjoin the State from determining a winner

23   based on the recount count, the second count of votes.

24         The next one would go a bit further and enjoin the State

25   by ordering the State to determine a winner according to the

1   first count.  Those are nuanced, slightly different.

2       And the third would be the call of a new election under

3   the First Circuit case that indicated that could be

4   appropriate if the -- if the court deems an election so

5   infected by irregularity or unconstitutionality.

6       So at this point, Your Honor, I'd like to call Professor

7   James Gimpel to the stand.

8               MS. GARDINER:  Your Honor?

9               THE COURT:  Yes.

10              MS. GARDINER:  May it please the court.  Secretary

11  of State objects to the relevance of Mr. Gimpel's testimony.

12  There is nothing in his report which provides any basis for

13  finding a consti -- likelihood of success on a constitutional

14  or statutory violation, so we don't think that that testimony

15  is relevant, and we don't think that having testimony, given

16  that the court already has seen the report, that there's any

17  need to take additional testimony, in any event, since it

18  can't go beyond the scope of the report.

19              THE COURT:  Mr. Goodman?

20              MR. GOODMAN:  Any other?

21      Your Honor, Professor Gimpel has issued a report that we

22  have submitted to the court, as well as to opposing counsel,

23  that indicates voters were disenfranchised in this election in

24  precisely the way that we were ruled to have theoretically

25  predicted at the temporary restraining order phase.  That his

1    report will go into how voters had to guess.  His testimony

2    will go into the lack of proper instructions on the ballot to

3    voters.  His testimony will indicate how voters attempted to

4    guess at their votes in the runoff election, and that he will

5    also testify to the other flaws we've identified in the

6    ranked-choice voting system, such as nonmonotonicity, and that

7    voters cannot express preferences knowledgeably when they move

8    to the subsequent rounds, and that those problems actually

9    manifested themselves in this election.  The perfect storm did

10   occur; it wasn't just a pre -- a weather prediction.

11        And we think those are highly relevant predicates to our

12   argument that this election was conducted in an

13   unconstitutional manner and actually disenfranchised over

14   8,000 voters in this election.

15          THE COURT:  All right.  I'm not going to

16   categorically at this point preclude Mr. Gimpel's testimony.

17   If any of the defendants want to make an objection to

18   relevance on any other grounds, they're welcome to do that

19   during the course of questioning.

20          THE CLERK:  Could you please raise your right hand.

21   Do you solemnly swear that the testimony you shall give in the

22   matter now in hearing shall be the truth, the whole truth, and

23   nothing but the truth, so help you God?

24          THE WITNESS:  Yes, I do.

25          THE CLERK:  Thank you.  Please be seated.  Could you

1  please state your name for the record and spell both your

2  first and last name.

3          THE WITNESS:  James Gimpel, so it's J-a-m-e-s,

4  Gimpel, G-i-m-p-e-l.

5  JAMES GIMPEL, having been duly sworn, was examined and

6  testified as follows:

7                      DIRECT EXAMINATION

8  BY MR. GOODMAN:

9  Q     Professor Gimpel, could you tell the court your

10  occupation and title and your place of employment?

11  A     I'm a professor of political science, or professor of

12  government, at the University of Maryland in College Park.

13  Q     And how long have you been a professor of political

14  science at the University of Maryland?

15  A     27 years.

16  Q     And can you explain your background, your educational

17  background, where you received your degrees and which degrees

18  you've received?

19  A     Well, I'm originally from the Midwest, so I have a

20  bachelor's degree from Drake University in -- in Iowa.  I did

21  a master's degree at the University of Toronto, not that far

22  from here actually, and then finished with a Ph.D. at the

23  University of Chicago.

24  Q     And a Ph.D. in?

25  A     In political science, yes.

1    Q      And what areas of political science did you focus on?

2    A      I focused on political parties and voting and elections.

3    Q      Voting, does that include voting behavior?

4    A      Yeah, it's voting behavior mainly, yes.

5    Q      Does it include voting behavior in the context of voting

6    systems and voting institutions?

7    A      Yes, voting participation, you know, different types of

8    -- of voting systems, election reform, innovation, such as

9    early voting and absentee voting, and, yes, alternative voting

10   systems, as well, as they've been adapted.

11   Q      And in your work, have you been -- have you been the

12   recipient of any honors or awards?

13   A      Several.  Most recently, I was a National Fellow at the

14   Hoover Institution at Stanford.

15   Q      And what was the subject of your work at Hoover

16   Institution at Stanford?

17   A      Voting and elections.

18   Q      And have you been a member of any professional political

19   science associations over the last 30 years?

20   A      The usual ones.  Most faculty in the profession are

21   members of one, two, or more professional associations.  So

22   I'm a member of the American Political Science Association,

23   also the Midwest Political Science Association, and there are

24   other regional ones that I'm not a member of.

25   Q      And have you been -- have you been a -- associated with

1    any political science journals?

2    A    I was the editor of the journal American Politics

3    Research for 11 years.

4    Q    What years?

5    A    From 2003 to 2011.

6    Q    Approximately how many articles that were -- did you

7    review or publish as editor for the American Politics journal?

8    A    I would say between a thousand and 1,100 articles were

9    reviewed, and we published probably a little over 200 of them

10    during that time.

11    Q    Hm-hmm.  Now, in your field where you teach in research

12    today, have you continued in the area of voting behavior and

13    elections and voting institutions?

14    A    Yes, yes, I have.

15    Q    Okay.  Can you describe the extent of your academic work

16    in research on the -- in the area of voting and voting

17    systems?

18    A    Well, I have a lot of research and -- and teaching and

19    -- on, you know, all of the -- the material covered in this

20    area; I mean, this is what I do every day.

21    Q    Did you --

22    A    I mean, I don't -- I don't really know what you're

23    asking.  I mean, this is what I do every day, right?  I mean,

24    it's not like some segment of what I do; this is what I do

25    every day.

1    Q    Yeah.   Have you ever published a paper or edited a paper

2    on ranked-choice voting?

3    A    I have not actually published a paper on ranked-choice

4    voting because it's a pretty narrow subject.   There aren't

5    many papers out there specifically on the subject.

6         However, one of the best papers that was published on

7    the subject was published under my editorship at American

8    Politics Research by Neely and Cook on the San Francisco

9    ranked-choice voting system, and, you know, Neely and -- that

10   paper is widely cited.

11   Q    You edited that paper?

12   A    Yes, hm-hmm.   I --

13   Q    At the American Politics journal?

14   A    Right.

15   Q    And approximately what year was that paper published?

16   A    2008.   It's -- you can check the citation.   It's in my

17   bibliography.

18   Q    Okay.   And do you regularly, as part of your profession,

19   keep up with professional reading and professional journals

20   about voting behavior and voting systems?

21   A    Right.   I mean, again, that's a regular responsibility.

22   I mean, that's like -- comes with the job description; that's

23   what you do.

24   Q    Have -- approximately how many journals do you keep up

25   with?

1    A     I keep up with probably over a hundred, and not just in

2    political science.

3    Q     And in your teaching, have you taught voting behavior

4    and election systems?

5    A     Right.  That's -- in my teaching, I -- I teach courses

6    on elections and voting behavior, and one of the standard

7    subjects, again, you know, it's not an entire semester's worth

8    of material because it's a pretty narrowly focused area, but

9    certainly one of the standard subjects you deal with are

10   alternative voting systems, various kinds of election reforms,

11   to enhance participation, and so forth.

12   Q     Have you -- have you taught ranked-choice voting in a

13   classroom?

14   A     Yes, I've presented it.

15   Q     Have you taught voting behavior within the context of

16   ranked-choice voting in the classroom?

17   A     Yes.

18   Q     And have you attended professional conferences where

19   voting behavior and ranked-choice voting were discussed?

20   A     Yes, that -- again, you're not going to find a lot of

21   panels on this subject in any conference, right?  It's -- you

22   might find slightly more now as this reform spreads, there

23   will be more interest in it, and you will have a lot easier

24   time finding experts, I'm sure, in the future.

25         But there are a couple of panels usually addressing this

GIMPEL - DIRECT EXAMINATION/GOODMAN

1   subject at every conference, and, you know, I -- I try to show

2   up to -- to those panels when I'm there.

3   Q     Have you attended such conferences --

4   A     Yes, I have.

5   Q     -- and panels?

6   A     Yes.

7   Q     Okay.  Have you served as an expert in connection with

8   any court cases in the past?

9   A     Yes.

10  Q     Have you ever been qualified as an expert in the field

11  of voting behavior or voter -- voting institutions and

12  testified in court?

13  A     Yes, once in a California state case, also in a federal

14  redistricting case, and I've consulted in a couple of other

15  redistricting cases.

16  Q     Have you ever been presented as an expert and

17  disqualified as an expert?

18  A     No.

19  Q     Okay.  In this case, did you prepare a report setting

20  forth opinions about the voting behavior of voters in this

21  election?

22  A     Yes.

23  Q     Okay.  And did you rely upon any election data to draw

24  those conclusions?

25  A     Yes, yes, the election data from the Secretary of

1   State's Web site.

2   Q      Okay.  And did you rely upon professional literature in

3   the field to inform your opinions in the report that you

4   issued in this case?

5   A      Yes, yes, it's not an extensive literature, but there is

6   some literature.  Much of it is cited in my bibliography, you

7   know, the source list at the back of the report.  There are a

8   few other papers, and, incidentally, there are some important

9   papers in the field of economics.

10  Q      Now, the information we discussed about your education,

11  your professional work, your research, is that reflected in

12  your CV or --

13  A      Yes.

14  Q      And do you see a copy --

15  A      Yes.

16  Q      -- anywhere near you?

17  A      I have a copy of my --

18  Q      Could you take a look at what's marked up there

19  Plaintiffs' Exhibit No. 1 and identify that document?

20  A      Yes, this is -- this is my CV, yes.

21  Q      Is that your CV?

22  A      Yes.

23  Q      Okay.  And is that an accurate copy of your CV with your

24  credentials?

25  A      Yes, I think so, updated as of probably October.  I

1  update it about every six months, yeah.

2  Q    Okay.

3  A    So --

4       MR. GOODMAN:  At this point, Your Honor, I move

5  Plaintiffs' Exhibit No. 1 into evidence.

6       THE COURT:  Any objection to Plaintiffs' 1?

7       MR. KILBRETH:  No objection.

8       THE COURT:  Plaintiffs' 1 --

9       MS. GARDINER:  No objection.

10      THE COURT:  Plaintiffs' 1's admitted.

11      MR. GOODMAN:  And at this point, Your Honor, I would

12 like to tender Dr. Gimpel as a qualified expert in the field

13 of voting behavior and the impacts of the RC voting process on

14 voters and voting behavior under Rule 702.

15      THE COURT:  Defendants wish to be heard?

16      MR. KILBRETH:  Yes, Your Honor.  I think that it was

17 fairly clear from Professor Gimpel's testimony that he's, in

18 fact, not an expert on voting systems.  He may be an expert on

19 election issues more generally and redistricting and things

20 like that.  But as he himself acknowledged, there isn't a lot

21 to this field, and I don't think he's properly qualified.

22      THE COURT:  Do any other defendants have anything

23 new or different to add to that objection?  No.

24    Mr. Goodman?

25      MR. GOODMAN:  Your Honor, the principal purpose of

1    Dr. Gimpel is to assess voter disenfranchisement and voting --

2    voter behavior in the context of the ranked-choice voting

3    system that was implemented here in Maine in this past

4    election.

5         Now, there will be some predicates about how ranked-

6    choice voting applies, the same predicates that we've already

7    discussed here among lay lawyers, but the critical aspects of

8    Dr. Gimpel's testimony are going to go to voting behavior and

9    how voters reacted to the ranked-choice voting ballot that

10   they were provided.  That is squarely within almost 30 years

11   of experience of Dr. Gimpel and voting behavior.

12        It is the voting behavior that is consequential, we

13   think, constitutionally in this case because that's where

14   disenfranchisement occurs.

15             THE COURT:  Dr. Gimpel is accepted by the court as

16   an expert witness for that purpose.

17        You may inquire, Mr. Goodman.

18             MR. GOODMAN:  Thank you, Your Honor.

19   BY MR. GOODMAN:

20   Q    Dr. Gimpel, in your written statement that you submitted

21   that was filed with the court, you -- you referred to Maine's

22   ranked-choice voting law as instant-runoff voting.

23   A    Yes.

24   Q    Can you explain what -- what instant-runoff voting is

25   and -- and why you characterized it as instant-runoff voting?

1   A       Well, the -- the best way to do that is to compare it to

2   the standard temporally-sequenced runoff that is adopted by

3   some states.  For instance, there are a number of southern

4   states.  We recently had an election in Mississippi of this

5   temporally-sequenced runoff-type, where there's a

6   multicandidate election that occurs in -- in November on

7   general election day for the rest of us, and then the top two

8   candidates, if there's not a majority, the top two candidates

9   go on to an election just against each other four weeks later,

10  sometime later, at a date set later, usually a few weeks after

11  the general.  And so there's a new campaign that -- that is

12  waged, and voters then can look at the -- the two finalists,

13  one against the other.

14      The instant runoff is -- is different in the sense that

15  there is one multicandidate election.  If there is no majority

16  -- okay -- if there isn't any candidate that reaches that

17  50-percent-plus-one threshold -- okay -- then trailing

18  candidates are dropped and their second round, or

19  second-preference votes, are then allocated to the leading

20  candidates according to how those second-choice preferences

21  are ranked.

22      And so in the Maine case, it's a little different in the

23  sense that trailing candidates, if they've been mathematically

24  eliminated, if there's no chance for them to -- to -- to win,

25  can actually be batch-eliminated.  Okay.  In a typical instant

1    runoff, candidates are eliminated one at a time.  Okay.  But

2    in the -- in the Maine case, trailing candidates can actually

3    be batch-eliminated, and then, say, two candidates are

4    eliminated and both of their second-choice preferences are

5    then reallocated to the leading candidates in the race.

6        If in the case a third round is necessary because we

7    still do not have a 50-percent threshold, then, again, a

8    trailing candidate, the candidate that's come in last, say, of

9    three that still remain, that candidate -- candidate is

10   eliminated and their third-choice preferences are reallocated

11   to the leading candidates, and perhaps at that point, we've

12   reached the majority threshold.

13       And, of course, anytime in the counting process that

14   that majority threshold is reached, then a winner can be

15   declared.

16   Q    And that's analogous to an actual runoff?

17   A    Well, here's the -- here's the problem.  In the -- the

18   temporally-sequenced runoff of the kind that we just observed

19   take place in Mississippi, for instance, the voters actually

20   get a chance to see who the leading candidates are.  They get

21   a reset, if you will -- okay -- of -- of the campaign picture

22   and of the choice set.  They don't have to guess as to who

23   might be leading after a round or two, and I -- I think that

24   this is the fundamental defect of the infinite runoff system,

25   or ranked-choice voting, is that voters are forced to make a

GIMPEL - DIRECT EXAMINATION/GOODMAN

1   guess about who the leading candidates will be after the first

2   round.

3        Okay.  What's very helpful for voters in the standard

4   runoff election is that they get the additional information

5   provided to them by the three- or four-week campaign that is

6   waged after the initial election and that provides voters with

7   much more information and gives them a chance to assess the

8   two leaders up against each other, which, of course, is a

9   different choice than when those two candidates were mixed in

10  with maybe five others.

11  Q     And does political science show that that is knowing who

12  the actual candidates are in the runoff election, is that

13  important to voter choice and voters' ability to cast an

14  eligible ballot?

15  A     Well, it most certainly is, and, of course, we also know

16  from years of survey research, and the proper province of this

17  expertise is in the survey research field, that voter

18  attentiveness and voter knowledge varies widely across the

19  electorate.

20        Okay.  And so, you know, undoubtedly, here in Maine,

21  there were quite a few people who were very attentive to the

22  news, watched the horse race coverage in the newspaper and on

23  television, and could anticipate that -- that Mr. Poliquin and

24  Mr. Golden would be the likely leaders coming out of the first

25  round.

1      But, of course, we know, as I said, that voter interest

2  and voter knowledge varies a lot across the electorate, as

3  does voter preference, right?  And so certainly there were

4  voters who did not anticipate or had a different guess --

5  right -- about who the two leaders would be coming out of the

6  first round.

7  Q    So if the majority of voters made a proper guess, that

8  in the runoff round of this election the leaders would be

9  Poliquin and Golden, there would, nonetheless, have been a

10 certain percentage of voters who guessed wrong?

11           MR. MONTELEONE:  Objection, Your Honor.

12           THE COURT:  Grounds?

13           MR. MONTELEONE:  We're -- we're now going beyond

14 relevancy considering that the plaintiffs in this matter are

15 voters who have expressed a preference for Mr. Poliquin, who

16 are analyzing the -- the preferences of -- of people that

17 change their votes along the way.

18     Clearly, I'm -- I mean, as far as plaintiffs are

19 concerned, they were in the final round.  There wasn't a

20 guessing, and -- and we're exploring essentially things that

21 are unrelated to plaintiffs' alleged harm.

22           THE COURT:  Overruled.  Go ahead.

23 BY MR. GOODMAN:

24 Q    So what was the ballot drop-off between the round 1

25 voting versus the runoff election count in -- in the Secretary

1  of State's certified result here?  How many -- how many

2  voters were eliminated from the pool of voters from round 1 to

3  round 2?

4  A    Well, I -- there -- I have some calculations on that.  I

5  think we're looking at over 8,000.

6  Q    Approximately --

7  A    Yeah.

8  Q    -- 8,000 plus?

9  A    Yeah, I'm trying to pin down from my memory the exact

10 number.  8,000 and some change.

11 Q    So in reviewing those ballots, is it fair to conclude

12 that -- that those 8,000 voters guessed wrong as to who they

13 -- who the runoff election would feature, the two candidates?

14 A    Well, on --

15        MR. KILBRETH:  Objection, Your Honor.

16        THE COURT:  Speculation?

17        MR. KILBRETH:  Speculation, exactly.

18        THE COURT:  Mr. Goodman?

19        MR. GOODMAN:  Your Honor, experts are allowed to

20 answer hypotheticals and to provide their opinions as to what

21 actually occurred in this election.  I imagine that the

22 defense is going to speculate about the intent of those

23 voters, as well.  I imagine -- I'm anticipating that the

24 defense is going to speculate that those voters intended not

25 to vote in the runoff election and --

GIMPEL - DIRECT EXAMINATION/GOODMAN

1    THE COURT:  So where does the sum total of

2    speculation leave me exactly?  Overruled.  Go ahead.

3    MR. GOODMAN:  Thank you, Your Honor.

4    BY MR. GOODMAN:

5    Q    So how many voters were absented from the election, from

6    round 1 -- did you say 8,000?

7    A    One of the -- one of the fundamental things that -- that

8    is taught in -- on the subject of voting systems when you're

9    teaching a class is that every voting system has a -- a kind

10   of theory of voters behind it.  Okay.  And ranked-choice

11   voting comes with a theory of voters -- okay -- that -- you

12   know, that these voters are calculating -- okay -- and

13   guessing, you know, what comes next, right?

14       And, you know, certainly on the basis of the theory

15   provided by ranked-choice voting -- you know, and -- and it

16   may be a theory that's too demanding or not -- you know, we'll

17   -- that's not -- we won't argue that right now -- but just on

18   the basis of the theory of ranked-choice voting, you have to

19   suppose that these people were guessing or calculating

20   incorrectly.

21   Q    Okay.  You -- you compared this to an actual runoff,

22   where voters are presented an actual choice of two

23   last-standing candidates.

24   A    That's exactly right.

25   Q    And you said there they do not guess; is that right?

GIMPEL - DIRECT EXAMINATION/GOODMAN

25

1   A      No, much more helpful for the voter to not have to

2   calculate or guess.

3   Q      But the weakness in the -- in the instant runoff is that

4   they have to guess at those two and some percentage will guess

5   wrong.

6   A      Absolutely.

7   Q      Okay.  If you will take a look at what's marked at your

8   table as Plaintiffs' Exhibit No. 2.  Did you consider

9   Plaintiffs' Exhibit No. 2, which is titled State of Maine

10  Sample Ballot General Election November 6th, 2018, in drawing

11  your conclusions?

12  A      Yes, this is a part of the sample ballot from the Second

13  District.

14  Q      And you understood this to be the sample ballot issued

15  by the Secretary of State's Office?

16  A      Yes.

17  Q      Okay.  And -- and you reviewed it and considered it in

18  drawing your conclusions about voter behavior in this case.

19  A      Yes.

20  Q      Okay.

21         MR. GOODMAN:  At this point, Your Honor, I would

22  move to enter as evidence Plaintiffs' Exhibit No. 2 as a

23  foundational document for Professor Gimpel's opinions.

24         THE COURT:  Thank you.  Any objection to

25  Plaintiffs' 2?

1          MR. KILBRETH:  No objection.

2          MS. GARDINER:  None, Your Honor.

3          THE COURT:  Seeing none, Plaintiffs' 2 is admitted.

4          MR. GOODMAN:  Okay.

5  BY MR. GOODMAN:

6  Q    I want to draw your attention, Professor Gimpel, to the

7  instructions to voters on the sample ballot.

8  A    Yes.

9  Q    Okay.  In your report, you mentioned that those were

10 vague and unclear.

11 A    Yes, I would not call them -- I would not call them by

12 fault.  You know, I -- I think they're correct as far as they

13 go, but they're incomplete I think would be the way I would

14 characterize it.  So as -- as it stands right now, they're

15 incomplete.

16        And -- and, of course, we know that the Secretary of

17 State had a vision for what complete instructions would look

18 like because there is a very helpful paper on their Web site

19 detailing instructions that were much clearer, and that's not

20 what we have here.

21 Q    So when a -- a voter went into the voter booth with this

22 ballot, did the instructions to the voter inform the voter of

23 the significance of voting second, third, fourth, fifth

24 choices?

25 A    No, not at all.

1   Q     Did the instructions inform the voter of the consequence

2   of not voting for all candidates, for example?

3   A     No.

4   Q     So a -- under these instructions, you mentioned in your

5   report that a voter was voting blind past the first election.

6   A     Yes.

7              MR. KILBRETH:  Objection, Your Honor.

8   BY MR. GOODMAN:

9   Q     Do you have an opinion --

10             THE COURT:  Hold on.  We have an objection.

11             MR. GOODMAN:  Yes.

12             THE COURT:  Grounds?

13             MR. KILBRETH:  Voting blind on the face of this

14  ballot, which is absolutely clear in the instructions, is both

15  a mischaracterization and calling for speculation.

16             THE COURT:  And I'm certain that one of you will

17  raise that on cross-examination.  Overruled.  Go ahead.

18  BY MR. GOODMAN:

19  Q     In your report, you characterized the voting -- the

20  position that the voter was placed in on this ballot as voting

21  blind.  Could you elaborate on what you meant by that?

22  A     Well, it's -- again, you know, on the very theory that

23  is behind ranked-choice voting, it expects the voter to guess,

24  to estimate, to calculate who's going to wind up in the lead

25  and who's going to wind up trailing.  Okay.  That's what it

1   presupposes the voter is able to do.

2        Okay.  So -- so, yes, I mean, it is -- it is calling on

3   them, you know, to, you know, make some -- some kind of a

4   guess.  Now, I don't doubt -- okay -- that, again, across the

5   Maine electorate, people's interest and knowledge level vary

6   widely, so I don't doubt for an instance that there are some

7   people whose guesses were accurate and whose estimates were

8   accurate.  Okay.  Others, you know, maybe middling -- okay --

9   and others not good at all.

10       Okay.  But, you know, this is definitely going to go hard

11  on the people who are a little less informed and a little less

12  knowledgeable.  It's just flat-out unfair to them.

13  Q    And so it -- because it does not tell them about the

14  significance of voting in a runoff election?

15  A    This leaves them clueless.

16  Q    Let me ask you, Professor Gimpel, you mentioned that the

17  -- this instant-runoff system affected by this ballot as

18  compared to an actual runoff, is -- does it provide the voters

19  the same amount of information?

20  A    Absolutely not.

21  Q    Okay.  How important is it for a voter to know, in -- in

22  the field of political science and studying voting behavior,

23  how important is it to voters to know the actual matchup of

24  the actual voters in the election in which they are voting?

25  A    The matchup, of course, is critical.  You know, the --

1    in the case of a voter who has, say, intransitive preferences,

2    A is preferred to B, B is preferred to C, but A might be

3    preferred to C, everything depends on the particular matchup,

4    right?  And -- and so the particular matchup that you're

5    anticipating is going to condition the vote.

6    Q    And how common -- how common is intransitive voting,

7    that is, A -- you pick A over -- if you know the matchups --

8    A    Yeah.

9    Q    -- you would pick A over B, you would pick B if you knew

10   the matchup was between B and C, but if you knew the matchup

11   was between A and C, how prevalent is that among voters?

12   A    It can be, you know, as high as 20 percent, you know, 25

13   percent of voters, you know, might make their choices in that

14   way.

15   Q    And is that more or less prev --

16        THE COURT:  I'm sorry, I'm sorry, Mr. Goodman.  Let

17   me interrupt.  I didn't understand Dr. Gimpel's last

18   statement.  In -- in what way?

19   A    Well, it's -- it's just that if there is a matchup

20   between two voters, let's just put it this way -- sorry.  If

21   there's a matchup between two candidates -- okay -- the -- the

22   choice might change -- okay -- if those two candidates differ,

23   right?  I mean, I mean, you might not prefer A -- some voters

24   are going to prefer A no matter what the matchup is; some

25   voters will prefer B no matter what the matchup is.

1        But there are some voters who, if it's a choice of A and

2    B, they'll prefer A.  But if it's a matchup between A and C,

3    they won't prefer A anymore; they'll prefer C.  Okay?  And so

4    that's the sense in which the context makes a big difference,

5    the context makes a big difference.

6        So, you know, in a -- in a particular matchup, you know,

7    it's true some people will choose A every time -- okay -- and

8    that's one of the reasons why party identification is helpful

9    because it gears us toward maybe A, if A is a Republican,

10   every time.  Okay.  But for those voters, in particular, who

11   are independent-minded, might be third-party voters, or,

12   again, people who lean toward a party but are not committed to

13   that party, then, you know, the -- that's where that 20

14   percent comes in, you know, the preferences might change if

15   it's A versus B as opposed to A versus C.  So I think that's a

16   better way of -- of explaining it.

17   BY MR. GOODMAN:

18   Q    And, Dr. Gimpel, is the -- what you call

19   intransitive-voting preference, is that a phenomenon more

20   prevalent among independent voters than party-identified

21   voters?

22   A    Sure, absolutely it is.  And, again, the province of

23   this expertise is survey research, and -- and from, you know,

24   over 60 years of survey research, we know that independent

25   voters tend to have less knowledge and less information than

GIMPEL - DIRECT EXAMINATION/GOODMAN

31

1  partisans.  It's one of the reasons why they're independent is
2  because they tend to have less interest in politics.  Okay.
3  This isn't my opinion, by the way; this is the case in -- in
4  years and years of survey research.  We can give know --
5  political knowledge tests to voters -- okay -- in the context
6  of doing surveys, and time and time again, we see that
7  independent and third-party voters wind up, on average, less
8  knowledgeable about politics and political institutions than
9  partisan voters.
10      Okay.  And -- and so, naturally, independent voters, you
11  know, being less knowledgeable, less interested, you know,
12  their preferences are going to be less stable.  All right.
13  Again, one of the advantages to party identification is that
14  it tends to constrain and fix your preferences, it tends to
15  constrain and fix your preferences.  You're going to choose A
16  every time because A is the Republican, and after all, you are
17  a Republican.
18      Okay.  But when it comes to independent-minded voters,
19  they don't have that kind of cognitive constraint you see.
20  And so independent voters are going to vary a lot, and context
21  is especially going to matter for them; you know, the
22  particular choice that they have before them will make a
23  difference.
24  Q     And in the Maine election of 2018, did you understand
25  that when you looked at voter data in this election, that Bond

1   and Hoar were independent voters -- I'm sorry -- independent

2   candidates?

3   A     Yeah, independent third-party candidates, yes.

4   Q     And, therefore, their support primarily came from

5   independent voters?

6   A     Yes.

7   Q     And, therefore, there the voters who voted Bond or Hoar

8   in the first election would be less stable and more sensitive

9   to the actual matchups of candidates in a runoff election?

10  A     Oh, that's most emphatically the case, yes.  And, by the

11  way, we know this from looking at other states, right?   In

12  other states, ballot-access requirements, of course, are much

13  higher than they are here.  Okay.  And so that means you have

14  Republicans and Democrats oftentimes the only choice that's

15  present on the ballot -- okay -- because third-party and

16  independent candidates can't get onto the ballot because there

17  are too many signatures required.

18       Okay.  So what that means is that independents in those

19  states routinely stream into the polls by legions to vote for

20  one of the two major-party candidates, and they do this

21  routinely.  Okay.  And, you know, I -- I think that one of the

22  things that we have observed, again, in years of survey

23  research, is that independents, the number of true

24  independents, is actually pretty small, the number of people

25  who have absolutely no party leaning whatsoever.  Many

1    independents lean towards one of the two major parties -- okay

2    -- and that's because, for the very practical reason, that

3    when they go into the polling place, oftentimes, there is no

4    independent or third-party choice on the ballot, particularly

5    in these states with the high ballot-access requirements.

6        And so that means that the independents, if they want to

7    vote, they're forced to choose between a Republican or a

8    Democrat.  And, interestingly enough, what we've found is that

9    many of them are pretty consistent.  As you move from the top

10   of the ballot down to the bottom -- okay -- many independents

11   lean toward the Republicans consistently; others lean towards

12   the Democrats very consistently.

13       Okay.  And across election cycles -- '10, '12, '14, '16,

14   '18 -- as independents go to the polls in these other states

15   where there aren't many independent or third-party candidates

16   on the ballot, they tend to line up their votes behind one

17   party or the other.  Okay.  And that's why, of course,

18   political scientists have not been satisfied with the three-

19   point party identification scale -- Republicans, independents,

20   Democrats -- but have separated it out into five, or even

21   seven, points -- okay -- so that these leaners can be teased

22   out -- okay -- and treated differently.

23       All right.  And, you know, this is going to be the case

24   with this very large block of independent voters in Maine.

25   It's a fascinating state; it's a lovely state.  I've only been

1   here twice; it's lovely.  And you have this very large block

2   of independent voters, but probably every survey researcher

3   who specializes in Maine elections and politics knows that

4   quite a few of those independents lean one direction or the

5   other.

6   Q     So those independent voters between Bond and Hoar, based

7   on the opinion you just rendered, if they were given a ballot

8   that gave them the choice between Poliquin and Golden, would

9   the majority of them have a choice as between Golden and

10  Poliquin?

11  A     Yes.

12            MR. KILBRETH:  Objection, leading.

13            THE COURT:  Overruled.  Go ahead.

14  A     Yes, I'm convinced that, just as in other states,

15  independents stream to the polls in large numbers to regularly

16  support the two major-party candidates, one or the other,

17  because that's -- those are the only choices they have in

18  those states.  That would almost certainly be the case here in

19  a runoff and has been the case in the state when there have

20  been no independent candidates on the ballot.

21         But do the independents suddenly drop out of the Maine

22  electorate when there's only a Republican or a Democrat on the

23  Maine ballot?  That's preposterous; no one would think that.

24  Where do your independents go, Mainers?  Where do your

25  independents go if there's only a Republican or a Democrat on

1    the ballot?  Do they just drop out?  I don't think so.  I

2    mean, we can check out some survey research on that from --

3    from some Democratic pollsters, if you'd like, and see what

4    they have to say.

5    BY MR. GOODMAN:

6    Q      Professor Gimpel, coming back to the issue of ballots --

7    I'm sorry -- coming back to the issue of ballots, can you

8    review a voter's ballot and infer certain indicia of voter

9    intent from looking at the voter's ballot?

10   A      I think that you have to make an inference or a judgment

11   based on the information in front of you.

12   Q      And you --

13   A      Yes.

14   Q      Do you judge that within the context of election rules?

15   A      Yes.

16   Q      Okay.  Have you been able to view and analyze the

17   ballot-level votes cast by the Maine voters in the 2018

18   election?

19   A      Yes.

20   Q      What -- what did you review to -- to understand how

21   Maine voters voted in the congressional district of -- the

22   Second Congressional District of Maine?

23   A      Well, I looked at the ballot-level data that was

24   reported on the Secretary of State's Web site, and then I took

25   that data and aggregated it up to look at the various

GIMPEL - DIRECT EXAMINATION/GOODMAN

1    combinations across the five preference rankings.  There are

2    various combinations that occur more regularly and some less

3    regularly.

4         There are over 1,500 combinations, you know, which is

5    testimony in and of itself to the complexity of this election,

6    folks.  1,500 combinations of rankings showed up -- okay --

7    when I aggregated the ballot-level data on the Secretary of

8    State's Web site.  It's there; feel free to do it for

9    yourself.

10   Q    You aggregated the data that was published by the

11   Secretary of State that gave you actual ballot preferences

12   that were marked in this election?

13   A    Yes, yes.

14   Q    Did you alter that data or change that data?

15   A    No, I mean, what you -- what you might see in my Excel

16   spreadsheet is that I then sorted it, just on an ordinary

17   Excel spreadsheet, I sorted it from the most common rankings,

18   the most common responses on the ballot, to the least common.

19   Q    And then did you -- once you downloaded the data from

20   the Secretary of State and you put it in your own spreadsheet

21   and you sorted it, but you didn't alter the data?

22   A    No, no.

23   Q    Okay.  Did you then use the data to draw conclusions

24   about voter behavior in this ranked-choice voting system?

25   A    Yes.

1   Q     Okay.  Could you take a look at Plaintiffs' Exhibit

2   No. 3 that is in front of you, please, and could you tell the

3   court what that document is?  And if you -- first, if you

4   recognize the document and what it is.

5   A     So, yeah, I mean, this is just my aggregation.  A row

6   indicates just, again, a particular combination of response,

7   right?  So, for instance, row 1 was the most common response

8   and that was the oval for first preference was for Poliquin;

9   second preference was left blank; third preference was left

10  blank; fourth preference was left blank; fifth preference was

11  left blank.

12        It's important to note that where I've put undervote

13  here, that should be understood as a blank or an oval that was

14  not filled in.

15  Q     Hm-hmm.

16  A     So I could have called that a blank.

17  Q     Okay.

18        MR. GOODMAN:  Your Honor, at this point, I would

19  move introduction of Plaintiffs' Exhibit No. 3 into evidence

20  as a foundational document for the professor's opinions and --

21  and analysis.

22        THE COURT:  Any objection to Plaintiffs' 3?

23        MR. KILBRETH:  No objection, Your Honor.

24        MS. GARDINER:  No.

25        THE COURT:  Plaintiffs' 3's admitted.

1    BY MR. GOODMAN:

2    Q      Okay.  Professor Gimpel, when you looked at the

3    aggregate election results certified by the Secretary of State

4    in this election, how many voters or ballots did you count as

5    having been dropped out of the first election to the runoff

6    election?

7    A      Well, that -- that was that 8,000 figure.

8    Q      Approximately 8,000?

9    A      Yeah, 8,250, I think, approximately.

10   Q      Okay.  And have you analyzed the voter preferences

11   marked on ballots of the 8,250-odd ballots that were removed

12   from the first election to the runoff election?

13   A      Yes, I've looked at those.

14   Q      And can you -- what -- what opinions or what conclusions

15   did you draw about the voters or the ballots that constitute

16   that 8,250 dropped voters or ballots in this election?

17   A      Well, on the -- the basis of the -- of the theory of

18   ranked-choice voting that guides the -- the very adoption and

19   interpretation of the data, you read those preferences as very

20   sincere preferences for Bond or Hoar or sometimes Ms. Bond or

21   Mr. Hoar alternatively.  It's -- again, there are a variety of

22   -- of orderings, right, and -- and some are Bond all the way

23   across, some are for Mr. Hoar all the way across, you know,

24   some alternate them, some are peppered with blanks.

25           But these are people that, you know, vote for Mr. Hoar

GIMPEL - DIRECT EXAMINATION/GOODMAN

39

1    or Ms. Bond pretty consistently.  Incidentally, once in a
2    while, by the time you get to the fourth or fifth, they might
3    insert or color in an oval for Mr. Poliquin or -- or -- or
4    Mr. Golden, but not until fourth or fifth.  You know, the --
5    the first three, you know, are preferences for the third-party
6    or independent candidate, and, again, you read that as those
7    voters anticipating that those candidates will be leading.
8    Q     Did -- did you draw a conclusion that a voter, for
9    example, who voted for Bond -- Hoar or Bond intended to vote
10   in the runoff election?
11   A     Well, I certainly think that they must have anticipated
12   that any subsequent rounds, they wanted their votes to go to
13   Bond, right?  And, you know, if -- same if you have votes for
14   Mr. Hoar all the way across, these voters were anticipating
15   that if there are subsequent rounds, they wanted their vote to
16   go to Mr. Hoar.
17   Q     So they tried to vote -- did they try to vote in the
18   runoff election?
19   A     Well, yes, absolutely.  They -- you know, again, they
20   were making a guess, an estimate consistent, you know, with
21   the theory behind your system here that, you know, the leaders
22   in the first round, second round, you know, would be their
23   candidates.
24   Q     Would it be fair to conclude that a Bond voter who voted
25   for Bond in the first election and Bond in the second election

1    intended to leave the election, intended to spoil their ballot

2    and not be present in the runoff election?

3    A     No, I don't think --

4         MR. KILBRETH:  Objection, Your Honor.  How can he

5    possibly answer what a voter intended in the abstract?

6         THE COURT:  Mr. Goodman?

7         MR. GOODMAN:  I'm asking based on voting behavior,

8    what the ballots indicate to a political scientist about

9    intent of a voter.  Now, we have a predicate where the

10   professor says you can infer intent given election rules and

11   the markings of a ballot.  Now I'm trying to ask an expert in

12   the field to interpret voter intent from the markings on a

13   ballot.

14        THE COURT:  Overruled.  I'll give the testimony all

15   the weight I think it deserves.  Go ahead.

16   A     I think you have to assume, consistent with the theory

17   behind ranked-choice voting, that these are sincere

18   preferences to have the vote counted all the way through,

19   absolutely.  You know, they want Bond or -- or Hoar to be

20   leading.

21        Look, there's no small amount of hope here in this

22   estimate, right, or guess, right?  There could be hope or

23   aspiration, you know, as well, right?  But you can't say that

24   these people are insincere or just pretending something.

25   BY MR. GOODMAN:

GIMPEL - DIRECT EXAMINATION/GOODMAN

41

1    Q      Or can you draw the assumption that they intended to

2    leave the election by --

3    A      No.

4    Q      -- voting for Bond or Hoar in the second or third

5    column?

6    A      No, I don't think you can infer that at all.

7    Q      In fact, is it your conclusion that they intended to

8    vote for a candidate that they guessed would be in the -- in

9    the runoff election?

10   A      Right, that's --

11          MR. KILBRETH:  Same objection, Your Honor.

12          THE COURT:  Yeah, understood.  Overruled.  Go ahead.

13   A      Guessing, guessing and hoping, guessing, estimating,

14   hoping, you know, a combination of all those things, you know,

15   probably went into these sincere choices they were making to

16   have their vote counted in the subsequent rounds.

17   BY MR. GOODMAN:

18   Q      And how many voters did you count in this -- in this

19   guessing game guessing wrong?

20   A      Well, like I said, around 8,000.

21   Q      And --

22   A      8,200.

23   Q      And what was the vote margin of the election?

24   A      About 3,900.

25   Q      35 -- I'm sorry -- what did you --

1    A    3,900.

2    Q    Did you --

3    A    35?  Okay.

4    Q    Less than 8,000?

5    A    Okay, yes.

6    Q    Okay.  Now, we've already covered this, but I just want

7    to punctuate this point at this point.  You have 8,000 voters

8    who voted for Bond or Hoar in some constellation and,

9    therefore, dropped out of the election in the runoff.

10        It's your -- it's your opinion that had you provided

11   them knowledge of the actual candidates in the runoff, that

12   they -- the -- some percentage of them would have chosen

13   Poliquin or Golden?

14   A    Well, of course, and -- and --

15        MR. KILBRETH:  Same objection, Your Honor.

16   A    And, you know, what -- what -- after all, what do

17   Maine --

18        THE COURT:  Well, hold on, hold on.

19        THE WITNESS:  Yeah.

20        MR. KILBRETH:  Could I just have a continuing

21   objection -- it would be easier, Your Honor -- to these

22   questions that ask him to speculate about voter intent?  And

23   then I won't keep objecting.

24        THE COURT:  Phrased exactly that way that objection

25   will stand, yes, and that objection will continually be

1   overruled.  Okay.  Thank you.

2   A      Well, of course, it would be ideal to go and talk to

3   them -- okay -- although post hoc, you know, I don't know, but

4   it might be inconclusive.

5          But what we have to examine, for example, is, is what a

6   regular, ordinary Maine independent to do whenever there are

7   two major-party candidates on the ballot -- okay -- and those

8   are their only choices?  So what do they do?  Do they all just

9   drop out of the electorate?  Again, I don't think that there's

10  evidence for that.  You know, Maine voters like -- Maine

11  independents, just like independents in other states, show up

12  and express a preference for the Democrat or for the

13  Republican.  You know, maybe it's not as strong a preference.

14  Again, that's why we call them leaners, but oftentimes it

15  tends to be pretty consistent, you know, up and down the

16  ballot and across election cycles, as I said ten minutes ago.

17         And -- and so, you know, my presumption here would be

18  that, of course, a lot of these 8,000 voters would loved to

19  have had the chance to vote for the two leading candidates

20  once they learned who they were.

21  BY MR. GOODMAN:

22  Q      Based on your knowledge of the science of voting

23  behavior, can you -- can you put an approximate percentage on

24  how many would choose, if they were actually offered Golden

25  and Poliquin --

1   A      Well, it's --

2   Q      -- versus how many would --

3   A      You know, it's --

4   Q      -- vote no -- no -- no candidate at all?

5   A      Sure, sure.  Yeah, it is true that independent voters do

6   not have the high level of turnout that partisan voters do.

7   They're less interested and less knowledgeable.  Any political

8   scientist who studies political behavior will know this; most

9   pollsters will know this.  Okay.  But it's not a huge

10  difference; it might be, say, 10 to 15 percent less, you know,

11  independent -- a turnout of independents versus the turnout of

12  partisans.

13          So, you know, you -- you have to presume that possibly

14  turnout among those 8,000 would be, you know, 80 percent since

15  they've already turned out in this election, you know, they

16  have turned out already, and that maybe among partisans, it

17  would be closer to 90.  You know, there would be some gap;

18  there usually is.

19          But -- but independent voters are quite accustomed to

20  voting for one of the two major parties because time and time

21  again, they see ballots where there are only two major parties

22  and there are no independent or third-party candidates

23  available.

24  Q     Dr. Gimpel, this problem of losing 8,000-plus voters due

25  to a guessing construct, can you compare that to, say, a

1    plurality election and whether that type of problem appears in

2    a plurality election?

3    A      It does not.

4    Q      How about in an actual-runoff election?

5    A      No, it does not.

6    Q      Okay.  Let me -- does the instant-runoff system change

7    the results of an election as compared with a traditional

8    plurality-voting system?

9    A      Well, it certainly can.  The -- the nice thing about the

10   plurality system is that it is considered monotonic.  That's

11   the -- the technical, you know, jargon term coming out of

12   statistics for the reliability -- okay -- of the tally.  Okay.

13   You just tally up the -- the candidate with the most votes.

14   It's simple; it's easy to understand.  Okay.  And if the

15   person has 48 percent or 56 percent or 39 percent and they

16   have more votes than the other candidates, they're the winner.

17   Okay.  And I understand you've had a number of elections like

18   this in Maine over the years, so this is a familiar outcome to

19   you.  So the -- just the winner, even if it is a majority, is

20   the one with the most votes.

21        Okay.  In the ranked-choice voting situation, you run

22   into a somewhat paradoxical and hard-to-understand outcome

23   where the -- the number of first-place preferences, the winner

24   of those first-place preferences might wind up losing because

25   a candidate running second, or even third, picks up more

1   second and third place than the leader does.  Okay.  And so,

2   you know, there are instances where, you know, the person

3   who's in the lead after the first round and has the most

4   first-place preferences winds up losing because of the

5   expression of the second and third and subsequent preferences.

6        And this is not, you know, just some abstract, you know,

7   mathematical, statistical, economic, theoretical exercise.

8   This has happened in municipal elections in Burlington,

9   Vermont, and in Oakland, California, where, essentially, the

10  wrong candidate won the election, a candidate with more

11  second- and third-place preferences, instead of the one with

12  the most first-place preferences because of the way the -- the

13  election results were ultimately tallied.

14       Incidentally, in the case of Burlington, they repealed

15  ranked-choice voting after this happened -- okay -- because

16  they discovered, you know, gee, this isn't exactly the kind of

17  system we want, and my prediction is that if this reform

18  spreads, you will most definitely have more outcomes like this

19  that are controversial and we'll see litigation.

20  Q    Professor, this monotonicity failure, is it unique to

21  the ranked-choice instant-runoff voting system?

22  A    Well, I mean, compared to -- it's not present in the

23  simple plurality system.

24  Q    How about actual-runoff elections?

25  A    And -- and -- and it's not in the -- in the standard

GIMPEL - DIRECT EXAMINATION/GOODMAN; CROSS-EXAMINATION/KILBRETH

47

1    temporally-sequenced runoff.

2            MR. GOODMAN:  Okay.  No further questions by me

3    right now, Your Honor.  Thank you.

4            THE COURT:  Thank you, Mr. Goodman.

5        Cross-examination.

6            MR. KILBRETH:  Thank you, Your Honor.  I have a few

7    colleagues to consult with on this, but --

8            THE COURT:  I gathered.

9            MR. KILBRETH:  -- I'll try to get through it tout

10   suite.

11                        CROSS-EXAMINATION

12   BY MR. KILBRETH:

13   Q     Good morning, Professor Gimpel.

14   A     Good morning, sir.

15   Q     I think you testified on direct examination that you've

16   never actually personally conducted a study about

17   ranked-choice voting; is that correct?

18   A     No, that's true.  I've never written a research paper on

19   the subject.

20   Q     And I think you mentioned that you have given expert

21   testimony before, and you mentioned a case in San Francisco;

22   is that right?

23   A     No, I mentioned that I was involved in a case in

24   California addressing at-large voting in municipalities.

25   Q     Was -- was that in San Francisco?

1   A     No.

2   Q     No.  You did give expert testimony in the Pennsylvania

3   gerrymandering case, though, didn't you?

4   A     Yes.

5   Q     And isn't it true that you gave testimony in that case

6   defending the 2011 Pennsylvania plan that the court struck

7   down?

8   A     That testimony, yes, was defending the 2011 plan,

9   although that particular court did not strike down the map.

10  Q     No, but --

11  A     In fact, that particular court, that three-judge panel,

12  went the opposite way.

13  Q     But the Pennsylvania Supreme Court, which you also

14  provided a report for --

15  A     Yes.

16  Q     -- did strike it down, correct?

17  A     Yes, yes.

18  Q     Now, just to ask you some more Maine-specific questions.

19  Are you familiar with the Bangor Daily News poll that was

20  taken after the election about how voters felt about

21  ranked-choice voting?

22  A     I'm not familiar with it.

23  Q     So you -- you're not aware that 75 percent of the voters

24  surveyed said it wasn't confusing?

25  A     I was not aware of that figure.  Can I comment further

GIMPEL – CROSS-EXAMINATION/KILBRETH

1   on that or --

2   Q     Pardon?

3   A     May I comment further on that?

4   Q     Well, your lawyer can ask you --

5   A     Okay.

6   Q     -- questions about that, if he wants to.

7   A     Okay.  Fair enough.

8   Q     Now, you talked a little about this intransitive-voting

9   phenomenon?

10  A     Yes.

11  Q     Voters are -- when you talk about that, don't you have

12  to distinguish between actual preferences and indifference?

13  Because there's such a thing as indifferent transivity, right?

14  A     Well, I -- I think what you have to imagine voters

15  fitting along is -- is a continuum, you know, between -- by

16  strength of preference.  So, you know, on one end, you have,

17  you know, very strong entrenched preferences, and those would

18  be typical of very strong partisans, loyal to one party no

19  matter what.

20        Okay.  And, you know, then there's a continuum of people

21  in the middle who, again, lean consistently.  There are people

22  that, you know, are even less partisan than that -- okay --

23  who, you know, may split their tickets quite a lot, waffle

24  back and forth, you know, vary.

25        Probably on one end over here, you will have entirely

1    indifferent voters, but, of course, what we've learned about

2    people who are entirely indifferent, we've learned a lot about

3    them, is that, for one thing, they invest very little in

4    knowledge acquisition or information acquisition -- okay --

5    and, of course, they're indifferent.  And -- and as a result,

6    their participation levels are pretty low.  You know, these

7    are -- these are people who don't show up to vote at all many

8    times.  You know, the -- most indifferent people, of course,

9    you know, would be people on the voter file who have very

10   spotty voting histories; you know, they show up sometimes, but

11   not others.

12   Q    Well, before I get into this further, have you talked to

13   any Maine voters?

14   A    Have I talked to any Maine voters?  A few, and I -- I

15   met some in the back rows over here that are aspiring voters

16   and future voters.

17   Q    But did you interview any Maine voters about their

18   voting preferences and decisions in this election?

19   A    No, I haven't.

20   Q    So in response to Mr. Goodman's question, your testimony

21   about voter behavior is all theoretical; is that correct?

22   A    Well, yes, but, you know, we would not expect Maine

23   voters to be wildly different than voters that have been

24   subject to study now for 60 years, and studies have certainly

25   included Maine.

1  Q     Well, let's -- let's look at the ballot that you were

2  asked about by Mr. Goodman and --

3             THE COURT:  That's Plaintiffs' 2?

4  BY MR. KILBRETH:

5  Q     -- that's Exhibit 2, I believe.  What exactly is

6  confusing about this ballot?

7  A     Well, I think, you know, what's very confusing in this

8  ballot is what is not here as opposed to what is here.

9  Q     Well, let's start with what is here.

10 A     Okay.

11 Q     What is here?  Could you explain if there's anything

12 confusing about that?

13 A     Well, for one thing, the problem of response patterns or

14 -- or ballot-completion patterns that would disqualify or

15 invalidate your vote, those are not discussed.  It would have

16 been helpful for voters to know that if they overvoted, and

17 what an overvote looked like, their ballot could be cast

18 aside, invalidated.

19 Q     Well, doesn't it say fill in no more than one oval for

20 each candidate or column?

21 A     Right.  But, you know, again, there are a lot of ovals

22 here, and, you know, just by looking at the response patterns,

23 you know, you can see that there are a lot of voters -- okay

24 -- who went right down the columns.  I mean, I can understand,

25 as someone who is studied on the subject, that you move down

1    and to the right -- okay -- that you read the choices, you

2    know, down and to the -- and to the right.

3        But it was very clear from -- sorry -- from the response

4    patterns that we saw in the aggregated vote totals from the

5    Secretary of State's Office that that was not clear -- right

6    -- to many voters who had their votes tossed out for

7    overvoting, and, again, there were a lot of undervotes.

8    Q    Well, do you have any evidence for the fact that -- for

9    that assertion, that it's not clear?  And let me just walk you

10   through this.  Go to Exhibit 3.  That's your compilation of

11   data, right?

12   A    Hm-hmm.

13   Q    And let's go down first preference, that column.  And,

14   basically, you have about 99.8 percent who validly marked a

15   first preference; isn't that correct?

16   A    Yes, most did, and I'll give you that.

17   Q    So voters seemed to be able to figure out who they

18   wanted to vote for first.

19   A    Yes.

20   Q    Right?

21   A    Yes.

22   Q    Now, you talked a lot about voter guessing.  Voter

23   preferences are not guesses, are they?

24   A    Well, ordinarily they wouldn't be.  Certainly in the --

25   the plurality election, they're not.  You know, you don't have

1   to -- to guess.  You walk in and you express a sincere

2   preference.

3         Similarly, in the temporally-sequenced runoff, you know,

4   there's a sincere preference expressed at each stage.

5         The guessing, the estimating comes in when you go to

6   those second, third, fourth choices, and, again, according to

7   ranked-choice-voting theory itself, you are called upon to try

8   to anticipate, estimate, you know, with maybe a little hope

9   stirred in, you know, as to who the leaders will be so that

10  your vote will be efficacious then in supporting one of the

11  two, or maybe three, left standing, as the case may be.

12  Q    Well, isn't that true that that just means that you are

13  allowed to vote for your second choice?

14  A    Well -- again --

15  Q    You don't have to.

16  A    -- that's not the same, though, as having the second

17  choice defined for you.  Okay.  That's -- it's not the same.

18  Okay.  When you have to estimate or guess who the leaders will

19  be, it's not the same as actually having the two leaders again

20  squaring off against each other in a campaign, election day is

21  going to be three or four weeks hence -- okay -- and you'll

22  have a chance to vote for one of those two.  And -- and that's

23  very clear -- okay -- and it doesn't require the same degree

24  of speculation or guessing on the part of the voter as to who

25  the leaders will be.

1    Q     Well, if the voter knows that their first choice isn't

2    going to be in a continuing round, they know who the remaining

3    candidates are, and they can make a choice, can't they?

4    A     Well, I -- I think that it's not altogether clear to me

5    that the voters are either acting consistent with the theory

6    of ranked-choice voting or are knowledgeable enough, you know,

7    to know what's going to happen, you know, in the second,

8    third, fourth rounds.

9          And, again, I would be very interested in designing a

10   survey-research instrument that would tap just what voters

11   understand themselves to be doing in the second-, third-,

12   fourth-, and fifth-place rounds.

13   Q     Well, let me ask you about -- you spent some time on the

14   8,000, I think, 250 votes Mr. Goodman was asking you about,

15   which, as I understood it, were votes cast for either Bond or

16   Hoar, but not in a subsequent round for Poliquin or Golden; is

17   that right?

18   A     Well, there were some of them that in the fourth and

19   fifth places may have ranked Golden or Poliquin.  But

20   certainly in the first three rounds, they were Hoar and/or

21   Golden -- sorry -- Hoar and/or Bond voters.

22   Q     Okay.  And so 8,250 is a little more than 2 percent of

23   the total votes cast in this election?

24   A     I haven't done the calculations, but I'll take your word

25   for it.

1    Q     And I think you said that in other elections, 10 to 15

2    percent of independents don't vote?

3    A     Well, you know, there -- that -- there's -- yes,

4    compared to partisans, independent participation lags 10 to 15

5    percent.

6    Q     So you could explain the fact that Bond and Hoar voters

7    didn't vote for Poliquin or Golden simply on the basis that

8    they didn't want a party candidate, couldn't you?

9    A     A small share, you know, probably would persistently

10   choose against a major-party candidate, in which case if they

11   were facing a traditional runoff, they would maybe put a

12   write-in candidate, they might drop off at that point.

13   There's a small share.

14         But I -- what I'm suggesting is that a majority of them

15   would have liked to have had the choice of Poliquin or Golden

16   and would have voted for one of the two, as -- as I think we

17   can observe independents doing commonly in Maine and other

18   states.

19   Q     Well, if 10 to 15 percent of independents wouldn't have

20   voted in an election involving just Poliquin and Golden, how

21   can you speculate about what these voters were thinking by

22   not --

23   A     Well --

24   Q     -- voting for Poliquin or Golden?

25   A     Well, because these were not nonvoters, of course; you

1    know, these were not nonvoters.  These were voters; these were

2    independents who showed up.  Okay.  So that's --

3    Q    And voted for independents.

4    A    Right.  And, you know, I'm -- I'm saying that they voted

5    for independents hoping that those independents would be

6    standing in the subsequent rounds, but might have chosen

7    differently or decided differently if they had known that the

8    choice was ultimately going to come down to Poliquin versus

9    Golden.

10   Q    Okay.  Now, you talked to Mr. Goodman about

11   monotonicity?

12   A    Yes.

13   Q    But isn't it true that you've misdescribed what

14   monotonicity is?  I think what you testified to was that

15   monotonicity involved an election in which a leading candidate

16   in the first round could be overtaken by a trailing candidate

17   in a subsequent round and that reflected a failure of

18   monotonicity.

19   A    Right.

20   Q    That's not accurate, is it?

21   A    Right.  Well, off the top of my head, you know, without

22   -- without, you know, a few notes in front of me, it's a --

23   it's a -- it's a difficult concept.

24        What I would say is that -- that the person with the

25   most first-preference votes -- and I might have

1   mischaracterized it as just first-round -- but the candidate

2   with the most first-preference votes does not wind up winning.

3   Instead, the candidate with the -- a combination of first- and

4   second- and third-preference votes winds up winning.  So I

5   think that's a better characterization.

6         It's -- it's a difficult concept.  Some of these

7   paradoxes are a little hard to understand without a few notes.

8   Q    Well --

9   A    And they're -- and they're hard to explain, too, like

10  without a blackboard or something.

11  Q    Well, isn't it true that monotonicity has to do with a

12  phenomenon of people voting for candidate A, more votes going

13  for candidate A causes candidate A to lose the election.

14  A    Yes.

15  Q    That's a different point, isn't it?

16  A    Well, no, it's -- it's not exactly a different -- it's

17  not exactly a different point because it also has to do with

18  the counting of the second preference and the third preference

19  and how those add up.

20  Q    Well, let's just put it this way.  In this election, was

21  there any nonmonotonicity problem?

22  A    I don't -- I didn't detect one.  It happens more

23  frequently in cases where there are three or more candidates

24  that are running close together.

25  Q    Right.  So it didn't happen in this election.

GIMPEL - CROSS-EXAMINATION/KILBRETH

58

1   A     No.

2   Q     Now, are you familiar with the work of Kenneth Arrow?

3   A     Somewhat familiar, yes.

4   Q     He's the Nobel Prize winner, right?

5   A     Yes.

6   Q     Who's basically the father, or however you put it, of

7   social choice theory?

8   A     Yes.

9   Q     And he describes various factors that should be

10  considered in selecting an election system.

11  A     Yes.

12  Q     Are you familiar with that?

13  A     Yes.

14  Q     And monotonicity is one of them, correct?

15  A     Yes.

16  Q     But there are several others, are there not?

17  A     Yes.

18  Q     And one of them is independence of irrelevant

19  alternatives, right?

20  A     Hm.

21          THE COURT:  Is that a yes?

22  A     Yes.

23  BY MR. KILBRETH:

24  Q     And that's -- in simpler terms, that's a so-called

25  spoiler problem, right?

GIMPEL - CROSS-EXAMINATION/KILBRETH

1    A     Ah, well, yes.

2    Q     Now, in a plurality election, you have many

3    opportunities for a spoiler problem, correct?

4    A     It -- it can occur, yes.

5    Q     So in terms of Arrow's factors, the independence of an

6    irrelevant alternative, the plurality system is the worst,

7    isn't it?

8    A     It does -- it does happen.  I'm not altogether sure that

9    the ranked-choice-voting system solves the spoiler problem,

10   however.  So, you know, it -- it may be a fault of plurality

11   voting -- all right -- but you -- you have to also consider

12   the pluses of plurality voting and its simplicity and -- and

13   how easy it is to grasp, you know, doesn't burden voters.

14         And, you know, you also have to consider, you know, the

15   weaknesses of ranked-choice voting, including the fact that it

16   can lead to outcomes, you know, that are nonmonotonic, for

17   instance, and --

18   Q     Well, that's a --

19   A     -- you know, not really resolving the spoiler problem.

20   Q     That -- that just says that there are problems with any

21   system, correct?

22   A     Well, this is true.

23   Q     Now, I think you testified a lot about runoffs as a --

24   one alternative system.

25   A     Hm-hmm.

1   Q    But some of the disadvantages of runoffs, wouldn't you
2   agree, involve the drop-off in turnout?
3   A    There can be, you know, some drop-off in turnout.  Also,
4   you know, some people cite the administrative cost of, you
5   know, of running the second election as -- as a defect.
6   Q    Now, in terms of -- I just want to focus a little about
7   voter confusion.
8   A    Yes.
9   Q    Have you looked at -- and you spent some time in your
10  report and with Mr. Goodman talking about undervotes, and I
11  think you defined that as a blank ballot.
12  A    Right.
13  Q    Have you looked at the history of undervoting in the
14  Second Congressional District?
15  A    I've not looked at the -- the history of -- of
16  undervoting specifically in the Second District in previous
17  elections, no, I have not.
18  Q    So let me give you some statistics --
19  A    Okay.
20  Q    -- and I'll see how you respond.  In 2014, there were
21  11,532 voters in the district who did not vote for the
22  Congressperson.  In 2016, there were 12,703 voters who didn't
23  make a vote for the candidate in the Second Congressional
24  District.  This year, there were 6,000 undervotes.
25       That doesn't suggest that people were confused more this

1  time, does it?

2            MR. GOODMAN:  Objection, Your Honor.  The -- those

3  statistics would have to be presented as a hypothetical, at

4  best, because there's no foundation for those statistics.

5            THE COURT:  Counsel?

6            MR. KILBRETH:  Well, I think I'm asking -- he's --

7            THE COURT:  Just ask it.

8            MR. KILBRETH:  Yeah, thank you.

9  A    You know, it would be interesting to study those --

10  those data in additional detail.

11       I agree with you that there is drop-off in standard

12  elections; I mean, that's well-known.  You know, sometimes

13  people don't want to cast a ballot in a particular race

14  perhaps because they're not knowledgeable.  I think it's more

15  common in like local elections where the candidates are -- can

16  be pretty obscure and -- and perhaps have not run very visible

17  campaigns.

18       So, you know, there are various reasons why, you know,

19  people drop off the ballot at lower levels, and so, you know,

20  I -- I agree that you're going to see those in general

21  elections, you'll see those voters not participating in

22  certain races, yes.

23  BY MR. KILBRETH:

24  Q    Well, take -- take this year's, we had two interesting

25  comparatives.  And what would you conclude if it turned out

GIMPEL - CROSS-EXAMINATION/KILBRETH

1   that there were fewer undervotes in the U.S. Senate race this

2   year, which was a ranked-choice race, than there were in the

3   gubernatorial race, which was a plurality race?

4   A       Hm-hmm, hm-hmm.  Well, there are -- you know, it's a

5   very good question, and there are some alternative

6   explanations.

7         You know, one of the things that determine drop-off is

8   familiarity with the candidate, and so, you know, again, if,

9   in the case of -- of the U.S. Senate race, the voters felt

10  familiar with the candidates and knowledgeable of the

11  candidates, there would have been less drop-off.

12        And the same would be true then, you know, conversely

13  with an election in which maybe there were no incumbents or it

14  was an open-seat race or -- or multiple candidates who were

15  not very well-known, you might find more drop-off in -- in

16  that case.

17        So, you know, when you -- boy, when you're dealing with

18  these outcomes, like drop-off and turnout levels, you know,

19  you also have to, of course, consider overall turnout for each

20  of the years when you look at the drop-off figures.  There are

21  alternative explanations.

22              MR. KILBRETH:  I'd like to mark, Your Honor, as -- I

23  guess what are we calling this, Exhibit -- Defendants'

24  Exhibit 1?

25              THE COURT:  Defendants' Exhibit 1.  Share it with

1    Mr. Golden -- Goodman.

2         MR. KILBRETH:  Can I hand it to the witness, Your

3    Honor?

4         THE COURT:  You may.

5         THE WITNESS:  Thank you.

6    BY MR. KILBRETH:

7    Q    Professor Gimpel, this is --

8         THE COURT:  Mr. Kilbreth, hold on just a moment.  I

9    want to make sure Mr. Goodman has had an opportunity to review

10   the proposed exhibit.

11        MR. KILBRETH:  I was just going to say, Your Honor,

12   it's a little hard to read; it's small print.

13        THE COURT:  I gathered by plaintiffs' table; they're

14   squinting.

15        MR. KILBRETH:  And it's -- I'm not going to ask

16   Professor Gimpel anything substantive about this.

17        THE COURT:  Go ahead.

18   BY MR. KILBRETH:

19   Q    Professor Gimpel, this is a snapshot from a Facebook

20   screen.  And you see where it says, protect your Maine vote?

21        MR. GOODMAN:  Objection, Your Honor.  Counsel is

22   testifying to what this document is.  It's not been

23   authenticated in any way by the witness.

24        THE COURT:  Yeah, let's do that first.

25        MR. KILBRETH:  Okay.

1          THE COURT:  Go ahead, Mr. Kilbreth.

2          MR. GOODMAN:  I'm not sure the witness can

3    authenticate it.

4          THE COURT:  Well, we're going to find -- I'm waiting

5    with bated breath.  We'll find out.

6    BY MR. KILBRETH:

7    Q     Let me just ask you.  So I think you testified that you

8    were -- you have not talked yourself to any Maine voters about

9    their intent or their voting --

10   A     Right.

11   Q     -- decisions.

12   A     Yes.

13   Q     Were you aware of an effort by the Republican National

14   Committee to find voters who were, quote, confused, quote --

15   A     I --

16         MR. GOODMAN:  Objection as to relevance, Your Honor.

17   A     I -- I --

18         THE COURT:  Hold on, hold on, hold on.

19         THE WITNESS:  Okay.

20         THE COURT:  There's an objection.  Why do I care?

21         MR. KILBRETH:  Excuse me?

22         THE COURT:  Why do I care what the answer to that

23   question is?

24         MR. KILBRETH:  Well, I think there -- this just goes

25   to the fact that they've made a point about voter confusion

1   and they haven't produced a single voter, notwithstanding
2   significant efforts --
3            THE COURT:  Despite efforts --
4            MR. KILBRETH:  -- to find one.
5            THE COURT:  -- to the contrary?  Overruled.  Go
6   ahead.  Let's not camp out on that too long, though.  Go
7   ahead.  The witness can answer.
8   A    I'm sorry.  Can you ask -- restate the question?
9   BY MR. KILBRETH:
10  Q    Yeah.  So, I mean, have you had discussions about
11  efforts to find voters who you could talk to?
12  A    I have not.  I've not.
13  Q    So you're not aware that the Republican National
14  Committee spent almost $50,000 trying to find such voters?
15  A    I was not aware.
16  Q    Now, I have one other thing to do.
17           MR. KILBRETH:  But, Your Honor, could I have a
18  minute to consult with --
19           THE COURT:  Take your time.
20  BY MR. KILBRETH:
21  Q    So the last thing I want to ask you about, Professor
22  Gimpel, is, in your report, which I now seem to have misplaced
23  -- there it is -- you talk a lot about voter preference, and I
24  think you also talk about how certain voters, particularly
25  voters who are strongly tied to a political party, might

1 choose to just vote for their party preference; is that right?

2 A    Yes, consistently -- more consistently.

3 Q    And I just want to read -- this is on page 12 of your

4 report -- it says, voters whose first preference turns out to

5 be one of the leading candidates and knowledgeable enough to

6 rank all candidates or confident enough to make a guess at how

7 to rank them will have their ballot counted repeatedly until a

8 candidate obtains a simple majority.  Unlike the voters whose

9 first preference winds up lagging behind, these voters will be

10 full participants in the instant-runoff system.  Do you

11 remember that?

12 A    Yeah, I mean, I -- I don't doubt that I said that.

13 Q    That's true, right?

14 A    Yeah.

15 Q    So when Mr. Baber, one of the plaintiffs, and

16 Mr. Poliquin, another one of the plaintiffs, say in their

17 affidavits that they were disenfranchised because they only

18 cast their ballot in the first round, that's incorrect, isn't

19 it?

20 A    Well, my understanding is that, you know, if you cast

21 your ballot and wound up casting your ballot for one of the

22 leading candidates, then, yeah, you continued.

23 Q    It continues to count --

24 A    Right.

25 Q    -- and you're not disenfranchised, are you?

GIMPEL - REDIRECT EXAMINATION/GOODMAN

```
 1   A      No, that's right.
 2              MR. KILBRETH:  Thank you.  I have no further
 3   questions, Your Honor.
 4              THE COURT:  Thank you.
 5         Mr. Goodman.
 6                   REDIRECT EXAMINATION
 7   BY MR. GOODMAN:
 8   Q      Professor Gimpel --
 9   A      Yes.
10   Q      -- did counsel ask you about confused voters and the
11   fact --
12   A      Yes.
13   Q      -- that you hadn't talked to any --
14   A      Yes.
15   Q      -- confused voters?
16         Did you, from viewing ballots actually cast in this
17   election, did you determine that there were confused voters
18   from viewing the actual ballots cast in the election?
19   A      Well, you know, with the wide variety of -- of
20   combinations, you know, over 1,500 combinations, it was
21   apparent to me that people at least did not understand the
22   theory of ranked-choice voting very completely or very
23   thoroughly.  You know, the -- you know, many of them didn't
24   rank -- you know, there were voters whose -- whose preferences
25   just seemed to be all over the place, and, you know, it seemed
```

1    to speak to at least being less knowledgeable or less informed

2    about the -- the theory of ranked-choice voting and, you know,

3    how to, you know, have your ballot count in the second

4    subsequent round by -- by perhaps studying and trying to

5    anticipate, you know, correctly, you know, who the two leading

6    candidates would be, you know, to -- to put more of an

7    investment in.

8         Now, again, I understand that, you know, not every voter

9    wants to put that kind of investment into studying who's

10   running, and, you know, not every voter has the time to do

11   that, but my impression was is that, you know, same with Jerry

12   Brown, you know, when he vetoed ranked-choice voting in

13   California, he said the system is just too complex; it's --

14   it's too complex; it's burdensome on voters.  And that's my

15   impression, you know, from looking at the figures.

16        Now, can I say something about the survey?

17   Q    I'm sorry.  Which survey?

18   A    The survey --

19        THE COURT:  The Bangor Daily News survey.

20   A    -- by the Bangor paper that said 75 percent were -- said

21   that it was not confusing.  Can I say something about that?

22   Q    Let me ask you --

23        MR. KILBRETH:  Is there a question?

24        THE COURT:  Attorney Kilbreth promised that you

25   would ask him about that.

1   BY MR. GOODMAN:

2   Q      Professor Gimpel --

3           THE COURT:  So go ahead and ask him about that.

4   BY MR. GOODMAN:

5   Q      -- may I ask you a question, please?  You were asked

6   about a Bangor, Maine survey --

7   A      Yeah.

8   Q      -- of voter confusion.  Do you have any response to or

9   ideas about that survey that you'd like to express?

10  A      Yeah, I mean, you know, in survey research, again, the

11  relevant expertise is in the field of survey research, there

12  -- there is something called socially desirable responding,

13  socially desirable response.  Okay.  When you talk to a

14  stranger on the poll -- in a phone poll or in some of these

15  online surveys they're doing now, you know, when you're

16  reporting your responses, you know, to someone who's going to

17  read them and tabulate them online, respondents are often very

18  sensitive to revealing weaknesses.

19          Okay.  For instance, one of the big problems that survey

20  researchers have is studying racism -- okay -- because,

21  naturally, people don't want to reveal to a stranger that, you

22  know, they might have racist preferences in a particular

23  election, and so it's very sticky and difficult, you know, to

24  tease out racially-based voting when, you know, the

25  respondent's usually reluctant, as you would understand, you

1   know, to report that they might have some level of racial

2   prejudice.

3        Well, I'm suggesting that you're going to get a lot of

4   underreporting of something like confusion -- okay -- or -- or

5   knowledge levels or interest levels because, of course, people

6   don't want to admit, you know, to a stranger over the

7   telephone that -- that they were confused, that they didn't

8   understand, that they misunderstood.

9        And the second thing that I would say is is that some

10  people may have thought that they understood the ballot --

11  okay -- but in reality wound up being wrong about that.  In

12  other words, their understanding of what they were doing, you

13  know, is -- is itself incorrect.

14       Okay.  So, you know, there are -- there are some reasons

15  why we might have only 75 -- only 25 percent saying that the

16  ballot was -- was confusing and 75 percent not.  I -- I do

17  think that in the survey research field, you know, they are

18  working on ways of asking these questions in an unobtrusive,

19  careful way that does not put the respondents on guard about

20  revealing a weakness or revealing that they might be confused

21  or they might be prejudiced or they might not be

22  knowledgeable.  So that would be my response.

23  Q    Professor Gimpel --

24  A    And I wouldn't be surprised, adding to that, I wouldn't

25  at all be surprised that if, you know, the NRCC or RNC or

1    somebody was trying to find confused voters, that they'd have

2    a hard time finding them because, again, you know, who wants

3    to step forward and say I'm confused.  You know, this is not

4    something people usually want to admit to.

5    Q    Professor Gimpel, in your analysis, did you identify

6    approximately 8,000 voters --

7    A    Yeah.

8    Q    -- who were -- based on your analysis of actual ballots

9    as a test for voter confusion, were confused in this election

10   as opposed to some Bangor, Maine poll after the fact?

11   A    Well --

12            MR. KILBRETH:  Objection.

13            THE COURT:  Overruled.  Go ahead.

14   A    They were not -- you know, they were not sort of acting

15   in accord with the demands of ranked-choice-voting theory,

16   that's for sure.  Now, if we want to call that confusion,

17   that's fine.

18   BY MR. GOODMAN:

19   Q    Is -- is it your opinion then that in this universe of

20   8,000 voters, who were Bond and Hoar voters, whose ballots

21   were either undervoted or exhausted and, therefore, thrown out

22   of this election, that the cause of their -- that they tried

23   to vote in the runoff election?

24   A    Yes.

25   Q    And that the cause of their being thrown out of this

1   election altogether was because they had to guess at the
2   candidates in the runoff election?
3   A     Yes.
4           MR. KILBRETH:  Objection.
5           THE COURT:  Overruled.
6           MR. GOODMAN:  Okay.
7   BY MR. GOODMAN:
8   Q     And you were also asked about what is confusing about
9   Plaintiffs' Exhibit No. 2, the sample ballot.
10  A     Yes.
11  Q     Okay.  You said there were two types of confusing
12  aspects:  One is what it says; and one is what it doesn't say.
13  A     Yes.
14  Q     Let me ask you, does the -- did the instructions to the
15  voters instruct them that there would be a runoff election if
16  there was no candidate who reached 50 percent?
17  A     No, there's nothing about that.
18  Q     Did the ballot inform them who the candidates would be
19  in the runoff election?
20  A     No.
21  Q     Did the ballot inform them of the significance of
22  guessing at a candidate who would be in a runoff election if
23  no candidate got the contingent 50 percent?
24  A     No.
25  Q     Did the instructions then tell the voter what the

1   consequence was of failing to rank all the voters so that they

2   could, at some point, get the guess right?

3   A    No.

4   Q    And, finally, were there -- you were asked about ballot

5   drop-off, from a senate race to a Governor's race to a

6   congressional race.  You were also asked data about prior

7   elections and this election, and you were asked to compare the

8   drop-offs.

9   A    Yes.

10  Q    Is it your opinion that there was an 8,000-plus voter

11  drop-off from the first election to the runoff election on

12  November 6th here?

13  A    Yes.

14  Q    And what was the cause of that drop-off?

15  A    Well, again, it was, you know, to the -- the misestimate

16  of who would be leading after the first round, you know, by

17  these voters.

18  Q    And do you -- is it your opinion that we would have seen

19  an 8,000-voter-disenfranchisement total if those voters had

20  been given a ballot that said the runoff election is between

21  Golden and Poliquin?

22  A    I don't think it would have been 8,000, no.

23       MR. GOODMAN:  No further questions.  Thank you, Your

24  Honor.

25       THE COURT:  Thank you.

1          Anything else for this witness?

2               MR. KILBRETH:  No, Your Honor, but I think at this

3     point we just renew the initial motion.  I move to strike his

4     entire testimony.  I appreciate where you're likely to go, but

5     just to make the record.  We don't think it's relevant; it's

6     entirely speculative; there's not a single Maine voter

7     involved in his testimony; and it's just not helpful.

8               THE COURT:  Understand.  That objection's overruled.

9               MR. GOODMAN:  Thank you.

10              THE COURT:  May the witness be finally excused?

11    Yes?  Thank you, Dr. Gimpel.

12              THE WITNESS:  Thank you.

13         (The witness left the witness stand.)

14              THE COURT:  We have, Mr. Goodman, one more witness

15    -- how many more witnesses?

16              MR. GOODMAN:  I have no more witnesses, just

17    argument, Your Honor.

18              THE COURT:  Just argument.  Why don't we do this

19    then.  Let's take 12 and a half minutes, come back at noon,

20    and I'll hear argument.

21         Okay.  Court's in recess.

22         (Court recessed from 11:49 a.m. to 12:03 p.m.)

23              THE COURT:  Okay.  Have a seat, folks.  Mr. Goodman,

24    I'll hear from you.

25              MR. GOODMAN:  Thank you, Your Honor, and thank you

1  for taking us on a Day of Mourning.  I started my career

2  working for Vice President Bush in 1986, and it's been a sad

3  -- a sad week, so thank you for taking us on this day, and

4  I'll try to do dignity to the former president.  He was such a

5  decent man.

6           THE COURT:  Thank you.

7           MR. GOODMAN:  Your Honor, based on the -- the -- the

8  Sorens report that is in the record and supplemented with

9  Dr. Gimpel's report and Dr. Gimpel's testimony here today, we

10  believe the -- both facially and as applied in this election,

11  the ranked-choice-voting system violated the Constitution in

12  several respects, as well as the Voting Rights Act, and I know

13  Your Honor is well-apprised with the papers.  We will rely on

14  our papers principally, and -- and the court has heard us now

15  a second time, so I'll try to be brief.

16      Your Honor, all voters in this election were, in fact,

17  denied a constitutionally-compliant ballot and a system that

18  informed them of the candidates they were to vote for in a

19  runoff election and that violated the Due Process Clause.

20      In addition, over 8,000 voters, who tried to vote blindly

21  in the runoff election, were disenfranchised from voting in

22  the runoff election, in an election decided by approximately

23  3,500 votes.

24      We believe that the Voting Rights Act can be -- can

25  protect and be invoked by nonminority voters and not just

1    minority voters, especially those provisions that -- that do

2    not, on their face, say they apply solely to voter

3    discrimination based on race.

4        And in the equal protection field, Your Honor, voters in

5    this election were inherently discriminated against.  I

6    understand that's an issue that has been debated and ruled on

7    in past rulings, and probably the best analysis is the 1975

8    Michigan Court decision.  We believe that those defenses of

9    the disparate activity that goes on in an election conclude

10   the equal protection analysis at too high a level.  Yes, each

11   voter goes in and votes a ballot on the same basis as every

12   other voter.

13       Bush v. Gore told us -- taught us that what happens after

14   that, how the election machinery and vote-counting occurs can

15   disenfranchise people and treat people disparately and their

16   votes differently, and we believe that what happens here is it

17   is a -- it is a bit of a -- of an equal-opportunity lottery,

18   that when you enter the voting booth, your vote will

19   subsequently, based on contingent events that nobody can

20   predict, certain voters' votes are going to be shifted around

21   to exercise greater voter power for that voter than others.

22   And we -- we submit to the court that that does violate the

23   Equal Protection Clause on how those votes are counted,

24   recounted, shifted from candidate to candidate, and that some

25   voters end up having additional or a disparate amount of voter

1    power to shift votes, and we think there's something in the
2    nature of being able to shift your vote that violates the
3    Equal Protection Clause.
4         Your Honor, under Article 1, Section 4, we still contend
5    that Article 1, Section 2 means something and that the Second
6    Circuit got it right that it means something, it means
7    plurality, and that the Article 1, Section 4 powers of the
8    State do not authorize the State to change from plurality to
9    majority, to manipulate majority votes the way the State had
10   to do here by throwing 8,000 ballots cast in the first
11   election out of the second election in order to manipulate the
12   majority, and without throwing those 8,000 votes out, then
13   Mr. Golden wins by plurality, which is not the question that
14   was put to the voters of Maine when they elected ranked-choice
15   voting.  The question put to them was, do you choose a system
16   that will elect a candidate by majority?
17        We do not believe that under Article 1, Section 4, time,
18   place, manner, that the State has the authority to manipulate,
19   to require the majority, or then manipulate votes in that
20   manner to determine a preferred plurality winner, or to
21   manipulate votes to then divine or produce the majority.
22        The State tells -- tells us, for the first time in
23   opposition, that it enacted ranked-choice voting to disfavor
24   spoiler candidates.  We don't think time, place, manner gives
25   the State authority to change the voting rules to prefer or

1    unprefer certain types of candidates in an election.

2        And the case called Cook v. Gralike, 531 U.S. 510, and

3    the Thornton decision both say the states were delegated

4    authority by the Constitution.  There is no inherent authority

5    for the State to enact substantive rules of election like this

6    under their inherent authority when the Constitution came into

7    being, and that it goes no farther than the mechanics of an

8    election.

9        So we contend, Your Honor, that the State has exceeded

10   its authority to manipulate this majority vote and has done so

11   in violation of Article 1, Section 2.

12       To sum up our argument, Your Honor, there is a

13   fundamental infirmity lurking in this system because it

14   requires voters to cast votes in a future runoff election

15   based on contingencies that may or may not materialize when

16   they cast their ballot, and we think that problem that lurks

17   within this system is unavoidable, it is inherent, it is

18   problematic, and that no one can deny the problem exists and

19   its impact on voters.

20       And the Ninth Circuit in Dudum spotlighted this problem

21   and did not resolve it, and it has not been resolved by any

22   court to date.  The problem manifested itself in this

23   election.  8,000-plus voters guessed wrong; some voters got it

24   right.  And I -- I agree with the sentiment in the questions

25   on direct, a lot of voters got it right.  But the fact that

1    the -- the -- a decisive number of voters guessed wrong, given

2    a ballot that forced them to make a guess we believe makes

3    this system unconstitutional, and the question, Your Honor,

4    for the court, that we submit to the court is, do the -- does

5    this problem of trying to collapse a runoff election with a

6    Maine election, does it rise to constitutional significance?

7    We submit it does.

8        We submit it violates the Due Process Clause in -- in

9    both facial and as applied in this election respects, and we

10   -- we believe that it violates Article 1, Section 2 and the

11   State is without authority to do it under Article 1, Section

12   4, and we request that the court declare it unconstitutional

13   and fashion relief to remedy the unconstitutional election

14   that was actually conducted on November 6th, in contravention

15   of the constitutional rights of my clients, the plaintiffs,

16   who are both voters in the system and the candidate whose

17   election result was determined in this unconstitutional

18   election.

19       And that's my presentation.  I'll be happy to take any

20   questions you have, Your Honor.

21           THE COURT:  Thank you.  Appreciate it.

22           MS. GARDINER:  Thank you, Your Honor.

23       Nothing really has changed since this court ruled on the

24   temporary restraining order, except we do, of course, know

25   that Mr. Golden prevailed in the election under the rules of

1    ranked-choice voting.

2        But the plaintiffs have not presented any legal theories,

3    legal arguments, or facts that undermine the conclusions that

4    this court reached in the temporary restraining order.  They

5    have offered nothing new on Article 1, Section 2 beyond the

6    Phillips v. Rockefeller case, which, as Your Honor noted, does

7    not stand for the proposition that they would like it to stand

8    for.

9        There is no basis for saying that the manner of -- that

10   -- that ranked-choice voting is not a manner of conducting an

11   election any more than Georgia and Mississippi conducting

12   runoffs is a manner of conducting an election.  So I think the

13   Article 1, Section 2 problem has long ago been resolved.

14       There is no equal protection problem, no disparate impact

15   on a group of voters.  There is simply no indication of any

16   severe burden on voters' ability to cast a ballot, and cast a

17   ballot effectively.

18       We have been listening to, in reviewing the experts'

19   reports, which, by the way, Mr. Sorens' report I don't believe

20   is in evidence.  It was attached to -- to their complaint.

21   But, in any event, Professor Gimpel's testimony simply adds to

22   what Your Honor noted already in the TRO ruling.  It's an

23   interesting academic debate; there are lots of theories based

24   on a lot of speculative -- speculation about what voters may

25   or may not have had in their minds when they were casting

1    their ballots.  Interesting academic -- interesting discussion

2    for academic symposia on what kind of election system best

3    represents the will of the voters, but none of it rises to the

4    level of anything of constitutional significance.

5         I want to address a few points that the plaintiffs are

6    relying on very heavily apparently in their due process claim

7    and perhaps also in their equal protection claim.

8         They're focused on -- heavily on this -- these 8,253

9    voters whom they claim tried to participate in a runoff

10   election and were not -- and were denied that opportunity.

11   That is a bizarre interpretation of what those voters did.

12   These are voters who chose Mr. Hoar or Ms. Bond as their first

13   -- or one first and one second choice.  They did not choose

14   other candidates; that was their choice.  We can conclude

15   their intent from what they marked on their ballots.  They

16   filled in ovals for Bond and Hoar, and they did not fill in

17   other ovals.

18        The purpose -- they did not participate in the so-called

19   second round, which is really all a continuous ranked-choice

20   voting process under a set of rules.  They did not participate

21   -- they did not choose other candidates because they did not

22   prefer those candidates.  That is the obvious conclusion from

23   the way they marked their ballots.  The only two candidates --

24             THE COURT:  Or another way to put it is we don't

25   know.

1          MS. GARDINER:  We don't know all of their thinking,

2     that is correct, Your Honor.  We do not know.  But what we do

3     know is who they chose and who they didn't choose.

4          THE COURT:  And so the First Amendment -- I take it

5     your argument is that the First Amendment, it doesn't

6     necessarily ineluctably draw the conclusion that the voters

7     that Dr. Gimpel referred to made a mistake.  Your argument, I

8     take it, is it's as likely the case that the First Amendment

9     protects quixotic voters.  They may have voted for their

10    preference and expressed their preference, and this wasn't --

11    whether or not -- the indicia of whether or not the vote was

12    effective is not revealed by whether or not folks, those

13    voters who were referenced by Dr. Gimpel, voted in previous

14    rounds, subsequent rounds, either for Mr. Golden or

15    Mr. Poliquin.  In other words, they made their preference,

16    ranked their preference, and as a matter of constitutional

17    analysis, that's enough.  Is that your contention?

18         MS. GARDINER:  Yes, Your Honor, and I think that is

19    all that one should -- that the court should infer from these

20    ballots is that these voters made a choice.

21         There's absolutely -- the -- the reference to voting

22    effectively that shows up in -- in the court cases is always

23    in the context of whether that voter can get to the polls,

24    whether the candidate -- the ballot-access requirements are

25    unduly onerous.  Do they actually have a choice of candidates

1    on the ballot?  Those are the kinds of things that go to

2    effective voting.  Effective -- being able to cast a vote

3    effectively has nothing to do with the strategies that

4    academics like to decode or infer or posit about different

5    combinations of choices on the ballot.

6        The purpose of ranked-choice voting is -- is not to see

7    whether voters can guess correctly who are the final two

8    candidates in the final round of the tabulation.  The purpose

9    of ranked-choice voting is to allow voters to express their

10   true preferences and allow them to choose a candidate, that

11   they may prefer Ms. Bond in this case or Mr. Hoar, who ends up

12   with a very small percentage of the vote, and then they get an

13   opportunity to indicate another preference.  It gives the

14   voters more choices, and that's what they're -- that's what

15   they're doing.  They're not guessing at who's going to be in

16   the final round.  They're deciding, this is my preferred

17   candidate.  If this candidate gets eliminated, is there

18   someone else in this group of four that I would -- that I

19   would have as my second choice?

20       I think it's also important -- there's a -- there's a

21   minor technical issue that the plaintiffs and their expert, I

22   think, confused a bit.  They talk about a first and a second

23   round as if your first oval that you fill out on the ballot is

24   the first round and the second oval is the second round, and I

25   hope the court understands that's not the way this works.  If

1   you vote for Bond and Hoar as -- in position 1 and 2, and you

2   even skip a third preference, and you write Poliquin or Golden

3   in as No. 4, the Poliquin or Golden vote will count.  So I

4   won't belabor that.  I -- obviously, the court gets that.

5       The notion that the -- that the system or that they

6   suggest that the Secretary of State manipulated the

7   denominator in the round -- in the final tabulation round by

8   declaring that -- when they declared that Mr. Golden had --

9   had gained more than 50 percent, they claim that we've tossed

10  out these 8,253 ballots and did not count those in the

11  denominator.

12      Well, they're not counted in the denominator because they

13  were no longer -- they no longer had a vote for a candidate

14  who was continuing into that final round and that is indeed

15  the way the rules of ranked-choice voting work, and the

16  denominator shrinks in that final round because it's -- the

17  denominator represents all of the votes that are cast in that

18  final round.  It's not a faux majority; it is a majority of

19  that round.

20      And as -- as we already touched on, this -- there's

21  nothing about ranked-choice voting that forces voters to guess

22  at who's going to be in the final round.  Really what

23  determines who's in the final round are the choices of all the

24  other 289,000 some-odd voters who participate in that

25  election.  Just as when you're voting in a plurality election,

1   you have -- a voter may gauge in deciding whom she wishes to

2   vote for, may gauge where the candidates are, their relative

3   strengths and weaknesses coming into the election.   In

4   deciding in a plurality election whether they want to cast

5   their vote for a candidate who may likely be less well-known,

6   perhaps a nonparty candidate who may be in the race for the

7   first time, they have to decide whether they're going to cast

8   their vote for that person because that's the candidate they

9   really prefer, even though they know that some other candidate

10  may -- may easily knock them out in a plurality race.

11       The plaintiffs don't see any constitutional infirmity in

12  a plurality system where voters are faced with that kind of a

13  choice; that apparently is fine by them.   But they don't think

14  that it's constitutional to have a ranked-choice voting system

15  where you actually get to say who'd you prefer if that other

16  -- if that nonparty candidate, who may be less well-known,

17  doesn't prevail.

18           THE COURT:   I think the distinction the plaintiffs

19  were trying to make -- and, frankly, it's one -- one of their

20  stronger arguments -- is that in a traditional runoff, if you

21  begin with the predicate that we are going to have a majority

22  requirement in elections, that a traditional runoff, at least

23  voters know in a runoff election who the candidates are so

24  that they can choose between those two actual candidates as

25  opposed to the instant system, where those batch of voters --

1    let's assume that there is also a batch of voters who are
2    going to just express their preferences regardless of how they
3    think the race is going to shake out, who the top two
4    vote-getters are going to be at the end of the first count,
5    first tabulation.
6         There's another category of voters, or at least it's
7    reasonable to conclude there's another category of voters, who
8    will vote much in the same way that they voted in plurality
9    systems, meaning they do have an interest in trying to figure
10   out who are going to be the top two vote-getters.  In-between
11   those two candidates, who do I want to vote for?
12        If you just limit the analysis to that category of
13   voters, don't the plaintiffs have a point, that those voters
14   are going to have a very difficult time figuring out how to
15   rank their choices if the goal is to be able to cast an
16   effective ballot for one of the two top vote-getters?  Which
17   is different from a --
18              MS. GARDINER:  Yeah.
19              THE COURT:  -- from a traditional Mississippi-style
20   runoff -- traditional runoff.
21              MS. GARDINER:  Well, it -- it is different than a
22   traditional runoff, and scholars and advocates can debate --
23              THE COURT:  It doesn't have a constitutional --
24              MS. GARDINER:  -- until the end of the day.
25              THE COURT:  -- dimension is what you're saying.

1           MS. GARDINER:  It does not have a constitutional

2    dimension.

3           THE COURT:  Okay.

4           MS. GARDINER:  There are -- there are pros and cons.

5    In a -- in a ranked-choice voting race, the voters only have

6    to show up on one day; they know who all the candidates are;

7    they have a ballot that clearly lays it out; they can vote for

8    as many or as few as they wish; and -- and they're done, and

9    the -- the system processes the ballots, as -- as we know.

10          And in the separate runoff, there's a significant period

11   of time; there's a significant cost involved; the same voters

12   may or may not show up the second time.  That's a huge issue

13   that gets debated in the literature.  But, again, it's not

14   imposing an unconstitutional or severe burden on the voters'

15   rights to express a preference for candidates by saying we're

16   going to do this all on one day as opposed to two separate --

17   you know, a separate runoff election.

18          And that -- it's really purely a -- an academic debate,

19   and there's absolutely no case law that supports a different

20   conclusion.  The plaintiffs have not found any; we have not

21   found any.  There's no constitutional right to know who's

22   going to be in the final round.  That's just an argument for

23   whether that's a better system or not a better system.

24          There is no evidence of voter confusion in this case, as

25   you've already heard.  They're hypothesizing that voters were

1    -- they're attributing various theories, as we -- as we spoke

2    about a moment ago, of why voters mark their ballots, but it

3    is -- it is all speculative.

4        So I just don't think they have presented anything to --

5    and -- and I guess I would point out that I think that

6    Plaintiffs' Exhibit No. 2, the sample ballot, is actually a

7    model of clarity.  It -- it defines, in very simple terms, to

8    the voters what their options are and how they can fill it

9    out, and that's their choice, and there was more information

10   available to them on the Secretary of State's Web site and in

11   other articles if they wished to -- to pursue it.

12       But there's no -- I believe the plaintiff suggested an

13   argument that there's some sort of constitutional ballot

14   requirement to have a long explanation of various ways in

15   which choosing to fill out one or more ovals is going to play

16   out in the election.  There is absolutely zero legal basis for

17   that, and I think if the Secretary of State were to put that

18   kind of argument and discussion on a ballot, it would probably

19   generate an issue of voter confusion, not relieve one.

20       So I think, given that there is no evidence of severe

21   burden, the court doesn't need to address the governmental

22   interest.  I think the court correctly identified governmental

23   interest in the TRO order.  We addressed that in our brief.  I

24   don't think I need to add, except to point out that it's the

25   plaintiffs' burden to negate any conceivable basis that might

89

1   support the ranked-choice-voting regulation.  It is not the

2   burden of the State to show that every one of its governmental

3   interests is best served by a particular election regulation

4   or a different election regulation, and that's what their --

5   how their brief attempts to -- to frame it.

6       I guess just speaking briefly to the relief that they're

7   seeking, it's been a little bit difficult to follow the

8   requests for relief as they have evolved in each stage of

9   these proceedings, but I'll address what Mr. Goodman described

10  this morning as the four types of relief.  I don't, again,

11  think that we are even going -- the court should even get

12  there, but, obviously, it would disenfranchise the voters who

13  did choose Mr. Bond -- I mean, Mr. Hoar or Ms. Bond and then

14  chose Golden or Poliquin if they -- if the -- if the court

15  were to direct the Secretary of State to simply have the

16  election determined based on a plurality of first-choice

17  votes.  That would be an extraordinary remedy that I don't

18  think, as the court is well aware, courts don't change the

19  rules of elections after the fact, and this is not a case

20  where there is any basis to order a new election either.  The

21  Griffin v. Burns case I think points out that distinction very

22  clearly.

23      So I think that -- I can speak to any more of that if the

24  court has questions, but I won't prolong things.  I think we

25  covered it in our brief.  Unless the court has questions, I

1    will --

2              THE COURT:  I don't.  Thank you.

3              MS. GARDINER:  Thank you.

4              THE COURT:  Mr. Brann?

5              MR. BRANN:  May it please the court, Peter Brann for

6    Jared Golden.

7         There is -- in our view, there's no need to cart coals to

8    Newcastle, to go through the merits in great detail.  The

9    court explained in the TRO order why it was that Poliquin and

10   the other plaintiffs are unlikely to prevail in this case.

11   The AG has further explained why it is that as a legal matter

12   they don't -- are not likely, that the claims lack merit.

13        And, indeed, there's nothing, as -- as the Attorney

14   General said today, there's nothing new that came to light

15   today.  What we had, at best, was testimony from a political

16   scientist who is, you know, certainly able in the ivory tower

17   to debate whether this is a good system or a bad system or

18   some other system might be better, but that's, of course, not

19   the issue.  The issue, of course, is whether or not it is

20   constitutional.

21        And, indeed, what we heard even further was that this is

22   an emerging area.  This is actually -- we need a lot more

23   research.  We don't have a definitive answer even today, even

24   in -- if you were to go down to your -- your polysci

25   convention in, you know, Miami or wherever you might go.  And

1   so -- but that is not -- obviously not what's on the table

2   here.

3      And, indeed, as the court alluded to in one of its

4   questions, the -- what we have is speculation from the -- from

5   the professor as to why it is that people made the choices

6   that they made.  It is -- and the court -- as the court

7   alluded to, the Constitution protects the quixotic voter.

8   That there is a -- there -- the Constitution doesn't make a

9   value judgment that I have to vote for the winner of the

10   election; you know, I -- I really need to know that.

11      I'm sure I'm not the only person in this room who's voted

12   for people who are clear losers.  You know, that guy's not

13   going to win, but I'm going to vote for him anyway because I

14   like him, he's my next-door neighbor, I used to -- I went to

15   high school with him or whatever.  It doesn't matter.  That's

16   -- that's not a value judgment certainly that the Constitution

17   imposes here and on -- on this circumstance.  And, indeed --

18   and it's -- we do not want to make a -- turn voter education

19   into the decision of, well, you've got to make sure you pick

20   the winner.

21      Exhibit 2 tells us the answer, if you go to it.  It says,

22   instructions to voters.  In the first column, for your first-

23   choice candidate, in the second column for your second-choice

24   candidate.  You can make a choice as to which one you want.

25   It doesn't say, make sure in your second choice you pick --

1    you guess right, that you've got the right guy or the right

2    girl to make sure that you're going to have a winner.  You

3    could say, you know what?  I am going to vote for Mr. Hoar and

4    I'm going to vote for Ms. Bond because I don't like the

5    major-party candidates.  That -- those are your 8,000 votes

6    that they're talking about.

7         And so there's nothing new that came out today that tells

8    -- that leads to any different conclusion than what we had in

9    the TRO order.

10        Now, I want to just touch briefly on a couple of the

11   other factors.  If there's no likelihood of success, it's

12   over.  But, nevertheless, there's no harm to the plaintiffs.

13   There's no claim of harm in their affidavits, and, indeed, the

14   sort of vague generality, jeez, we're harmed, they say, well,

15   we're disenfranchised.  Well, actually, as we heard from their

16   -- their own expert, because not just Mr. Poliquin and Mr.

17   Baber, who submitted affidavits, but if you look at the

18   complaint, all of the plaintiffs said we only voted for

19   Mr. Poliquin.  And guess what?  That means, according to their

20   own expert, these voters will be full participants in the

21   instant-runoff system.  The plaintiffs are not -- were not

22   disenfranchised.  They're not -- and so -- and so they then

23   show up here and say, well, we're really worried about these

24   other people who we're guessing were -- you know, were

25   confused or whatever.  But, yet, they show up with zero, not

1    one voter who says, I was confused or I -- jeez, I was left
2    out of the system.
3         The -- and even if there was a claim there, the
4    plaintiffs aren't in a position to bring it.  And just to
5    reiterate briefly the laches argument.  Plaintiffs sat this
6    out and Mr. Poliquin sat this case out when they went to the
7    opinion of the justices, when they went -- when they -- which
8    was brought by the Maine Legislature; they sat it out in the
9    Maine Republican Party case, which had to do specifically with
10   this race, in part; and they sat out the case in the Maine --
11   brought by the -- the Maine Senate, by their allies in the
12   Maine Senate.  It was a facial challenge.  They knew as of
13   June, when the voters said, once again, this is the system,
14   guys, this is how we're going -- these are the rules of the
15   game that we're going to play by.  They knew then, sat on the
16   sidelines, did nothing.
17        There was -- and, indeed, if what the real complaint of
18   this case is, in the evolving theory from the plaintiffs, is
19   we really think the ballot design was wrong, well, when the
20   sample ballot was released, why not run into court and go,
21   we've got a problem here?  This is not -- this is going --
22   this is going to confuse the voters.  Sat that out, didn't
23   file it then.  They didn't file anything until you get the --
24   start to get the results and the handwriting's on the wall and
25   you're going to lose the election.  That is not irreparable

94

1   injury by any stretch.

2       In contrast, let's look at the harm to the -- to the

3   defendants and the voters.  Now, in -- as opposed to the

4   speculation about why -- why some people only marked ballots

5   for Ms. Bond and Mr. Hoar, we know that there are 15,000

6   voters who said my first choice is either Mr. Bond -- Mr. --

7   Ms. Bond or Mr. Hoar, but my second choice is either Poliquin

8   or Golden.  There are 5 -- roughly 5,000 of them who said,

9   I've read the instructions; my second choice is, my second

10  choice is Poliquin, or my second choice is Golden.

11      And what the plaintiffs' case would do is to say those

12  15,000 votes don't count.  You -- you listened to the rules,

13  you voted, you did it according to the instructions, and you

14  said if my -- basically, those voters who said my -- if my

15  first choice doesn't make it, the -- my second choice is one

16  of the major candidates.  Those would be the 15,000, and we

17  know for a fact, unlike speculation, as to why people only

18  voted for the minor-party candidates, we know the ones who

19  marked their ballots for the second one, in accordance with

20  the very directions given by the Secretary of State, those

21  folks are out of luck if the -- if Poliquin wins this case.

22  And that -- a retroactive change of the rules after the

23  election is inappropriate.

24      And so -- and so that in the bottom line here, we have,

25  you know, a shifting series of arguments made, and the first

1    one is, well, just declare me the winner, even though everyone

2    -- the rules say that we're going to go through the entire

3    system.  That was the first request in the original complaint.

4         Then the second one, in the amended complaint, says,

5    order a new election.  As the Attorney General explains today,

6    absent invidious, serious discrimination, that's not even on

7    the table and there's no allegation of that.  That certainly

8    isn't anything that we heard from the -- from the professor

9    today.

10        And then the third thing in the reply brief is, well, you

11   don't have to issue any relief, just maintain the status quo,

12   that is, don't let anyone declared -- be declared the winner

13   in this race, leaving all of the voters and all of the people

14   in the Second Congressional District without any

15   representation in Congress while we litigate this case for --

16   for some long period of time.

17        And the theory is, if I can't have it, no one can, and

18   that is -- we would submit is inappropriate, and even if they

19   were to get beyond the claims on the merits that they had a

20   legal theory to stand on, which we think they do not, for

21   precisely the reasons the court identified in the TRO order,

22   they still would not be entitled to an injunction.

23        Thank you.

24             THE COURT:  Thank you.

25             MR. MONTELEONE:  May it please the court.  Maine

1    voters repeatedly recognized ranked-choice voting as -- as

2    their preferred manner of election, recognizing that it -- it

3    offered an opportunity to voice support for a candidate more

4    broadly, more deeply, in other words, beyond these -- this

5    traditional plurality notion, that a measure of secondary

6    support was of critical importance to understand who Maine

7    wanted to elect by the people.

8         Now, plaintiffs' expert today described that scenario as

9    the wrong winner.  In effect, that is actually the winner that

10   Maine voters recognized as their intended preference.  In

11   doing so, they also recognized the administrative values of

12   doing an election once, rather than multiple steps.

13        Now, those are two examples of -- of many interests that

14   the State may have in adopting ranked-choice voting as its

15   election -- as its manner of election.  However, in order to

16   demonstrate that plaintiffs have -- have suffered a

17   constitutional burden, they need to show that that burden was

18   severe, and where it wasn't severe, the court will apply -- or

19   the First Circuit certainly will apply -- a rational-basis

20   test, where so long as there's any conceivable rational basis

21   for the State's interest in creating ranked-choice voting,

22   then that will be deemed constitutionally sufficient and that

23   regulation, and here ranked-choice voting, will be permitted

24   to go forward.

25        Now, plaintiffs here have alleged a couple types of

1    injuries that are far from the type of burden that is even

2    severe and certainly have not been recognized by any courts

3    elsewhere as being severe or -- or really even a burden.

4         Without reiterating points already addressed by the

5    codefendants, I'd like to very briefly walk through a couple

6    of the cases that demonstrate that we don't get to the broad

7    level of a burden here.  For example, in the claim that voters

8    were confused and, therefore, 8,000 voters were disenfrancised

9    because they chose not to participate in -- in subsequent

10   rounds, no case that plaintiffs have identified or that --

11   that the defendants can identify suggests or -- or holds that

12   to not vote is the equivalent of a disenfranchisement.

13        An effective example of that is in the case of -- of

14   Burger v. Judge, which has been discussed by -- by both

15   parties.  Burger v. Judge was ultimately affirmed by the

16   Supreme Court, and it involved an inquiry in a -- in a

17   constitutional referendum in the state of Montana on whether

18   7,000 voters who decided not to vote yes or no, what they

19   meant by their decision not to vote yes or no.  They alleged

20   that they were -- they were essentially misled into believing

21   that.

22        The court ultimately held that there are many reasons why

23   voters choose not to vote, and they certainly had the ability

24   to vote their position on it if they chose.  The fact that

25   they failed to do so won't be reassessed retroactively to --

1    to analyze what they -- what they really intended.  They had

2    the opportunity to cast a yes or no vote; they chose not to.

3    What happened here is -- is analogous, where you have a number

4    of voters that had the chance, they certainly had clear

5    instructions in front of them; they chose not to.

6        Now, this ballot certainly is not more confusing than

7    some of the ballots that have been assessed in -- in other

8    cases evaluating potential misleading information.  For

9    example, in Griffin v. Roupas, the Seventh Circuit looked at a

10   ballot and essentially a claim by -- by working mothers that

11   said the -- the length of the ballot, the confusing nature of

12   the ballot meant that it took them more time, and because it

13   took them more time, they weren't able to participate in the

14   process as they would have preferred to.  In that case, they

15   looked at a ballot that was maybe 20 pages long and it had

16   more than 400 candidates.  Certainly a ballot with that many

17   candidates can be confusing.  The court ultimately held that

18   the confusion is consistent across the board.  It affects --

19   the challenge of working with a ballot like that applies to

20   all voters, not just that small group of working mothers.

21       Similarly here, if there was confusion about how this

22   process worked, it applied even-handily and consistently for

23   everyone.  In order to demonstrate a constitutional burden

24   rising to the level of an equal protection challenge or other

25   Fourteenth Amendment claims, they would need to demonstrate

1    that this was, in fact, discriminatory, that it singled out

2    these -- these plaintiffs, and they failed to do that here.

3        Briefly, one final example in -- in the case of Kohler

4    within Louisiana, that case involved 41 proposed

5    constitutional amendments on the ballot with very minimal

6    information about what they were -- what those amendments were

7    about, just essentially a three- or four-word summary.  The

8    court said that there the voters had the opportunity to

9    prepare beforehand and the fact that there -- there might be

10   something to be confused of when you're sitting there that day

11   voting on 41 different constitutional amendments, that in --

12   you have an obligation to do your homework, and if you fail to

13   do your homework, then the court isn't going to recognize that

14   as a -- as a -- a unique burden.

15       Regarding the claim that the inability to know which

16   candidates will be paired in a final matchup, that that

17   constitutes guessing, preventing an effective ballot.

18   Similarly, there has been -- there's no case that plaintiffs

19   have cited to -- to demonstrate that not knowing who the final

20   pairing of -- of candidates in a -- in a runoff matchup is a

21   constitutional harm.

22       More importantly, the testimony from the expert today was

23   that this ranked-choice voting is, in fact, a -- one election.

24   Now, it's repeatedly been referred to as -- as a -- you know,

25   a first election and a -- and a secondary runoff election, as

1    -- as plaintiffs describe it that way.  But, in fact, there's
2    one ballot and there's one election.
3        Now, voters have the right to understand the candidates
4    on the ballot and express their -- their preferences for those
5    candidates on that day and have those preferences ultimately
6    tabulated.  Plaintiffs don't assert that that did not happen
7    here.  In fact, it's quite clear that they had the opportunity
8    to cast their vote; if they intended to vote for Poliquin,
9    that vote ultimately went forward to the final tally.
10       However, to say that they would have the right -- that
11   they might change their mind weeks down the road in a
12   secondary election is really a separate issue entirely because
13   additional information can come in the meantime.  You can
14   learn something new about the candidate that yesterday you
15   supported and maybe tomorrow you won't because of something
16   you've learned.  It requires all sorts of speculation about
17   how behavior might change in the future.  We don't have that
18   here.  What we have is one ballot and a right to have that
19   ballot reflect preferences and ultimately tallied.
20       Finally, I'd like to very briefly address the VRA --
21   excuse me -- the Voting Rights Act issues.  This is -- this is
22   compared -- the effective ballot issues are compared to the
23   Voting Rights Act cases that reference special protections for
24   voters that are blind, special protections for voters that are
25   severely handicapped, special protections for voters that --

1   for a particular subset of voters that don't speak -- speak

2   English.

3       There is no -- there's no case law that suggests that the

4   Voting Rights Act should be opened up beyond that in terms of

5   the right to cast an effective ballot.  Effectively, those are

6   cases where, but for some assistance, it is -- it is a wild

7   guess.  You can fill in a balloon, a bubble on a -- on a piece

8   of paper, but it means nothing for people that can't read,

9   that can't see.  By contrast, the only claim here that's --

10  that required guessing is predicting the future, which is

11  consistent regardless of what that election is and it's

12  consistent regardless what party you represent.

13      In total, these issues represent modest burdens at best.

14  Where we have a modest burden, any legitimate, conceivable,

15  rational basis for the State to implement its regulation, its

16  choice that ranked-choice voting is its choice of election is

17  sufficient to overcome these claimed -- these claimed burdens.

18      In turn, we respectfully ask that the court deny

19  preliminary injunction.

20          THE COURT:  Thank you.

21          MR. MONTELEONE:  Thank you, Your Honor.

22          THE COURT:  Mr. Goodman.

23          MR. GOODMAN:  Briefly, Your Honor.

24          THE COURT:  Hm-hmm.

25          MR. GOODMAN:  It was at the TRO hearing where the

1   State told us this was a runoff election, effectively a runoff
2   election, and today we hear argument, well, it's really just a
3   preference poll at the first election, and that's not the
4   purpose of ballots and votes, to just take preference polls
5   and -- and if it is a preference poll, Your Honor, a voter
6   still has a right to do what many preference polls do.  What's
7   your preference if it's Trump v. Clinton, what's your
8   preference if it's Bush v. Clinton, what -- Trump v. Sanders,
9   those -- those -- all the evidence shows that matters
10  critically.
11      We are accused of speculating.  Actually, we have actual
12  ballots cast in this election that show precise numbers of
13  voters who were exhausted and put out of the election, and we
14  have expert evidence that -- that indicates that these voters
15  would have chosen but -- but for the fact that they had to
16  guess.  The type of confusion that we are featuring on the
17  ballot is not the traditional vanilla, oh, it was a confused
18  ballot.  It's that the ballot didn't inform people of all the
19  contingencies and who their choices would be.
20      And there, Your Honor, I think we end with the
21  fundamental issue joined particularly on the issue of due
22  process, and that's where I'll end my argument.  The State has
23  argued that today, and I'm going to come pretty close to a
24  quote, if not a paraphrase, that there is no constitutional
25  right to know who the candidates are on the ballot when you

1    vote no.  We believe there is a constitutional right to know

2    that, that it is critical to the effective right of the

3    franchise, and we ask that a judge declare that act

4    unconstitutional.

5          Thank you, Your Honor.

6              THE COURT:  Thank you.

7          Counsel, thank you very much for the presentation of

8    evidence and your arguments and your exceptional briefing of

9    the issues.  It's been a great assistance to me.  I'm going to

10   take the matter under advisement and will have a decision to

11   you next week, if that's not impermissibly vague to say that.

12   It won't be tomorrow like last time.

13         Court will stand in recess.

14         (Proceedings concluded at 12:49 p.m.)

15                        CERTIFICATION

16         I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.

18

19

20   /s/ Julie G. Edgecomb                    December 6, 2018
     Julie G. Edgecomb, RMR, CRR              Date
21   Official Court Reporter

22

23

24

25